NOT YET SCHEDULED FOR ORAL ARGUMENT

APPEAL NO. 24-5004

# UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

Simon Ateba,

*Plaintiff-Appellant*,

v.

Karine Jean-Pierre, *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Columbia

Case No. 1:23-cv-02321-JDB / Hon. John D. Bates

## APPELLANT'S OPENING BRIEF

Harmeet Dhillon
Jesse Franklin-Murdock
Dhillon Law Group Inc.
177 Post St, Suite 700
San Francisco, CA 94108
(415) 433-1700
harmeet@dhillonlaw.com
jfm@dhillonlaw.com

Josh Dixon
Eric Sell
Center for American Liberty
1311 S. Main Street, Suite 207
Mount Airy, MD 21771
(703) 687-6212
jdixon@libertycenter.org
esell@libertycenter.org

*Counsel for Plaintiff-Appellant*

## Certificate as to Parties, Rulings, and Related Cases

The following parties appeared before the district court in this matter or will be appearing in the appeal before this court:

### A.    Parties

Plaintiff-Appellant:

Simon Ateba

Counsel for Plaintiff-Appellant:

Josh Dixon, Center for American Liberty

Eric Sell, Center for American Liberty

Harmeet K. Dhillon, Dhillon Law Group Inc.

Gary Lawkowski, Dhillon Law Group Inc.

Jesse Franklin-Murdock, Dhillon Law Group Inc.

Defendants-Appellees:

Karine Jean-Pierre

United States Secret Service

Kimberly Cheatle, Director United States Secret Service

Counsel for Defendants-Appellees:

Steven Myers, United States Department of Justice

Joshua Salzman, United States Department of Justice

Joseph Borson, United States Department of Justice

Michael Knapp, United States Department of Justice

**B.      Rulings Under Review**

The rulings at issue in this appeal are the Memorandum Opinion and Order Granting Defendant's Motion for Summary Judgment of the U.S. District Court for the District of Columbia, dated December 7, 2023.

**C.      Related Cases**

Appellant is not aware of any related cases currently pending before this court.

**D.      Corporate Disclosure Statement**

Appellant is an individual. Appellant has no parent companies, subsidiaries or affiliates with outstanding public securities.

# TABLE OF CONTENTS

**Page**

Certificate as to Parties, Rulings, and Related Cases ................................................i

TABLE OF AUTHORITIES ..............................................................................v

INTRODUCTION ...........................................................................................1

JURISDICTIONAL STATEMENT ...................................................................4

STATEMENT OF THE ISSUES......................................................................4

STATEMENT OF THE CASE.........................................................................4

    I.      THE WHITE HOUSE PRESS AREA ...................................................

           A.     The Briefing Room and Associated Press Facilities..................4

           B.     The White House Hard Pass .......................................................5

    II.     MR. ATEBA'S COVERAGE OF THE WHITE HOUSE...................7

    III.    THE CURRENT HARD PASS REQUIREMENTS ............................8

    IV.    THE HARD PASS GATEKEEPERS .................................................10

           A.     The Supreme Court Press Gallery ...........................................10

           B.     The Congressional Press Galleries...........................................10

STATEMENT OF PROCEEDINGS BELOW.......................................................13

SUMMARY OF ARGUMENT ...........................................................................16

STANDARD OF REVIEW ................................................................................19

ARGUMENT ....................................................................................................19

    I.      THE FIRST AMENDMENT APPLIES TO THE WHITE
          HOUSE HARD PASS PROGRAM..................................................19

           A.     The First Amendment Applies to the Hard Pass
                 Program Under Forum Analysis ...............................................19

                 1.     The Press Area is a Limited Public Forum....................20

                 2.     The First Amendment Applies to Press
                      Credentialing for Access to a Non-Public Forum .........22

B.     The First Amendment Applies Independent of Forum Analysis ...................................................................23

II.     THE WHITE HOUSE HARD PASS PROGRAM VIOLATES THE UNBRIDLED DISCRETION DOCTRINE ..........26

A.     The Daily Press Gallery's Criteria for Obtaining Credentials is Impermissible ....................................26

1.     There is No Explicit Textual Limitation Requiring the District Court's Interpretation .................28

2.     There is no "well-established" practice of interpreting the "of repute" requirement in the manner the district court did ...........................................31

B.     The Congressional Press Gallery Credentialing Process Impermissibly Fails to Mandate Timely Decisions .................33

C.     The Daily Press Gallery Credentialing Process Provides No Opportunity for Effective Judicial Review ..........38

1.     The Daily Press Gallery's rules do not allow for effective judicial review of its decision..........................38

2.     The Speech or Debate Clause precludes effective judicial review ...............................................................40

III.     THE WHITE HOUSE HARD PASS ELIGIBILITY CRITERIA ARE CONSTITUTIONALLY UNREASONABLE...........................................................................41

A.     The Hard Pass Eligibility Criteria Impermissibly Require Applicants to Demonstrate a Need to Cover Congress or the Supreme Court .................................41

B.     The White House Cannot Subject Hard Pass Applicants to Their Competitor's Decision-making ...................................43

CONCLUSION ........................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams Outdoor Advert. Ltd. P'ship by Adams Outdoor GP, LLC v. Penn. Dep't of Transp.*,
930 F.3d 199 (3d Cir. 2019) ........................................................ 35, 37

*Am. Broad. Cos. v. Cuomo*,
570 F.2d 1080 (2d Cir. 1977) ...........................................................24

*Am. Freedom Def. Initiative v. Washington Metro. Area Transit Auth.*,
901 F.3d 356 (D.C. Cir. 2018) ...........................................................22

*Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*,
896 F.3d 437 (D.C. Cir. 2018) ...........................................................19

*Associated Press v. United States*,
326 U.S. 1 (1945) ...........................................................................44

*Baltimore Sun Co. v. Ehrlich*,
437 F.3d 410 (4th Cir. 2006) .............................................................24

*Boardley v. U.S. Dep't of Interior*,
615 F.3d 508 (D.C. Cir. 2010) .......................................... 32, 35, 39, 44

*Branzburg v. Hayes*,
408 U.S. 665 (1972) .........................................................................21

*Cable News Network, Inc. v. Am. Broad. Cos, Inc.*,
518 F. Supp. 1238 (N.D. Ga. 1981) ....................................................25

*Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Sch.*,
457 F.3d 376 (4th Cir. 2006) ......................................................... 21, 34

*Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*,
470 F.3d 1062 (4th Cir. 2006) ....................................................... 22, 32

*City of Lakewood v. Plain Dealer Publ'g Co.*,
486 U.S. 750 (1988) ............................... 20, 21, 27, 28, 29, 30, 31, 32

*City of Littleton v. Z.J. Gifts D-4, L.L.C.*,
541 U.S. 774 (2004) .................................................................... 33, 37

*Community for Creative Non-Violence v. Turner*,
  893 F.2d 1387 (D.C. Cir. 1990)............................................................30

*Consumer Union of U.S. v. Periodical Correspondents Ass'n*,
  515 F.2d 1341 (D.C. Cir. 1975)................................................ 11, 27, 40

*Conteers LLC v. City of Akron*,
  No. 5:20-CV-00542, 2020 WL 5529656 (N.D. Ohio Sept. 15, 2020)................27

*Craigmiles v. Giles*,
  110 F. Supp. 2d 658 (E.D. Tenn. 2000),
  *aff'd*, 312 F.3d 220 (6th Cir. 2002) ....................................................43

*Diener v. Reed*,
  77 F. App'x 601 (3d Cir. 2003).............................................................39

*Doe v. Harris*,
  772 F.3d 563 (9th Cir. 2014) ...............................................................28

*Encore Videos, Inc. v. City of San Antonio*,
  330 F.3d 288 (5th Cir.), *opinion clarified on other grounds*,
  352F.3d 938 (5th Cir. 2003), *abrogated on other grounds*
  *by Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ........................ 35, 36

*Est. of Coll-Monge v. Inner Peace Movement*,
  524 F.3d 1341 (D.C. Cir. 2008)............................................................19

*Field Day, LLC v. Cnty. of Suffolk*,
  463 F.3d 167 (2d Cir. 2006) ................................................................39

*Forsyth Cnty. v. Nationalist Movement*,
  505 U.S. 123 (1992) ..................................................................... 27, 29

*Freedman v. Maryland*,
  380 U.S. 51 (1965) ....................................................................... 36, 37

*FW/PBS, Inc. v. City of Dallas*,
  493 U.S. 215 (1990) ......................................................... 20, 33, 36, 37

*Getty Images News Servs. Corp. v. Dep't of*,
  *Def.*, 193 F. Supp. 2d 112 (D.D.C. 2002)............................................23

*Globe Newspaper Co. v. Super. Ct. for the Cnty. of Norfolk*,
  457 U.S. 596 (1982) ...........................................................................23

*Gouse v. District of Columbia*,
  359 F. Supp. 3d 51 (D.D.C. 2019).......................................................40

*Grosjean v. Am. Press Co.*,
  297 U.S. 233 (1936) ........................................................................23

*Huminski v. Corsones*,
  396 F.3d 53 (2d Cir. 2005) ............................................................23

*InfoCision Mgmt. Corp. v. Griswold*,
  570 F. Supp. 3d 1051 (D. Colo. 2021) ...........................................36

*John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*,
  994 F.3d 602 (7th Cir. 2021) .........................................................24

*Kaahumanu v. Hawaii*,
  682 F.3d 789 (9th Cir. 2012) ................................................. 21, 34

*Karem v. Trump*,
  960 F.3d 656 (D.C. Cir. 2020)................................................ 25, 42

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
  591 U.S. 657 (2020) ......................................................................30

*Marsh v. Chambers*,
  463 U.S. 783 (1983) ......................................................................45

*Minn. Voters All. v. Mansky*,
  585 U.S. 1 (2018) .......................................... 22, 27, 28, 29, 42

*MINPECO, S.A. v. Conticommodity Servs., Inc.*,
  844 F.2d 856 (D.C. Cir. 1988)........................................................40

*Nat'l Ass'n of Mfrs. v. Dep't of*,
  *Def.*, 583 U.S. 109 (2018)...............................................................31

*Nestor Colon Medina & Sucesores, Inc. v. Custodio*,
  964 F.2d 32 (1st Cir. 1992) ...........................................................44

*Nichols v. United States*,
  578 U.S. 104 (2016) ......................................................................30

*Polaris Amphitheater Concerts, Inc. v. City of Westerville*,
  267 F.3d 503 (6th Cir. 2001) ................................................. 34, 35

*Promotions, Ltd. v. Conrad*,
  420 U.S. 546 (1975) ......................................................................21

*Pulsifer v. United States*,
  144 S. Ct. 718 (2024) ....................................................................31

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ........................................................................36

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
515 U.S. 819 (1995) ........................................................................20

*S. Oregon Barter Fair v. Jackson Cnty.*,
401 F.3d 1124 (9th Cir. 2005) .................................................... 36, 37

*S.A. Restaurants, Inc. v. Deloney*,
909 F. Supp. 2d 881 (E.D. Mich. 2012) ..........................................30

*Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality,*
*Repression & Criminalization of a Generation v. City of Seattle*,
550 F.3d 788 (9th Cir. 2008) ....................................................... 32, 39

*Sentinel Commc'ns Co. v. Watts*,
936 F.2d 1189 (11th Cir. 1991) ......................................................28

*Sherrill v. Knight*,
569 F.2d 124 (D.C. Cir 1977) .......................................... 9, 22, 25, 42

*Shuttlesworth v. City of Birmingham*,
394 U.S. 147 (1969) ........................................................................20

*Southworth v. Bd. of Regents of Univ. of Wisc. Sys.*,
307 F.3d 566 (7th Cir. 2002) ...................................................... 21, 34

*Stevens v. N.Y. Racing Ass'n, Inc.*,
665 F. Supp. 164 (E.D.N.Y. 1987) ..................................................42

*Stewart v. D.C. Armory Bd.*,
863 F.2d 1013 (D.C. Cir. 1988) ......................................................20

*Tavoulareas v. Washington Post Co.*,
724 F.2d 1010 (D.C. Cir. 1984) ......................................................24

*TGP Commc'ns, LLC v. Sellers*,
No. 22-16826, 2022 WL 17484331 (9th Cir. Dec. 5, 2022) ...............21

*Thomas v. Chi. Park Dist.*,
534 U.S. 316 (2002) ................................................. 36, 37, 38, 39, 40

*United Food & Com. Workers Union, Loc. 1099 v.*
*Sw. Ohio Reg'l Transit Auth.*,
163 F.3d 341 (6th Cir. 1998) ..........................................................33

*United States v. Stevens*,
  559 U.S. 460 (2010) ...................................................................... 28, 32

*Utah Animal Rts. Coal. v. Salt Lake City Corp.*,
  371 F.3d 1248 (10th Cir. 2004) ..........................................................39

*Watt v. Energy Action Ed. Foundation*,
  454 U.S. 151 (1981) ...........................................................................30

*White v. Lee*,
  227 F.3d 1214 (9th Cir. 2000) ............................................................44

*Zukerman v. U.S. Postal Serv.*,
  961 F.3d 431 (D.C. Cir. 2020)............................................................22

**Statutes & Other Authorities**

U.S. Const. amend. 1.............................................................................21

28 U.S.C. § 1291 ...................................................................................4

28 U.S.C. § 1331 ...................................................................................4

28 U.S.C. § 1361 ...................................................................................4

House Radio and TV Press Gallery, Accreditation Criteria,
  https://radiotv.house.gov/membership/accreditation-criteria..............12

## INTRODUCTION

For decades the White House has regulated access to its Press Area by relying on the other branches of government to filter out journalists they deem unworthy. And for decades this process has been unconstitutional.

The White House gives special access to journalists to whom it has issued a "hard pass." This superior press credential is essential for full-time correspondents. It provides instant, on-demand access to the White House Press Area during business hours and emergency events. For major breaking news, a journalist will not get a spot in the briefing room without one.

To get a hard pass, correspondents must first obtain press credentials from the Supreme Court or one of the Congressional press galleries. But obtaining this special approval is no easy task. The Supreme Court has limited space and only issues credentials to full-time Court correspondents. By definition, that makes all White House correspondents ineligible.

While the Congressional press galleries do not require full-time coverage of Congress, their process is a black box of arbitrary, irrational, and conflicted decision-making. The relevant Congressional press gallery here only issues credentials to those journalists it deems "of repute in their profession." There is no time frame within which the Congressional press gallery must process an application. There is no opportunity for judicial review of the Congressional press gallery's decisions.

And the Congressional press gallery's rules do not even require issuance of press credentials to those who meet the stated eligibility criteria. In short, journalists cannot get full access to the White House Press Area without first subjecting themselves to the absolute discretion of five reporters who work for competing outlets and cover a different branch of government.

Appellant Simon Ateba is a White House correspondent for the online news publication *Today News Africa*. He is a professional journalist who reports on the White House every day and posts his coverage on his outlet's website and his social media accounts. He needs a hard pass to do his job. He applied for a Congressional press pass in June of 2023—over eleven months ago—and still has not received a decision on his application. He is ineligible to obtain a White House hard pass until he receives approval from the appropriate Congressional press gallery.

The lack of standards in the Congressional press gallery rules is a classic violation of the unbridled discretion doctrine. The nebulous "of repute" requirement, the lack of a deadline for issuing decisions, and the lack of any opportunity for effective judicial review of denials are all the precise evils against which the doctrine was designed to protect. Moreover, the White House's requirement that hard pass applicants demonstrate a need to cover another branch of government is an arbitrary and unreasonable requirement for covering the executive branch. And finally,

forcing journalists to get approval from their competition before they can obtain a hard pass invites conflicts that taint the decision-making process.

The White House's reliance on press galleries for the other branches of government to weed out journalists they deem unworthy is an afront to the free-press protections central to the First Amendment. All journalists enjoy equal rights of access to government-designated press facilities, like the White House Press Area. The lodestar for eligibility is whether the individual is engaging in newsgathering activity, not whether they satisfy a contentless "of repute" standard or work for an institutional news outlet. By limiting hard passes to those who receive the blessing from the Supreme Court or a Congressional press gallery under a meaningless standard, the White House has created special access for the institutional press. First Amendment rights cannot depend on this type of decision-making.

The White House is free to adopt objective, activity-based criteria for limiting access to its designated press area. A clear and uniformly applied code of conduct, space restrictions, or reasonable frequency-of-access requirements, for example, would all be permissible. But the White House cannot give special access to certain favored journalists simply because they pass a press gallery's smell test. A person does not have greater entitlement to the protections of the First Amendment just because they work for the *New York Times*, *Fox News*, or the *Wall Street Journal*. The First Amendment protects all who exercise their rights under it. *See* Hon. David

B. Sentelle, *Freedom of the Press: A Liberty for All or A privilege for a Few?*, Cato Institute 15, 17 (Sept. 17, 2013) (noting that the Press Clause does not "create[] a special class of privileged persons bearing the noble title 'the press'"). The Court should reverse the judgment below.

## JURISDICTIONAL STATEMENT

This case involves Appellant's challenge to the White House's press credentialing process. The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1361. The district court granted Appellees' motion for summary judgment and entered judgment on December 7, 2023. On January 4, 2024, Appellant timely filed a notice of appeal. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Whether the district court erred in granting Appellees summary judgment as to Appellant's facial and as-applied First Amendment challenge to the White House press credentialing process.

## STATEMENT OF THE CASE

### I.   THE WHITE HOUSE PRESS AREA

#### A.   The Briefing Room and Associated Press Facilities

The White House press secretary holds press briefings in the James S. Brady Press Briefing Room. JA216. The briefing room is perhaps the most important forum for news media to interact with the President of the United States. JA013. Nearly

every major media outlet in the country—and many others around the world—has a designated correspondent who attends press briefings to report on the daily activities of the President and his administration. JA013. But the White House press corps also includes reporters from smaller outlets, ranging from start-ups to regional publications. JA012. In the briefing room, correspondents from the *New York Times*, *Washington Post*, *CNN*, and *ABC News* sit shoulder to shoulder with correspondents from publications with a mere fraction of the viewership and subscriber base of these larger outlets. JA013.

In addition to the briefing room, the White House has also opened press offices, the press apron, the North Grounds Stand Up Area, and the Driveway (referred to as "Pebble Beach") to journalists. JA072, 216. Together, these areas are referred to as the White House "Press Area." JA216. Access to the Press Area is essential for those covering the President of the United States. JA094.

### B.    The White House Hard Pass

Under the White House's rules, journalists seeking access to the Press Area must first obtain a pass. JA216. Relevant here, the White House has made two options available: a "day pass" and a "hard pass." JA216. Day passes are short-term passes that are good for one day only. JA216. Day pass holders must apply at least the day before they wish to access the Press Area, and they must submit to heightened scrutiny from the Secret Service each time upon arrival. JA217. This

heightened scrutiny can cause delays. JA078–79, 094, 217. Sometimes the wait can exceed 45 minutes, with the day-pass holder forced to wait for a White House escort while other reporters take up the limited space in the briefing room. JA078.

Unlike a day pass, a hard pass allows unlimited access to the Press Area during business hours. JA210, 211. There is no dispute that a hard pass is far superior to a day pass. As the White House Correspondents' Association has previously advised, "'a hard pass is critical for anyone who reports regularly on the White House.'" JA094. Correspondents must provide "the public with on-the-spot-news coverage of unforeseen and unscheduled events, along with cataloguing the daily activities of the head of the executive branch." JA094. "[W]ithout the access that a hard pass grants, a White House correspondent cannot effectively perform his or her duties." JA094.

Historically, journalists may qualify for—and maintain—press passes under a set of rules promulgated by the White House. JA238. The White House has had no shortage of controversy surrounding revocation of journalists' press credentials, including hard passes. JA014–15. *Washington Post* journalists have had their press credentials revoked on numerous occasions after provoking the ire of various Presidents and their staffs over scandals, including Watergate and the Pentagon Papers. JA015. Arbitrary enforcement of the White House press credentialing regime has even resulted in litigation. JA015–16.

Strained relations between the White House and the press corps persisted during the Trump administration. JA015–16. Eventually, the Trump White House revised the requirements to obtain a hard pass to make them stricter. JA016. The revisions included the requirement that journalists appear on the White House grounds for 90 of the previous 180 days to qualify for a hard pass. JA016. Many long-time White House reporters lost their credentials under those revisions. JA016.

Though the Trump White House argued the new credentialing requirements were necessary due to "security concerns," many journalists speculated that the changes were intended to prevent specific journalists from obtaining a hard pass. JA016–17. Indeed, the Trump White House provided "exemptions" to certain journalists whom it deemed worthy of keeping their hard pass. JA017.

The media's most powerful institutions and civil liberties advocates alike uniformly denounced the Trump White House's new credentialing requirements and practice of handing out exemptions. JA017. The ACLU blasted the move as "un-American." JA017. The collective response from free press advocates was that the Trump White House's new credentialing requirements were a direct assault on the First Amendment. JA017.

## II.     MR. ATEBA'S COVERAGE OF THE WHITE HOUSE

Mr. Ateba is the White House correspondent for the daily online publication *Today News Africa*. JA017, 077, 217. Mr. Ateba has been a journalist for the past

fifteen years, covering politics and current affairs in both Africa and in the United States during most of that time. JA017, 077, 217. He has covered both the United States State Department and the White House for the past six years. JA017, 217.

Mr. Ateba became a White House Correspondent in 2018. For approximately his first three years covering the White House, Mr. Ateba used a day pass. JA217. When President Biden took office in 2021, the White House initially made hard passes more easily available. In February 2021, Mr. Ateba applied for, and received, a hard pass under these relaxed rules. JA078. Since then, Mr. Ateba has covered the White House on a regular basis. JA079. He writes regular stories for *Today News Africa*, which requires regular attendance at White House briefings. JA077.

## III.   THE CURRENT HARD PASS REQUIREMENTS

On May 5, 2023, the White House notified all hard pass holders that it was restricting who could qualify for a hard pass. JA218. This announcement appears to have been in response to several tense exchanges during press briefings, some of which involved Mr. Ateba. JA219. The White House, however, claims the change was to eliminate passes that were not being used. JA219. In any event, the White House terminated all existing hard passes on July 31, 2023, and required journalists to apply for a new pass under updated criteria. JA218. The new criteria include:

- Full-time employment with an organization whose principal business is news dissemination (If you are freelance, we will need letters from two news organizations describing your affiliation, or, if you freelance primarily for one organization, a letter from that organization

describing the extent and duration of your relationship with the organization);

- Physical address (either residential or professional) in the greater Washington, D.C. area;

- Have accessed the White House campus at least once during the prior six months for work, or have proof of employment within the last three months to cover the White House;

- Assignment to cover (or provide technical support in covering) the White House on a regular basis;

- Accreditation by a press gallery in either the Supreme Court, U.S. Senate or U.S. House of Representatives; and

- Willingness to submit to any necessary investigation by the U.S. Secret Service to determine eligibility for access to the White House complex, where Secret Service will determine eligibility based on whether the applicant presents a potential risk to the safety or security of the President, the Vice President, or the White House complex.

JA218–219. Central to this appeal is the requirement that an applicant must first obtain Supreme Court or Congressional press credentials. While this requirement has been in place at various times over at least the last forty-plus years, *Sherrill v. Knight*, 569 F.2d 124, 129 n.19 (D.C. Cir 1977), it did not exist when Mr. Ateba obtained his hard pass in 2021. JA017

On July 31, 2023, Mr. Ateba's hard pass was terminated pursuant to the new policy. JA074. Mr. Ateba did not apply for a hard pass renewal prior to July 31 because doing so would have been futile—at that time, he did not have the requisite credentials from the Supreme Court or a Congressional Press Gallery. JA078.

## IV. THE HARD PASS GATEKEEPERS

### A. The Supreme Court Press Gallery

The Supreme Court Public Information Office is responsible for issuing press credentials to journalists seeking to cover the Court. JA219. The press area at the Supreme Court is notoriously small; there are only about eighteen seats for journalists in the courtroom. JA026, 219. The Supreme Court PIO only issues press credentials to journalists whose full-time beat involves coverage of the Court. JA029. Reporters who primarily cover the White House cannot qualify for a Supreme Court pass. JA029.

On August 3, 2023, Mr. Ateba applied for press credentials from the Supreme Court Press Office. JA026. That office informed Mr. Ateba that he was not eligible for Supreme Court press credentials because he does not cover the Court full time. JA026, 219. Indeed, the Supreme Court Public Information Office has informed the White House that it will not issue hard passes for any White House journalists due to space constraints at the Court. JA026.

As a result, obtaining credentials from one of the Congressional press galleries is Mr. Ateba's only option for attaining a White House hard pass. JA219.

### B. The Congressional Press Galleries

The press has been covering Congress since its earliest sessions. JA126. Today, members of the press have designated "galleries" in both chambers of

Congress. JA126–127. These galleries include office space and work resources for credentialed journalists covering Congress. JA126.

Ever since the late nineteenth century, Congress has delegated regulation of access to the Congressional press galleries to the Correspondents Committees—a group of journalists elected to oversee credentialing and other administrative aspects of the Congressional press galleries. JA127, 129. Today, there are four Correspondents Committees: the Daily Press Galleries (for daily news publications); the Periodical Press Galleries (for weekly, monthly, and quarterly publications); the Radio and Television Galleries; and the Press Photographers' Gallery. JA132–35. These committees act on behalf of Congress when making credentialing decisions. *Consumer Union of U.S. v. Periodical Correspondents Ass'n*, 515 F.2d 1341, 1350 (D.C. Cir. 1975) (noting that Congressional press galleries act "by virtue of an express delegation of authority as aides or assistants of Congress").

The Correspondents Committee for each gallery is made up of approximately five members—all journalists who already have Congressional press credentials. JA132–35. The Correspondents Committee of the Daily Press Gallery, for example, is made up of journalists from the *Detroit News*, *CQ-Roll Call*, the *Associated Press*, the *Pittsburgh Post-Gazette*, and *States Newsroom*. JA024. The Correspondents Committees process applications for Congressional credentials based on the respective credentialing criteria adopted by each gallery. JA032–35.

11

To qualify for press credentials under the Daily Press Gallery's rules, a journalist must be:

- A bona fide correspondent of repute in their profession;[1]

- A full-time, paid correspondent who requires on-site access to congressional members and staff;

- Employed by a news organization: with General Publication periodicals mailing privileges under U.S. Postal Service rules, and which publishes daily; . . or "whose principal business is the daily dissemination of original news and opinion of interest to a broad segment of the public, and which has published continuously for 18 months;

- Reside in the Washington, D.C. area;

- Not be engaged in any lobbying or paid advocacy, advertising, publicity or promotion work for any individual, political party, corporation, organization, or agency of the U.S. Government, or in prosecuting any claim before Congress or any federal government department, and will not do so while a member of the Daily Press Galleries;

- Editorially independent of any institution, foundation or interest group that lobbies the federal government, or that is not principally a general news organization.

JA0147–48. The rules do not contain a deadline by which the Daily Press Gallery must adjudicate an application. JA147–48.

---

[1] Other Congressional press galleries have a similar "of repute" requirement. *See* JA221 (citing the Periodical Press Gallery rules requiring journalists be "reputable" before they will be approved for press credentials); *see also* House Radio and TV Press Gallery, Accreditation Criteria (last visited May 15, 2024), https://radiotv.house.gov/membership/accreditation-criteria.

Congress's outsourcing of the gatekeeping function to established journalists has had a dramatic effect on outlet diversity in Congress over the past several decades. JA137. From 1976 to 2016, the number of credentialed *correspondents* increased from 2,500 to around 6,000. JA137. During that same period, the number of credentialed *media outlets* dropped from over 1,200 to fewer than 600. JA137.

On June 5, 2023, in response to the White House's announcement of its new credentialing requirements, Mr. Ateba applied for Congressional credentials with the Daily Press Gallery. JA078. Because *Today News Africa* is a daily publication, Mr. Ateba was required to apply with this gallery. JA132, 147–48. To date, eleven months later, the Daily Press Gallery still has not processed Mr. Ateba's application, nor has it told him by when it will do so.

## STATEMENT OF PROCEEDINGS BELOW

On August 10, 2023, Mr. Ateba filed a verified complaint in the United States District Court for the District of Columbia, seeking, among other things, preliminary and permanent injunctive relief. JA008–53. He brought three claims: (1) a facial and as-applied challenge to the White House hard-pass scheme; (2) a First Amendment viewpoint discrimination claim; and (3) a claim under the Administrative Procedure Act. JA027–29. On September 6, 2023, the court denied Mr. Ateba's motion for a preliminary injunction. JA057–069. The court, however, recognized the importance of addressing the merits and expedited summary judgment briefing. JA069.

The parties filed cross-motions for summary judgment, and the district court held a hearing on these motions on November 2, 2023. JA005–6. On December 7, 2023, the district court issued its opinion and judgment. JA213–251. The court granted summary judgment to Appellees on Mr. Ateba's challenge to the hard-pass scheme and his APA claim. JA213. The district court dismissed Mr. Ateba's viewpoint discrimination claim without prejudice. JA213. Mr. Ateba appeals only the district court's entry of judgment on his challenge to the hard-pass scheme.

In granting summary judgment to Appellees on that claim, the district court agreed with Mr. Ateba that "being required to use a day pass instead of a hard pass burdens [Mr.] Ateba's Press Area access" and creates an "actionable First Amendment injury." JA229. To conclude otherwise, the district court held, "would suggest that the White House could alter the hard pass criteria—and thereby impose disparate burdens on journalists seeking access to a place generally opened to them—in entirely viewpoint-discriminatory ways, and journalists would have no cause of action." JA230.

The district court also agreed with Mr. Ateba that because the White House had chosen to use the Congressional press galleries as the gatekeeping mechanism for determining hard-pass eligibility, that process must comply with the First Amendment. JA231. The court disagreed, however, that the credentialing process violated the First Amendment. JA231–242.

Mr. Ateba's central arguments were that the White House's credentialing process violated the unbridled discretion doctrine because (1) the "of repute" standard the Daily Press Gallery uses to determine eligibility is not objective and narrowly drawn to cabin the decisionmakers' discretion, (2) there is no deadline by which the Daily Press Gallery must render its decision, and (3) there is no opportunity for meaningful judicial review of the credentialing decision. JA231–242. In addition, Mr. Ateba argued that requiring hard-pass applicants to obtain credentials from a committee of his competitors housed within another branch of government is an arbitrary and unreasonable requirement for equal access to the Press Area. JA241–42.

In rejecting these arguments, the district court analyzed the eligibility criteria and interpreted the other criteria—*i.e.,* working for an outlet of regular publication, not engaged in lobbying, *etc.*—as informing who is "of repute in their profession." JA238–39. The court also concluded that the lack of a required time frame within which the press galleries must issue credentials is not a First Amendment violation because the regulations are content neutral. JA241–42. And while the court recognized that the lack of judicial review is a violation of the unbridled discretion doctrine, JA235, it failed to address why the Daily Press Gallery rules do not violate this requirement. Finally, though the court agreed that many "hard pass seeker[s] may not want to cover Congress or the Supreme Court," it concluded outsourcing

the press credentialing decisions to another branch of government is reasonable because the White House does not have its own press gallery. JA241.

Mr. Ateba appeals the district court's grant of summary judgment against him on his First Amendment challenge to the White House credentialing scheme.

## SUMMARY OF ARGUMENT

The White House hard pass eligibility criteria are unconstitutional. The requirement that applicants obtain press credentials from the Supreme Court or a Congressional press gallery violates the unbridled discretion doctrine. Moreover, outsourcing credentialing decisions to the other branches of government in this manner is unreasonable. The district court erred in concluding otherwise.

Because the White House Press Area is a government-designated press facility, access regulations—like the hard pass—must comply with the First Amendment. This is true under forum analysis or independent of forum analysis. Under a forum analysis, the Press Area is a classic limited public forum. But even if the Press Area were a non-public forum, the First Amendment still prohibits unreasonable access regulations such as those conferring unbridled discretion on the decisionmaker. And if forum analysis is not the proper framework for press-credentialing schemes, the First Amendment still prohibits arbitrary restrictions on access, including unbridled discretion.

The hard pass criteria violate the unbridled discretion doctrine for three reasons. First, the Daily Press Gallery's "of repute" requirement is standardless and susceptible to abuse. The district court held that the other criteria provide meaning to the "of repute" requirement. But this interpretation is inconsistent with the text of the Daily Press Gallery rules, and there is no well-established, uniformly applied tradition of the Daily Press Gallery interpreting "of repute" this way. Absent either limitation, the "of repute" requirement violates the unbridled discretion doctrine.

Second, the Daily Press Gallery's rules do not require issuance of decisions within a set time. For this reason, the Daily Press Gallery can withhold a license indefinitely, prohibiting exercise of First Amendment rights by simply not deciding (as it appears to be doing to Mr. Ateba). This is also unbridled discretion.

Third, because the Daily Press Gallery is not required to provide a written reason for denying an application, there is no opportunity for effective judicial review of its decisions. This is particularly true in the context of the Congressional press galleries, which are absolutely immune from both suit and third-party discovery under the Speech or Debate Clause. Because the Congressional press galleries are not required to explain application denials, there is no opportunity for meaningful judicial review of their decisions. This too violates the unbridled discretion doctrine.

The hard pass criteria are also constitutionally arbitrary and unreasonable because they require applicants to demonstrate a need to cover the other branches of government. Demonstrating a need to cover the Supreme Court or Congress is a prerequisite to obtaining press credentials from either of those branches of government. But many White House correspondents do not wish to—or are unable to—cover the other branches and therefore cannot demonstrate a need to do so. Without press credentials from the Supreme Court or Congress, a journalist is ineligible for a White House hard pass. This is constitutionally unreasonable.

Finally, the hard pass criteria are impermissible because they subject applicants to the decision-making authority of their competitors. The Daily Press Gallery Correspondents Committee is comprised of journalists who cover Congress for various legacy media outlets. An applicant for a White House hard pass must obtain the stamp of approval from these other journalists. In effect, this allows an applicant's competition within the industry to decide whether they get access to a White House hard pass. This is constitutionally unreasonable.

The White House hard pass program is unconstitutional. The district court erred in concluding otherwise. This Court should reverse the decision below and direct the court to enter judgment in Mr. Ateba's favor as to Count I of his complaint.

## STANDARD OF REVIEW

This Court reviews a "district court's grant of summary judgment *de novo*, applying the same standards as the district court and drawing all inferences from the evidence in favor of the non-movant." *Am. Soc'y for Testing & Materials v. Public.Resource.Org, Inc.*, 896 F.3d 437, 445 (D.C. Cir. 2018) (citation omitted). Affirmance is appropriate "only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Est. of Coll-Monge v. Inner Peace Movement*, 524 F.3d 1341, 1346 (D.C. Cir. 2008).

## ARGUMENT

## I. THE FIRST AMENDMENT APPLIES TO THE WHITE HOUSE HARD PASS PROGRAM

Because the White House hard pass regulates access to a government-designated press area, it must comply with the First Amendment. This is true regardless of the mode of analysis—forum analysis or otherwise—that applies.

### A. The First Amendment Applies to the Hard Pass Program Under Forum Analysis

The Press Area is a limited public forum and must comply with the strictures for this forum type; namely, restrictions on speech must be reasonable and not arbitrarily exclude those for whom the forum was created. And even if the Press Area were a non-public forum, the First Amendment still imposes a reasonableness restraint on how the White House regulates access to it.

1. *The Press Area is a Limited Public Forum*

A limited public forum is government property that has been opened for a specific First Amendment purpose. *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). The "touchstone" for determining whether government property is a limited public forum "is the government's intent in establishing and maintaining the property." *Stewart v. D.C. Armory Bd.*, 863 F.2d 1013, 1016 (D.C. Cir. 1988). The Court looks to "objective indicia of intent," including the "nature of the property, its compatibility with expressive activity, and the consistent policy and practice of the government." *Id.* at 1017 (cleaned up).

In limited public fora, regulation of First Amendment activity must be "reasonable in light of the purpose served by the forum" and "viewpoint [neutral]." *Rosenberger*, 515 U.S. at 829. To comply with the reasonableness requirement, a credentialing regime may not give the government unbridled discretion to regulate when those rights may be exercised. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 223 (1990); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 153 (1969).[2] Unbridled discretion in a credentialing regime presents two distinct threats to the exercise of protected expression. For one, "the absence of express standards" renders it difficult

---

[2] Put another way, the government may not define who has access to a limited public forum through licensing or credentialing schemes that define the class with insufficient specificity. *Rosenberger*, 515 U.S. at 829.

for courts to differentiate between a legitimate denial of access and an "illegitimate abuse of censorial power." *Lakewood*, 486 U.S. at 758. For another, the lack of standards "intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *Id.* at 757. The prohibition against unbridled discretion applies in limited public fora. *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555 (1975); *Kaahumanu v. Hawaii*, 682 F.3d 789, 806 (9th Cir. 2012); *Child Evangelism Fellowship of MD, Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376, 386–87 (4th Cir. 2006) ("*CEF*"); *Southworth v. Bd. of Regents of Univ. of Wisc. Sys.*, 307 F.3d 566, 580 (7th Cir. 2002).

The First Amendment protects the freedom of the press. U.S. Const. amend. 1; *see also Branzburg v. Hayes*, 408 U.S. 665, 707 (1972). This includes the freedom to engage in newsgathering, which is an essential component to press activity. *Branzburg*, 408 U.S. at 681 ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated."). For this reason, designated press areas are classic examples of limited public fora. *See, e.g.*, *TGP Commc'ns, LLC v. Sellers*, No. 22-16826, 2022 WL 17484331, at *4 (9th Cir. Dec. 5, 2022) (recognizing designated press conference facilities as a limited public forum).

The Press Area is a limited public forum. By longstanding practice, the White House created and has operated the Press Area for the purpose of allowing journalists access to the White House to communicate with the President and his staff and to

gather and disseminate the news. *Sherrill*, 569 F.2d at 129. The Press Area is plainly

compatible with that purpose. *Id.* The White House is not constitutionally obligated

to "open its doors to the press," *id.*, but because the White House voluntarily created

a designated space for the purpose of engaging in First Amendment activity, it has

created a limited public forum.

2. *The First Amendment Applies to Press Credentialing for*
   *Access to a Non-Public Forum*

Even if the Press Area were a non-public forum (and it is not), the First

Amendment still applies, as the district court recognized. *See* JA231, n.5; JA232, n.6

(holding hard pass is subject to First Amendment through forum analysis, regardless

of forum type). Like limited public fora, regulation of access to non-public fora must

be "reasonable in light of the purposes served by the forum" and "viewpoint neutral."

*Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062,

1068 (4th Cir. 2006) (collecting cases). And also like limited public fora, the

unbridled discretion doctrine applies in non-public fora. *Minn. Voters All. v. Mansky*,

585 U.S. 1, 21 (2018) (holding, in non-public forum, that government must have

"objective, workable standards"); *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 449

(D.C. Cir. 2020) (striking down rule in non-public forum because it was "too broad

to guide the discretion of the [government's content reviewers]"); *Am. Freedom Def.*

*Initiative v. Washington Metro. Area Transit Auth.*, 901 F.3d 356, 373 (D.C. Cir.

2018) ("*AFDI*") (remanding to district court to determine whether regulation in non-

public forum was sufficiently determinate); *see also Getty Images News Servs. Corp. v. Dep't of Def.*, 193 F. Supp. 2d 112, 121 (D.D.C. 2002) (applying unbridled discretion doctrine to press credentialing in a nonpublic forum).

Even if the White House Press Area were a non-public forum, access to it still must be reasonable and viewpoint neutral. This means the credentialing process may not confer unbridled discretion in the decisionmaker.

## B.    The First Amendment Applies Independent of Forum Analysis

Even if forum analysis is not appropriate for analyzing credentialing access to a government-designated press area, the First Amendment still applies to the White House hard pass program. Once the government designates property as open to the press, it may not draw arbitrary distinctions when regulating access to it.

Those engaged in press activity have an equal right of access to government property that "historically has been open to the press." *Globe Newspaper Co. v. Super. Ct. for the Cnty. of Norfolk*, 457 U.S. 596, 605–06 (1982); *see also Grosjean v. Am. Press Co.*, 297 U.S. 233, 251 (1936) (holding the government may not give preferential treatment to "a selected group" of the media). Distinguishing between classes of journalists on such property is constitutionally suspect because it invites impermissible viewpoint discrimination. *Huminski v. Corsones*, 396 F.3d 53, 84 (2d Cir. 2005) (observing that "granting favorable treatment to certain members of the media allows the government to influence the type of substantive media coverage

that public events will receive") (cleaned up); *see also Tavoulareas v. Washington Post Co.*, 724 F.2d 1010, 1026 (D.C. Cir. 1984) (holding "equality of protection regarding access applies [equally to] the institutional press and individuals"), *rev'd on other grounds*, 737 F.2d 1170 (D.C. Cir. 1984). The government may distinguish between those engaging in press activity and those who are not, *Am. Broad. Cos. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977), but arbitrary classification among those engaged in press activity is presumptively unconstitutional, *see* Hon. David B. Sentelle, *Freedom of the Press: A Liberty for All or A privilege for a Few?*, Cato Institute at 17 (Sept. 17, 2013) (noting that the Press Clause does not "create[] a special class of privileged persons bearing the noble title 'the press'").

This does not mean journalists have an unlimited right to conduct press activities. There is, for example, no First Amendment right to force the government to respond to press inquiries. *See Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410 (4th Cir. 2006) (holding the First Amendment rights of the press cannot serve as a mechanism to compel government speech). Nor does the First Amendment protect access to government property not usually open to the press. *See John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 607, 612 (7th Cir. 2021) (holding no right to invitation-only interview in governor's private conference room). But once the government opens government property to press activities, it may not

impose regulations that draw arbitrary distinctions between journalists. *Sherrill*, 569 F.2d at 128; *see also Karem v. Trump*, 960 F.3d 656, 665 (D.C. Cir. 2020).

The First Amendment's prohibition against arbitrary treatment of the press applies to the White House hard pass program. *Sherrill*, 569 F.2d at 128. Because the "White House press facilities hav[e] been made publicly available as a source of information for newsmen," access to these facilities cannot "be denied arbitrarily or for less than compelling reasons." *Id.* at 129 (citations omitted); *see also Karem*, 960 F.3d at 660 (observing White House hard pass criteria are suspect when they are "unnecessarily vague and subject to ambiguous interpretation"); JA109, *CNN v. Trump*, 1:18-cv-02610-TJK, at *7:19–22 (D.D.C. Nov. 16, 2018), Transcript of Oral Decision (ECF 22) ("The court was very clear [in *Sherrill*] that the basis of [its decision] was rooted in the First Amendment and not the decision of any part of the executive branch to agree that Sherrill should be granted the press pass."); *Cable News Network, Inc. v. Am. Broad. Cos, Inc.*, 518 F. Supp. 1238, 1245 (N.D. Ga. 1981) (holding that the "exclusion of television representatives from White House pool coverage denies the public and the press their limited right of access, guaranteed by the First Amendment").

\*\*\*

Regardless of whether forum analysis or some other mode of analysis applies to press credentialing, the White House hard pass must satisfy First Amendment

scrutiny. This includes a prohibition against giving decisionmakers unbridled discretion in issuing press credentials and otherwise adopting arbitrary or constitutionally unreasonable access requirements.

## II. THE WHITE HOUSE HARD PASS PROGRAM VIOLATES THE UNBRIDLED DISCRETION DOCTRINE

The hard pass program violates the unbridled discretion doctrine in at least three ways. First, the requirement that Congressional press credentials only be issued to journalists "of repute in their profession" is standardless and susceptible to abuse. Second, the Daily Press Gallery is not required to issue decisions within a set time frame. And finally, the Daily Press Gallery process precludes meaningful judicial review because the Gallery is not required to issue a written explanation for credential denials, and these decisions are effectively unreviewable under this Court's precedent.

### A. The Daily Press Gallery's Criteria for Obtaining Credentials is Impermissible

The Daily Press Gallery will only issue credentials to applicants deemed "of repute in their profession." JA147. This "of repute" requirement is standardless and gives the Daily Press Gallery limitless discretion to issue the requisite press credentials necessary to obtain a hard pass. Moreover, even if an applicant satisfies the stated criteria for obtaining a congressional press pass, there is no requirement that the press gallery actually issue one. JA147–48.

As noted, the First Amendment prohibits press licensing and credentialing schemes that "delegate[] overly broad licensing discretion" to decisionmakers. *Lakewood*, 486 U.S. at 756 (cleaned up). To pass constitutional muster, a licensing or credentialing scheme's criteria must be "narrowly drawn, reasonable and definite." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 133 (1992); *Mansky*, 585 U.S at 21 (holding government's discretion must be limited by "objective, workable standards" when regulating access to non-public fora). The licensing scheme must contain "explicit" textual limitations or limit discretion by a "well-established practice." *Lakewood*, 486 U.S. at 769–70.[3] Moreover, licensing schemes must mandate issuance of the license if an applicant meets the stated criteria. S*ee Conteers LLC v. City of Akron,* No. 5:20-CV-00542, 2020 WL 5529656, at *11 (N.D. Ohio Sept. 15, 2020) (holding licensing scheme violated unbridled discretion doctrine because "even if an applicant satisfies [the] vague requirements, the ordinance does not require [the government] to grant a [permit]").

The district court erred in holding the Daily Press Gallery's eligibility criteria satisfy the unbridled discretion doctrine. JA237–242. Although the district court's reasoning is not entirely clear, it appeared to interpret the "of repute" requirement to

---

[3] A judicial or administrative order may also cabin the decisionmaker's discretion. *Lakewood*, 486 U.S. at 770. But because the Congressional press galleries' credentialing decisions are not subject to judicial review, *Consumers Union*, 515 F.2d at 1351, there is no such order here.

mean that if an applicant satisfies the *other* criteria set forth in the Press Gallery's rules, the journalist is necessarily "of repute." JA239 (concluding that the "of repute" requirement "draws meaning from the rules that follow").[4] This was error.

1. *There is No Explicit Textual Limitation Requiring the District Court's Interpretation*

The district court's interpretation of the Daily Press Gallery credentialing criteria is impermissible. Only *explicit* textual limitations will cabin a licenser's discretion. *Lakewood*, 486 U.S. at 770 ("This Court will not write nonbinding limits into a silent [statute]."). An implicit limitation available through creative interpretation—such as the district court's here—is not sufficient to limit the decisionmaker's discretion. *Doe v. Harris*, 772 F.3d 563, 580 (9th Cir. 2014) (holding licensing scheme must have explicit "constraining principle"); *Sentinel Commc'ns Co. v. Watts*, 936 F.2d 1189, 1199 n.9 (11th Cir. 1991) ("[I]t is not enough to presume that officials will act in good faith and adhere to standards absent from a statute or scheme's face."); *see also United States v. Stevens*, 559 U.S. 460, 480 (2010) ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.").

The Supreme Court's unbridled-discretion cases demonstrate this point. Those cases involve similar licensing schemes that contain multiple criteria, some

---

[4] These other criteria are listed *supra* at 12.

of which are narrow and objective. But when just one necessary criterion is so open ended as to allow for the decision maker to exercise unbridled discretion, the entire licensing regime is impermissible.

In *Lakewood*, for example, a city enacted a licensing scheme for placing news racks on government property. 486 U.S. at 753–54. The city required applicants to (1) obtain approval from the city's architectural board for the design of their racks, (2) enter an indemnification agreement with the city, and (3) comply with "any other terms and conditions deemed necessary and reasonable by the mayor." *Id.* Though the licensing regime included two objective criteria, the additional inclusion of an undefined criterion—any other conditions the mayor "deemed necessary and reasonable"—rendered the licensing scheme unconstitutional. *Id.* at 754. Such an undefined standard in a list of other requirements does not sufficiently cabin the decisionmaker's discretion even if other requirements are sufficiently definite. *Id. at* 759; *see also Forsyth Cnty.*, 505 U.S. at 133 (holding unbridled discretion doctrine violated when decisionmaker "is not *required* to rely on any objective factors" (emphasis added)); *Mansky*, 585 U.S. at 21 (holding licensing criteria cannot be "indeterminate" or capable of "virtually open-ended interpretation").

So too here. While the Daily Press Gallery rules include some objective criteria for obtaining press credentials, they reserve to the executive committee the discretion to determine which journalists are "of repute in their profession." JA147.

This regime fails the unbridled discretion doctrine. *Lakewood*, 486 U.S. at 769; *see also Community for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1395 (D.C. Cir. 1990) (holding separately enumerated objective criteria do not cabin a "classically vague restriction, replete with the dangers" of unbridled discretion); *S.A. Restaurants, Inc. v. Deloney*, 909 F. Supp. 2d 881, 899 (E.D. Mich. 2012) (holding licensing regime violates unbridled discretion doctrine even when "[s]ome of the factors in [the] rules plainly are objective and nondiscretionary").

Indeed, it "is a fundamental principle of statutory interpretation that absent provisions cannot be supplied by the courts." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020) (cleaned up). This "principle applies not only to adding terms not found in the statute, but also to imposing limits on . . . discretion that are not supported by the text." *Id.* (citing *Watt v. Energy Action Ed. Foundation*, 454 U.S. 151, 168 (1981)). By concluding "of repute" means satisfying each of the other, objective criteria, the district court read into the rules words that simply are not there. *See Nichols v. United States*, 578 U.S. 104, 110 (2016) ("To supply omissions transcends the judicial function."). The other criteria are listed as independent requirements in the rules separate from the "of repute" requirement. JA147–48. Some of these criteria are objective, but there is no textual basis to conclude that satisfying them means an applicant is automatically considered "of repute in their profession."

The district court's interpretation of the rules also renders "of repute" devoid of content, in violation of the "canon against surplusage." *Pulsifer v. United States*, 144 S. Ct. 718, 732 (2024). Under the district court's interpretation, the "of repute" requirement "does no independent work," rendering it meaningless. *Id.* at 731. Absent "clear evidence that [the drafter] intended this surplusage," the rules should be read to give effect to each element. *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128 (2018). In this case, that means interpreting "of repute" to be an independent requirement for obtaining press credentials. And because this phrase lacks clear standards, the rules must be interpreted as delegating the unbridled discretion to define "of repute" to the Daily Press Gallery. The district court's interpretation violates this principle of statutory construction.

Because there is no explicit textual limitation on the meaning of the "of repute" standard, this standard violates the unbridled discretion doctrine.

  2. *There is no "well-established" practice of interpreting the "of repute" requirement in the manner the district court did.*

There is also no "well-established" practice cabining the Daily Press Gallery's discretion to determine which journalists are "of repute in their profession."

For a practice to limit a decisionmaker's discretion, it must be one that is "well-understood and *uniformly applied*" such that it "has virtually the force of a judicial construction." *Lakewood*, 486 U.S. at 770 n.11 (emphasis added). When there is no explicit textual limitation, the government must "articulate" a "consistent

set of factors" relied on to determine whether an applicant qualifies for the license. *Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression & Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 799 (9th Cir. 2008) (citing *Lakewood,* 486, U.S. at 770). And the government must follow these same factors and interpret them in the same manner in every case. *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 518 (D.C. Cir. 2010) (holding no violation of unbridled discretion doctrine because "*all* national parks 'appear to have' adopted short and definite deadlines" for issuing permits (emphasis added)).

The district court suggested the "of repute" requirement "derives meaning from the central tenets of the regulations—that the person is working as a journalist for an established news organization and that the person does not have any conflicts of interest." JA239. But there is not a shred of evidence that the *Daily Press Gallery* has adopted this interpretation. Moreover, the Daily Press Gallery is not bound by the district court's interpretation of its rules. The district court itself noted that it was not "offer[ing] a binding or limiting definition of the term 'of repute' as used in the press credentialing rules." JA239. Because the district court's interpretation is neither "binding" nor "limiting" on the Daily Press Gallery, it cannot reflect the Gallery's "uniform applied" and "well-established" practice as a matter of law. *Lakewood*, 486 U.S. at 770 n.11 (emphasis added); *CEF*, 470 F.3d at 1071 (noting

that without uniform application, a regulator's prior practice is "an exercise of their discretion, rather than a constraint upon it").

The record is devoid of any evidence supporting the district court's interpretation of the Daily Press Gallery rules. Accordingly, the rules must be interpreted on their own terms. And because they are "not susceptible to objective definition" on their face, they are susceptible to abuse. *United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 360 (6th Cir. 1998). Under the rules, the Daily Press Gallery may issue credentials to those journalists it deems worthy. This falls within the heartland of the unbridled discretion doctrine.

## B. The Congressional Press Gallery Credentialing Process Impermissibly Fails to Mandate Timely Decisions

In addition to the nebulous "of repute" requirement, the Daily Press Gallery rules also violate the unbridled discretion doctrine because they do not require the gallery to process applications within a set time frame.

A licensing scheme regulating the exercise of First Amendment activity violates the unbridled discretion doctrine when it allows the licensor unlimited time to process applications. *FW/PBS*, 493 U.S. at 227 (holding licensors may not "indefinitely suppress" exercise of First Amendment rights). The licensing scheme must contain "strict administrative time limits" to ensure the decisionmaker does not censor the applicant by simply not processing the application. *City of Littleton v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774, 779 (2004).

There is no dispute that the Daily Press Gallery rules do not set forth a time limit within which a decision must be made. JA147–148. The district court nevertheless concluded those rules were permissible because "the press gallery regulations are content-neutral." JA242. In addition, the district court concluded that the rules did not violate the unbridled discretion doctrine because Mr. Ateba "still has access to the Press Area with his day pass during the credentialing process." JA242. These conclusions are erroneous.

As an initial matter, because the Daily Press Gallery's "of repute" requirement violates the unbridled discretion doctrine, its rules are not "content neutral." *Kaahumanu*, 682 F.3d at 806 (holding that the "viewpoint neutrality requirement includes the prohibition on a licensing authority's unbridled discretion"); *CEF*, 457 F.3d at 384 ("[V]iewpoint neutrality requires not just that a government refrain from explicit viewpoint discrimination, but also that it provide adequate safeguards to protect against the improper exclusion of viewpoints."); *Southworth*, 307 F.3d at 579 ("[W]e conclude that the prohibition against unbridled discretion is a component of the viewpoint-neutrality requirement."); *Polaris Amphitheater Concerts, Inc. v. City of Westerville*, 267 F.3d 503, 509 (6th Cir. 2001) ("[W]hen a regulation fails to place appropriate limits on the discretion of public officials to administer the law in a manner that is abusive of speech, the result should be no different than if the law had brazenly set out to discriminate on the basis of content."). Inclusion of a standardless

criterion necessary to obtain a license infects the entire scheme with potential viewpoint discrimination. *Id.* The district court erred in concluding otherwise.

But even if the Daily Press Gallery's rules were content neutral, the district court still erred. The district court relied primarily on *Boardley* in concluding content-neutral licensing regimes need not include a time limit for issuing decisions. JA242 (citing 615 F.3d at 518). But that is not *Boardley*'s holding. In *Boardley*, this Court acknowledged that *other* circuits have not required time limits for content-neutral licensing schemes. 615 F.3d at 518 (collecting cases). This Court, however, did not say it *agreed* with those circuits; instead, it specifically analyzed the regulation at issue for timeliness. *Id.* The Court held that because the regulation required decisions be issued "without unreasonable delay," and because the relevant agency had "adopted short and definite deadlines of between three and ten days," the regulation did not violate the timeliness requirement of the unbridled discretion doctrine. *Id.* at 518–19 (cleaned up). Thus, under *Boardley*, content-neutral licensing schemes must require timely decisions. *See also Adams Outdoor Advert. Ltd. P'ship by Adams Outdoor GP, LLC v. Penn. Dep't of Transp.*, 930 F.3d 199, 208 n.2 (3d Cir. 2019) (observing that "procedural safeguards [*in addition* to timely decisions] apply to permitting regimes that involve content-based determinations"); *Encore Videos, Inc. v. City of San Antonio*, 330 F.3d 288, 296 (5th Cir.) (noting that in "a content-neutral licensing scheme . . . [t]he licensor must make the decision whether

to issue the license within a specified and reasonable time period" (cleaned up)), *opinion clarified on other grounds*, 352 F.3d 938 (5th Cir. 2003), *abrogated on other grounds by Reed v. Town of Gilbert*, 576 U.S. 155 (2015); *InfoCision Mgmt. Corp. v. Griswold*, 570 F. Supp. 3d 1051, 1073 (D. Colo. 2021) (holding content-neutral regime must contain time limits within which regulator must act).

The reason for this rule is clear: "[E]ven content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression." *Thomas v. Chi. Park Dist.,* 534 U.S. 316, 323 (2002). Without time limits, decisionmakers may effectively "veto" protected First Amendment activity through mere "footdragging." *S. Oregon Barter Fair v. Jackson Cnty.*, 401 F.3d 1124, 1124 (9th Cir. 2005) (Berzon, J., dissenting from denial of rehearing en banc). Allowing decisionmakers to delay indefinitely in issuing a license thus significantly under protects First Amendment freedoms. *Id.* at 1125.

To be sure, *Thomas* held that content-neutral licensing regimes do not require all of the procedural safeguards necessary for content-based regimes. *Thomas*, 534 U.S. at 322–23 (citing *Freedman v. Maryland*, 380 U.S. 51 (1965)).[5] But *Thomas*

---

[5] *Freedman* required that, for content-based licensing regimes:
> (1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained;
> (2) expeditious judicial review of that decision must be available; and
> (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court.

*FW/PBS*, 493 U.S. at 227 (plurality op.) (citing *Freedman*, 380 U.S. at 58-60).

rejected only those procedural safeguards pertaining to prompt "judicial review" of the licensor's decision. *Id. Thomas* did not hold the *licensor* can delay deciding on the license application indefinitely. *Id.* at 324 (holding no unbridled discretion problem because regulation required the city to "process applications within 28 days"); *S. Oregon Barter Fair*, 401 F.3d at 1126 (noting that *Thomas* held only that the precise *Freedman* requirements pertaining to "*judicial* review" were inapplicable for content-neutral licensing regimes (emphasis in original)) (Berzon, J., dissenting from denial of rehearing en banc).

Indeed, the Supreme Court has since reaffirmed that licensing schemes regulating First Amendment activity must be "issued within a reasonable period of time." *Littleton*, 541 U.S. at 780. If the opposite were true, the licensing authority could stifle speech by sitting on an application "indefinitely." *FW/PBS*, 493 U.S. at 227; *S. Oregon Barter Fair*, 401 F.3d at 1124 (Berzon, J., dissenting from denial of rehearing en banc). This violates the unbridled discretion doctrine. *Adams Outdoor*, 930 F.3d at 208 (holding content-neutral licensing scheme violated unbridled discretion when it had "no time limit at all" for issuing decisions).

Moreover, the district court erred in concluding the lack of a required time limit for issuing press credentials does not harm Mr. Ateba because he has access to the Press Area through the day pass system. JA242. As the district court already concluded, the difference between a day pass and hard pass creates a "First

Amendment injury." JA229. Because the differences in (1) the burden of obtaining a day pass versus a hard pass and (2) the access granted by the two types of passes give rise to a First Amendment injury, the permitting regime regulating the hard pass must comply with all aspects of the unbridled discretion doctrine. JA229, 231–37.

Because the Press Gallery rules do not require issuance of a decision within a set time frame, the credentialing scheme violates the unbridled discretion doctrine.

### C. The Daily Press Gallery Credentialing Process Provides No Opportunity for Effective Judicial Review

The Daily Press Gallery's licensing scheme violates the unbridled discretion doctrine for the additional reason that it does not afford applicants a meaningful opportunity for judicial review of its decision.

> 1. *The Daily Press Gallery's rules do not allow for effective judicial review of its decision.*

Licensing schemes regulating the exercise of First Amendment rights must allow applicants to seek judicial review of licensure denials. Because the Daily Press Gallery can summarily deny any application without providing a reasoned decision, meaningful judicial review is unavailable.

Returning to *Thomas*, while the Court there held that applicants under a content-neutral licensing regime were not entitled to the full panoply of procedural safeguards set forth in *Freedman,* they are nevertheless entitled to "effective judicial review" of the licensor's decision. 534 U.S. at 323. The Park District's permitting

regime in *Thomas* cleared this bar because the District was required to "clearly explain its reasons for any denial." *Id.* at 324. Following *Thomas*, this Court has confirmed that content-neutral licensing schemes must be "'subject to effective judicial review[.]'" *Boardley*, 615 F.3d at 517 (quoting *Thomas*, 534 U.S. at 323)); *see also Seattle Affiliate*, 550 F.3d at 800 ("The breadth of the [permitting] Ordinance becomes particularly troublesome when we consider its failure to require officials to articulate their reasons for denying permission to march in the streets and the absence of any mechanism for direct administrative or judicial review."); *Utah Animal Rts. Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1260 (10th Cir. 2004) (noting that inquiry in examining permitting regime "narrows to whether the regulations . . . possess adequate standards to guide the exercise of official discretion and make possible meaningful judicial review"); *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 178 (2d Cir. 2006) (upholding permitting regime because criteria "are capable of guiding a permitting official's decision and rendering that decision subject to effective judicial review"); *Diener v. Reed*, 77 F. App'x 601, 607–08 (3d Cir. 2003) ("Important aspects of the criteria in *Thomas* included that the Park District could deny a permit only for one or more of the reasons set forth in the ordinance, that the Park District was required to process the applications with 28 days and clearly explain its reasons for denial, and that an appeals process was available.").

The Daily Press Gallery's rules do not require that it provide applicants a reasoned decision. Accordingly, those rules impermissibly fail to allow applicants the opportunity for effective judicial review.

2. *The Speech or Debate Clause precludes effective judicial review.*

Applicants for a White House hard pass lack effective judicial review for another reason. Under this Court's precedent, the Congressional press galleries are absolutely immune from suit for their credentialing decisions under the Speech or Debate clause. *Consumer Union*, 515 F.2d at 1351. This immunity precludes suit against the galleries, and it protects them even from responding to third-party subpoenas. *MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856, 859 (D.C. Cir. 1988); *Gouse v. District of Columbia*, 359 F. Supp. 3d 51, 57 (D.D.C. 2019). If Mr. Ateba's application for a hard pass is denied, he may sue and obtain discovery from White House officials, but he may not sue or obtain discovery from the Daily Press Gallery. But if Mr. Ateba's application for a hard pass is denied, it will be because the *Daily Press Gallery* denied his application for a Congressional press pass. Because Mr. Ateba is precluded from even obtaining discovery from the actual decision-maker, that decision will effectively—and impermissibly—be insulated from judicial review. *Thomas*, 534 U.S. at 323. The White House—which does not have immunity under the Speech or Debate Clause—should not be permitted to piggy-back off Congressional immunity in denying press credentials.

***

The Daily Press Gallery's rules for obtaining press credentials violate the unbridled discretion doctrine. Consequently, the White House's requirement that correspondents subject themselves to this unconstitutional process before they can obtain a hard pass is arbitrary, constitutionally unreasonable, and a violation of the First Amendment.

## III. THE WHITE HOUSE HARD PASS ELIGIBILITY CRITERIA ARE CONSTITUTIONALLY UNREASONABLE

The hard pass eligibility criteria are constitutionally unreasonable for two other reasons. First, the requirement that applicants demonstrate they have a need to cover *Congress or the Supreme Court* is not a relevant criterion for regulating access to the *White House*. Second, the White House impermissibly subjects hard pass applicants to the whims of their competitors when applying for press credentials.

### A. The Hard Pass Eligibility Criteria Impermissibly Require Applicants to Demonstrate a Need to Cover Congress or the Supreme Court

The Daily Press Gallery, like the other Congressional press galleries, requires applicants for press credentials demonstrate they "require[] on-site access to congressional members and staff." JA148; *see also* JA241, n.8. Similarly, the Supreme Court Press Office requires that correspondents cover the Supreme Court full time. JA219. Thus, the hard pass program requires applicants to demonstrate that they require access to members of Congress or that they cover the Supreme

Court on a full-time basis to cover the White House. This is arbitrary and unreasonable.

Press credentialing criteria are arbitrary and unreasonable in violation of the First Amendment when they do not have a rational nexus with the government's reason for the restriction. *Mansky*, 585 U.S. at 13 (holding regulation of First Amendment rights must always be "reasonable" in light of the government objective); *Sherrill*, 569 F.2d at 129 (holding White House hard passes may not "be denied arbitrarily or for less than compelling reasons" (citations omitted)); *Karem*, 960 F.3d at 660 (same); *Stevens v. N.Y. Racing Ass'n, Inc.*, 665 F. Supp. 164, 175 (E.D.N.Y. 1987) (noting that "a restriction which affords different degrees of access to members of the press . . . must be rationally related to the accomplishment of [the government's] purpose.") (cleaned up). Requiring White House correspondents to demonstrate a need to cover Congress and the Supreme Court fails this test.

The district court acknowledged that "Mr. Ateba's point that a hard pass seeker may not want to cover Congress or the Supreme Court is well-taken," but it concluded this feature of the hard-pass program "does not defeat the other reasonable features of the credentialing gallery requirement." JA241. According to the district court, this irrational requirement is washed of its unconstitutional taint by other "reasonable" reasons for using such a filtering mechanism. Namely, because the

White House does not have "its own press gallery," it is reasonable for it to rely on Congress or the Supreme Court. JA241. This was error.

While restricting Press Area access to those engaged in journalism is a legitimate reason for requiring press credentials, requiring journalists to obtain credentials from another branch of government to cover the executive is an arbitrary and unreasonable way to achieve this interest. *See Craigmiles v. Giles*, 110 F. Supp. 2d 658, 664 (E.D. Tenn. 2000), *aff'd*, 312 F.3d 220 (6th Cir. 2002) (holding it is "irrational to require" businesses to obtain unnecessary licenses). Journalists covering the White House might not want—or might not have the capacity—to have access to members of Congress or to cover the Supreme Court on a full-time basis. Requiring them to obtain Congressional or Supreme Court approval before engaging in First Amendment activity at the White House is arbitrary and unreasonable.

## B. The White House Cannot Subject Hard Pass Applicants to Their Competitor's Decision-making

Because the White House's credentialing scheme subjects applicants to the whims of their competitors, it is uniquely susceptible to abuse and therefore constitutionally unreasonable.

The Daily Press Gallery Correspondents Committee—like the other Correspondents Committees—consist of journalists who work for news outlets that have a strong institutional foothold in the Washington, D.C. media ecosystem. JA231. These journalists are members of the institutional press, and like all

journalists, they have a vested interest in limiting the level of competition in their industry. *See Associated Press v. United States*, 326 U.S. 1, 17–20 (1945) (discussing interest in stifling competition among news outlets). By giving these journalists the authority to decide which of their competition are sufficiently "of repute" to obtain a Congressional (and White House) press credential—and to delay the decision indefinitely—the White House hard pass program unreasonably authorizes these journalists to limit their competition's access to government property open to the press. *White v. Lee*, 227 F.3d 1214, 1233 (9th Cir. 2000) (holding that a "conflict of interest" can have "chilling effect" on First Amendment rights); *Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 44 (1st Cir. 1992) (holding that decision-making based on a conflict of interest "stated a First Amendment claim").

This is true even if there are no unbridled discretion problems. *Boardley*, 615 F.3d at 519 (analyzing regulation for reasonableness despite holding no unbridled discretion problem). The mere prospect of potential abuse and impropriety by the Congressional press galleries is enough to chill an applicant's speech. *White*, 227 F.3d at 1233. To convince the journalists on the committees that they are "of repute," applicants might modify their coverage or otherwise change how they exercise their constitutional rights because they are concerned with how they might be perceived by the Congressional press galleries. Delegating the decision to the applicant's

competitors is thus an unreasonable way to regulate access to a government-issued press credential.

It is also no defense to say this practice is "reasonable" because it has been in place for decades. Indeed, "historical patterns cannot justify contemporary violations of constitutional guarantees." *See Marsh v. Chambers*, 463 U.S. 783, 786, 789 (1983) (holding legislative prayer permissible under the Establishment Clause because the practice is "deeply embedded in the history and tradition of this country" since before the founding). The evidence in the record illustrates the deleterious effects of requiring hard pass applicants to obtain credentials from the Congressional press galleries. Since 1976, the number of credentialed journalists covering Congress has increased by 140 percent, but the total number of outlets has decreased by 50 percent. JA137. This consolidation of journalists covering Congress under a few, self-selecting outlets is antithetical to the First Amendment's promise of a free and independent press. Thus, the relatively short historical pedigree this process enjoys is one of discrimination, not objectivity. And it has resulted in fewer outlets covering Congress, and in turn, the White House. This practice has been unconstitutional from the outset and cannot be justified by the mere fact that it has gone unabated.

## CONCLUSION

Mr. Ateba simply wishes to access the White House Press Area on equal footing with all other journalists. Once there, he will subject himself to the

reasonable, viewpoint-neutral, and uniformly applied policies adopted to advance legitimate safety and administrative objectives. But the current eligibility requirements are arbitrary and unreasonable and inconsistent with the free press guarantees at the heart of the First Amendment. The court below erred in concluding otherwise. For the foregoing reasons, this Court should REVERSE the judgment of the district court with respect to Count I of Mr. Ateba's complaint and direct the court to enter judgment in Mr. Ateba's favor.

Respectfully submitted,

May 17, 2024

*/s/ Josh Dixon*
Josh Dixon
Eric Sell
Center for American Liberty
1311 S. Main Street, Suite 207
Mount Airy, MD 21771
(703) 687-6212
jdixon@libertycenter.org
esell@libertycenter.org

Harmeet Dhillon
Jesse Franklin-Murdock
Dhillon Law Group Inc.
177 Post St, Suite 700
San Francisco, CA 94108
(415) 433-1700
harmeet@dhillonlaw.com
jfm@dhillonlaw.com

Attorneys for Plaintiff-Appellant

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) and Circuit Rule 27 because this brief contains 10,704 words, excluding the parts exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Office 365.

This brief complies with the typeface and type-style requirements of Fed. R. App. P. 27(d)(1)(E) and Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using 14-point Times New Roman.

Respectfully submitted,

*/s/ Josh Dixon*
Josh Dixon
Attorney for Plaintiff-Appellant

**CERTIFICATE OF SERVICE**

I hereby certify that on May 17, 2024, I electronically filed the foregoing Certificate with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Josh Dixon*
Josh Dixon
Attorney for Plaintiff-Appellant