**NOT YET SCHEDULED FOR ORAL ARGUMENT**
**APPEAL NO. 24-5004**

# UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Simon Ateba,

*Plaintiff-Appellant*,

v.

Karine Jean-Pierre, *et al*.,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the District of Columbia

Case No. 1:23-cv-02321-JDB / Hon. John D. Bates

---

## JOINT APPENDIX

---

Harmeet Dhillon
Jesse Franklin-Murdock
Dhillon Law Group Inc
177 Post St, Suite 700
San Francisco, CA 94108
(415) 433-1700
Harmeet@dhillonlaw.com
jfm@dhillonlaw.com

Josh Dixon
Eric Sell
Center for American Liberty
1311 S. Main Street, Suite 207
Mount Airy, MD 21771
(703) 687-6212
jdixon@libertycenter.org
esell@libertycenter.org

*Counsel for Plaintiff-Appellant*

| ECF No. | Document Description | Page |
|---------|--------------------|------|
|  | District Court Docket Report | JA001 |
| ECF 1 | Verified Complaint | JA008 |
| ECF 4 | Notice of Errata | JA054 |
| ECF 21 | Order Denying Preliminary Injunction | JA057 |
| ECF 22-2 | Third Fleischer Declaration | JA070 |
| ECF 23-2 | Second Ateba Declaration | JA077 |
| ECF 24 | Request for Judicial Notice | JA081 |
|  | Summary Judgment Hearing Transcript | JA150 |
| ECF 31 | Summary Judgment Order | JA213 |
| ECF 32 | Summary Judgment Opinion | JA215 |
| ECF 33 | Notice of Appeal | JA252 |
| ECF 36 | Clarification Order | JA253 |

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:23-cv-02321-JDB

ATEBA v. JEAN-PIERRE et al
Assigned to: Judge John D. Bates
Case in other court: USCA, 24-05004
Cause: 28:1331 Fed. Question

Date Filed: 08/10/2023
Date Terminated: 12/07/2023
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**SIMON ATEBA**                    represented by    **Eric Arthur Sell**
1311 South Main Street
Suite 301
Mt. Airy, MD 21771
202-627-0121
Email: Esell@libertycenter.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gary Lawkowski**
DHILLON LAW GROUP, INC..
2121 Eisenhower Avenue
Suite 608
Alexandria, VA 22314
703-574-1654
Email: glawkowski@dhillonlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Harmeet Dhillon**
DHILLON LAW GROUP INC
177 Post St.
Suite #700
San Francisco, CA 94108
415-433-1700
Email: harmeet@dhillonlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jesse Franklin-Murdock**
DHILLON LAW GROUP
177 Post Street
Suite 700
San Francisco, CA 94108
415-433-1700

JA001

Email: jfranklin-murdock@dhillonlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**KARINE JEAN-PIERRE**                    represented by    **Joseph Evan Borson**
*in her official capacity as Press Secretary*                 U.S. DEPARTMENT OF JUSTICE
*to the President of the United States*                       Civil Division, Federal Programs Branch
                                                             1100 L Street NW
                                                             Washington, DC 20005
                                                             (202) 514-1944
                                                             Fax: (202) 616-8470
                                                             Email: joseph.borson@usdoj.gov
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Michael Fraser Knapp**
                                                             U.S. DEPARTMENT OF JUSTICE
                                                             1100 L Street NW
                                                             Washington, DC 20005
                                                             (202) 514-2071
                                                             Fax: (202) 616-8470
                                                             Email: michael.f.knapp@usdoj.gov
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES SECRET SERVICE**         represented by    **Joseph Evan Borson**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Michael Fraser Knapp**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

**Defendant**

**KIMBERLY CHEATLE**                      represented by    **Joseph Evan Borson**
*in her official capacity as Director of the*                 (See above for address)
*United States Secret Service*                               *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Michael Fraser Knapp**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/10/2023 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number ADCDC-10268599) filed by SIMON ATEBA. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Civil Cover Sheet, # 6 Summons, # 7 Summons, # 8 Summons)(Dhillon, Harmeet) (Entered: 08/10/2023) |
| 08/10/2023 | 2 | MOTION for Preliminary Injunction by SIMON ATEBA. (Attachments: # 1 Proposed Order)(Dhillon, Harmeet) (Entered: 08/10/2023) |
| 08/11/2023 | | Case Assigned to Judge John D. Bates. (zcb) (Entered: 08/11/2023) |
| 08/11/2023 | 3 | SUMMONS (5) Issued Electronically as to KIMBERLY CHEATLE, KARINE JEAN-PIERRE, UNITED STATES SECRET SERVICE, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zcb) (Entered: 08/11/2023) |
| 08/14/2023 | 4 | ERRATA by SIMON ATEBA re 1 Complaint,. (Dhillon, Harmeet) (Entered: 08/14/2023) |
| 08/17/2023 | 5 | NOTICE of Appearance by Michael Fraser Knapp on behalf of All Defendants (Knapp, Michael) (Entered: 08/17/2023) |
| 08/17/2023 | 6 | NOTICE of Appearance by Eric Arthur Sell on behalf of SIMON ATEBA (Sell, Eric) (Main Document 6 replaced on 8/17/2023) (zjm). (Entered: 08/17/2023) |
| 08/17/2023 | 7 | Consent MOTION for Extension of Time to File Response/Reply as to 2 MOTION for Preliminary Injunction by KIMBERLY CHEATLE, KARINE JEAN-PIERRE, UNITED STATES SECRET SERVICE. (Attachments: # 1 Text of Proposed Order)(Knapp, Michael) (Entered: 08/17/2023) |
| 08/17/2023 | 8 | NOTICE of Appearance by Jesse Franklin-Murdock on behalf of SIMON ATEBA (Franklin-Murdock, Jesse) (Entered: 08/17/2023) |
| 08/17/2023 | 9 | NOTICE of Appearance by Gary Lawkowski on behalf of SIMON ATEBA (Lawkowski, Gary) (Entered: 08/17/2023) |
| 08/17/2023 | 10 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General August 15, 2023. (Franklin-Murdock, Jesse) (Entered: 08/17/2023) |
| 08/17/2023 | 11 | ENTERED IN ERROR.....RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General August 15, 2023. (Franklin-Murdock, Jesse) Modified on 8/17/2023 (zjm). (Entered: 08/17/2023) |
| 08/17/2023 | 12 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. KIMBERLY CHEATLE served on 8/14/2023 (Franklin-Murdock, Jesse) Modified on 8/17/2023 to correct date served (zjm). (Entered: 08/17/2023) |
| 08/17/2023 | 13 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. KARINE JEAN-PIERRE served on 8/14/2023 (Franklin-Murdock, Jesse) Modified on 8/18/2023 to correct date of service (zjm). (Entered: 08/17/2023) |
| 08/17/2023 | 14 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. UNITED STATES SECRET SERVICE served on 8/14/2023 (Franklin-Murdock, Jesse) Modified |

| | | |
|---|---|---|
| | | on 8/18/2023 to correct the date served (zjm). (Entered: 08/17/2023) |
| 08/17/2023 | | MINUTE ORDER: Upon consideration of 7 defendants' consent motion to extend the deadline to respond to 2 plaintiff's motion for a preliminary injunction, and the entire record herein, it is hereby ORDERED that defendants' motion is GRANTED; and it is further ORDERED that defendants shall respond to the motion for a preliminary injunction by not later than August 24, 2023. SO ORDERED. Signed by Judge John D. Bates on 8/17/2023. (lcjdb3) (Entered: 08/17/2023) |
| 08/17/2023 | | NOTICE OF ERROR regarding 11 Summons Returned Executed as to U.S. Attorney General. The following error(s) need correction: Incorrect event. Please refile using Summons Returned executed as to US Attorney. Please enter date of **delivery** (not date mailed). Please refile. (zjm) (Entered: 08/17/2023) |
| 08/17/2023 | 15 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 8/15/2023. Answer due for ALL FEDERAL DEFENDANTS by 10/14/2023. (Franklin-Murdock, Jesse) (Entered: 08/17/2023) |
| 08/23/2023 | 16 | NOTICE of Appearance by Joseph Evan Borson on behalf of KIMBERLY CHEATLE, KARINE JEAN-PIERRE, UNITED STATES SECRET SERVICE (Borson, Joseph) (Entered: 08/23/2023) |
| 08/24/2023 | 17 | Memorandum in opposition to re 2 Motion for Preliminary Injunction filed by KIMBERLY CHEATLE, KARINE JEAN-PIERRE, UNITED STATES SECRET SERVICE. (Attachments: # 1 Exhibit 1 - Fleischer Decl, # 2 Exhibit 2 - Aug 6 email, # 3 Text of Proposed Order)(Knapp, Michael) (Entered: 08/24/2023) |
| 08/25/2023 | | MINUTE ORDER: Upon consideration of 2 plaintiff's motion for preliminary injunction and 17 defendants' opposition to plaintiff's motion, it is hereby ORDERED that plaintiff shall file any reply in support of his motion by not later than August 29, 2023, at 12:00 p.m. SO ORDERED. Signed by Judge John D. Bates on 8/25/2023. (lcjdb3) (Entered: 08/25/2023) |
| 08/25/2023 | | Set/Reset Deadlines : Plaintiff's Reply in Support of 2 Plaintiff's Motion for Preliminary Injunction due by 12:00 PM on 8/29/2023. (kk) (Entered: 08/25/2023) |
| 08/29/2023 | 18 | REPLY to opposition to motion re 2 MOTION for Preliminary Injunction filed by SIMON ATEBA. (Attachments: # 1 Declaration of Simon Ateba)(Dhillon, Harmeet) (Entered: 08/29/2023) |
| 08/29/2023 | 19 | Unopposed MOTION for Leave to File *Surreply* by KIMBERLY CHEATLE, KARINE JEAN-PIERRE, UNITED STATES SECRET SERVICE. (Attachments: # 1 Supplement Proposed Surreply, # 2 Exhibit 3 - Supplemental Fleischer Dec, # 3 Exhibit 4 - Aug. 28 Emails, # 4 Text of Proposed Order)(Borson, Joseph) (Entered: 08/29/2023) |
| 08/30/2023 | | MINUTE ORDER: Upon consideration of 19 defendants' unopposed motion for leave to file a surreply, and the entire record herein, it is hereby ORDERED that the motion is GRANTED; and it is further ORDERED that [19-1] defendant's surreply and the appended exhibits [19-2] and [19-3], are deemed filed as of the date of this Order. SO ORDERED. Signed by Judge John D. Bates on 8/30/2023. (lcjdb3) (Entered: 08/30/2023) |
| 08/30/2023 | 20 | SURREPLY to re 2 MOTION for Preliminary Injunction filed by KIMBERLY CHEATLE, KARINE JEAN-PIERRE, UNITED STATES SECRET SERVICE. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Exhibit 3 - Supplemental Fleischer Dec, # 2 Exhibit 4 - Aug 28 Emails)(zjm) (Entered: 09/01/2023) |
| 09/06/2023 | 21 | MEMORANDUM OPINION AND ORDER denying 2 plaintiff's motion for preliminary injunction and setting schedule for expedited summary judgment briefing. See text of Order for details. Signed by Judge John D. Bates on 9/6/2023. (lcjdb3) (Entered: 09/06/2023) |
| 09/06/2023 | | Set/Reset Deadlines: Defendants Summary Judgment / Administrative Record due by 9/20/2023. Plaintiffs Cross Motion and Response to Motion for Summary Judgment due by 10/4/2023. Defendants Response to Cross Motion and Reply to Motion for Summary Judgment due by 10/11/2023. Plaintiffs Reply to Cross Motion due by 10/18/2023. (zed) (Entered: 09/07/2023) |
| 09/20/2023 | 22 | MOTION for Summary Judgment by KIMBERLY CHEATLE, KARINE JEAN-PIERRE, UNITED STATES SECRET SERVICE. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1 - Third Fleischer Decl, # 3 Statement of Facts, # 4 Text of Proposed Order)(Knapp, Michael) (Entered: 09/20/2023) |
| 10/04/2023 | 23 | Cross MOTION for Summary Judgment *and Opposition to Defendants' Motion for Summary Judgment* by SIMON ATEBA. (Attachments: # 1 Declaration Declaration of Jesse D. Franklin-Murdock, # 2 Declaration Second Declaration of Simon Ateba, # 3 Statement of Facts Response to Defendants' Statement of Material Facts as to which there is No Genuine Dispute, # 4 Statement of Facts Statement of Undisputed Material Facts and Opposition to Defendants Statement of Undisputed Material Facts, # 5 Cross-Motion for Summary Judgment on Motion for Additional Discovery as to Count 2 of the Verified Complaint, # 6 Text of Proposed Order Proposed Order)(Dhillon, Harmeet) Modified event title on 10/5/2023 (znmw). (Entered: 10/04/2023) |
| 10/04/2023 | 24 | MOTION to Take Judicial Notice by SIMON ATEBA. (Attachments: # 1 Declaration Declaration of Eric A. Sell, # 2 Exhibit Exhibit A, # 3 Exhibit Exhibit B, # 4 Exhibit Exhibit C, # 5 Exhibit Exhibit D, # 6 Exhibit Exhibit E)(Dhillon, Harmeet) (Entered: 10/04/2023) |
| 10/04/2023 | 25 | Memorandum in opposition to re 22 Motion for Summary Judgment, filed by SIMON ATEBA. (See Docket Entry 23 to view document). (znmw) (Entered: 10/05/2023) |
| 10/11/2023 | 26 | Memorandum in opposition to re 23 Motion for Summary Judgment,, filed by KIMBERLY CHEATLE, KARINE JEAN-PIERRE, UNITED STATES SECRET SERVICE. (Attachments: # 1 Statement of Facts (Defs.' Resp. to Pl.'s Stmt), # 2 Text of Proposed Order)(Knapp, Michael) (Entered: 10/11/2023) |
| 10/11/2023 | 27 | REPLY to opposition to motion re 22 MOTION for Summary Judgment filed by KIMBERLY CHEATLE, KARINE JEAN-PIERRE, UNITED STATES SECRET SERVICE. (Knapp, Michael) (Entered: 10/11/2023) |
| 10/12/2023 | | NOTICE of Hearing: Oral Arguments Hearing set for 11/2/2023 at 10:00 AM in Courtroom 30A- In Person before Judge John D. Bates. (zed) (Entered: 10/12/2023) |
| 10/13/2023 | 28 | Consent MOTION to Stay re 1 Complaint, by KIMBERLY CHEATLE, KARINE JEAN-PIERRE, UNITED STATES SECRET SERVICE. (Attachments: # 1 Text of Proposed Order)(Knapp, Michael) Modified on 10/13/2023 to correct relief (zjm). (Entered: 10/13/2023) |
| 10/13/2023 | | MINUTE ORDER: Upon consideration of 28 defendants' consent motion to stay the |

| | | |
|---|---|---|
| | | deadline to respond to the complaint, and the entire record herein, it is hereby ORDERED that the motion is GRANTED; it is further ORDERED that the defendants' deadline to answer or otherwise respond to the complaint is STAYED pending further order of the Court. SO ORDERED. Signed by Judge John D. Bates on 10/13/2023. (lcjdb3) (Entered: 10/13/2023) |
| 10/18/2023 | 29 | REPLY to opposition to motion re 23 Cross MOTION for Summary Judgment *and Opposition to Defendants' Motion for Summary Judgment* filed by SIMON ATEBA. (Dhillon, Harmeet) (Entered: 10/18/2023) |
| 11/02/2023 | | Minute Entry for proceeding held on 11/2/2023 before Judge John D. Bates: Oral Arguments heard before the Court. Both sides presented their arguments on the record. Order forthcoming. (Court Reporter Bryan Wayne.) (zed) (Entered: 11/02/2023) |
| 12/04/2023 | 30 | NOTICE *of Correspondence* by KIMBERLY CHEATLE, KARINE JEAN-PIERRE, UNITED STATES SECRET SERVICE (Attachments: # 1 Exhibit)(Borson, Joseph) (Entered: 12/04/2023) |
| 12/07/2023 | 31 | ORDER granting 22 defendants' motion for summary judgment as to Counts One and Three; denying 22 defendants' motion for summary judgment as to Count Two; denying 23 plaintiff's motion for summary judgment; granting 24 plaintiff's motion to take judicial notice; and dismissing Count Two without prejudice. See text of Order and accompanying Memorandum Opinion for details. Signed by Judge John D. Bates on 12/7/2023. (lcjdb3) (Entered: 12/07/2023) |
| 12/07/2023 | 32 | MEMORANDUM OPINION. Signed by Judge John D. Bates on 12/7/2023. (lcjdb3) (Entered: 12/07/2023) |
| 01/04/2024 | 33 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 32 Memorandum & Opinion, 31 Order on Motion for Summary Judgment,,,, Order on Motion to Take Judicial Notice, by SIMON ATEBA. Filing fee $ 605, receipt number ADCDC-10595674. Fee Status: Fee Paid. Parties have been notified. (Dhillon, Harmeet) (Main Document 33 replaced on 1/4/2024) (zjm). (Entered: 01/04/2024) |
| 01/04/2024 | 34 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re 33 Notice of Appeal to DC Circuit Court. (zjm) (Entered: 01/04/2024) |
| 01/11/2024 | | USCA Case Number 24-5004 for 33 Notice of Appeal to DC Circuit Court, filed by SIMON ATEBA. (znmw) (Entered: 01/11/2024) |
| 02/21/2024 | 35 | MOTION to Clarify re 32 Memorandum & Opinion, 31 Order on Motion for Summary Judgment,,,, Order on Motion to Take Judicial Notice, by SIMON ATEBA. (Attachments: # 1 Text of Proposed Order)(Dhillon, Harmeet) (Entered: 02/21/2024) |
| 02/21/2024 | 36 | ORDER granting 35 Motion to Clarify. See text of Order for details. Signed by Judge John D. Bates on 2/21/2024. (lcjdb3) (Entered: 02/21/2024) |
| 03/01/2024 | 37 | TRANSCRIPT OF MOTIONS HEARING before Judge John D. Bates held on November 2, 2023; Page Numbers: 1-63. Date of Issuance: 3/1/2024. Court Reporter: Bryan A. Wayne. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, |

condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 3/22/2024. Redacted Transcript Deadline set for 4/1/2024. Release of Transcript Restriction set for 5/30/2024.(Wayne, Bryan) (Entered: 03/01/2024)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/13/2024 08:47:30 | | | |
| **PACER Login:** | EricSell | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cv-02321-JDB |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

JA007

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SIMON ATEBA,
1922 Park Road NW,
Washington, D.C., 20010

       *Plaintiff,*

  vs.

KARINE JEAN-PIERRE,
in her official capacity as Press Secretary
to the President of the United States,
1600 Pennsylvania Avenue NW
Washington, D.C. 20500;

the UNITED STATES SECRET SERVICE,      Case No.
950 H Street NW
Washington, D.C. 20223;

and

KIMBERLY CHEATLE,
in her official capacity as Director of the
United States Secret Service,
950 H Street NW #7800
Washington, D.C. 20223,

       *Defendants.*

## PLAINTIFF'S VERIFIED COMPLAINT

Plaintiff Simon Ateba complaining against the above-named Defendants (collectively, the

"White House" or "Defendants") alleges as follows:

## INTRODUCTION

1.     A free and robust press is vital to a healthy democracy. The Framers understood

this to be an unassailable truth, enshrining protection of the free press in the First Amendment as

an essential check on government power. This constitutional safeguard is at its zenith when the

JA008

government itself is the subject of scrutiny.

2.      "The press" does not just include a small class of elite journalists, credentialed by one another. The First Amendment's guarantees protect the *public's* right to engage in constitutionally protected press activity. Indeed, the "inclusion of the words 'the press' in the First Amendment does not confer upon [journalists] a title of nobility."[1]

3.      Mr. Ateba is the White House correspondent for Today News Africa, a daily online news publication primarily covering American politics and relations between the United States and African countries. Just like other White House correspondents, Mr. Ateba regularly interacts with, and requests information from, the White House Press Office for his coverage. But in the five years since joining the White House press corps, Mr. Ateba has been treated with contempt by the current Press Secretary, Karine Jean-Pierre, and her staff, receiving only a handful of responses to questions and almost no opportunity to meaningfully communicate with the White House.

4.      Given his publication's focus on U.S./African relations, Mr. Ateba's questions often relate to issues other White House correspondents do not cover. The White House's refusal to communicate with Mr. Ateba significantly undermines his ability to properly inform his readers. Mr. Ateba covers topics affecting millions of people around the world—and many of his colleagues have little interest in asking the questions to which Mr. Ateba wants answers.

5.      After months of not receiving answers to his inquiries from the White House press office, Mr. Ateba chose to utilize the only option available to him: speaking up during press briefings. On several occasions since December 2021, Mr. Ateba asserted himself in the briefing room, speaking over other reporters and the White House Press Secretary in an attempt to make

---

[1] Hon. David B. Sentelle, *Freedom of the Press: A Liberty for All or A privilege for a Few?*, Cato Institute (Sept. 17, 2013).

JA009

his concerns known.

6.    While Mr. Ateba has garnered national attention for his approach, he simply wants to do his job. To do this, he must be treated like any other correspondent—which includes having access to the White House and an open dialogue with the White House Press Office.

7.    But the White House has made clear it does not intend to treat Mr. Ateba like his colleagues. Quite this opposite: the White House Press Office recently revised its credentialing criteria for a media "hard pass" this past May in a brazen attempt to exclude Mr. Ateba from the White House briefing room. As of August 1, 2023, over 440 previously credentialed White House reporters no longer have "hard pass" access to the White House media facilities under the new requirements. [2] While other reporters were affected by the revisions, excluding Mr. Ateba was the primary objective because the White House no longer wanted deal with him or his questions. [3]

8.    Targeted changes to hard-pass credentialing qualifications to exclude specific journalists is troubling by itself, but the new credentialing criteria the White House adopted also raise grave First Amendment concerns for reporters generally. As a prerequisite to obtaining a

---

[2] Gabriel Hays, *More than 440 reporters lose press passes after White House changes requirements*, Fox News (Aug. 4, 2023), https://www.foxnews.com/media/440-reporters-lose-press-passes-white-house-changes-requirements.

[3] Steven Nelson, *White House unveils new press badge restrictions, rules for access*, The New York Post (May 5, 2023), https://nypost.com/2023/05/05/white-house-unveils-new-press-badge-restrictions-rules-for-access/ ("The move is widely believed to be spurred by interest in stripping African journalist Simon Ateba of his access to the briefing room after a series of disruptions, though people involved in discussions said that White House staff had talked about making changes even before Ateba became a minor celebrity."); Justin Baragona *White house wants new rules to shut down briefing room chaos*, Daily Beast (March 27, 2023), https://www.thedailybeast.com/white-house-wants-new-rules-to-shut-down-briefing-room-chaos; Paul Farhi, *New White House Rules: Reporters can be kicked out if not 'professional,'* Washington Post (May 9, 2023), https://www.washingtonpost.com/media/2023/05/09/white-house-press-rules-simon-ateba/; Brianna Lyman, *Exclusive: WHCA Advises Biden Admin On New Rules Governing Press Passes*, Daily Caller (May 11, 2023), https://dailycaller.com/2023/05/11/whca-advised-biden-admin-new-rules-potentially-ban-journalists/.

White House hard pass, the applicant must—among other things—first have press credentials from the Supreme Court or one of the four Congressional Press Galleries. For Mr. Ateba, like many journalists, this is no easy task, and it further bears no logical relation to covering the White House, a different branch of government.

9.     Obtaining credentials from the Supreme Court is generally effectively impossible for any White House-focused journalist, because the Court only gives out a limited number of passes—and only to reporters who cover the Court full-time.

10.     The Congressional Press Galleries are only slightly better. Executive committees self-selected by the journalists who make up the Congressional press corps govern each of the four press galleries. And these executive committees only issue press credentials to journalists they themselves deem to be "of repute." As a result, the entrenched, mainstream media have the power to pick and choose which reporters may access Congress and the White House. These decisions are subject to the final approval of the Speaker of the House and the Senate Committee on Rules and Administration. But in practice, whatever the Correspondents Committees say, goes.

11.     Mr. Ateba applied for credentials to the Congressional Daily Press Gallery on June 5, 2023, and has yet to receive any word on the progress of his application.

12.     Defendants' modification of the White House hard-pass criteria means Mr. Ateba is no longer able to set foot on the White House grounds without going through the daily process of receiving short-term approval. For a journalist seeking regular access to the White House briefing room, this cumbersome process is untenable long term.

13.     Moreover, the process adopted by the White House—*i.e.*, delegating access to the White House "hard pass" to the other branches of government—is an unconstitutional attempt to arbitrarily restrict who qualifies as "the press." Established media outlets control the Congressional

Correspondents Committees, which only provide press credentials to reporters who meet the vague standard of being a "reputable journalist." Congress gave the committees unbridled discretion to pick and choose which journalists can exercise their constitutional rights at the Capitol. The White House has incorporated this delegation into its own credentialing process—and with it, the same constitutional infirmities.

14.     Defendants do not like Mr. Ateba's behavior—or his questions—during press briefings. But instead of enforcing a decorum requirement equally across all White House correspondents, Defendants simply re-defined who is allowed in the door in the first place. And they did so to specifically exclude Mr. Ateba.

15.     Defendants' intentional discrimination against Mr. Ateba and the conditions the White House has placed on obtaining a "hard pass" violate the First Amendment. Mr. Ateba brings this action to vindicate his constitutional rights—the same rights shared by all other members of a free press.

## JURISDICTION AND VENUE

16.     This action arises under the First Amendment to the United States Constitution, the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Administrative Procedure Act, 5 U.S.C. §§ 701, *et seq*. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1361.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). A substantial part of the events giving rise to this claim occurred in this District, and Defendants are officers of the United States sued in their official capacities.

## PARTIES

18.     Mr. Ateba is the White House Correspondent for *Today News Africa* ("TNA"), an online publication that focuses on relations between the United States and African nations. Mr.

JA012

Ateba has been a journalist for over fifteen years and has regularly covered politics and public affairs in both Africa and in the United States. Mr. Ateba has been the White House Correspondent for TNA since 2018. He has held a White House hard pass since February 2021.

19.     Defendant Karine Jean-Pierre is Press Secretary to the President of the United States. As press secretary, Ms. Jean-Pierre is in charge of the White House Press Office, the organization responsible for credentialing reporters for the White House press facilities. She is sued in her official capacity.

20.     The United States Secret Service is the federal law enforcement agency that administers and oversees security at the White House. The Secret Service performs background checks on those seeking a White House hard pass and is the agency ultimately responsible for issuing the hard pass.

21.     Defendant Kimberly Cheatle is Director of the United States Secret Service. She is sued in her official capacity.

## STATEMENT OF FACTS

### The White House Press Room

22.     The James J. Brady Press Briefing Room is perhaps the most important forum for news media to interact with the President of the United States and his staff. Nearly every major media outlet in the country—and many others around the world—has a designated correspondent stationed at the White House to report on the daily activities of the President and his administration. The White House press corps, however, also includes reporters from smaller outlets, ranging from start-ups to regional publications. In the briefing room, correspondents from the *New York Times*, *Washington Post*, *CNN*, and *ABC News* sit shoulder to shoulder with correspondents from publications with a mere fraction of the viewership and subscriber base of the larger outlets.

23.     For all journalists, the White House briefing room serves as an essential access

JA013

point for those seeking to cover the President of the United States.

24.     But it is not a place for the faint of heart. Reporters must fend for themselves in order to do their job, which is to obtain information for their readers, viewers, and listeners.

25.     The unpredictable and volatile atmosphere of press briefings breeds disorder, tense exchanges, and, of course, raised voices. Yet the briefing room has historically operated under little more than an informal understanding that all correspondents would act professionally. And while some administrations have adopted more formal expressions of their decorum expectations, they largely exist on paper only. Despite the many instances where journalists failed to adhere to these expectations, formal punishment for decorum violations is exceedingly rare.

26.     Journalists seeking access to the White House press facilities and briefing room must have the proper credentials. The White House issues short-term passes for one day up to six months. These passes require the individual to submit to heightened Secret Service scrutiny each time they come to the White House.

27.     Some journalists can obtain a "hard pass," a special form of press credentials that allows unlimited access to the White House press facilities. As the White House Correspondents' Association previously advised, "'[a] hard pass is critical for anyone who reports regularly on the White House.' . . . It is no exaggeration to say that, without the access that a hard pass grants, a White House correspondent cannot effectively perform his or her duties, which include providing the public with on-the-spot-news coverage of unforeseen and unscheduled events, along with cataloguing the daily activities of the head of the executive branch."[4]

28.     The White House has had no shortage of controversy surrounding revocation of

---

[4] Brief of Amicus Curiae The White House Correspondents' Association in Support of Appellee Seeking Affirmance, *Karem v. Trump*, Case No. 19-5255 (D.C. Cir. Jan. 13, 2020) (citation omitted).

JA014

press credentials. The *Washington Post* has had press credentials revoked from its journalists on numerous occasions after provoking the ire of various Presidents and their staff over scandals, including Watergate and the Pentagon Papers.[5]  Arbitrary enforcement of the White House press credentialing regime has even resulted in litigation.[6]

29.    Strained relations between the White House and the press corps persisted during the Trump administration. High-profile examples include the Trump White House revoking the press credentials of CNN White House Correspondent Jim Acosta and Playboy Correspondent Brian Karem.

30.    The 2018 Acosta incident followed months of tense exchanges during press briefings between the CNN Correspondent and the White House press staff. Mr. Acosta regularly spoke over the press secretary during exchanges. Other White House correspondents expressed dismay at Mr. Acosta's behavior. During one particularly heated exchange, Mr. Acosta refused to give up the microphone during a briefing, prompting the White House to revoke his hard pass.

31.    The White House Correspondents' Association "strongly object[ed] to the Trump Administration's decision to use US Secret Service security credentials as a tool to punish a reporter with whom it has a difficult relationship."[7]

32.    The Trump White House also revoked the hard pass of Playboy Correspondent Brian Karem in 2019 following an incident at a Social Media Summit in the Rose Garden between Karem and a Trump Administration advisor. This prompted the White House to revoke his

---

[5] Jason Daly, *The Complicated History Between the Press and the Presidency*, Smithsonian Magazine (June 14, 2016), https://www.smithsonianmag.com/smart-news/complicated-history-between-press-and-presidency-180959406/.

[6] *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977); *Forcade v. Knight*, 416 F. Supp. 1025 (D.D.C. Cir. 1976).

[7] Richard Gonzales, *White House Revokes Press Pass of CNN's Jim Acosta,* NPR (Nov. 7, 2018), https://www.npr.org/2018/11/07/665497382/white-house-revokes-press-pass-of-cnns-jim-acosta.

JA015

credentials for "unprofessional conduct."

33.    Both reporters went to court over the revocation of their hard passes.[8] The district court found Acosta was likely to succeed on the merits of his claim and issued a preliminary injunction requiring the White House to reinstated Acosta's credentials. The White House did not appeal the district court's injunction.[9]

34.    Karem's case went to the DC Circuit, which held revocation of his press pass by the White House violated his due process rights. The court concluded that Karem had a liberty interest in his press pass and that he was not on notice that his conduct at the Rose Garden could lead to the revocation. This failure to provide notice was a deprivation of procedural due process.

35.    Following the lawsuit filed by Acosta, the Trump Administration revised the press credentialing requirements to obtain a hard pass.[10] The revisions included the onerous requirement that journalists appear on the White House grounds for 90 of the previous 180 days to qualify for a hard pass. The practical impact of this new requirement was that many long-time White House reporters lost their credentials.

36.    Though the Trump White House argued the new credentialing requirements were necessary due to "security concerns," many journalists speculated that the changes were intended

---

[8] *Karem v. Trump,* 960 F.3d 656 (D.C. Cir. 2020); *Cable News Network, Inc. v. Trump*, No. 18-2610 (D.D.C. Nov. 16, 2018).

[9] *Cable News Network, Inc. v. Trump*, No. 18-2610 (D.D.C. Nov. 16, 2018); *see also* Ed Pilkington, *CNN sues White House and demands return of Jim Acosta's press credentials*, the Guardian (Nov. 13, 2018), https://www.theguardian.com/media/2018/nov/13/cnn-sues-white-house-jim-acosta-return-press-pass-trump-revoked, ("A journalist may not be stripped of access because of distaste for his questions, a desire to retaliate against him for prior coverage or frustration at what the president may view as a hostile attitude.").

[10]Mathew Ingram, *White House revokes press passes for dozens of journalists*, Columbia Journalism Review (May 19, 2019), https://www.cjr.org/the_media_today/white-house-press-passes.php.

JA016

to prevent specific journalists from obtaining a hard pass.[11] Indeed, the Trump White House

provided "exemptions" to certain journalists that it deemed worthy of keeping their hard pass.[12]

37.     The media's most powerful institutions and civil liberties advocates alike uniformly

denounced the new credentialing requirements and practice of handing out exemptions. The ACLU

blasted the move as "un-American."[13] The collective response from free press advocates was that

the White House's new credentialing requirements were a direct assault on the First Amendment.

### Mr. Ateba's Coverage of the White House

38.     Mr. Ateba is the White House correspondent for the daily online publication *Today

News Africa*.[14] Mr. Ateba has been a journalist for the past fifteen years, covering politics and

current affairs in both Africa and in the United States during most of that time. This includes

covering both the United States State Department and the White House for the past five years.

39.     Mr. Ateba became a White House Correspondent in 2018. For his first three years

covering the White House, Mr. Ateba obtained a temporary daily press pass, which required him

to go through additional Secret Service security prior to entering the grounds.

40.     Mr. Ateba applied for, and received, a White House "hard pass" in February 2021.

41.     Since then, Mr. Ateba has covered the White House on a daily basis. He writes

---

[11] Chris Riotta, *Trump administration commits 'mass purge' of journalists allowed to enter White House*, Independent (May 10, 2019), https://www.independent.co.uk/news/world/americas/us-politics/trump-bans-journalists-white-house-reporters-press-hard-pass-a8906781.html.

[12] Paul Farhi, *White House imposes new rules on reporters' credentials, raising concerns about access*, Washington Post (May 8, 2019), https://www.washingtonpost.com/lifestyle/style/white-house-imposes-new-rules-on-reporters-credentials-raising-concerns-about-access/2019/05/08/793dc404-71dd-11e9-9eb4-0828f5389013_story.html.

[13] Pilkington, *supra.*

[14] https://todaynewsafrica.com.

regular stories for TNA, which requires regular communication with the White House Press Office. Thus, Mr. Ateba frequently sends questions to the White House Press Office and attend the White House press briefings.

42.     Over his five years as a White House correspondent, Mr. Ateba has rarely received any response—or even acknowledgement—of his questions from the White House. Regardless of what the questions are, the White House generally ignores them. This refusal to provide information to Mr. Ateba makes it increasingly difficult for Mr. Ateba to obtain the necessary information needed for the quality of coverage he seeks to provide his readers.

43.     Mr. Ateba has been allowed to attend President Biden's press conferences just once in nearly three years. When he attempts to attend, he is denied access. For the press conferences he was allowed to attend, he was not allowed to ask a question.

44.     Mr. Ateba requested an opportunity to interview President Biden in the lead up to an African Leaders Summit at the White House in December 2022. These requests were completely ignored.

45.     After months of not receiving responses to written questions from the White House and not receiving an opportunity to ask questions in the briefing room, Mr. Ateba resorted to one of the only options available to him: speaking up during press briefings.

46.     It is common for White House correspondents to raise their voices and even shout over each other during press briefings. Indeed, the D.C. Circuit has acknowledged that "[i]n the context of a White House press corps described as an 'unruly mob," behavior such as a journalist shouting questions and engaging in a sarcastic, "irreverent, caustic" back and forth with White House staff "was not so outrageous as to bring into fair contemplation" a suspension of a reporter's

JA018

hard pass.[15]

47.      Just like his colleagues, Mr. Ateba would engage in the scrum, shouting his questions to the White House Press Secretary questions during briefings. And on a few occasions, when the Press Secretary would not acknowledge him, Mr. Ateba would speak over his fellow journalists.

48.      The White House did not appreciate this "breach of decorum."

49.      One notable incident took place on March 20, 2023. The Press Secretary began the daily briefing by introducing the cast of the hit Apple TV show Ted Lasso. The White House invited the group to the briefing to discuss the President's mental-health initiatives. Before the Press Secretary could finish the introduction, Mr. Ateba began speaking, questioning why he has not received any responses to his written inquiries or been given the opportunity to ask a question during the press briefing. A tense exchange between Mr. Ateba and the Press Secretary followed, which included shouts from other correspondents for "decorum."

50.      The March 20 incident received national media attention.[16]

51.      Another notable incident took place on June 26, 2023. In another attempt to receive answers from the White House regarding its refusal to respond to his questions, Mr. Ateba interrupted a fellow correspondent during a daily press briefing. Mr. Ateba pressed forward with his questioning, despite his fellow correspondents asking him to stop. The White House went as far as to scrub video footage of this incident in which the Press Secretary told Mr. Ateba that he

---

[15] *Karem*, 960 F.3d at 665.

[16] Jamie Burton, *Ted Lasso's Visit to the White House Descends Into 'Chaos*,' Newsweek (March 21, 2023), https://www.newsweek.com/ted-lasso-cast-visit-white-house-descends-chaos-jason-sudeikis-1789180.

was "being incredibly rude" from its YouTube livestream.

52.    Since December 2021, Mr. Ateba has asserted himself during the press briefings on a number of occasions. The mainstream media coverage of these incidents has largely painted Mr. Ateba as disruptive, disrespectful, and even seeking attention for himself. But Mr. Ateba is simply seeking answers to his questions, which the White House refuses to give.[17]

53.    The White House did not like these exchanges and wanted them to end.[18]

### The White House Targets Mr. Ateba

54.    On information and belief, the significant media coverage focusing on Mr. Ateba's conduct in the briefing room prompted the Biden White House to act. On May 5, 2023, the White House notified all existing hard pass holders that it was restricting who could qualify for a hard pass. *See* Exhibit A (Email Announcing the New White House Press Office Policy). The White House Press Office issued a new list of stated criteria for obtaining a hard pass, and required that all existing hard passes terminate on July 31, 2023, and that journalists would have to apply for a new pass under the updated criteria.

55.    The new criteria include:

- Full-time employment with an organization whose principal business is news dissemination (If you are freelance, we will need letters from two news organizations describing your affiliation, or, if you freelance primarily for one organization, a letter from that organization describing the extent and duration of your relationship with the organization);

---

[17] *E.g.*, Joseph Bernstein, *Why Won't Simon Ateba Stop Shouting?*, (July 27, 2023) New York Times https://www.nytimes.com/2023/07/26/style/simon-ateba-white-house-today-news-africa.html; Paul Farhi, *White House warns reporter Simon Ateba about his press-room outbursts*, The Washington Post (July 12, 2023), https://www.washingtonpost.com/media/2023/07/12/simon-ateba-white-house-warning/.

[18] Ian Schwartz, *White House Scrubs Video of Reporter Simon Ateba Confronting Karine Jean-Pierre*, Real Clear Politics (June 26, 2023), https://www.realclearpolitics.com/video/2023/06/26/white_house_scrubs_video_of_reporter_simon_ateba_confronting_karine_jean-pierre.html.

JA020

- Physical address (either residential or professional) in the greater Washington, D.C. area;

- Have accessed the White House campus at least once during the prior six months for work, or have proof of employment within the last three months to cover the White House;

- Assignment to cover (or provide technical support in covering) the White House on a regular basis;

- Accreditation by a press gallery in either the Supreme Court, U.S. Senate or U.S. House of Representatives; and

- Willingness to submit to any necessary investigation by the U.S. Secret Service to determine eligibility for access to the White House complex, where Secret Service will determine eligibility based on whether the applicant presents a potential risk to the safety or security of the President, the Vice President, or the White House complex.

56.    Mr. Ateba objected to the new hard pass requirements and requested the White House delay implementation for one year to allow him time to obtain press credentials from a Congressional Press Gallery. The White House never responded to his request.

57.    Media outlets widely reported that the new hard pass requirements were targeted directly at Mr. Ateba.[19] His high-profile exchanges with the White House Press Secretary during briefings had garnered both international media attention, and a provoked the anger of the Biden Administration.

58.    Additional actions taken by the White House confirm that the new hard pass criteria targeted Mr. Ateba. On July 27, 2023, the White House took the rare step of issuing a written warning to Mr. Ateba regarding this conduct during daily press briefings. *See* Exhibit B (Letter of

---

[19] Steven Nelson, *White House unveils new press badge restrictions, rules for access*, The New York Post (May 5, 2023), https://nypost.com/2023/05/05/white-house-unveils-new-press-badge-restrictions-rules-for-access/; Justin Baragona *White house wants new rules to shut down briefing room chaos*, Daily Beast (March 27, 2023), https://www.thedailybeast.com/white-house-wants-new-rules-to-shut-down-briefing-room-chaos.

JA021

Reprimand to Mr. Ateba). The letter described four specific instances in which Mr. Ateba allegedly disrupted the daily press briefings. If Mr. Ateba continued this conduct, the letter warned, his "hard pass may be suspended or revoked, following notice and an opportunity to respond."[20]

59.    In the letter, the White House also pointed to the new decorum criteria it announced in May and advised Mr. Ateba that he must adhere to these expected standards or risk revocation of his press credentials.

### The Press Credential Gatekeepers

60.    The threat of revoking Mr. Ateba's press credentials was largely meaningless because the White House knew he would not qualify for a hard pass under the new criteria. Indeed, excluding Mr. Ateba was the goal of the specific revisions.

61.    The White House Press Office's new criteria for a hard pass includes a requirement that an applicant must first be credentialed by the press gallery of the United States Supreme Court, or one of the press galleries in either chamber of Congress.

62.    Consistent with the White House Press Office's warning, the U.S. Secret Service terminated Mr. Ateba's hard pass on July 31, 2023.

63.    Mr. Ateba's hard pass was not scheduled to expired, and would automatically renew so long as he continued covering the White House.

64.    On August 4, 2023, Mr. Ateba requested the White House Press delay termination of his hard pass until his application to the Daily Congressional Press Gallery or Supreme Court was approved or denied. The White House refused this request.

65.    The termination of Plaintiff's hard pass represents the culmination of agency action, and thus, is a final agency action. *See* 7 U.S.C. § 704. While Plaintiff can (and did) apply for a new

---

[20] *Id.*

JA022

hard pass, this is a new agency action, not a reinstatement of Plaintiff's prior pass.

66.     The Secret Service's termination of Mr. Ateba's hard pass is arbitrary and capricious. When agencies change their policy, they are required to "provide reasoned explanation for its action," including showing "that there are good reasons for the new policy." The Secret Service has failed to do so, relying instead on the White House Press Office policy, which itself was issued without any explanation, let alone reasoned explanation.

67.     The Supreme Court Public Information Office is responsible for issuing press credentials to journalists seeking to cover the Court.[21] The press gallery at the Supreme Court is notoriously small with only 18 seats for journalists in the argument room. As a result, the Supreme Court only issues press credentials to journalists whose full-time beat involves coverage of the Supreme Court.[22] Reporters who primarily cover the White House cannot qualify for a Supreme Court pass.

68.     Obtaining credentials from one of the Congressional Press Galleries is Mr. Ateba's only option for obtaining a White House hard pass. This is not a viable option, either.

69.     The media has been covering Congress since its earliest sessions.[23] The press have designated galleries in both chambers of Congress. These "galleries" include office space and work

---

[21]Supreme         Court         Public         Information         Office, https://www.supremecourt.gov/publicinfo/press/Media_Requirements_And_Procedures_Revised _071023.pdf (Press Credential Requirements).

[22]*Id.* ("The PIO has traditionally reserved hard passes for full-time professional journalists employed by media organizations that have records of substantial and original news coverage of the Court and a demonstrated need for regular access to the Court's press facilities.").

[23] Sarah J. Eckman, *Congressional News Media and the House and Senate Press Galleries*, Congressional Research Service (April 17, 2023).

resources for credentialed journalists covering Congress.

70.    Ever since the late nineteenth century, Congress delegated regulation of access to the Congressional Press Galleries to the Correspondents Committees—a group of journalists elected to oversee credentialing and other administrative aspects of the Congressional press galleries. Today, there are four Correspondents Committees: the Daily Press Galleries (for daily news publications); the Periodical Press Galleries (for weekly, monthly, and quarterly publications); the Radio and Television Galleries; and the Press Photographers' Gallery. Each chamber of Congress has provided professional staff for each respective press gallery.

71.    The Correspondents Committee for each gallery is made up of five or six members—all journalists who already have press credentials. The executive committee of the Daily Press Gallery, for example, is made up of journalists from the *Detroit News*, *CQ-Roll Call*, the *Associated Press,* the *Pittsburgh Post-Gazette*, and *States Newsroom*.[24] These standing committees process applications based on the respective credentialing criteria adopted by each gallery. They are the gatekeepers to the press credentials.

72.    To qualify for press credentials for the Daily Press Gallery, a journalist must be:

- A bona fide correspondents of repute in their profession;

- A full-time, paid correspondent who requires on-site access to congressional members and staff;

- Employed by a news organization:  with General Publication periodicals mailing privileges under U.S. Postal Service rules, and which publishes daily; . . . or "whose principal business is the daily dissemination of original news and opinion of interest to a broad segment of the public, and which has published

---

[24]    Standing   Committee   of   Correspondents,   U.S.   Senate   Press   Gallery, https://www.dailypress.senate.gov/about/standing-committee-of-correspondents/   (last   visited Aug. 8, 2023 at 11:00 p.m.).

JA024

continuously for 18 months;

- Reside in the Washington, D.C. area;

- Not be engaged in any lobbying or paid advocacy, advertising, publicity or promotion work for any individual, political party, corporation, organization, or agency of the U.S. Government, or in prosecuting any claim before Congress or any federal government department, and will not do so while a member of the Daily Press Galleries;

- And they must be editorially independent of any institution, foundation or interest group that lobbies the federal government, or that is not principally a general news organization.[25]

73.     The other press galleries have similar requirements.[26]

74.     This gatekeeping function has had a dramatic effect on outlet diversity in Congress over the past decade. In 2017, the Congressional Research Services found that the number of credentialed correspondents in Congress increased from around 2,500 in 1976 to 6,000 in 2016. But during that same period, the number of credentialed media outlets dropped from over 1,200 to fewer than 600. This drop in the number of media outlets covering Congress supports the notion that the Correspondents Committees responsible for credentialing have become increasingly insular and hostile to "outsiders."

**Mr. Ateba Persists**

75.     In response to the new restrictions the White House adopted for hard passes in May 2023, Mr. Ateba applied for press credentials with the Standing Committee of Correspondents for

---

[25] *See* https://www.dailypress.senate.gov/membership/gallery-rules/ (criteria for press credentials).

[26] *See* https://periodical.house.gov/accreditation/rules-and-regulations (criteria for press credentials); https://www.radiotv.senate.gov/membership/ (same); https://www.pressphotographers.senate.gov/wp-content/uploads/2022/08/Annual-Membership-Regulation-Agreement.pdf (same).

JA025

the Daily Press Gallery.

76.     Mr. Ateba submitted his application on June 5, 2023. *See* Exhibit C (Letter from to Senate Daily Press Gallery). He has yet to receive a response.

77.     Mr. Ateba applied for press credentials from the Supreme Court Press office on August 3, 2023. *See* Exhibit D (Letter to the Supreme Court Public Information Office). The Supreme Court press office informed Mr. Ateba that he was not eligible for Court press credentials because he does not cover the Supreme Court full time for his publication.

78.     On information and belief, the Supreme Court Public Information Office has informed the White House that it will not issue hard passes for any White House journalists due to space constraints at the Court. The Supreme Court's Public Information Office indicated as much to Mr. Ateba. Mr. Ateba intends to prove this through discovery.

79.     Knowing he would be denied for not having the requisite credentials from a Congressional Press Gallery or the Supreme Court, Mr. Ateba initially did not apply for a White House hard pass renewal by the July 31 deadline.

80.      Out of an abundance of caution, Mr. Ateba reapplied for a White House hard pass on August 4, 2023.

81.     Despite being specifically targeted by the White House for exclusion, and despite being subject to the unbridled discretion of the Standing Committee for the Congressional Press Gallery, Mr. Ateba will continue to cover the White House for TNA. Though this job has become exceedingly more difficult without a hard pass, Mr. Ateba is determined to continue providing quality coverage for his readers.

82.     But without a hard pass, Mr. Ateba is, and will continue to be, irreparably harmed. Defendants have infringed on his constitutional rights. And this infringement will persist absent

intervention by this court.

## FIRST CLAIM FOR RELIEF
### Violation of the First and Fifth Amendments
### (Delegation of Unbridled Discretion)

83.     Mr. Ateba hereby incorporates by reference all other paragraphs of this Verified

Complaint as though fully set forth herein.

84.     The hard-pass criteria adopted by the White House Press office in May 2023 violate

the First Amendment. By requiring that all applicants obtain press credentials from the Supreme

Court or one of the Congressional Press Galleries, Defendants have adopted a regime that gives

the government unbridled discretion to permit the exercise of First Amendment rights.

85.     The four Congressional Press Gallery Standing Committees wield this unbridled

discretion, only approving credentials for journalists they deem are "reputable." The failure to

adopt and apply purely objective standards for congressional press credentials renders the

credentialing process unconstitutional. The White House has incorporated this credentialing

process into its own hard pass criteria, rending the White House process constitutionally

impermissible as well.

86.     Defendants have no compelling reason to justify this impermissible credentialing

process, nor is this process narrowly tailored.

87.     Mr. Ateba has no adequate remedy at law, has suffered, and will suffer serious and

irreparable harm to his constitutional rights unless the White House is enjoined.

88.     Mr. Ateba is entitled to declaratory relief and temporary, preliminary, and

permanent injunctive relief invalidating and restraining the White House from violating his

constitutional rights.

89.     Mr. Ateba found it necessary to engage the services of private counsel to vindicate

his rights under the law. Mr. Ateba is therefore entitled to an award of attorneys' fees and costs

pursuant to 28 U.S.C. § 2412.

## SECOND CLAIM FOR RELIEF
### Violation of the First Amendment
### (Viewpoint Discrimination)

90.     Mr. Ateba hereby incorporates by reference all other paragraphs of this Verified

Complaint as though fully set forth herein.

91.     Defendants violated Mr. Ateba's First Amendment rights by changing the criteria

for hard pass credentials to intentionally prevent Mr. Ateba from obtaining hard pass access.

Defendants did so by adopting credentialing criteria specifically designed to exclude Mr. Ateba

from eligibility. Such discrimination amounts to a content-based regulation and viewpoint

discrimination against Mr. Ateba in violation of the First Amendment.

92.     Defendants have no compelling reason to exclude Mr. Ateba from obtaining a

White House hard pass. Even if they did, this exclusion is not narrowly tailored to achieve this

interest.

93.     Mr. Ateba has no adequate remedy at law, has suffered, and will suffer serious and

irreparable harm to his constitutional rights unless the White House is enjoined.

94.     Mr. Ateba is entitled to declaratory relief and temporary, preliminary, and

permanent injunctive relief invalidating and restraining the White House from violating his

constitutional rights.

95.     Mr. Ateba found it necessary to engage the services of private counsel to vindicate

his rights under the law.  Mr. Ateba is therefore entitled to an award of attorneys' fees and costs

pursuant to 28 U.S.C. § 2412.

## THIRD CLAIM FOR RELIEF
### Violation of the Administrative Procedure Act (5 U.S.C. § 702)

96.     Mr. Ateba hereby incorporates by reference all other paragraphs of this Verified

JA028

Complaint as though fully set forth herein.

97.     The Secret Service is an agency within the meaning of the Administrative Procedure Act.

98.     On July 31, 2023, the Secret Service terminated Mr. Ateba's hard pass.

99.     The termination of Mr. Ateba's hard pass is a final agency action.

100.    The termination of Mr. Ateba's hard pass is also a change in agency policy or position.

101.    The Secret Service has failed to provide *any* reason to justify terminating Mr. Ateba's hard pass, let alone a "good reason" or "reasoned explanation." Instead, the Secret Service appears to be relying on a policy issue by the White House Press Office, which likewise provides no explanation for the change in policy.

102.    By failing to provide a reasoned explanation for its change in policy or position, the Secret Service has acted arbitrarily and capriciously in cancelling Mr. Ateba's hard pass, in violation of 5 U.S.C. § 702.

103.    By virtue of the ongoing violation of Mr. Ateba's rights, Mr. Ateba is entitled to a declaration that the Secret Service's cancellation of Mr. Ateba's hard pass was arbitrary and capricious, and an injunction preventing the Secret Service from cancelling Mr. Ateba's previously issued hard pass.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Simon Ateba prays this Honorable Court grant the following relief in his favor:

1.     Declaratory relief in the form of an order and declaratory judgment holding and declaring that the White House Press Office's revised credentialing requirements are

JA029

unconstitutional on their face and as applied under the First Amendment to the United States Constitution for the reasons set forth above;

2.  Injunctive relief in the form of a temporary, preliminary, and permanent injunction requiring the Government, its agents, employees, and all persons acting in concert with them to not enforce the revised White House credentialing requirements;

3.  Declaratory relief in the form of an order and declaratory judgement holding and declaring that the U.S. Secret Service's termination of Mr. Ateba's hard pass was arbitrary and capricious, in violation of law;

4.  Injunctive relief in the form of a temporary, preliminary, and permanent injunction enjoining the U.S. Secret Service from terminating Mr. Ateba's hard pass without reasoned explanation;

5.  That the Court issue the requested injunctive relief without a condition of bond or surety or other security being required of Mr. Ateba;

6.  An award of Mr. Ateba's reasonable costs and attorneys' fees pursuant to 28 U.S.C. § 2412;

7.  That the Court retain jurisdiction of this matter for the purposes of enforcing the Court's order(s); and

8.  Such other relief as the Court deems necessary and proper.

Dated: August 10, 2023

                        Respectfully submitted,


                        By: /s/ Harmeet K. Dhillon
                        Harmeet K. Dhillon
                        (D.D.C. Bar ID: CA00078)
                        Mark Trammell*
                        Josh Dixon*
                        Eric A. Sell
                        (D.D.C. Bar ID: 1742565)

JA030

CENTER FOR AMERICAN LIBERTY
1311 S. Main Street, Suite 207
Mount Airy, MD 21771

Gary M. Lawkowski
(D.D.C. Bar ID: VA00125)
DHILLON LAW GROUP INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314

Jesse D. Franklin-Murdock
(D.D.C. Bar ID: CA00147)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108

*Counsel for Plaintiff Simon Ateba*
*\*Pro Hac Vice Motions Forthcoming*

JA031

## VERIFICATION

I, Simon Ateba, declare as follows:

    1.     I am over the age of eighteen years old, I am competent to make this verification, and have personal knowledge of the matters set forth herein.

    2.     I have reviewed the Verified Complaint to be filed on my behalf in this matter.

    3.     The allegations in paragraphs 1–15, 38–66, and 75–82 of the Verified Complaint are within my personal knowledge and are true and correct to the best of my knowledge.

    4.     All exhibits attached in support of this Verified Complaint are true and correct copies of the original documents.

    5.     I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.


Executed on August 10, 2023

 

 

SIMON ATEBA

JA032

# EXHIBIT A

**Subject:** <no subject>
**Date:**    Wednesday, August 9, 2023 at 11:10:36 AM Eastern Daylight Time
**From:**    Eric Sell (Liberty Center)
**To:**      Eric Sell (Liberty Center)

Sent by PRESS@who.eop.gov

May 5, 2023

Dear colleague,

We are writing to inform you that the White House intends to revise the policy on press hard passes to be consistent with that of prior administrations. Under the policy, all current press hard passes will expire on July 31. You will be able to request renewal of your current hard pass as described below, and any renewed passes will remain valid for one year, subject to annual renewal.

To renew your pass, your bureau chief/supervisor will need to email a letter to presswaves@who.eop.gov. Your news organization will not need to submit multiple letters if requesting hard passes for more than one employee as long as your letter covers all employees requesting hard pass access to the White House campus.

This letter will need to be written on the official letterhead of your news organization, including contact information for someone who can verify the details provided below, and indicate that each applicant meets the following requirements:

1. Full-time employment with an organization whose principal business is news dissemination (If you are freelance, we will need letters from two news organizations describing your affiliation, or, if you freelance primarily for one organization, a letter from that organization describing the extent and duration of your relationship with the organization);
2. Physical address (either residential or professional) in the greater Washington, D.C. area;
3. Have accessed the White House campus at least once during the prior six months for work, or have proof of employment within the last three months to cover the White House;
4. Assignment to cover (or provide technical support in covering) the White House on a regular basis;
5. Accreditation by a press gallery in either the Supreme Court, U.S. Senate or U.S. House of Representatives; and
6. Willingness to submit to any necessary investigation by the U.S. Secret Service to determine eligibility for access to the White House complex, where Secret Service will determine eligibility based on whether the applicant presents a potential risk to the safety or security of the President, the Vice President, or the White House complex.

**This letter should be attached, along with a photograph or scan of a Supreme Court, Senate, or House of Representatives credential, and the completed hard pass application and submitted at one time to presswaves@who.eop.gov.**

After receiving the letter from your supervisor and updating your background check, the U.S. Secret Service will grant a hard pass upon confirmation from the Press Office that you meet the above criteria. You will not need to receive a new physical pass if you already have one.

If you currently do not have a hard pass, you will need to complete the standard application and also provide the letter stated above. The Press Office will then be in touch to schedule a time to pick up your hard pass if approved.

The White House expects that all hard pass holders will act in a professional manner while on White House grounds by respecting their colleagues, White House employees, and guests; observing stated restrictions on access to areas of the White House or credentialed events; and not impeding events or briefings on campus. Absent security concerns involving the United States Secret Service or other exigent circumstances, the White House will provide a written warning to you if your conduct violates these expectations. Subsequent violations may lead to the suspension or revocation of your hard pass, following notice and an opportunity to respond.

If you have comments or questions regarding this proposed policy, please submit them to presswaves@who.eop.gov no later than May 15.
Please let us know if you have any questions.

Sincerely,

The White House Press Office

# EXHIBIT B

JA036

Mr. Ateba,

We strongly support the important role that members of the press play in covering the White House. As part of that role, reporters ask tough questions of White House officials to better understand the Administration's position on important policy matters. These questions, and the resulting exchanges, are expected elements of the back-and-forth that regularly occurs in reporting the news to the American people.

That back-and-forth only works, however, when the individuals who are part of it engage with each other in a professional and respectful manner. When members of the press impede briefings or other events by shouting over colleagues who have been called on for a question, or yelling over a White House official who is trying to respond to a question or present a briefing, all members of the press are harmed in their ability to report the news.

On May 5, 2023, the White House issued a notice to holders of hard passes to, among other things, inform them of the expectations for professional behavior on White House grounds. Those expectations include respecting your colleagues and not impeding events or briefings on campus. The notice further informed holders of hard passes that, "[a]bsent security concerns involving the United States Secret Service or other exigent circumstances, the White House will provide a written warning to you if your conduct violates these expectations. Subsequent violations may lead to the suspension or revocation of your hard pass, following notice and an opportunity to respond."

In contravention of these expectations, you impeded a June 26, 2023, press briefing and interrupted the Press Secretary. When the Press Secretary called on another member of the press, you continued to interrupt, preventing your colleague from asking his question. You did not stop interrupting when your colleagues asked you to stop, or when the Press Secretary informed you that you were being rude to her and to your colleagues.[1]

Although this written warning is specific to the June 26 press briefing, it was not an isolated episode. The following are just a few examples of times your behavior has prevented your colleagues from asking questions or prevented White House officials from answering them:

- On May 13, 2022, you repeatedly interrupted colleagues who were attempting to ask important questions about the supply of baby formula.[2]

- On December 8, 2022, you interrupted the press briefing and demanded to ask a question. When the Press Secretary tried to answer your question, you interrupted and shouted over her answer. The Press Secretary then attempted to call on one of your colleagues, but you continued to interrupt and prevented others from being heard. Your actions required

---

[1] https://www.whitehouse.gov/briefing-room/press-briefings/2023/06/26/press-briefing-by-press-secretary-karine-jean-pierre-and-nsc-coordinator-for-strategic-communications-john-kirby-17/.

[2] https://www.whitehouse.gov/briefing-room/press-briefings/2022/05/13/press-briefing-by-press-secretary-jen-psaki-may-13-2022/.

JA037

the Press Secretary to end the briefing, preventing your colleagues from asking additional questions.[3]

- On March 20, 2023, you prevented the Press Secretary from introducing White House guests at a press briefing by shouting over her. Other members of the press called for "decorum" in the room. One of your colleagues apologized to the guests for the disruption before the briefing continued. Several minutes later, you again interrupted and impeded the briefing while other members of the press again asked for decorum. While you were impeding the briefing, the Press Secretary could not speak and other members of the press could not ask questions. One member of the press felt it necessary to explain how your disruptive actions had harmed all other journalists at the briefing, stating that "you are impinging on everybody in here who is only trying to do their job."[4]

  o Later that day, the White House Correspondents' Association emailed its members, explaining that "there was an extreme breakdown of decorum in today's Daily Briefing." According to the Association, "[w]hat happened today created a hostile work environment for everyone in that room." The Association explained that the breakdown caused by your outbursts "prevent[ed] a briefing from proceeding," which "hurts the entire press corps and amounts to a violation of the collegiality called for in the WHCA's bylaws."

The White House recognizes that members of the press often raise their voices or shout questions at press briefings or events. Ordinarily such shouting stops when a reporter is called on for a question, and the briefing or event is able to continue. Continued interruptions are different; they prevent journalists from asking questions or administration officials and guests from responding. The Press Secretary's only option in response to such disruptions is to stop the briefing or event, which is to the detriment of all journalists.

This letter serves as your written warning, pursuant to the May 5, 2023 Notice, that the behavior you exhibited on June 26, 2023 is unacceptable. If you continue to impede briefings or events by shouting over your colleagues who have been called on for a question, even after you have been asked to stop by a White House employee, then your hard pass may be suspended or revoked, following notice and an opportunity to respond.

We hope that you will work with us to avoid any future issues in the press briefing room or at other events on White House grounds. If you would like to comment on this letter, please reply by email within 7 days.

---

[3] https://www.whitehouse.gov/briefing-room/press-briefings/2022/12/08/press-briefing-by-press-secretary-karine-jean-pierre-december-8-2022/.

[4] https://www.whitehouse.gov/briefing-room/press-briefings/2023/03/20/press-briefing-by-press-secretary-karine-jean-pierre-the-cast-of-ted-lasso-and-nsc-coordinator-for-strategic-communications-john-kirby/.

# EXHIBIT C

JA039



Senate Press Gallery
United States Senate
Washington, D.C. 20510

June 5, 2023

Subject: Introduction of Simon Ateba - White House Correspondent
and Congressional Reporter

Dear Senate Press Gallery,

I am writing to introduce Mr. Simon Ateba, an esteemed journalist and
our White House Correspondent at Today News Africa. We are thrilled
to inform you that Mr. Ateba will now be extending his coverage to
include the Senate and House of Representatives, with a particular
focus on the work being done by various committees on Africa,
including diplomacy, trade, investment, education, cultural exchanges,
and security ties.

Today News Africa is a for-profit publication based in the District of
Columbia, dedicated to shedding light on the dynamic and
multifaceted relationships between the United States and Africa.
Recognizing the significance of Congress in shaping these
relationships, we believe that Mr. Ateba's extensive experience and
expertise will greatly contribute to providing comprehensive coverage



of the legislative affairs and policy developments that impact the African continent.

Mr. Ateba is a highly accomplished journalist with a strong background in Mass Communications. With over 15 years of professional experience in journalism, he has diligently covered a wide range of beats, from politics to policy, and from aviation to drug trafficking. He has also established a notable presence in reporting on key institutions such as the State Department and the White House.

By expanding his coverage to Congress, Mr. Ateba seeks to enhance public understanding of the vital role that legislative initiatives play in shaping U.S.-Africa relations. Through his reporting, he aims to provide accurate and insightful analysis of committee activities, legislative debates, and policy developments related to Africa. With his well-honed skills as a journalist, his commitment to journalistic ethics, and his ability to effectively communicate complex issues, we are confident that Mr. Ateba will bring a fresh perspective to the Senate Press Gallery.

We kindly request your assistance in facilitating Mr. Ateba's access to press briefings, committee hearings, and other relevant activities within the Senate and House of Representatives. His coverage will contribute to a better-informed public and foster a deeper understanding of the critical relationship between the United States and Africa.

Thank you for your attention to this matter. We would be delighted to provide any further information or answer any questions you may



have. Please feel free to contact us at todaynewsafrica@proton.me or reach out to me directly at 2025390126.

We look forward to the opportunity of working closely with the Senate Press Gallery to ensure comprehensive coverage of Congressional affairs.

Sincerely,
Olabisi Ololade
Chairperson for Today News Africa

1666 Connecticut Ave NW
Washington, D.C. 20009
Email: todaynewsafrica@proton.me

# EXHIBIT D



August 3, 2023
Public Information Office
Supreme Court of the United States
1 First Street, NE
Washington, D.C. 20543

Dear Sir/Madam,

I am writing to apply for Supreme Court Press Credentials (hard pass)
for Mr. Simon Ateba, a dedicated journalist with Today News Africa,
based in Washington, D.C. As Mr. Ateba's Supervisor at Today News
Africa, I wish to endorse his application wholeheartedly.

Mr. Ateba has been engaged in journalism for over a decade and has
shown an unwavering commitment to the field. His experience,
integrity, and passion for journalism have made him an asset to our
team and the community.

Remarkably, journalism has been his sole profession, a testament to
his dedication and proficiency in the field.

Below, please find the information required for the issuance of the
hard pass:

JA044



Full Name: Simon Ateba
Affiliation: Today News Africa, Washington, D.C.
Contact Information: 1922 Park Road NW, Washington, D.C., Phone:
202-510-3733

I affirm that Mr. Ateba meets the requirements for issuing the hard
pass. I have enclosed his credentials, portfolio, and relevant
documentation with this letter to confirm his eligibility.

Please consider Mr. Ateba's extensive experience and commitment
and grant him the requested hard pass, enabling him to continue his
excellent work with full access to the Supreme Court.

Please do not hesitate to contact me at todaynewsafrica@proton.me if
you require further information or clarification.

Thank you for your attention to this matter. I look forward to hearing
back from you.

Sincerely,

Olabisi Ololade
Chairperson for Today News Africa

1666 Connecticut Ave NW
Washington, D.C. 20009
Email: todaynewsafrica@proton.me

JA045

Page 48 of 256

Filed: 05/17/2024

Document #2055098

USCA Case #24-5004

# CIVIL COVER SHEET

JS-44 (Rev. 11/2020 DC)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| SIMON ATEBA, | KARINE JEAN-PIERRE, et al. |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **Washington**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Harmeet K. Dhillon
CENTER FOR AMERICAN LIBERTY
1311 S. Main Street, Suite 207
Mount Airy, MD 21771

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
● 2 U.S. Government Defendant
○ 3 Federal Question (U.S. Government Not a Party)
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place an X in one category, A-N, that best represents your Cause of Action and one in a corresponding Nature of Suit)

○ **A.** *Antitrust*

☐ 410 Antitrust

○ **B.** *Personal Injury/ Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Product Liability

○ **C.** *Administrative Agency Review*

☐ 151 Medicare Act

**Social Security**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**Other Statutes**
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D.** *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E.** *General Civil (Other)*         OR         ○ **F.** *Pro Se General Civil*

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 27 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Conditions
☐ 560 Civil Detainee – Conditions of Confinement

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 835 Patent – Abbreviated New Drug Application
☐ 840 Trademark
☐ 880 Defend Trade Secrets Act of 2016 (DTSA)

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant)
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

**Other Statutes**
☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC 3729(a))
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc
☐ 460 Deportation
☐ 462 Naturalization Application

☐ 465 Other Immigration Actions
☐ 470 Racketeer Influenced & Corrupt Organization
☐ 480 Consumer Credit
☐ 485 Telephone Consumer Protection Act (TCPA)
☐ 490 Cable/Satellite TV
☐ 850 Securities/Commodities/ Exchange
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

JA046

Page 49 of 256        Filed: 05/17/2024        Document #2055098        USCA Case #24-5004

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/Privacy Act* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus – General<br>☐ 510 Motion/Vacate Sentence<br>☐ 463 Habeas Corpus – Alien Detainee | ☐ 442 Civil Rights – Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loan (excluding veterans) |
| ○ **K.** *Labor/ERISA (non-employment)* | ⊙ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 740 Labor Railway Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☒ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities – Employment<br>☐ 446 Americans w/Disabilities – Other<br>☐ 448 Education | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights – Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi-district Litigation   ○ 7 Appeal to District Judge from Mag. Judge   ○ 8 Multi-district Litigation – Direct File

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

First and Fifth Amendment, and APA Challenge to White House Credentialing Process. 28 U.S.C. §§ 1331 and 1361, 5 U.S

**VII. REQUESTED IN COMPLAINT**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ ___   JURY DEMAND:   Check YES only if demanded in complaint   YES ☐   NO ☒

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form

DATE: __August 10, 2023__   SIGNATURE OF ATTORNEY OF RECORD   /s/ Harmeet K. Dhillon

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
**Authority for Civil Cover Sheet**

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and services of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the cover sheet.

I.      COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff if resident of Washington, DC, 88888 if plaintiff is resident of United States but not Washington, DC, and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of the case.

VI.    CAUSE OF ACTION: Cite the U.S. Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASE(S), IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

JA047

AO 440 (Rev. 06/12; DC 3/15)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| SIMON ATEBA, | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. |
| KARINE JEAN-PIERRE, et al. | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | ) | |

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)*   KARINE JEAN-PIERRE,
in her official capacity as Press Secretary
to the President of the United States,
1600 Pennsylvania Avenue NW
Washington, D.C. 20500

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Harmeet K. Dhillon
CENTER FOR AMERICAN LIBERTY
1311 S. Main Street, Suite 207
Mount Airy, MD 21771

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

Page 50 of 256      Filed: 05/17/2024      Document #2055098      USCA Case #24-5004

JA048

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

Page 51 of 256    Filed: 05/17/2024    Document #2055098    USCA Case #24-5004

JA049

AO 440 (Rev. 06/12; DC 3/15)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| SIMON ATEBA, | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. |
| | ) |
| KARINE JEAN-PIERRE, et al. | ) |
| | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  the UNITED STATES SECRET SERVICE,
950 H Street NW
Washington, D.C. 20223

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Harmeet K. Dhillon
CENTER FOR AMERICAN LIBERTY
1311 S. Main Street, Suite 207
Mount Airy, MD 21771

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date: _____        _____
                                                        *Signature of Clerk or Deputy Clerk*

JA050

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .


I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

Page 53 of 256

Filed: 05/17/2024

Document #2055098

USCA Case #24-5004

JA051

AO 440 (Rev. 06/12; DC 3/15)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| SIMON ATEBA, | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | )    Civil Action No. |
| KARINE JEAN-PIERRE, et al. | ) |
| | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   KIMBERLY CHEATLE,
in her official capacity as Director of the
United States Secret Service,
950 H Street NW #7800
Washington, D.C. 20223

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Harmeet K. Dhillon
CENTER FOR AMERICAN LIBERTY
1311 S. Main Street, Suite 207
Mount Airy, MD 21771

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date: _____          _____
*Signature of Clerk or Deputy Clerk*

JA052

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

Page 55 of 256

Filed: 05/17/2024

Document #2055098

USCA Case #24-5004

JA053

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SIMON ATEBA,
1922 Park Road NW,
Washington, D.C., 20010

        *Plaintiff,*

  vs.

KARINE JEAN-PIERRE,
in her official capacity as Press Secretary
to the President of the United States,
1600 Pennsylvania Avenue NW
Washington, D.C. 20500;

the UNITED STATES SECRET SERVICE,
950 H St NW
Washington, D.C. 20223;

and

KIMBERLY CHEATLE
in her official capacity as Director of the
United States Secret Service
950 H St NW #7800
Washington, D.C. 20223,

        *Defendants.*

Case No. 1:23-cv-02321-JDB

### PLAINTIFF'S NOTICE OF ERRATA FOR VERIFIED COMPLAINT

Plaintiff Simon Ateba, by and through his undersigned counsel, files this Notice of Errata to correct a factual allegation in his Verified Complaint (ECF 1).

Paragraph 80 of the Verified Complaint states that "Out of an abundance of caution, Mr. Ateba reapplied for a White House hard pass on August 4, 2023." Instead, this paragraph should read, consistent with Paragraph 64 of the Verified Complaint and page 12 of the Memorandum in Support of his Motion Preliminary Injunction (ECF 2), "[o]n August 4, 2023, Mr. Ateba requested the White House Press delay termination of his hard pass until his application to the Daily

1

JA054

Congressional Press Gallery or Supreme Court was approved or denied. The White House refused

this request."

Plaintiff submits this Notice of Errata to ensure that the proper information is before the

Court.

Dated: August 14, 2023

Respectfully submitted,

By: /s/ Harmeet K. Dhillon
Harmeet K. Dhillon
(D.D.C. Bar ID: CA00078)
Mark Trammell*
Josh Dixon*
Eric A. Sell
(D.D.C. Bar ID: 1742565)
CENTER FOR AMERICAN LIBERTY
1311 S. Main Street, Suite 207
Mount Airy, MD 21771

Gary M. Lawkowski
(D.D.C. Bar ID: VA00125)
DHILLON LAW GROUP INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314

Jesse D. Franklin-Murdock
(D.D.C. Bar ID: CA00147)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108

*Counsel for Plaintiff Simon Ateba*
*Pro Hac Vice Motions Forthcoming*

JA055

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was mailed via certified mail, postage prepaid, this 14th day of August 2023, to the following:

Hon. Merrick Garland
United States Attorney General
950 Pennsylvania Ave. NW
Washington, DC 20530

Karine Jean-Pierre
1600 Pennsylvania Ave. NW
Washington, DC 20500

The Secret Service
950 H Street NW
Washington, D.C. 20223

Kimberly Cheatle
950 H Street NW
Washington, D.C. 20223

U.S. Attorney
Civil Process Clerk
U.S. Attorney's Office for the District of Columbia
601 D Street NW
Washington, D.C. 20530

/s/ Harmeet K. Dhillon
Harmeet K. Dhillon

JA056

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SIMON ATEBA,

    Plaintiff,

    v.

KARINE JEAN-PIERRE, in her official
capacity as Press Secretary to the President
of the United States, et al.,

    Defendants.

Civil Action No. 23-2321 (JDB)

**MEMORANDUM OPINION AND ORDER**

The D.C. Circuit has long recognized that journalists' access to the White House may implicate First Amendment interests.  See Karem v. Trump, 960 F.3d 656, 665 (D.C. Cir. 2020); Sherrill v. Knight, 569 F.2d 124, 129–30 (D.C. Cir. 1977).  Simon Ateba, a journalist covering the White House for Today News Africa, an online publication focusing on American politics and the relationship between the United States and African countries, challenges a recent change in White House policy related to access for journalists.  The new policy alters the requirements for obtaining a "hard pass"—a special press credential that allows a journalist to enter the White House press areas "on-demand."  Karem, 960 F.3d at 106.  Ateba, who previously held a hard pass, lost his credential under the new rule.

On August 10, 2023, Ateba sued Karine Jean-Pierre, the White House Press Secretary; Kimberly Cheatle, the Director of the Secret Service; and the Secret Service (collectively, the "White House"), alleging that the new policy violates his First Amendment rights and runs afoul of the Administrative Procedure Act ("APA").[1]  Before the Court is Ateba's motion for a

---

[1] Ateba alleges that all defendants violated his First Amendment rights, but only the Secret Service violated his rights under the APA.  The Court will differentiate among defendants when it reaches the merits of this dispute at a later stage in the litigation.

1

JA057

preliminary injunction reinstating his hard pass and prohibiting the White House from enforcing

the new policy.  The Court will deny the motion because Ateba has not shown he is likely to suffer

irreparable harm during the pendency of this litigation.  The Court will, however, order expedited

summary judgment briefing so that the merits of Ateba's challenge can be swiftly adjudicated.

## **Background**

For decades, the White House has offered press credentials to journalists who cover the

President and his administration.  See Sherrill, 569 F.2d at 126.  These credentials allow journalists

to access the press areas of the White House complex, including the James S. Brady Press Briefing

Room, where they can attend press conferences, interview White House officials, and report on

the day-to-day of the administration.  See Pl.'s Verified Compl. [ECF No. 1] ("Compl.") ¶¶ 22,

26–27.  The White House press corps includes reporters from a wide range of outlets, who rely on

the "essential access point" of the briefing room to do their jobs.  Id. ¶¶ 22–23.

Given the "strict security requirements" necessary to protect the President, access to the

White House is "tightly controlled."  Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj. [ECF No. 17]

("Opp'n") at 2; see Sherrill, 569 F.2d at 130 (recognizing a "compelling, even . . . overwhelming

interest" in the President's safety (internal quotation marks omitted)).  Today, the White House

offers two principal forms of access:  First, a reporter can obtain a "hard pass," a credential that

allows him to come and go freely from the press areas of the White House.  Decl. of Nathan

Fleischer [ECF No. 17-1] ("Fleischer Decl.") ¶ 6.  Second, a reporter may get a "day pass," a daily

credential issued upon application to the Secret Service.  Id. ¶ 7.  As discussed further below, day

pass and hard pass holders can access the same parts of the White House at the same times.  Id.

¶¶ 6–7.  However, day pass holders must undergo additional initial security screening and be

escorted from the White House gate to the press areas.  Id. ¶¶ 7–9.

JA058

Ateba is the White House Correspondent for <u>Today News Africa</u>, an "online publication that focuses on relations between the United States and African nations." Compl. ¶ 18. A longtime journalist, Ateba began covering the White House in 2018. <u>Id.</u> ¶¶ 38–39. For the first three years, he entered the White House with a day pass. <u>Id.</u> ¶ 39. From February 2021 through July 2023, he held a hard pass. <u>Id.</u> ¶¶ 40, 62. During his time as correspondent, Ateba has become increasingly frustrated by the reception he has received from the White House Press Office. Ateba asserts that he "has rarely received any response—or even acknowledgment—of his questions from the White House" and has been denied access to press conferences held by President Biden (even before he lost the hard pass). <u>Id.</u> ¶ 42; <u>see id.</u> ¶ 43. As a result, faced with this situation, Ateba claims he "resorted to one of the only options available to him: speaking up during press briefings." <u>Id.</u> ¶ 45. Ateba is known to "shout[] his questions to the White House Press Secretary . . . during briefings . . . [and] speak over his fellow journalists." <u>Id.</u> ¶ 47; <u>see id.</u> ¶¶ 47–52. In one notable incident, Ateba interrupted a press conference featuring the cast members of the comedy TV series "Ted Lasso," who were invited to speak on mental health, to ask why he was not allowed to ask questions. <u>Id.</u> ¶ 49. Ateba's outbursts have not ingratiated him with the White House Press Office or his fellow correspondents. <u>Id.</u> ¶¶ 48–53. His conduct has been the subject of considerable news coverage, and he received a letter from the White House warning him that his hard pass could be suspended or revoked if he continued disrupting press briefings. <u>Id.</u> ¶¶ 52, 58.

On May 5, 2023, the White House announced a new set of criteria for obtaining a hard pass: (1) full-time employment with a news organization; (2) a D.C.-area address; (3) access of the White House within the last six months for work; (4) an assignment to regularly cover the White House; (5) accreditation by a press gallery of the Supreme Court, the U.S. Senate, or the U.S. House of Representatives; and (6) willingness to submit to a Secret Service background

JA059

check.  Compl. ¶ 55; see Ex. A [ECF No. 1-1].  Ateba asserts that these new criteria were "targeted" at keeping him out of the White House.  Compl. ¶ 57; see id. ¶ 54.  Specifically, Ateba claims that "excluding [him] was the goal of the specific revisions" requiring press gallery accreditation, since "the White House knew he would not qualify for a hard pass under the new criteria."  Id. ¶ 60; see id. ¶ 61.  He asserts that Supreme Court press passes are difficult to come by, and he argues that the criteria for obtaining a congressional press credential are subjective and prone to abuse, particularly as to journalists who, like him, have spoken out of turn.  Id. ¶¶ 67–74.  Ateba fears he will not be able to obtain a credential from the committees of journalists responsible for congressional press credentialing because, he contends, they are "insular and hostile to 'outsiders,'" id. ¶ 74, and use an amorphous criterion of being a "bona fide correspondent[] of repute in the[] profession" to determine eligibility, id. ¶ 72; see also Mem. of Law in Supp. of Prelim. Inj. [ECF No. 2] ("Mot.") at 19–20.  The White House, for its part, notes that this same requirement of a congressional press gallery credential has been employed by many administrations, including those of Presidents Obama and Trump.  See Opp'n at 3; Sherrill, 569 F.2d at 126 & n.3, 129.

Since the White House announced the new policy, Ateba has been unable to secure either accreditation.  He was denied the requisite credentials by the Supreme Court and continues to await an answer regarding congressional press credentialing.  Compl. ¶¶ 76–77.

Ateba's hard pass expired when the new policy became effective on July 31, 2023.  Compl. ¶¶ 54, 62.  On August 4, 2023, he requested an extension of his prior hard pass, which was denied. Email from Allyson N. Bayless to Today News Africa (Aug. 6, 2023) [ECF No. 17-2].  He has not applied for a new hard pass, he says, because it would be futile without the required congressional or Supreme Court credential.  Decl. of Simon Ateba [ECF No. 18-1] ("Ateba Decl.") ¶ 6.  Since

JA060

the expiration of his hard pass, Ateba has sought a day pass on only one occasion.  See id. ¶¶ 12, 15–16; Defs.' Surreply in Opp'n to Pl.'s Mot. for Prelim. Inj. [ECF No. 20] ("Surreply") at 1–2. His request was granted but he did not enter the White House.  Surreply at 2.  Ateba claims he was confused about whether the request was granted.  See Ateba Decl. ¶ 17.

On August 10, 2023, Ateba simultaneously filed a complaint and a motion for a preliminary injunction, asking the Court to enjoin enforcement of the new hard pass policy and reinstate his hard pass for the duration of the litigation.  He claims the White House Press Office engaged in viewpoint discrimination by adopting a hard pass policy intended to exclude him and impermissibly vested "unbridled discretion" in the congressional press gallery committees. Compl. ¶¶ 83–95.  He further asserts that the Secret Service's failure to provide a reasoned explanation for terminating his hard pass by allowing it to expire violates the APA.  Id. ¶¶ 96–103. The preliminary injunction motion is fully briefed and ripe for resolution.

## Legal Standard

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'"  Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 920 F.3d 1, 10 (D.C. Cir. 2019) (per curiam) (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008)).  The moving party bears the burden of persuasion to establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tip in its favor; and (4) an injunction is in the public interest.  Id.  A failure to show irreparable harm is "grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006).

JA061

## Analysis

Because preliminary injunctive relief is never warranted in the absence of irreparable harm, the Court may begin there.  See, e.g., Chaplaincy, 454 F.3d at 297; Nat'l Treasury Emps. Union v. United States ("NTEU"), 927 F.2d 1253, 1254 (D.C. Cir. 1991) (Thomas, J.).  For purposes of this analysis, the Court will "assume[], without deciding, that [Ateba] has demonstrated a likelihood that the [White House's] conduct violates the law."  Chaplaincy, 454 F.3d at 303.  To satisfy this prong, Ateba must demonstrate harm that is "certain and great," "actual and not theoretical," "imminent" and "beyond remediation."  League of Women Voters of United States v. Newby, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (quoting Chaplaincy, 454 F.3d at 297).  In this Circuit, "a prospective violation of a constitutional right constitutes irreparable injury," Gordon v. Holder, 721 F.3d 638, 653 (D.C. Cir. 2013), but only if the violation is "ongoing or 'imminent.'"  Singh v. Berger, 56 F.4th 88, 109 (D.C. Cir. 2022) (quoting Chaplaincy, 454 F.3d at 297) (cleaned up).

### I.   Alleged Deprivation of White House Access

Ateba argues that he faces irreparable harm because, without a hard pass, "he has extremely limited access to the White House press facilities . . . which substantially limits his ability to cover the White House for [Today News Africa]."  Mot. at 23.  While the parties are at odds over the equivalence of a day pass, certain facts are not in dispute.  On a weekly basis, journalists can request links to a form that would allow them to register for visitor passes to enter the White House each day.  Ateba Decl. ¶ 8; Fleischer Decl. ¶ 8.  After a journalist submits this form, which includes biographical data, the Secret Service conducts a background check and authorizes access to the White House press areas.  Fleischer Decl. ¶ 8; Mot. at 2.  When a journalist visits the White House on a day pass, he must undergo additional security screening and then be escorted to the press areas.  Compl. ¶ 39; Fleischer Decl. ¶¶ 7, 9.  But once inside, the day pass allows a journalist to enter the White House grounds during the same times as a hard pass holder and attend the same

JA062

press events.  Fleischer Decl. ¶ 7; <u>see</u> Compl. ¶ 26.   Ateba is eligible to apply for a day pass.  <u>See</u> Suppl. Decl. of Nathan Fleischer [ECF No. 20-1] ("Fleischer Suppl. Decl.") ¶ 3; Ateba Decl. ¶ 15.  For three years before he obtained a hard pass, Ateba used day passes to enter the White House.  Compl. ¶ 39; Surreply at 2.

   Ateba disputes the convenience and reliability of this day pass system.  He contends that it limits his ability to cover breaking news because he needs to request day pass links the Thursday prior and submit a form by 5:00 p.m. the day before he intends to access the White House.  Ateba Decl. ¶¶ 8–9.  He claims that it can be confusing whether a request for a day pass was in fact granted.  <u>Id.</u> ¶¶ 14–17.  And he asserts that journalists arriving on a day pass must wait "as much as a half hour" for an escort, which "mak[es] the process quite cumbersome."  <u>Id.</u> ¶ 11.  Without a hard pass, Ateba says he is "unable to provide the quality of coverage of the White House that . . . [his] readers deserve."  <u>Id.</u> ¶ 5; <u>see</u> Compl. ¶ 27 (noting that the White House Correspondents' Association has said a hard pass is necessary for a correspondent to "effectively perform his or her duties, which include providing the public with on-the-spot news coverage of unforeseen and unscheduled events, along with cataloguing the daily activities of the head of the executive branch" (quoting Br. of Amicus Curiae The White House Correspondents' Association in Supp. of Appellee Seeking Affirmance at 3, <u>Karem</u>, 960 F.3d 656 (No. 19-5255)).

   The White House, by contrast, characterizes the security clearance process as simple, requiring only a short form with the journalist's biographical data.  Fleischer Decl. ¶ 8.  Security screening takes "[o]n average . . . one minute longer" for the journalist to clear security, although they "might need to wait for [an] escort . . . to the Press Area."  <u>Id.</u> ¶ 9.  The White House submitted further evidence suggesting that a journalist can apply for a day pass shortly before arrival, irrespective of the policy Ateba describes requiring submission by 5:00 p.m. the day before.  <u>See</u>

JA063

Ateba Decl. ¶ 8.  For example, on the one occasion Ateba sought a day pass since losing his hard pass, he requested the day pass application links at 9:40 p.m. on Sunday, August 27, 2023, and received them the next day at 9:07 a.m.  Ex. 4 to Surreply [ECF No. 20-2].  He filled out the form by 11:00 a.m., and his same-day request to attend a press briefing was granted.  Fleischer Suppl. Decl. ¶¶ 2–3.

Ateba contends that he is irreparably harmed by the loss of his hard pass, which requires him to use the day pass system when he plans to enter the White House.  He claims that the D.C. Circuit's holding in Karem, 960 F.3d 656, that a reporter suffered irreparable harm when his hard pass was merely suspended, supports his position.  Mot. at 23.  But in Karem, it was the fact of the suspension, without requisite Fifth Amendment due process, that squarely supported a finding of irreparable harm.  960 F.3d at 667–68 (citing Sherrill, 568 F.2d at 131).  And, moreover, it appears that Karem (the reporter) was actually unable to access the White House.  See id. at 665 (characterizing Karem's punishment as a "month's exile").  Ateba does not allege that he was denied due process,[2] and he can still access the White House with a day pass.

Rather, Ateba asserts that the deprivation of a hard pass causes irreparable harm to his First Amendment rights.  The D.C. Circuit has recognized that "White House press facilities having been made publicly available as a source of information for [newspersons], the protection afforded newsgathering under the [F]irst [A]mendment guarantee of freedom of the press requires that this access not be denied arbitrarily or for less than compelling reasons."  Sherrill, 569 F.2d at 129

---

[2] As argued in the White House's opposition, Ateba likely cannot demonstrate similar harm here since the White House issued this policy months in advance and gave Mr. Ateba an opportunity to apply for renewal of his hard pass—something he has not done—while simultaneously setting forth the standards and procedures that would govern both issuance of a hard pass in the first instance and revocation of a hard pass once granted.

Opp'n at 24.  Ateba's passing allegation of a Fifth Amendment violation in his reply brief will not be considered.  See Pl.'s Reply in Supp. of Mot. for Prelim. Inj. [ECF No. 18] ("Reply") at 14.

JA064

(footnote and citations omitted).  <u>Sherrill</u> may imply that a journalist suffers a First Amendment harm when he or she is arbitrarily <u>denied access</u> to the White House press areas.  <u>But cf.</u> <u>Zemel v. Rusk</u>, 381 U.S. 1, 17 (1965) (noting there is no general First Amendment right to enter the White House).  Even accepting this premise, Ateba has not demonstrated that he has suffered harm since he still has access to White House press areas with a day pass.  <u>See</u> Opp'n at 24.  The Court recognizes that Ateba is inconvenienced by needing to fill out the form and wait on a press escort.  Further, it is possible he would miss an event occurring on short notice because he had not requested credentials in advance.  But this latter result may be avoided if Ateba applies for a week's worth of day passes in advance, even if he is unsure whether he will use them.  Ultimately, he remains able to enter the White House using the day pass system, which, on the evidence before the Court, appears to be an acceptable alternative for the duration of the litigation.

Ateba points to a recent Ninth Circuit order in support of his position that being required to use a day pass instead of a hard pass constitutes irreparable harm.  A panel of that court recently concluded that a journalist was irreparably injured when he was excluded from Maricopa County press briefings because "constitutional injury is not 'rendered de minimis or otherwise mitigated by requiring [him] to avail [himself] of a less desirable, even if somewhat effective alternative.'" Reply at 19 (quoting <u>TGP Commc'ns, LLC v. Sellers</u>, No. 22-16826, 2022 WL 17484331, at *6 (9th Cir. Dec. 5, 2022)).  But that journalist, unlike Ateba, was <u>denied access</u> to the briefings and left to watch a livestream.  <u>See</u> <u>TGP Commc'ns</u>, 2022 WL 17484331, at *6 (describing "the County's exclusion of [the journalist] from its limited forum"); <u>cf.</u> <u>Consumer's Union of U.S., Inc. v. Periodical Correspondents' Ass'n</u>, 365 F. Supp. 18, 26 (D.D.C. 1973) (condemning arbitrary "[e]xclusion from the [congressional] press galleries"), <u>rev'd on other grounds</u>, 515 F.2d 1341 (D.C. Cir. 1975).  On the evidence before the Court, Ateba has not made a "clear showing," <u>Winter</u>,

JA065

555 U.S. at 22, that <u>denial</u> of access to the White House is "likely to occur," <u>Henke v. Dep't of Interior</u>, 842 F. Supp. 2d 54, 59 (D.D.C. 2012), such that he would be irreparably harmed during the litigation.

## II. Other Alleged Harms

Ateba further argues that "adoption of an unconstitutional hard pass eligibility policy that infringes on the freedom of the press is itself irreparable harm that justifies a preliminary injunction." Mot. at 23. It is often said that when a party seeks a preliminary injunction to prevent the deprivation of a First Amendment right, the only question for the Court is whether "the deprivation is shown to be likely." <u>Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.</u>, 897 F.3d 314, 334 (D.C. Cir. 2018). Because a "prospective violation of a constitutional right constitutes irreparable injury," <u>Gordon</u>, 721 F.3d at 653, even if it lasts only "minimal periods of time," <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976), a preliminary injunction should issue if the violation is shown to be likely to occur and the plaintiff is likely to succeed on the merits, <u>Archdiocese of Wash.</u>, 897 F.3d at 334.

However, "[t]hat abstract principle must be applied to the relevant factual setting." <u>Getty Images News Servs. Corp. v. Dep't of Def.</u>, 193 F. Supp. 2d 112, 123 (D.D.C. 2002). It is not enough to "merely allege a violation of freedom of expression in order to satisfy the irreparable injury prong." <u>Chaplaincy</u>, 454 F.3d at 301; <u>see also</u> <u>Sanders v. McClellan</u>, 463 F.2d 894, 903 (D.C. Cir. 1972) (weighing "indirect and incidental chill" of government action that did not result in "direct suppression of speech or press"). A plaintiff "must show that their 'First Amendment interests are either threatened or in fact being impaired at the time relief is sought.'" <u>Chaplaincy</u>, 454 F.3d at 301 (quoting <u>NTEU</u>, 927 F.3d at 1254–55). Where speech is not directly curtailed, a

JA066

plaintiff must "demonstrate that the allegedly impermissible government action would chill allowable individual conduct." Id. at 301.

The D.C. Circuit's opinion in NTEU is instructive.  See Chaplaincy, 454 F.3d at 301. NTEU involved a suit by government employees to enjoin an ethics law prohibiting them from receiving compensation for delivering speeches or writing articles.  927 F.2d at 1253–54.  The D.C. Circuit affirmed the denial of a preliminary injunction since the employees failed to show they would "cease speaking or writing before the district court resolves their constitutional challenges." Id. at 1255.  Since the employees could still get reimbursed for their expenses, it was unconvincing that they were unable to afford to continue engaging in First Amendment activities. Id.  And any lack of financial incentive to "continue writing or speaking" was a "foreseeable long-term effect[]" that "did not entitle the [plaintiffs] to preliminary, injunctive relief." Id.

Because the White House policy does not limit what Ateba can publish, his bare assertion that the policy violates the freedom of the press does not suffice to establish a likelihood of irreparable harm.  And Ateba has not demonstrated the hard pass policy is likely to chill his newsgathering activities to the detriment of his readers.  Ateba has indicated that, despite the difficulties he faces without a hard pass, he "will continue to cover the White House" and remains "determined to continue providing quality coverage for his readers."  Compl. ¶ 81.  The evidence suggests he will be able to do so:  "For his first three years covering the White House, Mr. Ateba obtained a temporary daily press pass . . . ." Id. ¶ 39; see Opp'n at 25.  And since his hard pass expired, he has only tried to seek entry to the White House one time.  Ateba asserts that on the prior two occasions the White House held a press briefing in August, he was not aware in time to request a day pass.  Ateba Decl. ¶ 13.  It is not clear to the Court whether this was a failure of Ateba's diligence or the White House Press Office's advance planning.  In any event, the fact that

JA067

the White House was willing to clear an 11:00 a.m. request for access, see Fleischer Suppl. Decl. ¶¶ 2–3, suggests Ateba could cover most if not all press briefings, allowing him to gather the news and deliver it effectively to his readers.  See Getty Images, 193 F. Supp. 2d at 123 (finding no irreparable harm when it was unclear how the challenged regulation would affect journalists' right of access to Guantanamo Bay).

Ateba also argues that his speech (and that of other journalists) will be chilled because his "efforts to fight the White House's de facto policy of never calling on him made [him] unpopular with colleagues in the press corps," and accordingly the new policy "requires" him and other journalists to "self-censor so that they can ingratiate themselves with their colleagues" who decide whether he can obtain the press gallery credential that is now a prerequisite to obtaining a White House hard pass.  Mot. at 20.  This alleged harm is too speculative to support relief, particularly in light of the evidence Ateba supplies of his own behavior—years of acting in ways that disgruntle other correspondents, despite the contemporaneous cost to his relationship with the White House. See Compl. ¶¶ 46–53.  While self-censorship could possibly be a "long-term effect" of the hard pass policy, the evidence at this stage does not support a finding that First Amendment interests are "threatened or in fact being impaired."  NTEU, 927 F.2d at 1255 (internal quotation marks omitted).

Finally, in reply, Ateba argues that he suffers a competitive harm because he is at a "disadvantage to the other White House journalists who are allowed to have hard-pass access." Reply at 20.  The Court has found on the evidence before it that Ateba retains access to the White House facilities on substantially similar terms.  Indeed, he has the very access most reporters do in terms of entry.  To the extent "Mr. Ateba's competition gets more—and more efficient—access to the White House press areas and the President," id. at 19, any resulting competitive harm is

JA068

unlikely to "accrue 'in the absence of preliminary relief'—that is, before the district court can resolve the case on the merits."  Singh, 56 F.4th at 109 (quoting Winter, 555 U.S. at 20).

In sum, the Court concludes that Ateba has not demonstrated a likelihood of irreparable harm.  Hence, a preliminary injunction is not warranted.

*       *       *

For the foregoing reasons, and upon consideration of the entire record herein, it is hereby

**ORDERED** that [2] plaintiff's motion for a preliminary injunction is **DENIED**; it is further

**ORDERED** that the following schedule shall govern further proceedings:

1. Defendants shall file any motion for summary judgment, including any Administrative Record, by not later than September 20, 2023.  Briefing shall be limited to 25 pages.

2. Plaintiff shall file any opposition to defendants' motion combined with any cross-motion for summary judgment by not later than October 4, 2023.  Briefing shall be limited to 25 pages.

3. Defendants shall file any reply in support of their motion combined with any opposition to plaintiff's cross-motion by not later than October 11, 2023.  Briefing shall be limited to 15 pages.

4. Plaintiff shall file any reply in support of his cross-motion by not later than October 18, 2023.  Briefing shall be limited to 15 pages.

**SO ORDERED.**


/s/
_____
JOHN D. BATES
United States District Judge

Dated: September 6, 2023

JA069

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ———————————————— ) | |
| Simon ATEBA, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | Case No. 1:23-cv-02321-JDB |
| ) | |
| Karine JEAN-PIERRE, in her official ) | |
| capacity as White House Press Secretary, ) | |
| et al. ) | |
| ) | |
| *Defendants*. ) | |
| ———————————————— ) | |

**THIRD DECLARATION OF NATHAN FLEISCHER**
**ASSISTANT TO THE SPECIAL AGENT IN CHARGE**
**PRESIDENTIAL PROTECTIVE DIVISION**
**UNITED STATES SECRET SERVICE**

I, Nathan Fleischer, do hereby declare, subject to penalty of perjury pursuant to 28 U.S.C.

§ 1746, as follows:

1.  I previously submitted a declaration in support of Defendants' Opposition to the

    Plaintiff's Motion for a Preliminary Injunction, ECF No. 17-1, as well as a

    supplemental declaration in support of Defendants' Surreply in Opposition to the

    Plaintiff's Motion for a Preliminary Injunction, ECF No. 19-2.   I have been asked to

    file this declaration in support of Defendants' Motion for Summary Judgment.

2.  I make the statements in this declaration in support of Defendants' Opposition to the

    Plaintiff's Motion for a Preliminary Injunction based on my own knowledge and

experience and upon review of information provided to me in my official capacity by others who work in the United States Secret Service.

3.     The United States Secret Service (Secret Service) is a protective and law enforcement agency operating under the provisions of Title 18 of the United States Code, sections 3056 and 3056A. The Secret Service is charged with responsibility for the protection of the President and Vice President of the United States and their immediate families, former Presidents of the United States and their spouses, major Presidential and Vice-Presidential candidates, foreign heads of state visiting in the United States, and other high-level governmental officials as designated by statute or by the President. This responsibility is accomplished through both physical protection and the investigation of potential threats to these protectees.

4.     I am currently employed as the Assistant to the Special Agent in Charge in the Worker and Visitor Entry System (WAVES) Section of the Presidential Protective Division. I have held that position since June 19, 2022. As the Assistant to the Special Agent in Charge in the WAVES Section of the Presidential Protective Division, I have supervisory responsibility over WAVES. The WAVES section is responsible for the processing and reviewing of all requests for entry to the White House Complex, as well as the issuance of all White House Complex security passes.

5.     I have been employed by the Secret Service as a special agent for over fifteen years. Prior to becoming the Assistant to the Special Agent in Charge in the WAVES Section of the Presidential Protective Division, I worked as an Assistant to the

2

Special Agent in Charge in the Counter Assault Division of the Special Operations

Division.   I have also served as a member of Counter Assault Team for six years and

as an instructor for the Counter Assault program.   Prior to that time, I worked in the

Washington Field Office as a special agent conducting investigations of financial

crimes and performing a variety of protection assignments.

### *White House Complex Entry Passes and Processes*

6.   In furtherance of the protective mission, the Secret Service issues passes to those

individuals seeking access to the White House Complex.   There are three types of

press passes that can be issued for access to the White House complex.   These are

the permanent press pass (sometimes called a "hard" pass), a temporary press pass

(sometimes called a "day" pass), and an appointment press pass, which is not at issue

here.

7.   A hard pass allows a member of the press to access the White House Complex

between the hours of 0530-2230. With a hard pass, the press member is authorized to

access press offices, the press apron, the North Grounds Stand Up Area, and the

Driveway (referred to as "Pebble Beach') (collectively the "Press Area").

8.   A day pass also allows a member of the press to access the White House Complex

between the hours of 0530-2230.   With a day pass, the press member must initially

be escorted from the entrance checkpoint to the Press Area, but once there has access

to the same areas as those press members with a hard pass.   The press member does

not need to be escorted once they have entered the Press Area.

JA072

9.   A day pass is acquired by filling out a link to the WAVES system that is generated

by the White House Press Office.   The Secret Service does not have a role in

determining who the White House Press Office invites to fill out a WAVES link.

An applicant will fill out a form that requires biographical data such as the press

member's full name, date of birth, and social security number.   This is the same

process utilized by routine visitors to the White House Complex.   Once the USSS

conducts the necessary security checks, the press member is then cleared to enter the

White House Complex.

10.   As a practical matter, a press member with a day pass may not get through the

security checkpoint as quickly as those press members with a hard pass because the

Uniformed Division Officer must check the press member's photo identification

against the identifying information provided in the WAVES system. On average, it

may take one minute longer and rarely would it exceed two minutes longer for those

press members with a day press pass to clear security than those with a hard pass.

Once through security, the press member with a day pass might also need to wait for

his or her escort to arrive at the checkpoint to escort them to the Press Area.

### *The Secret Service's Role in the Issuance of Hard Passes*

11.   With respect to the issuance of hard passes, the White House Press Office provides

the United States Secret Service WAVES section with a list of the names and

requisite personal identifying information of those members of the press that have

met the Press Office's criteria for obtaining or renewing a hard pass to the White

House Complex.

JA073

12.  The Secret Service WAVES Section performs the necessary security checks with respect to those members of the press on the hard pass list provided by the Press Office.   If an individual member of the press successfully passes the security screening, and does not currently possess a hard pass, the White House Press Office will make an appointment for that press member to come to the White House Pass Office, which is operated by the Secret Service, to have their picture taken in order to create a hard pass. If the press person has an existing hard pass, the WAVES section will renew the existing hard pass by extending the expiration date in WAVES.

13.  The Secret Service has no role in generating the list of press members that the White House Press Office authorizes for a hard pass.   The Secret Service's role in the process of authorizing entry into the White House complex is limited to conducting the necessary security checks and the issuance/renewal of the physical hard pass to the individual press member.

14.  The Secret Service has not changed its policy, procedure, or position with respect to its role in the issuance of press passes of any type.

15.  On August 1, 2023, the White House Press Office instructed the Secret Service to deactivate the hard passes that did not meet the White House Press Office's requirements for renewal, including Mr. Ateba's.   Approximately 500 hard passes were deactivated.

### Simon Ateba's Access to the White House Complex

16.  Simon Ateba did not seek to obtain a day pass to enter the White House Complex between when his hard pass expired on July 31, 2023 and when he submitted a

5

JA074

WAVES request the morning of Monday, August 28, 2023.   Mr. Ateba was

authorized through the WAVES system to access the White House Complex that

same date, although he did not access the White House Complex that day.

17.   Since August 28, 2023, Mr. Ateba has requested day pass access to the White House

and he was authorized through the WAVES system to access the White House

Complex each time he sought entry.   I further understand that Mr. Ateba entered the

White House on several of those occasions.

### *APA Claim*

18.   I have been advised that Count III of Plaintiff's complaint alleges that the Secret

Service violated the Administrative Procedure Act by deactivating Mr. Ateba's hard

pass.   The Secret Service did not make any decision to deny Mr. Ateba a hard pass;

rather, the White House Press Office included Mr. Ateba's name on a list of hard

passes that did not meet the requirements for renewal under the existing hard pass

guidelines.   The Secret Service deactivated unrenewed hard passes, including Mr.

Ateba's, at the White House Press Office's direction.

***

In accordance with 28 U.S.C. § 1746, I hereby certify and declare under penalty of

perjury that the foregoing is true and correct.


9/19/2023
_____                         *Nathan Fleischer*
Date                                     Nathan Fleischer
                                         Assistant to the Special Agent in Charge
                                         Presidential Protective Division
                                         United States Secret Service

6

JA075

7

JA076

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SIMON ATEBA,

        *Plaintiff,*

  v.

KARINE JEAN-PIERRE,                                Case No. 1:23-cv-02321-JDB
in her official capacity as Press Secretary
to the President of the United States, *et al.*,

        *Defendants.*

## SECOND DECLARATION OF SIMON ATEBA

I, Simon Ateba, hereby declare:

1.      I am the plaintiff in the above-captioned matter. I am above the age of 18, and I make this declaration from my own personal knowledge. If called upon to testify to the contents below, I could and would do so competently.

2.      I am the White House Correspondent for *Today News Africa*, an online news publication focusing primarily on American politics and relations between the United States and African countries.

3.      As part of my duties as a White House Correspondent, I regularly communicate questions to the White House Press Office while in the designated Press Area. I also regularly post on social media from the White House Press Area—which is a superior vantage point from which to report breaking news about the President and his administration.

4.      During press briefings, I regularly post my reporting from the White House Press Area out to my social media followers, including my 528,000 followers on X (formerly Twitter).

5.      I have been covering the White House since 2018.

JA077

6.      I held a White House hard pass from February 2021 until August 1, 2023.

7.      When I first obtained a White House hard pass in February 2021, the White House did not require applicants first be credentialed by the Supreme Court or a Congressional Press Gallery.

8.      Prior to obtaining a White House hard pass, I used the White House day pass.

9.      Without a White House hard pass, I am unable to provide the quality of coverage of the White House that I wish to provide and that my readers deserve to receive.

10.     I have not yet applied for a hard pass under the new criteria adopted by the White House because I know I do not qualify. On June 5, 2023, I applied for press credentials with the Congressional Daily Press Gallery. On August 30, 2023, I was informed by the Congressional Daily Press Gallery staff that my application is under consideration. I will apply for a White House hard pass if and when I receive a Congressional press pass.

11.     I have been informed by the Daily Press Gallery staff that congressional Press credentials expire at the end of every Congressional session and must be renewed.

12.     The day pass is an inadequate substitute for a hard pass for the following reasons:

    a.  Advance Application: Day passes require applicants to submit their requests by 5:00 p.m. the previous day, which is not conducive to covering breaking news. For reporters covering the White House regularly, news events often occur spontaneously and without prior notice.

    b.  Limited Access: Day pass holders are required to be escorted to the Press Area. Obtaining an escort upon arrival can be time-consuming, with waits of up to 45 minutes, making it impractical for timely news coverage. This delay can be especially problematic during weekends when staffing levels may be lower.

JA078

c. <u>Repetitive Applications:</u> Regular White House reporters would need to submit new applications every day, every week, and every month for day passes, which adds administrative burdens and complicates the reporting process.

d. <u>Unplanned Visits:</u> For breaking news situations, journalists may not have planned to be at the White House, making it impossible to meet the advance application deadline for day passes.

e. <u>Internet Accessibility:</u> Because day pass applications typically require online submission by 5:00 p.m., they sometimes pose challenges for reporters facing technical issues with either their computers or internet access.

13.     Before I acquired a hard pass, this day-pass process was cumbersome and required me to expend additional time each day before I could access the White House Press Area.

14.     This process also precluded me from attending spontaneous press events at the White House. Day pass links for the upcoming week are released every Thursday. Requests for the links can be sent to presswaves@who.eop.gov. Once you've made a request, the White House press office then sends forms for each desired day. If you miss this deadline, entry will be denied.

JA079

Page 82 of 256

Filed: 05/17/2024

Document #2055098

USCA Case #24-5004

I, Simon Ateba, declare under penalty of perjury that the factual allegations in the foregoing **SECOND DECLARATION OF SIMON ATEBA** are true and correct.

Executed this 4th day of October 2023

_____

Simon Ateba

4

JA080

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SIMON ATEBA,

               *Plaintiff,*

  v.

KARINE JEAN-PIERRE,
in her official capacity as Press Secretary
to the President of the United States, *et al.*,

           *Defendants.*

Case No. 1:23-cv-02321-JDB

**PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE**

Plaintiff Simon Ateba hereby requests the Court to take judicial notice of the following

public records and information from government websites under Rule 201 of the Federal Rules of

Evidence:

1. Brief of *Amicus Curiae* The White House Correspondents' Association, *Karem v. Trump*, Case No. 19-5255 (D.C. Cir. Jan. 13, 2020) (Attached as RJN Exhibit A).

2. Transcript of Oral Decision, *CNN v. Trump*, 1:18-cv-02610-TJK, at *7:19–22 (D.D.C. Nov. 16, 2018), Decision (ECF 22) (Attached as RJN Exhibit B).

3. *Congressional News Media and the House and Senate Press Galleries* 4, Congressional Research Service (April 13, 2017), available at https://crsreports.congress.gov/product/pdf/R/R44816 (Attached as RJN Ex. C).

4. Periodical Press Gallery, *Accreditation*, House Periodical Press Gallery, available at https://periodical.house.gov/accreditation (Attached as RJN Ex. D).

5. Senate Daily Press Gallery, *Governing Rules*, available at https://www.dailypress.senate.gov/membership/gallery-rules/ (Attached as RJN Ex. E)

These materials are the appropriate subjects of judicial notice because they are "generally

known within [this] court's territorial jurisdiction" and "can be accurately and readily determined

from sources whose accuracy cannot reasonably be questioned." Fed. R. Ev. R. 201(b).  As

demonstrated in the Declaration of Eric A. Sell, attached hereto as Ex. F, the materials were

obtained from websites administered by the federal government. Because the materials are "public records and government documents available from reliable sources," they are also the proper subjects of judicial notice under Rule 201. *Johnson v. Comm'n on Presidential Debates*, No. CV 15-1580 (RMC), 2016 WL 4179269, at *4 (D.D.C. Aug. 5, 2016); *see also Juliana v. United States*, No. 6:15-CV-01517-AA, 2018 WL 9802138, at *2 (D. Or. Oct. 15, 2018) (collecting cases in which federal courts took judicial notice of reports from the Congressional Research Service).

For the foregoing reasons, the Court should take judicial notice of the aforementioned public records and information from government websites.

Dated: October 4, 2023

Respectfully submitted,

By: /s/Harmeet K. Dhillon
Harmeet K. Dhillon
Mark Trammell*
Josh Dixon
Eric A. Sell
(D.D.C. Bar ID: 1742565)
CENTER FOR AMERICAN LIBERTY
1311 S. Main Street, Suite 207
Mount Airy, MD 21771

Gary M. Lawkowski
(D.D.C. Bar ID: VA125)
DHILLON LAW GROUP INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314

Jesse D. Franklin-Murdock
(D.D.C. Bar ID: CA00147)
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, CA 94108

*Counsel for Plaintiff Simon Ateba*
*\*Pro Hac Vice Motions Forthcoming*

JA082

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SIMON ATEBA,
1666 Connecticut Ave NW
Washington, D.C. 20009

    *Plaintiff,*

 vs.

KARINE JEAN-PIERRE,
in her official capacity as Press Secretary
to the President of the United States,
1600 Pennsylvania Avenue NW
Washington, D.C. 20500;

the UNITED STATES SECRET SERVICE,  Case No. 1:23-cv-02321-JDB
950 H Street NW
Washington, D.C. 20223;

and

KIMBERLY CHEATLE
in her official capacity as Director of the
United States Secret Service,
950 H Street NW #7800
Washington, D.C. 20223,

    *Defendants.*

<u>**DECLARATION OF ERIC A. SELL**</u>

I, Eric A. Sell, declare as follows:

1.  I am over the age of eighteen and am competent to testify as to the matters herein.

I am licensed to practice law in the District of Columbia, the United States District Court for the

District of Columbia, and the United States Court of Federal Claims.

2.  I am an attorney at the Center for American Liberty ("CAL").

3.  I am one of the attorneys representing Plaintiff Simon Ateba ("Mr. Ateba") in the

above-captioned matter.

1

JA083

4.      On October 4, 2023, I personally visited the website pacer.uscourts.gov and downloaded a true and correct copy of Brief of *Amicus Curiae* The White House Correspondents' Association, *Karem v. Trump*, Case No. 19-5255 (D.C. Cir. Jan. 13, 2020) (Attached as RJN Exhibit A).

5.      On October 4, 2023, I personally visited the website pacer.uscourts.gov and downloaded a true and correct copy of Transcript of Oral Decision, *CNN v. Trump*, 1:18-cv-02610-TJK, at *7:19–22 (D.D.C. Nov. 16, 2018), Decision (ECF 22) (Attached as RJN Exhibit B).

6.      On October 4, 2023, I personally visited the website https://crsreports.congress.gov/product/pdf/R/R44816 and downloaded a true and correct copy of *Congressional News Media and the House and Senate Press Galleries* 4, Congressional Research Service (April 13, 2017) (Attached as RJN Ex. C).

7.      On October 4, 2023, I personally visited the website https://periodical.house.gov/accreditation and downloaded the web page as a PDF document, Periodical Press Gallery, *Accreditation*, House Periodical Press Gallery (Attached as RJN Ex. D).

8.      On October 4, 2023, I personally visited the website https://www.dailypress.senate.gov/membership/gallery-rules/ and downloaded the web page as a PDF document, Senate Daily Press Gallery, *Governing Rules* (Attached as RJN Ex. E)

I, Eric A. Sell, declare under penalty of perjury that the foregoing is true and correct.

Executed at Baltimore, Maryland, October 4, 2023.

/s/

Eric A. Sell

JA084

# EXHIBIT A

JA085

ORAL ARGUMENT NOT YET SCHEDULED

No. 19-5255

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

BRIAN J. KAREM,
*Plaintiff-Appellee,*

V.

DONALD J. TRUMP; STEPHANIE A. GRISHAM
*Defendants-Appellants.*

_____

On Appeal from the
United States District Court for the District of Columbia
No. 19-cv-2514 (Hon. Rudolph Contreras)

_____

**BRIEF OF AMICUS CURIAE
THE WHITE HOUSE CORRESPONDENTS' ASSOCIATION
IN SUPPORT OF APPELLEE SEEKING AFFIRMANCE**

_____

George A. Lehner, Esq.
Eli Segal, Esq.*
PEPPER HAMILTON LLP
Hamilton Square
600 Fourteenth Street, N.W.
Washington, D.C.  20005-2004
Phone: 202.220.1416
lehnerg@pepperlaw.com
segale@pepperlaw.com
*Counsel for Amicus Curiae White
House Correspondents' Association*
*Of counsel

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES PURSUANT TO CIRCUIT RULE 28(a)(1)(A)

**A.**   <u>Parties and amici curiae</u>

All parties, intervenors, and amici appearing before the district court and in this Court, to date, are listed in Appellant's brief.

**B.**   <u>Rulings under review</u>

References to the rulings at issue appear in Appellant's brief.

**C.**   <u>Related cases</u>

Counsel for the White House Correspondents' Association are not aware of any related case pending before this Court or any other court.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, the White House Correspondents' Association certifies that it is a nonprofit organization with no parent company, no subsidiaries, and no stock.

## RULE 29(a)(4)(E) CERTIFICATION

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), the

White House Correspondents' Association certifies that its counsel, Pepper

Hamilton LLP, authored this brief in whole or in part; no party or party's counsel

contributed money that was intended to fund preparing or submitting this brief; and

no person—other than the White House Correspondents' Association, its members,

or counsel—contributed money that was intended to fund preparing or submitting

the brief.

## CIRCUIT RULE 29(d) CERTIFICATION

The White House Correspondents' Association certifies that the filing

of this brief is necessary to adequately represent the unique interests of, and

provide the unique perspective of, its members—the individuals who cover the

White House day in and day out and who would be impacted most directly if the

Court were to accept the Defendants' position that the White House Press

Secretary can take away a hard pass from any White House correspondent whose

conduct she might deem "unprofessional."

# TABLE OF CONTENTS

I.    SOURCE OF AUTHORITY ..............................................................1

II.   IDENTITY AND INTEREST OF AMICUS CURIAE ..................................1

III.  SUMMARY OF ARGUMENT .........................................................2

IV.   ARGUMENT ...........................................................................3

V.    CONCLUSION .........................................................................7

-iv-

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

Cases

*Mills v. Alabama*, 384 U.S. 214 (1966) ....................................................................6

Other Authorities

First Amendment....................................................................................................1, 2

## I.      SOURCE OF AUTHORITY

Amicus curiae the White House Correspondents' Association has

obtained consent to file this brief from all parties and therefore may file it pursuant

to Federal Rule of Appellate Procedure 29(a)(2) and Circuit Rule 29(b).

## II.      IDENTITY AND INTEREST OF AMICUS CURIAE

Amicus curiae is the White House Correspondents' Association

("WHCA"), a nonprofit association incorporated in the District of Columbia,

whose primary mission is to advocate for the newsgathering rights of the press on

behalf of journalists who cover the White House and on behalf of Americans who

rely on the press to provide information about the activities of their elected

officials.  Founded over 100 years ago, in February 1914, the WHCA has

consistently and effectively worked to ensure that the men and women who gather

and report the news from the White House have the ability to seek answers from

powerful officials, up to and including the President of the United States.  The

WHCA has 439 regular members and 152 associate members who represent over

100 different print, television, radio, and online journalism outlets.

The WHCA was founded on the belief, as expressed by this country's

Founders and enshrined in the First Amendment, that an independent news media

is vital to the health of the republic.  The ability of the people to effectively govern

themselves depends upon a free press' vigorous and regular coverage of those who

hold power in trust.  When government officials—including the President of the

United States and his Press Secretary here—attempt to restrict, curtail, intimidate,

or silence the press in its newsgathering activities, the rights of the people and the

press, as guaranteed by the First Amendment, are infringed, and our democratic

form of government is placed in jeopardy.

Plaintiff and the district court have outlined in compelling detail the

constitutional violations caused by the actions of the President and Press Secretary

in connection with the suspension of Plaintiff's hard pass.  Amicus WHCA submits

this brief, as authorized by its Board, to highlight the extent and breadth of the

danger posed to all White House journalists, and to the American public, if the

Court accepted the Defendants' unprecedented assertion that the White House

Press Secretary may exclude from the White House any journalist whose conduct

she might deem "unprofessional."

## III.   SUMMARY OF ARGUMENT

The Defendants contend that the White House Press Secretary should

have absolute discretion to strip a hard pass—an essential tool for those who cover

the White House—from any White House correspondent whose conduct she might

deem "unprofessional."  As discussed below, the Court should reject this

dangerous legal position as unworkable and unconstitutional for at least three

reasons.  First, whether a particular journalist's conduct in a particular situation is

"unprofessional" is largely subjective.  Second, journalistic "professionalism" is

highly context-dependent.  And third, particularly in the current climate,

empowering the Press Secretary to be the "professionalism" arbiter would risk

severely chilling White House correspondents from providing the White House

reporting on which our democracy depends.  After all, knowing that the Press

Secretary could eliminate their ability to do their job just by classifying their

conduct as "unprofessional," would White House correspondents necessarily feel

comfortable asking tough or aggressive questions or reporting information that

could reflect negatively on the administration?

## IV.   ARGUMENT

As explained by Todd J. Gillman—a WHCA Board Member and

Washington Bureau Chief for *The Dallas Morning News*—in his Declaration

attached to Plaintiff's injunction papers, "[a] hard pass is critical for anyone who

reports regularly on the White House."  JA77-79 (Gillman Decl. at ¶¶ 1, 2, 9).  It is

no exaggeration to say that, without the access that a hard pass grants, a White

House correspondent cannot effectively perform his or her duties, which include

providing the public with on-the-spot news coverage of unforeseen and

unscheduled events, along with cataloguing the daily activities of the head of the

executive branch.  *See* JA827-828 (Mem. Op. at 21-22).  Yet the President and his

Press Secretary assert that the Press Secretary may take away any White House

correspondent's hard pass as long as she (and she alone) deems that person's conduct "unprofessional."  Appellants' Br. at 22-25.  Moreover, they contend that the Press Secretary's "professionalism" decision is not subject to judicial review. *See id.* at 34-35.

The Defendants' position is deeply troubling to WHCA's members, as it should be to the public at large, and WHCA urges this Court to follow the district court's lead in roundly rejecting it.  Indeed, arming the White House Press Secretary—the President's agent for dealing with the press, an institution that he has branded an "enemy of the people" and purveyor of "fake news," Appellee's Br. at 10—with absolute discretion to deny White House access based on such a vague "professionalism" standard would threaten the free flow of information about the President and his administration that is so crucial to the functioning of our democratic system.  The Defendants insist that "[t]he concept of professionalism reflects expectations of professional conduct understood and adhered to by millions of Americans every day," and that there is therefore no problem with having the continued possession of a hard pass turn on the Press Secretary's administration of that "concept."  Appellants' Br. at 29.  The Defendants are wrong.  For at least three reasons, the "the-Press-Secretary-thinks-it's-unprofessional" barometer for which they advocate is both unworkable and unconstitutional for White House correspondents.

*First*, whether a particular journalist's conduct in a particular situation is "professional" or "unprofessional" is largely subjective.  Conduct in the course of newsgathering that one person classifies as the former, another person could easily classify as the latter.  As the district court put it, "[s]uch abstract concepts may at times indicate what is allowed and disallowed at the furthest margins, but they do not clearly define what is forbidden or permitted in common practice within those margins."  *See* JA822 (Mem. Op. at 16).  For example, questioning of the President or a White House aide that appears overbearing, rude, or harassing—and therefore "unprofessional"—to one observer might reasonably be viewed by another as simply the dogged pursuit of the truth.

*Second*, along with being subjective, journalistic "professionalism" is highly context-dependent.  The district court correctly noted that White House events "vary greatly in character" and that "[w]hat is deemed 'professional' behavior in the context of a state dinner may be very different from what is considered 'professional' behavior during a performance by James Brown." JA823 (Mem. Op. at 17).  And in this administration—with the elimination of the daily press briefing, Appellee's Br. at 9—White House correspondents must rely almost exclusively on an unpredictable hodgepodge of informal, freewheeling, and often chaotic questioning opportunities that do not lend themselves to any sort of uniform "professionalism" standard.

(Page 80 of Total)

**Third**, making the Press Secretary the "professionalism" arbiter compounds these problems exponentially. The relationship between the press and the White House is, by design, adversarial. As the Supreme Court put it, "the press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials, and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were selected to serve." *Mills v. Alabama*, 384 U.S. 214, 219 (1966). During the current administration, that adversarial relationship has, of course, risen to a new and disturbing level. The President regularly doles out to the media reproaches of "fake news" and "enemy of the people" and has even endorsed violence against reporters. Appellee's Br. at 10.

By all appearances, in the eyes of the President and his administration, asking tough questions, bringing to light abuses of power, and airing criticisms of the administration is "unprofessional"—indeed, treasonous—press conduct. But in the eyes of the press and the Supreme Court, such conduct is precisely what the job of a journalist demands.

A framework that permits the White House Press Secretary—an agent of the President—to exclude a journalist from the White House based on her own evaluation of that journalist's "professionalism" thus leaves White House correspondents with an untenable, unconstitutional, speech-chilling choice: avoid

any newsgathering activity that might tend to offend the President or raise the ire of one of his senior aides, on the one hand, or risk losing the access required to effectively do their job, on the other hand   In the Press Secretary's own words, she suspended Mr. Karem's hard pass in order to "*deter* Mr. Karem and other members of the press" from engaging in further conduct that she might deem unprofessional. JA at 146-47 (Aug. 16, 2019 Grisham Letter at 8-9) (emphasis added).   That desired and likely "deter[rent]"—AKA chilling—effect makes it essential that this Court affirm the district court and thereby help ensure the continued free flow of information from and about the White House to the millions of people who depend on it to decide the future course of the republic.

## V.   CONCLUSION

For all of these reasons, the White House Correspondents' Association requests that the Court affirm the district court's decision and reject the Defendants' dangerous legal position.

Dated:  January 13, 2020                   Respectfully submitted,

                                           /s/ George A. Lehner
                                           George A. Lehner
                                           PEPPER HAMILTON LLP
                                           Hamilton Square
                                           600 Fourteenth Street, N.W.
                                           Washington, D.C.  20005-2004
                                           Phone: 202.220.1416
                                           Fax: 202.220.1665
                                           lehnerg@pepperlaw.com

-7-

Eli Segal
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA  19103-2799
Phone: 215.981.4239
Fax: 215.981.4750
segale@pepperlaw.com

*Counsel for Amicus Curiae White House
Correspondents' Association*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a) because this brief contains 1506 words, excluding the parts of the brief exempted under Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  January 13, 2020

/s/ George A. Lehner
George A. Lehner
*Counsel for Amicus Curiae White House*
*Correspondents' Association*

JA100

# CERTIFICATE OF SERVICE

I hereby certify that, on January 13, 2020, I caused the foregoing Brief of Amicus Curiae the White House Correspondents' Association in Support of Appellee Seeking Affirmance to be filed with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated:  January 13, 2020                Respectfully submitted,

                                        /s/ George A. Lehner
                                        George A. Lehner
                                        *Counsel for Amicus Curiae White House Correspondents' Association*

# EXHIBIT B

JA102

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x

CABLE NEWS NETWORK, INC., et al., CA No. 1:18-cv-02610-TJK


                  Plaintiffs,           Washington, D.C.
v.                                      Friday, November 16, 2018
                                        10:00 a.m.

DONALD J. TRUMP, et al.,

           Defendants.
- - - - - - - - - - - - - - - - x

_____

TRANSCRIPT OF MOTION HEARING
HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the Plaintiffs:      Theodore J. Boutrous, Jr., Esq.
                         Joshua S. Lipshutz, Esq.
                         Anne M. Champion, Esq.
                         GIBSON, DUNN & CRUTCHER LLP
                         333 South Grand Avenue
                         Los Angeles, CA 90071
                         (213) 229-7804

For the Defendants:      James M. Burnham, Esq.
                         Michael H. Baer, Esq.
                         Eric R. Womack, Esq.
                         Joseph E. Borson, Esq.
                         U.S. DEPARTMENT OF JUSTICE
                         Civil Division
                         950 Pennsylvania Avenue, NW
                         Washington, DC 20530
                         (202) 353-5049

Court Reporter:          Timothy R. Miller, RPR, CRR, NJ-CCR
                         Official Court Reporter
                         U.S. Courthouse, Room 6722
                         333 Constitution Avenue, NW
                         Washington, DC 20001
                         (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1 <u>**P R O C E E D I N G S**</u>

2        THE DEPUTY CLERK:  Your Honor, this is civil

3 matter 18-2610, Cable News Network, Incorporated, et al., v.

4 Donald J. Trump, et al.

5        Will counsel please approach the lectern and state

6 your appearance for the record.

7        MR. BOUTROUS:  Good morning, Your Honor.  Theodore

8 Boutrous for Plaintiffs CNN and Jim Acosta.

9        THE COURT:  Good morning, sir.

10        MS. CHAMPION:  Good morning, Your Honor.  Anne

11 Champion from Gibson Dunn for Plaintiffs CNN and Jim Acosta.

12        MR. LIPSHUTZ:  Good morning, Your Honor.  Joshua

13 Lipshutz from Gibson Dunn for Plaintiffs CNN and Jim Acosta.

14        THE COURT:  Good morning.

15        MR. BURNHAM:  Good morning, Your Honor.  James

16 Burnham here on behalf of the defendants, along with Michael

17 Baer, Eric Womack and Joseph Borson.

18        THE COURT:  All right.  Good morning to you all.

19        We are here for an oral ruling on the plaintiffs'

20 application for a temporary restraining order.

21        And I'd better get some water right away here.

22        (Brief pause.)

23        On November 7th, 2018, President Trump held a news

24 conference at the White House.  Soon after it started, he

25 called on Plaintiff Acosta, a reporter for CNN, to take a

1    question from him.  After Mr. Acosta asked several questions

2    about the caravan of migrants heading to the U.S.-Mexican

3    border, the President indicated that he wanted to move on to

4    call on another reporter but Mr. Acosta would not be seated

5    and continued trying to ask his question and then he would

6    not give up the microphone, even when approached by an

7    intern employed by the White House Press Office who

8    attempted to retrieve it from him.  The President made

9    several comments toward Mr. Acosta while this happened,

10   including, You are a rude, terrible person, and, When you

11   report fake news which CNN does a lot, you are an enemy of

12   the people.  Eventually, Mr. Acosta did relinquish the

13   microphone.

14          That night, his Secret -- the Secret Service asked

15   Mr. Acosta to relinquish his hard pass, his credential that

16   allows him access to the White House press facilities.  That

17   same evening, the White House Press Secretary, Sarah

18   Sanders, posted a video on Twitter purporting to show the

19   exchange between Mr. Acosta, the intern and the President.

20   In a tweet, Ms. Sanders cited the conduct in the video as

21   the reason that Mr. Acosta's hard pass had been revoked.  In

22   a tweet, she characterized Mr. Acosta as placing her hand --

23   his hands on the intern and she also asserted that Mr.

24   Acosta had been disrespectful to his colleagues to not allow

25   them to -- the opportunity to answer a question.

1          The next day, on November 8th, CNN sent a letter

2     to the White House requesting that Ms. -- the reporter's

3     credentials be reinstated immediately.  CNN alleged that the

4     White House simply did not like the content of the questions

5     posed to the President and threatened to take legal action

6     if the revocation was not reversed.

7          The next day, on November 9th, the President

8     suggested that other reporters might have their credentials

9     revoked and that reporters must treat the White House with

10    respect and treat the presidency with respect and he also

11    conceded that Mr. Acosta's -- but he also conceded that Mr.

12    Acosta's conduct toward the Press Office intern had not been

13    overly horrible.

14         Then the long holiday weekend intervened.  And on

15    the morning of Tuesday, November 13th, CNN and Mr. Acosta

16    filed this lawsuit and moved for a temporary restraining

17    order.

18         That morning, after -- the same morning, after the

19    suit was filed, Ms. Sanders issued a written statement

20    setting forth reasons for the revocation of Ms. -- Mr.

21    Acosta's hard pass.  It read:  We have been advised that CNN

22    has filed a complaint challenging the suspension of Jim

23    Acosta's hard pass.  This is just more grandstanding from

24    CNN and we will vigorously defend against this lawsuit.

25    CNN, who has nearly 50 additional hard pass holders, and Mr.

1    Acosta is no more or less special than any other media

2    outlet or reporter with respect to the First Amendment.

3    After Mr. Acosta asked the President two questions, each of

4    which the President answered, he physically refused to

5    surrender a White House microphone to an intern so that

6    other reporters might ask their questions.  This was not the

7    first time this reporter had -- has inappropriately refused

8    to yield to other reporters.  The White House cannot run an

9    orderly and fair press conference when a reporter acts this

10   way which is neither appropriate nor professional.  The

11   First Amendment is not served when a single reporter, of

12   more than 150 present, attempts to monopolize the floor.  If

13   there is no check on this type of behavior, it impedes the

14   ability of the President, the White House staff and members

15   of the media to conduct business.

16        To obtain a temporary restraining order, the

17   plaintiffs must clearly demonstrate, one, a likelihood of

18   success on the merits of their claim; two, a likely

19   irreparable harm in the absence of preliminary relief;

20   three, a balance of the -- that the balance of the equities

21   is in their favor; and, four, that the TRO is in the public

22   interest.  And where the Government is the party opposing

23   the TRO, the Court merges the latter two factors into a

24   single inquiry.

25        Much of our discussion at the hearing the other

1    day concerned the applicability or inapplicability of the

2    D.C. Circuit case Sherrill v. Knight.  I'm going to first

3    talk about the likelihood of success of [sic] the merits

4    with regard to the plaintiffs' Fifth Amendment due process

5    claim.

6         Much of our discussion at the hearing concerned

7    the applicability of Sherrill v. Knight.  I've read the case

8    closely and I think it's fair to conclude, as the Government

9    argued, that there are at least some portions of it that

10   plaintiffs would rely on that are fairly characterized as

11   dicta, but if Sherrill stands for anything at all, I think

12   it's unavoidable to conclude that it -- to conclude anything

13   other than it stands for the Fifth Amendment's due process

14   clause protects a reporter's First Amendment liberty

15   interest in a White House press pass.  Whether that's a

16   holding I agree with or not is another thing, but that is

17   not relevant.  The case has not been abrogated and, as a

18   district judge, I must apply the precedent of this circuit

19   as I see it.

20        So let me quote from Sherrill.  Quote, In our

21   view, the procedural requirements of notice and the factual

22   basis for denial and opportunity for the applicant to

23   respond to these and a final written statement of the

24   reasons for denial are compelled by the foregoing

25   determination that the interest of a bona fide Washington

1    correspondent in obtaining a White House press pass is

2    protected by the First Amendment.  This First Amendment

3    interest undoubtedly qualifies as liberty which may not be

4    denied without due process of law under the Fifth Amendment.

5                 A few more words about Sherrill before I move on.

6                 The Government argued that the holding of Sherrill

7    is limited to Secret Service restrictions based on security

8    concerns, and the Government points out there's nothing in

9    the record here that the security of the President or the

10   White House is at issue, but Sherrill, as I read it,

11   provides no reason why the court's recognition of a First

12   Amendment interest in a press pass -- in a White House press

13   pass would turn on whether that decision to limit that

14   interest was made by the White House Press Office or the

15   Secret Service or any other part of the executive branch,

16   and the case suggests no reason to me why the due process

17   required to deny someone a pass would turn on a specific

18   component of the executive branch that made that decision.

19   The court was very clear that the basis of this interest was

20   rooted in the First Amendment and not the decision of any

21   part of the executive branch to agree that Sherrill should

22   be granted the press pass.

23                The Government also made the point that there is

24   case law for the proposition that the public doesn't have a

25   general First Amendment right to enter the White House

1    grounds.  I have no quarrel with that at all, but Sherrill

2    holds that once the White House opens a portion of it up to

3    reporters for their use, some kind of First Amendment

4    liberty interest protected by a due process right is

5    created, and I simply have no choice but to apply that

6    precedent here.

7         The Government also argued that some of the

8    factual underpinnings of Sherrill had changed and that

9    today, the White House routinely exercises discretion in

10   different ways, giving out hard passes to certain

11   journalists aside from whatever review the Secret Service

12   undertakes for security purposes.  I can see how that might

13   be relevant in examining the nature of whatever liberty

14   interest Sherrill holds is at stake here, but even assuming

15   that was a distinction that would make a difference in terms

16   of how I apply Sherrill, I don't have any evidence in the

17   record here; I don't have any declarations or sworn

18   statements that explain how that factual landscape has

19   shifted since Sherrill was decided.

20        And, finally, the Government makes the point that

21   the First Amendment does not restrict the ability of the

22   President to dictate the terms of how he chooses to engage

23   or not engage with any particular journalist.  That seems

24   entirely correct to me, but nothing in the holding of

25   Sherrill relating to the Fifth Amendment due process right

1     it recognized contradicts that.  In fact, Sherrill

2     explicitly recognizes the President's right to engage with

3     whomever he pleases.  Certainly, he need not ever call on

4     Mr. Acosta again.  But under Sherrill, as I read it, the

5     government must provide Mr. Acosta due process if it is to

6     revoke his hard pass.  Accordingly, the likelihood that the

7     plaintiffs succeed on the First -- on the Fifth Amendment

8     claim hinges on whether the government provided adequate due

9     process to Mr. Acosta.  The court in Sherrill held that this

10    process must include notice, an opportunity to rebut the

11    government's reasons and a written decision.  And all the

12    court -- although the court in Sherrill did not have

13    occasion to address it, when an important interest is at

14    stake and when the government is able to provide this

15    process before deprivation, it generally must do so.  There

16    is no evidence that one of the few exceptions to this rule

17    would apply here such as some kind of emergency.  So I do

18    hold that plaintiffs have demonstrated a likelihood of

19    success on their claim that adequate process was not

20    provided to Mr. Acosta.  Indeed, whatever process occurred

21    within the government is still so shrouded in mystery that

22    the Government could not tell me at oral argument who made

23    the initial decision to revoke Mr. Acosta's press pass --

24    his hard pass.

25              On the notice, as for notice, the Government

1    points to only one statement that could possibly constitute

2    prior notice to Mr. Acosta that his pass would be revoked,

3    the President's statements to him during the exchange at the

4    press conference on November 7th, but the President's

5    statements did not revoke -- did not reference Mr. Acosta's

6    hard pass at all, let alone that it would be revoked;

7    therefore, that statement cannot have put him on notice of

8    the government's intention to revoke it.

9        Now, it is true that the public and Mr. Acosta

10   were eventually provided two things.  First, explanations as

11   to why his hard pass was revoked through Ms. Sanders's

12   tweets; and a written statement of explanation, apparently

13   prompted by this litigation, but given their timing and

14   their lack of connection to Mr. Acosta's opportunity to

15   rebut -- which we'll talk about in a moment -- these belated

16   efforts were hardly sufficient to satisfy due process.

17       As for Mr. Acosta's opportunity to be heard in

18   rebuttal, the Government points to the letter CNN sent to

19   the White House the day after his hard pass was revoked, but

20   this does not reflect a meaningful opportunity to rebut the

21   government's reasons for the revocation or to challenge the

22   appropriateness of the government's action.  Indeed, anyone

23   can avail themselves of the mail, and there's nothing in the

24   record that demonstrates that whoever the decisionmaker --

25   the initial decisionmaker was in this case read or

1    considered the letter.  And, of course, the letter was sent

2    after the revocation, not beforehand.  The need for the

3    opportunity to be heard seems especially important in this

4    case when the record strongly suggests that one of the

5    initial specific reasons for the revocation cited by the

6    government -- that Mr. Acosta laid his hands on the White

7    House intern -- was likely untrue and was at least partly

8    based on evidence that was of questionable accuracy.

9         At oral argument, the Government made the point

10   that more process would not have helped here because the

11   ultimate decisionmaker -- I believe, is how the Government

12   referred to the President -- at a minimum, ratified this

13   action.  Maybe that's so, but on the record before me which,

14   at this point, is devoid of evidence concerning who, in the

15   government, first reached this decision; how they reached

16   the decision; whether they considered CNN's letter or

17   whether they considered potential other responses by the

18   government, I simply cannot assume that that would be so.

19        So in light of all the above, I find that the

20   plaintiffs are likely to succeed on the merits of their

21   Fifth Amendment due process claim.

22        I'll now talk about irreparable harm with regard

23   to that claim.

24        The plaintiffs also must demonstrate that

25   irreparable harm will result in the absence of preliminary

1    relief.  That harm must be both certain and great, and it

2    must be actual and not theoretical.  Here, harm to Mr.

3    Acosta has already occurred.  As already explained, he's

4    demonstrated a likelihood of success on the merits of his

5    claim that his Fifth Amendment due process rights were

6    violated such that his liberty interests were deprived;

7    therefore, I don't need to speculate or theorize as to

8    whether harm will occur absent preliminary relief, but for

9    plaintiffs to satisfy their burden, the harm must be

10   irreparable.  Constitutional injuries are often considered

11   irreparable due to their very nature.  Indeed, the D.C.

12   Circuit has held that, quote, Suits for declaratory and

13   injunctive relief against the threatened invasion of a

14   constitutional right do not ordinarily require proof of any

15   injury other than the threatened constitutional deprivation

16   itself, closed quote.

17         On the other hand, procedural due process injuries

18   do not necessarily cause irreparable harm when, for example,

19   the thing that is deprived is tangible property, because the

20   due process violation that led to that injury might be

21   reparable with money damages.  Here, the procedural due

22   process violation at issue that has led to the deprivation

23   -- to a deprivation of what Sherrill requires me to

24   recognize as a liberty interest as opposed to a property

25   interest that's grounded in, quote, The First Amendment

1    guarantee of freedom of the press, closed quote.

2            Moreover, the First Amendment interests, as

3    recognized in Sherrill, were not vested merely in

4    publications or agencies.  They were liberties of the

5    individual journalists themselves.  For that reason, that

6    CNN may still send another journalist or other journalist to

7    the White House does not make the harm to Mr. Acosta any

8    less irreparable.  Each day that he is deprived of that

9    interest without the process prescribed by the court in

10   Sherrill, he suffers a harm that cannot be remedied in

11   retrospect.  The Court cannot restore his access to press

12   briefings that have already occurred or to conversations in

13   the White House press facilities that have already been had.

14           And so on this highly, highly unusual set of facts

15   and interests at stake, I do find that the plaintiffs have

16   met their burden of establishing that irreparable harm has

17   and will continue to occur in the absence of preliminary

18   relief.

19           The next factors are the balance of the equities

20   and the public interests.

21           In balancing the equities at stake, I find that

22   the harm to Mr. Acosta from sustaining an ongoing violation

23   of his Fifth Amendment due process rights outweighs the

24   government's interest in orderly, respectful press

25   conferences.  This is especially so because the government

1    can serve its stated interest in other ways during this

2    litigation or perhaps until it is back before me arguing

3    that their due process obligations had been fulfilled.

4    Obviously, the balance of the equities would not likely have

5    come out this way if Mr. Acosta had been excluded for safety

6    or security reasons, in which case, my deference to the

7    executive equities would be far, far higher.  But even in

8    this circumstance, I don't take lightly the executive

9    branch's weighty general interest in control of its White

10   House press facility, but the balance here is tipped by the

11   fact that Sherrill obligates me to recognize the violation

12   of Mr. Acosta's due process rights and the resulting impact

13   on his First Amendment interests.  So in finding -- also, in

14   finding that these factors favor the plaintiffs, I have also

15   considered case law that suggests that constitutional

16   violations are always contrary to the public's interest.

17         So because the plaintiffs have shown a likelihood

18   that the government has violated Mr. Acosta's Fifth

19   Amendment rights under Sherrill, because the type of injury

20   he has suffered is irreparable and because the public

21   interest in the balance of equities favor granting a

22   temporary restraining order, I will grant the application

23   for a -- for the temporary restraining order here.  I will

24   order the defendants immediately restore Mr. Acosta's hard

25   pass until further order of the Court or the restraining

1    order expires.  And if, at some point after restoring the

2    hard pass, the Government would like to move to vacate the

3    restraining order on the grounds that it has fulfilled its

4    due process obligations, then it may, of course, do so and I

5    will promptly address that and then the remaining bases for

6    the TRO.

7          I want to emphasize the very limited nature of

8    today's ruling.  In resolving this TRO, I haven't -- because

9    I've found that it must be granted on -- as to the due

10   process claim, I haven't had to reach the plaintiffs' First

11   Amendment claim at all in which they alleged that the

12   government engaged in viewpoint or content discrimination.

13   So I want to make very clear a couple of things.  I have not

14   determined that the First Amendment was violated here; I

15   have not determined what legal standard would apply to the

16   First Amendment claim here; I have not determined the

17   specific nature of the First Amendment interest that

18   Sherrill recognizes -- or that Sherrill at least doesn't

19   describe but recognizes, yes; and I haven't determined what

20   portions of Sherrill, if any, would bind me on those

21   questions.

22          So let me turn to the parties, then, and suggest

23   that as far as procedurally moving forward goes, one -- the

24   avenue I thought of is to give you all some time to consult

25   with your clients; assess your positions; and come back

1    early next week -- perhaps Tuesday afternoon -- to see how

2    you all would like to proceed from here.  I trust the --

3    this litigation will continue in a rapid pace.  Either

4    party?

5             MR. BOUTROUS:  Thank you.  Thank you very much,

6    Your Honor.

7             That sounds like a good process to us.  We can

8    confer.  We may be able to just confer and then report back

9    Monday with the proposal and see if we can work out either a

10   briefing schedule for the preliminary injunction or

11   something else and, if not, we can just come back and see

12   you on Tuesday.

13            THE COURT:  All right.  So your proposal would be

14   a written joint report for the parties --

15            MR. BOUTROUS:  Would that --

16            THE COURT:  -- on Monday?

17            MR. BOUTROUS:  Yeah.  Would that work for the

18   Court?

19            THE COURT:  All right.  That's fine, if that's --

20   but I'd like to hear from Mr. Burnham.

21            MR. BURNHAM:  Your Honor, I'd like to talk to our

22   clients.  That should be okay, but I'd just like to talk to

23   our clients and come up with a proposal before we --

24            THE COURT:  Absolutely.  I mean, we can't have any

25   quicker turnaround than a joint report --

```
 1                 MR. BURNHAM:  Right.

 2                 THE COURT:  -- on Monday.  So --

 3                 MR. BURNHAM:  Right.

 4                 THE COURT:  I mean, I --

 5                 MR. BURNHAM:  The timing certainly works for us.

 6     Thank you.

 7                 THE COURT:  Fair enough.  So I'll get that report.

 8     Obviously, if you can agree on something, great; if you

 9     can't agree, if you would still submit it jointly but just

10     lay out your respective positions on where we go from here,

11     I'll take that under advisement, and my hope is -- well,

12     depending on what you all agree to, if we need to come back

13     to court next week, even though it's the short week -- the

14     holiday -- I will be available to do that.

15                 MR. BURNHAM:  Okay.  Thank you, Your Honor.

16                 THE COURT:  All right.

17                 MR. BOUTROUS:  We greatly appreciate it, Your

18     Honor.

19                 THE COURT:  All right.

20                 MR. BOUTROUS:  And then just procedurally, under

21     the TRO, we'll just proceed to get the hard pass back

22     immediately and have it reactivated.  Thank you very much.

23                 THE COURT:  Yes.  Is there any other -- anything

24     further -- else from the plaintiffs that you think I need to

25     address today before I turn to Mr. Burnham?
```

USCA Case #24-5004     Document #2055098          Filed: 05/17/2024     Page 122 of 256

```
1                    MR. BOUTROUS:  I think that's it, Your Honor.

2                    THE COURT:  All right.

3                    MR. BOUTROUS:  Thank you.

4                    THE COURT:  Sir?

5                    MR. BURNHAM:  So Your Honor, under the local

6      rules, our opposition to the PI is due on Tuesday.

7                    THE COURT:  Okay.

8                    MR. BURNHAM:  Would it be okay, given all that's

9      going on, to suspend that deadline until we file our joint

10     status report?

11                   THE COURT:  Yeah.  I assume the plaintiffs --

12                   MR. BURNHAM:  I assume --

13                   THE COURT:  -- would agree to that.

14                   MR. BURNHAM:  We haven't spoken about it.

15                   THE COURT:  Yes.

16                   MR. BOUTROUS:  That's fine with --

17                   MR. BURNHAM:  Okay.

18                   MR. BOUTROUS:  That's fine with us, Your Honor.

19                   THE COURT:  Yeah.  So that deadline certainly will

20     be, you know, held in abeyance --

21                   MR. BURNHAM:  Thank you, Your Honor.

22                   THE COURT:  -- vacated until I get your report and

23     we'll see where we go from there.

24                   MR. BURNHAM:  Thank you, Your Honor.

25                   THE COURT:  All right.
```

```
 1              MR. BOUTROUS:  Thank you.

 2              THE COURT:  If there's nothing further, then,

 3       counsel's dismissed.

 4              THE DEPUTY CLERK:  All rise.  This Honorable Court

 5       is adjourned.

 6              (Proceedings concluded at 10:28 a.m.)

 7                   *  *  *  *  *  *  *  *  *  *  *  *

 8              CERTIFICATE OF OFFICIAL COURT REPORTER

 9       I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify

10       that the above and foregoing constitutes a true and accurate

11       transcript of my stenographic notes and is a full, true and

12       complete transcript of the proceedings to the best of my

13       ability, dated this 16th day of November 2018.

14                             /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                               Official Court Reporter
15                             United States Courthouse
                               Room 6722
16                             333 Constitution Avenue, NW
                               Washington, DC 20001
17

18

19

20

21

22

23

24

25
```

JA121

# EXHIBIT C



# Congressional News Media and the House and Senate Press Galleries

**Updated April 13, 2017**

**Congressional Research Service**

https://crsreports.congress.gov

R44816

**CRS REPORT**
Prepared for Members and
Committees of Congress

JA123

Case 1:23-cv-02321-JDB   Document 24-4   Filed 10/04/23   Page 3 of 21
USCA Case #24-5004   Document #2055098   Filed: 05/17/2024   Page 126 of 256

*Congressional News Media and the House and Senate Press Galleries*

# Summary

The House and Senate press galleries provide services both for journalists and for Members of Congress. The news media helps Members communicate with the public, and enables the public to learn about policy initiatives, understand the legislative process, and observe elected officials representing their constituents. In the earliest Congresses, news reports commonly provided the most comprehensive record of congressional proceedings, even for Members themselves, because few official documents were kept. To accommodate the press, and in response to its growth through the mid-19th century, the House and Senate established formal press galleries in 1877, providing resources and organization for journalists reporting from the Capitol. This report provides information about the rules and authorities that affect media coverage of Congress, current practices among the press galleries, and selected data on gallery membership since the 94th Congress. It also provides a brief discussion of considerations that commonly underlie the galleries' practices or may affect gallery operations and congressional media rules.

Although they are separate entities, the House and Senate press galleries have traditionally operated under the same governing rules, approved by the Speaker of the House and the Senate Committee on Rules and Administration. Additionally, chamber rules addressing use of electronic devices, photography, and recording or broadcasting of audio and video, also affect journalists covering Congress. Increasingly, non-journalists may also be able to effectively report news from the Capitol with handheld Internet-connected devices. Many elements of the original press gallery rules have persisted over time, and include provisions to preserve journalistic independence from encroachment by Congress. One key feature that helps preserve this independence is the delegation of many gallery responsibilities to correspondents' committees, comprised of gallery members, and to nonpartisan House and Senate staff. Requirements for press credentials, along with other gallery practices, also reflect a balance between ensuring congressional access for professional reporters while managing the limited space and resources available in the Capitol.

Today, four correspondents' committees exist to oversee the seven congressional press galleries: one for the House and Senate daily press galleries; one for the House and Senate periodical press galleries; one for the House and Senate radio/television galleries; and one for the Senate press photographers' gallery. Credentials from a correspondents' committee provide journalists with access to the relevant House and Senate galleries and office resources. Each committee's credentialing requirements, along with other gallery rules and the names of accredited journalists and news outlets, are published in the *Official Congressional Directory*.

The congressional press galleries also provide services for Members of Congress and staff. This can include distributing press releases or helping to facilitate Member communications with journalists. Members can use a number of sites around the Capitol Complex for press conferences or interviews. Some of these locations need to be reserved through a particular press gallery. Press gallery staff can also assist Members with media logistics and security for certain events.

Although the press galleries have retained similar structures and practices over the years, changes in gallery membership and broader trends in how news is produced and distributed may be relevant as the House, Senate, and correspondents' committees consider the existing rules related to media coverage of Congress and the press galleries. Since the 94th Congress, for example, the number of credentialed correspondents has grown, particularly for the radio/television galleries, but the number of outlets they represent has decreased. Cable and satellite television and the Internet allow for smaller, more specialized news outlets to exist, yet many news outlets are consolidated under larger parent companies. Additionally, journalists making use of the multimedia capacities of Internet-based journalism may find it difficult to categorize themselves under the current gallery structure.

Case 1:23-cv-02321-JDB  Document 24-4  Filed 10/04/23  Page 4 of 21
USCA Case #24-5004  Document #2055098  Filed: 05/17/2024  Page 127 of 256
*Congressional News Media and the House and Senate Press Galleries*

# Contents

Introduction and Origins of Press Galleries .................................................................... 1

General Authorities for Media and Press Galleries ......................................................... 2
   House of Representatives .............................................................................................. 2
   Senate ............................................................................................................................ 3
   Correspondents' Committees ........................................................................................ 4

Related Rules Affecting Media in Congress .................................................................... 5

Typical Press Credentialing Requirements ....................................................................... 6

Daily Press Galleries ........................................................................................................ 7

Periodical Press Galleries ................................................................................................. 7

Radio and Television (Radio/TV) Galleries ..................................................................... 8
   House Radio/TV Gallery and Related Resources .......................................................... 8
   Senate Radio/TV Gallery and Related Resources ......................................................... 9

Press Photographers' Gallery ........................................................................................... 9

Gallery Membership in Selected Years ........................................................................... 10

Additional Considerations and Developments ............................................................... 13
   Independence of Correspondents' Committees ............................................................ 13
   Establishing and Maintaining Journalistic Standards ................................................... 14
   New Media Environment and Gallery Operations ....................................................... 15

Concluding Observations ................................................................................................ 16

## Figures

Figure 1. Number of Credentialed Correspondents in Selected Congresses ................................. 12
Figure 2. Number of Credentialed Media Outlets in Selected Congresses ................................... 12

## Tables

Table 1. Number of Credentialed Correspondents in Selected Congresses ................................... 10
Table 2. Number of Credentialed Media Outlets in Selected Years ............................................. 11

## Contacts

Author  Information .......................................................................................................... 16

JA125

Case 1:23-cv-02321-JDB   Document 24-4   Filed 10/04/23   Page 5 of 21
USCA Case #24-5004    Document #2055098        Filed: 05/17/2024    Page 128 of 256
*Congressional News Media and the House and Senate Press Galleries*

# Introduction and Origins of Press Galleries

Reporters have covered Congress since its earliest sessions. Press coverage of Congress and other government institutions helps inform citizens about public policy, the legislative process, and representation. It is also thought to improve government accountability.[1] As the number of reporters and news outlets covering Congress increased during the 1800s, the House and Senate established formal press galleries, resources, and administrative rules to help manage the Capitol press corps while preserving its access and independence.

The first congressional reporters mainly transcribed the floor debates and provided more detailed accounts of congressional proceedings than what was available in the official records maintained in the *House Journal* and the *Senate Journal*.[2] This information, sometimes provided by Members of Congress themselves, would be sent as correspondence to newspaper publishers outside the capital area. Known correspondents were often permitted on the chamber floors so that they could better hear the proceedings, but correspondents were sometimes restricted to the public galleries. By the middle of the 1800s, each chamber had established its own designated reporters' gallery space.

In 1877, the House and Senate decided to create a committee of correspondents to oversee press gallery membership and administration.[3] The *Official Congressional Directory* first published a list of 86 correspondents entitled to admission to the reporters' galleries in 1880[4] and published press gallery rules in 1888.[5] Separate galleries and correspondents' committees now exist for the daily printed press, periodical press, radio and television press, and press photographers. Correspondents' committees, often upon request of gallery members, may propose changes to their gallery rules, subject to the approval of the Speaker of the House and the Senate Committee on Rules and Administration.

Today, the congressional press galleries provide services both for journalists and for Members of Congress. For the media format and chamber it represents, each press gallery is typically responsible for credentialing journalists, maintaining Capitol workspace for correspondents, and coordinating coverage for news conferences, hearings, and other congressional events. The press galleries also distribute press releases; provide the press with information on floor proceedings, upcoming rules, amendments, and legislation; provide information on committee hearings, witness testimony, and mark-ups; and deliver messages or facilitate Member communications with journalists. In addition to these regular responsibilities, the House and Senate press galleries

---

[1] W. Lance Bennet, and William Serrin, "The Watchdog Role," in *The Press*, eds. Geneva Overholser and Kathleen Hall Jamieson (Oxford: Oxford University Press, 2005), ch. 10, pp. 169-188; Thomas Patterson and Philip Seib, "Informing the Public," ibid., ch. 11, pp. 189-202.

[2] Today, much of this information is officially available in the *Congressional Record* from the Government Publishing Office (GPO), but the *Record* was not published until 1873. Precursors to the *Record*, including the *Annals of Congress* (1789-1824), *Register of Debates* (1824-1837), and the *Congressional Globe* (1833-1873), were compiled by private publishers and varied in the scope of their coverage. See U.S. Senate Historical Office, "Reporters of Debate and the Congressional Record," at http://www.senate.gov/artandhistory/history/common/briefing/ Reporters_Debate_Congressional_Record.htm; Library of Congress, "A Century of Lawmaking for a New Nation: U.S. Congressional Documents and Debates, 1774-1875," available at http://memory.loc.gov/ammem/amlaw/lawhome.html; Elizabeth Gregory McPherson, "Reports of the Debates of the House of Representatives During the First Congress," *Quarterly Journal of Speech*, vol. 30, no. 1, February 1944, pp.64-71.

[3] U.S. Senate Press Gallery, "Gallery History," at http://www.dailypress.senate.gov/?page_id=81.

[4] U.S. Congress, Senate, *Official Congressional Directory*, 2nd ed., 46th Cong., 2nd sess., corrected to January 29, 1880, (Washington: GPO, 1880), pp. 93-94.

[5] U.S. Congress, Senate, *Official Congressional Directory*, 1st ed., 50th Cong., 1st sess., corrected to December 3, 1887, S. Mis. 1 (Washington: GPO, 1887), p. 160.

---

JA126

Case 1:23-cv-02321-JDB   Document 24-4   Filed 10/04/23   Page 6 of 21
USCA Case #24-5004    Document #2055098      Filed: 05/17/2024    Page 129 of 256
*Congressional News Media and the House and Senate Press Galleries*

take on additional roles during presidential elections, overseeing arrangements and credentialing for daily press at the national political conventions and presidential inaugurations.

The degree of autonomy granted to each press gallery and correspondents' committee results from responsibilities bestowed upon them by the Speaker of the House and the Senate Committee on Rules and Administration. Many rules and practices are similar across the different galleries and correspondents' committees. Additional House and Senate chamber rules that apply generally to photography, use of electronic equipment, and audio and video recording or broadcasting in the Capitol may also affect how members of the press cover Congress.

Due to the similarities across galleries, this report first presents the general rules and authorities that affect the press galleries and media coverage of Congress, followed by the credentialing requirements that the galleries typically share. Key distinctions between the daily press galleries, periodical press galleries, radio and television galleries, and press photographers' gallery are then discussed. To highlight some of the changes in gallery composition over time, data are provided comparing the number of gallery members and news outlets represented in 10-year intervals between the 94th Congress (1975-1976) and the 114th Congress (2015-2016). The report concludes with a brief discussion of some of the considerations that commonly underlie the galleries' practices and some current developments in news production and distribution that may affect the congressional press galleries.

# General Authorities for Media and Press Galleries

The House and Senate press galleries have historically operated under a unified set of governing rules, approved by the Speaker of the House and the Senate Committee on Rules and Administration.[6] The rules established for each press gallery type, and the names of gallery members, are published in the *Official Congressional Directory*. Because the galleries are creations of each chamber, separate House and Senate authorities are responsible for their own galleries, and each chamber hires its own administrative gallery staff. In practice, however, the galleries may often coordinate with one another on a number of matters. The sections below provide more details on press gallery rules and authorities for the House and for the Senate. A third section addresses the shared delegation of responsibilities from the chambers to the correspondents' committees, which began in 1877.

## House of Representatives

Media access to the House of Representatives is subject to the discretion and control of the Speaker of the House. This tradition was first established by a House resolution in 1838 enabling the Speaker to admit press representatives to the floor.[7] When the new House chamber was completed in 1857, a designated press space was created in the gallery above the Speaker's chair, and the rules of the House were amended to allow the Speaker to grant press gallery access.[8] The

---

[6] The chambers have shared press gallery rules since at least 1888, when the rules pertaining to the regulation of the congressional press galleries first appeared in the *Official Congressional Directory*. See U.S. Congress, Senate, *Official Congressional Directory*, 1st ed., 50th Cong., 1st sess., corrected to December 3, 1887, S. Mis. 1 (Washington: GPO, 1887), p. 160.

[7] Asher C. Hinds, *Hinds' Precedents of the House of Representatives of the United States* (Washington, DC: GPO, 1907), vol. 5, ch. 148, §7305, pp. 1116-1117. The Speaker's general authority to maintain order and decorum in the House galleries or lobby is found in House Rule I, clause 2.

[8] *House Journal*, December 23, 1857, vol. 54, pp. 116-117; Asher C. Hinds, *Hinds' Precedents of the House of Representatives of the United States* (Washington, DC: GPO, 1907), vol. 5, ch. 148, §7304, pp. 1116-1117; "Rule VI:

Case 1:23-cv-02321-JDB   Document 24-4   Filed 10/04/23   Page 7 of 21
USCA Case #24-5004   Document #2055098   Filed: 05/17/2024   Page 130 of 256
*Congressional News Media and the House and Senate Press Galleries*

press gallery was outfitted by the superintendent of the House with "desks and seats, and conveniences for taking notes," and a room was also reserved for the use of telegraph companies and reporters.[9] In 1939, language was added to the House rules designating a portion of the gallery for radio, wireless, and similar correspondents, who were subject to rules similar to those that applied to print reporters.[10]

Today, the Speaker's role in regulating gallery admission and floor access for daily print and periodical journalists is found in Rule VI, clause 2, of the *Rules of the House of Representatives*. This clause also states that the Standing Committee of Correspondents will supervise the daily press gallery and designate its employees, and that the Executive Committee of Correspondents for the Periodical Press Gallery will perform those same functions for the periodical gallery. The Speaker's role in regulating gallery admission and any floor access for radio and television journalists is found in Rule VI, clause 3, which also delegates radio/TV gallery supervision and designation of its employees to the Executive Committee of Radio and Television Correspondents' Galleries.[11] The professional staff who operate the House press galleries report to the Chief Administrative Officer and Committee on House Administration.

## Senate

Records indicate that in 1838, the Senate adopted rules granting floor privileges to local newspaper reporters, and in 1839, the Senate Committee on the Contingent Fund recommended that gallery seats be reserved for reporters.[12] Initially, the vice president oversaw the Senate press gallery. On March 12, 1873, the Senate agreed to a resolution that gave the Rules Committee jurisdiction over the Senate press gallery and authorized that the committee provide no more than one gallery seat to each newspaper. Additionally, a seat on the floor could be reserved for Associated Press reporters.[13] In 1939, the Senate amended its existing rules to include reporters transmitting news via radio, wire, wireless, and similar media.[14]

---

Official Reporters and News Media Galleries," in U.S. Congress, House, *Rules of the House of Representatives, One Hundred Fifteenth Congress*, prepared by Karen L. Haas, Clerk of the House of Representatives, 115th Cong., 1st sess., January 5, 2017, p. 5, available at https://rules.house.gov/sites/republicans.rules.house.gov/files/115/PDF/House-Rules-115.pdf.

[9] *House Journal*, December 23, 1857, vol. 54, pp. 116-117.

[10] "Assignment of Space in Gallery of House of Representatives to Radio Reporters," consideration of H. Res. 169, *Congressional Record*, vol. 84, part 4 (April 20, 1939), p. 4561. The evolution of these clauses from Rule VI is discussed in Sections 693-694 of U.S. Congress, House, *Constitution, Jefferson's Manual, and Rules of the House of Representatives of the United States, One Hundred Fourteenth Congress*, 113th Cong., 2nd sess., H. Doc. 113-181, (Washington: GPO, 2015), at https://rules.house.gov/HouseRulesManual114/rule6.xml.

[11] "Rule VI: Official Reporters and News Media Galleries," in U.S. Congress, House, *Rules of the House of Representatives, One Hundred Fifteenth Congress*, prepared by Karen L. Haas, Clerk of the House of Representatives, 115th Cong., 1st sess., January 5, 2017, p. 5, available at https://rules.house.gov/sites/republicans.rules.house.gov/files/115/PDF/House-Rules-115.pdf.

[12] Information on the early Senate press is reported in U.S. Congress, Senate Committee on Rules, *Use of Reporters' Galleries in Senate*, report to accompany S. Res. 117, 76th Cong., 1st sess., April 21, 1939, Report No. 317 (Washington: GPO, 1939).

[13] Sen. Henry Anthony, "Duties of Committee on Rules," *Congressional Record*, vol. 1 (March 12, 1873), p. 48; F.B. Marbut, *News from the Capital: The Story of Washington Reporting* (Carbondale, IL: Southern Illinois University Press, 1971), p. 135.

[14] "The Senate Press Gallery," consideration of S. Res. 117, *Congressional Record*, vol. 84, part 5 (April 25, 1939), pp. 4721-4723. See also U.S. Congress, Senate Committee on Rules, *Use of Reporters' Galleries in Senate*, report to accompany S. Res. 117, 76th Cong., 1st sess., April 21, 1939, Report No. 317 (Washington: GPO, 1939).

Case 1:23-cv-02321-JDB   Document 24-4   Filed 10/04/23   Page 8 of 21
USCA Case #24-5004   Document #2055098         Filed: 05/17/2024   Page 131 of 256
*Congressional News Media and the House and Senate Press Galleries*

Under the current *Standing Rules of the Senate*, Rule XXV, paragraph 1(n)(1), provides the Committee on Rules and Administration with the general authority to make rules and regulations for the Senate floor and galleries.[15] Further directives providing the Committee on Rules and Administration with authority to make rules and regulations for the reporters' galleries and related press facilities on the Senate side of the Capitol are found in Rule XXXIII, paragraph 2.[16] Rule VI of the *Rules for Regulation of the Senate Wing* provides additional details on admission to and administration of each of the Senate press galleries, and notes that the Sergeant at Arms is responsible for maintaining order in the galleries.[17] The professional staff who operate the galleries report to the Senate Sergeant at Arms and the Senate Committee on Rules and Administration.

## Correspondents' Committees

Since 1877, the Speaker of the House and the Senate Committee on Rules and Administration have provided for the correspondents' committees to make many of the decisions related to the operation of the galleries.[18] One correspondents' committee exists per gallery type, which helps ensure that gallery practices are consistent between the chambers, even as the House and Senate maintain separate gallery facilities. Four correspondents' committees exist today: one for the House and Senate daily press galleries; one for the House and Senate periodical press galleries; one for the House and Senate radio/TV galleries; and one for the Senate press photographers' gallery.

A main responsibility of each correspondents' committee is determining which journalists receive congressional press credentials. Press credentials may be offered on a temporary or permanent basis,[19] and they entitle journalists admission to a particular gallery type in both the House and the Senate, along with access to the resources provided by the gallery's office. Changes to press gallery rules or credentialing requirements may be suggested by the correspondents' committees on behalf of gallery members, but are subject to the approval of the Speaker of the House and the Committee on Rules and Administration.[20]

Correspondents' committee members must be members in good standing of the gallery they oversee. They are selected by fellow gallery members in accordance with the rules set by that gallery. This system is thought to help preserve the independence of the press corps by removing it from direct congressional influence. It is also thought to help maintain journalistic integrity in

---

[15] Rule XXV, paragraph 1(n)(1) in U.S. Congress, Senate Committee on Rules and Administration, *Standing Rules of the Senate*, revised to January 24, 2013, 113th Cong., 1st sess., November 4, 2013, Doc. 113-18 (Washington: GPO, 2013), p. 26, available at http://www.gpo.gov/fdsys/pkg/CDOC-113sdoc18/pdf/CDOC-113sdoc18.pdf.

[16] Rule XXXIII, paragraph 2, in ibid., pp. 59-60.

[17] See Rule VI of the *Rules for the Regulation of the Senate Wing* in U.S. Congress, Senate Committee on Rules and Administration, *Senate Manual*, 113th Cong., 1st sess., S. Doc. 113-1 (Washington: GPO, 2014), pp. 211-217.

[18] U.S. Senate Press Gallery, "Gallery History," at http://www.dailypress.senate.gov/?page_id=81; Marbut, pp. 154-156.

[19] Permanent press credentials are only valid for the Congress during which they were issued. At the start of a new Congress, each journalist who had permanent credentials for the preceding Congress must reapply to retain them.

[20] U.S. Congress, Joint Committee on Printing, *Official Congressional Directory*, 114th Cong., 1st sess., corrected to February 12, 2016, S.Pub. 114-1 (Washington: GPO, 2016) (hereinafter cited as *Official Congressional Directory*, 114th Cong., 1st sess.). For daily press galleries, see p. 982; for press photographers' gallery, see p. 1003; for radio/TV galleries, see. p. 1016; and for periodical press galleries, see. p. 1064.

JA129

Case 1:23-cv-02321-JDB   Document 24-4   Filed 10/04/23   Page 9 of 21
USCA Case #24-5004   Document #2055098   Filed: 05/17/2024   Page 132 of 256
*Congressional News Media and the House and Senate Press Galleries*

the congressional press corps, as the rules agreed upon by gallery members reflect commonly held professional norms and standards of the news industry.[21]

As gallery members themselves, correspondents' committee members must remain primarily employed as journalists. The day-to-day management of the gallery facilities is instead tasked to professional, nonpartisan staff members hired by the House and Senate to operate the press facilities for each media type. Press gallery staff for each chamber report to the Chief Administrative Officer and the Committee on House Administration or the Senate Sergeant at Arms and the Senate Committee on Rules and Administration.

# Related Rules Affecting Media in Congress

In addition to the House and Senate rules that directly address the operation of the press galleries, other provisions in each chamber's rules affect media coverage of Congress. For more information on these topics, see CRS Report R44665, *Video Broadcasting of Congressional Proceedings*, by Sarah J. Eckman. Many of these provisions address photography or the broadcasting or recording of audio and video. The press gallery rules regulate these activities for credentialed correspondents, yet handheld electronic devices, like smartphones, have made it technologically possible for individuals who are not reporters to capture and transmit visual and/or audio materials.

Some of these rules prohibit certain activities to preserve decorum in the chamber, like photographing or broadcasting proceedings, or prohibit use of particular electronic devices on which these activities might occur. In the House and Senate galleries, for example, use of cameras and electronic devices is generally prohibited.[22] These provisions apply to any individual, including accredited journalists. The widespread ability to report news from smartphones and other handheld Internet-connected devices may be a relevant consideration for broader chamber rules and policies like these regarding photography, broadcasting, or use of electronic devices.

Other rules enable the House, the Senate, and committees within each chamber to broadcast their own proceedings. Live audio and video feeds and past recordings of floor proceedings have been produced by the House since 1977,[23] and by the Senate since 1986.[24] Employees of the House

---

[21] For some examples of these journalistic values, see Robert M. Entman, "The Nature and Source of News," in *The Press*, eds. Geneva Overholser and Kathleen Hall Jamieson (Oxford: Oxford University Press, 2005), ch. 3, pp. 48-65.

[22] For the House, see Rule XVII, clause 5, and its interpretations as discussed in Section 945 of U.S. Congress, House, Constitution, Jefferson's Manual, and Rules of the House of Representatives of the United States, One Hundred Fourteenth Congress, 113th Cong., 2nd sess., H. Doc. 113-181, [compiled by] Thomas J. Wickham, Parliamentarian (Washington: GPO, 2015), at https://rules.house.gov/HouseRulesManual114/rule17.xml. For the Senate, see "Rule IV: Taking of Pictures Prohibited; Use of Mechanical Equipment in Chamber," U.S. Congress, Senate, Rules for Regulation of the Senate Wing of the United States Capitol and Senate Office Buildings, in Senate Manual, 113th Cong., 1st sess., S. Doc. 113-1, prepared by the Committee on Rules and Administration (Washington: GPO, 2014) p. 193; "Use of Tablet Computer Under Interpretative Ruling 444," Dear Colleague letter from Sen. Barbara Boxer, chair, and Sen. Johnny Isakson, vice-chair, Senate Select Committee on Ethics, and Sen. Charles E. Schumer, chair, and Sen. Lamar Alexander, ranking member, Senate Committee on Rules and Administration, June 12, 2012, at http://www.ethics.senate.gov/public/index.cfm/files/serve?File_id=A25EEB37-8A15-44E2-A9C9-FC47756047C1; Brian Friel, "Calculated Move," National Journal, March 24, 2007.

[23] H.Res. 866 (95th Congress), agreed to October 27, 1977; "Providing for Radio and Television Coverage of House Proceedings," *Congressional Record,* vol. 123, part 27 (October 27, 1977), pp. 35425-35437; "Rule V: Broadcasting the House," in U.S. Congress, House, *Rules of the House of Representatives, One Hundred Fifteenth Congress*, prepared by Karen L. Haas, Clerk of the House of Representatives, 115th Cong., 1st sess., January 5, 2017, p. 4, available at https://rules.house.gov/sites/republicans.rules.house.gov/files/115/PDF/House-Rules-115.pdf.

[24] S.Res. 28 (99th Congress), agreed to February 27, 1986; *Congressional Record*, vol. 132, part 3 (February 27, 1986),

JA130

Case 1:23-cv-02321-JDB   Document 24-4   Filed 10/04/23   Page 10 of 21
USCA Case #24-5004   Document #2055098       Filed: 05/17/2024   Page 133 of 256
*Congressional News Media and the House and Senate Press Galleries*

Recording Studio and the Senate Recording Studio are responsible for operating the recording equipment for each chamber. Accredited radio/TV correspondents may request access to these audio or video feeds to rebroadcast, as long as the footage is used for news or public affairs programs, not for commercial or political purposes. The Legislative Reorganization Act of 1970 enabled the House and Senate to allow photographic, radio, and television coverage of proceedings, subject to additional rules established by each committee.[25]

Today, the House and Senate also provide live and archived video of floor proceedings on their websites, enabling anyone with an Internet connection to access these official video feeds. Beginning in 2010, the House made floor videos available under the direction of the Clerk of the House.[26] The Senate began providing floor videos on its website in January 2012 under the direction of the Sergeant at Arms.[27]

# Typical Press Credentialing Requirements

Press credentialing requirements are published in each edition of the *Official Congressional Directory*, and are often available on the press gallery websites. Press credentials admit individual journalists to the congressional press galleries and allow journalists access to the resources provided for their medium, like workspace in the Capitol. The *Official Congressional Directory* also lists the names of the individuals who hold current permanent credentials for each gallery and the news organizations represented.[28]

Each correspondents' committee administers its own credentialing requirements at the start of every Congress, subject to the approval of the Speaker of the House and the Senate Committee on Rules and Administration. Journalists seeking press credentials must submit a new application at the start of every Congress to continue their gallery membership. Temporary credentials may be available to journalists who do not meet all of the gallery's regular requirements. These requirements are typically similar across the galleries and have been consistent over time. Generally, to receive a press credential from a congressional gallery, an individual

---

pp. 3130-3158; Nancy J. Schwerzler, "Leaders of Senate Agree on TV Plan, Rule Reforms," *The Sun*, February 21, 1986, pp. 1A-13A; Standing Order 69, "Television and Radio Broadcast of Senate Chamber," U.S. Congress, Senate, *Senate Manual*, 113th Cong., 1st sess., S. Doc. 113-1, prepared by the Committee on Rules and Administration (Washington: GPO, 2014) pp. 129-133.

[25] P.L. 91-510, 84 Stat. 1140. See §116(b) for House committees and §116(a) and §242(a) for Senate committees. For the House, also see Rule XI, clause 4, in U.S. Congress, House, *Rules of the House of Representatives, One Hundred Fifteenth Congress*, prepared by Karen L. Haas, Clerk of the House of Representatives, 115th Cong., 1st sess., January 5, 2017, pp. 23-24, available at https://rules.house.gov/sites/republicans.rules.house.gov/files/115/PDF/House-Rules-115.pdf. For the Senate, also see Rule XXVI, paragraph 5(c) in U.S. Congress, Senate Committee on Rules and Administration, *Standing Rules of the Senate*, 113th Cong., 1st sess., November 4, 2013, Document 113-18 (Washington: GPO, 2013), pp. 32-33.

[26] HouseLive is available at http://www.houselive.gov. See also U.S. Congress, House Committee on House Administration, *Oversight of the Clerk, Sergeant at Arms, Chief Administrative Officer, and Inspector General of the House of Representatives*, hearing, 111th Cong., 2nd sess., April 28, 2010 (Washington: GPO, 2010), pp. 5-13, 164; U.S. Congress, House Committee on Appropriations, Subcommittee on Legislative Branch, *Legislative Branch Appropriations for 2015*, Part 2 - Fiscal Year 2015 Legislative Branch Appropriations Requests, 113th Cong., 2nd sess., March 4-6, 26 2014 (Washington: GPO, 2015), p. 233.

[27] Senate floor webcast is available at http://www.senate.gov/floor.

[28] The most recent gallery rules, along with the names of gallery staff, correspondents' committee members, gallery members, and news organizations represented for each gallery is found in the *Official Congressional Directory*, 114th Cong., 1st sess. For daily press galleries, see pp. 981-1002; for press photographers' gallery, see pp. 1003-1010; for radio/TV galleries, see pp. 1015-1062; and for periodical press galleries, see pp. 1063-1082.

Case 1:23-cv-02321-JDB   Document 24-4   Filed 10/04/23   Page 11 of 21
USCA Case #24-5004    Document #2055098        Filed: 05/17/2024    Page 134 of 256
*Congressional News Media and the House and Senate Press Galleries*

- must be a correspondent for that medium, in good standing at a reputable employing organization;
- must be primarily employed as a journalist;
- cannot pursue any claim before Congress or another department of government;
- cannot be employed by the U.S. government or a foreign government; and
- cannot engage in direct or indirect lobbying activity.

Every four years, each correspondents' committee is also responsible for providing press credentials for the presidential nominating conventions and inauguration. Beyond these basic parameters, each gallery may set additional credentialing requirements.

# Daily Press Galleries

The original House and Senate press galleries were established in the 1800s for members of the daily printed press, which today includes newspapers, wire services, and electronic news organizations. Correspondents seeking daily press credentials must work for a publication that either (1) publishes daily and holds general publication periodicals mailing privileges from the U.S. Postal Service; or (2) has been in publication continuously for 18 months and has as its principal business "the daily dissemination of original news and opinion of interest to a broad segment of the public."[29]

The daily press galleries are overseen by the Standing Committee of Correspondents. The Standing Committee of Correspondents is comprised of members of the daily press gallery who are elected to two-year terms.[30] Day-to-day operations of the daily press galleries are managed by professional staff members from each chamber. The House press gallery offices are located in H-315 - H-319 and employ four professional staff. The Senate press gallery offices are located in S-316 and employ seven professional staff.[31]

Although the Standing Committee of Correspondents is responsible for accreditation decisions, the Senate press gallery office serves as a liaison between the committee and the journalists, receiving applications, supporting materials, or fees submitted by journalists. In addition to other credentialing requirements, journalists in the daily press galleries must reside in the Washington, DC, area.

# Periodical Press Galleries

The periodical press galleries of the House and Senate include correspondents working for magazines, newsletters, and non-daily newspapers or online publications. These periodicals must "regularly publish a substantial volume of news material of either general, economic, industrial, technical, cultural, or trade character" and "require Washington coverage on a regular basis."[32]

The periodical press galleries are overseen by the Executive Committee of Correspondents, which is comprised of seven periodical press correspondents. The Executive Committee of

---

[29] *Official Congressional Directory*, 114th Cong., 1st sess., p. 981.

[30] Three members of the daily correspondents committee are elected by gallery members in January of odd-numbered years, and two members are elected in January of even-numbered years.

[31] *Official Congressional Directory*, 114th Cong., 1st sess., p. 981.

[32] Ibid., p. 1063.

Case 1:23-cv-02321-JDB   Document 24-4   Filed 10/04/23   Page 12 of 21
USCA Case #24-5004   Document #2055098   Filed: 05/17/2024   Page 135 of 256
*Congressional News Media and the House and Senate Press Galleries*

Correspondents is elected by periodical press gallery members every two years, coinciding with the start of a new Congress. Credentialing responsibilities rotate between the administrative staff of the House and Senate periodical galleries every four years.[33] The House periodical press gallery offices are located in H-304 and employ four professional staff. The Senate periodical press gallery offices are located in S-320 and employ three professional staff.

# Radio and Television (Radio/TV) Galleries

The radio and television galleries provide credentials for members of broadcast media outlets. The Senate radio/TV gallery coordinates the application process, but credentialing decisions are made by the Executive Committee of the Radio and Television Correspondents' Galleries. The Executive Committee is comprised of seven members.[34]

Electronic recording or broadcasting equipment is generally prohibited in the chamber galleries, but radio/TV gallery credentials enable journalists to rebroadcast the floor audio and video footage produced by the House and the Senate. The radio/TV galleries also maintain broadcast and recording studio spaces, which can be used by any correspondent with congressional credentials.

In addition to the services provided to journalists, the radio/TV galleries also provide assistance to Members of Congress. The radio/TV galleries manage reservations from Members and congressional staff seeking to hold press conferences in various locations around the Capitol Complex. The radio/TV galleries can also assist Members with media logistics and security for these events.

## House Radio/TV Gallery and Related Resources

The House radio and television gallery is located in H-320 and employs seven professional staff. The House radio/TV gallery manages reservation requests for Members' press conferences at the "House Triangle,"[35] and provides information about other press conference locations suitable for radio or television coverage.[36] Upon the invitation of an accredited journalist, and subject to other gallery rules, Members may host press conferences in the House radio/TV gallery's Capitol

---

[33] U.S. Senate Periodical Press Gallery, "Congressional Press Accreditation Application Process," at http://www.periodicalpress.senate.gov/accreditation/. Credentialing responsibilities are currently handled by the Senate periodical gallery.

[34] "Election Bylaws," U.S. Senate Radio & Television Correspondents Gallery, at http://www.radiotv.senate.gov/executive-committee-bylaws/.

[35] The "House Triangle" is a popular location for media availabilities, is located outside near the southeast corner of the Capitol.

[36] Information on media spaces available for Members and their staff is available from House Radio Television Correspondents' Gallery, "Press Conference Locations," at https://radiotv.house.gov/for-press-secretaries/press-conference-locations. For a full list of locations where journalists may broadcast live from the House, see House Radio Television Correspondents' Gallery, "House Complex Live Locations," at https://radiotv.house.gov/for-gallery-members/house-complex-live-locations.

Case 1:23-cv-02321-JDB   Document 24-4   Filed 10/04/23   Page 13 of 21
USCA Case #24-5004      Document #2055098        Filed: 05/17/2024     Page 136 of 256
*Congressional News Media and the House and Senate Press Galleries*

Visitor Center (CVC) studios.[37] Any of the three House studios may be used by journalists seeking exclusive interviews with Members, subject to gallery rules.[38]

Other locations throughout the Capitol may be used by Members for broadcast media events, but are not managed by the House radio and television gallery. Committee rooms, for example, may be available by contacting the committee of jurisdiction; events in HC rooms on the House-side of the Capitol may be available by contacting the Speaker's Office. Gallery staff can assist Members with logistics for events in these locations.[39]

## Senate Radio/TV Gallery and Related Resources

The Senate radio and television gallery is located in S-325 and employs six professional staff. The Senate radio/TV gallery manages reservation requests for Senators' press conferences outside the Capitol building at the "Senate Swamp,"[40] and provides information about other press conference locations suitable for radio or television coverage.[41] Upon the invitation of an accredited journalist, and subject to other gallery rules, Senators may host press conferences in the Senate radio/TV gallery's Capitol Visitor Center (CVC) studio.[42] The Senate studio may also be used by journalists seeking exclusive interviews with Senators.

Senators may use other locations in the Capitol for broadcast media events that are not managed by the Senate radio and television gallery. Committee rooms, for example, may be available by contacting the relevant committee. Rooms in the CVC, including SVC-200/201 may be available from the Committee on Rules and Administration; S-211 may be available from the Secretary of the Senate; and S-207 may be available from the Sergeant-at-Arms. Gallery staff can assist Members with logistics for events in these locations.[43]

# Press Photographers' Gallery

The Press Photographers' Gallery provides credentials for news photographers and assists in facilitating photographic coverage of the House and the Senate. The photo gallery offices are located on the Senate side of the Capitol, in S-317, and employ three professional staff. There is

---

[37] Media events in the HVC studios may only be attended by accredited journalists and staff of the Members involved. For HVC Studio A, located in HVC 117, a Member must be invited by a broadcast journalist who attends and covers the duration of the event; for HVC Studio B, located in HVC 110, a Member may be invited by a print or broadcast journalist. Ibid.

[38] House Radio Television Correspondents' Gallery, "Exclusive Interview Locations," at https://radiotv.house.gov/for-gallery-members/exclusive-interview-locations.

[39] House Radio Television Correspondents' Gallery, "For Gallery Members," at http://radiotv.house.gov/for-gallery-members.

[40] The "Senate Swamp," a popular location for media availabilities, is located outside near the northeast corner of the Capitol.

[41] Information on media spaces available for Senators and their staff is available from the Senate Radio and Television Correspondents Gallery, "For Press Secretaries," at http://www.radiotv.senate.gov/for-press-secretaries/. For a full list of locations where journalists may broadcast live from the Senate, see Senate Radio and Television Correspondents Gallery, "Senate Complex Live Locations & Other Connectivity Details," at http://www.radiotv.senate.gov/senate-complex-live-locations/.

[42] The Senate Majority and Minority Leaders can make studio reservations without an invitation from a journalist. Media events in the SVC studio, located in S-325, may only be attended by accredited journalists and staff of the Senators involved. Ibid.

[43] U.S. Senate Periodical Press Gallery, "Using the Gallery," at http://www.radiotv.senate.gov/using-the-gallery/.

Case 1:23-cv-02321-JDB   Document 24-4   Filed 10/04/23   Page 14 of 21
USCA Case #24-5004      Document #2055098        Filed: 05/17/2024      Page 137 of 256
*Congressional News Media and the House and Senate Press Galleries*

no separate House photo gallery facility. The press photographers' photo studio is located in 151 Dirksen. Requirements for press photography credentials are found in Senate Rule XXXIII.

The Standing Committee of Press Photographers is a six-member board that is responsible for the administration of the photographers' gallery. Members of the photo gallery elect standing committee members each year, no later than March 31. The Press Photographers' Gallery rules also state that the standing committee must include one member from Associated Press Photos; Reuters News Pictures or AFP Photos; a magazine; a local newspaper; and an agency or freelance photographer. No organization may have more than one representative on the standing committee at any time.

# Gallery Membership in Selected Years

The news media environment has changed in a number of ways over the last several decades, and some of these changes are reflected by the composition of the congressional press galleries. Data regarding press gallery membership was collected from the *Official Congressional Directory* for 10-year intervals representing Congresses between 1975 and 2015. The changes in gallery membership and the current composition of the galleries may be relevant to consideration of the rules governing the press galleries or the resources allocated across different galleries.

**Table 1** provides the number of credentialed congressional correspondents in selected years, subdivided by gallery type. Credentials provide correspondents with access to the galleries and associated offices, but at any one time, it is unlikely that all eligible correspondents would be working from the Capitol. Between the 94th and the 114th Congresses, the overall number of accredited congressional journalists more than doubled, growing from 2,588 credentialed correspondents in 1975 to 6,016 in 2015. These findings suggest that, consistent with other measures to increase congressional transparency since the 1970s, more journalists have access to Congress today than in the past.

**Table 1. Number of Credentialed Correspondents in Selected Congresses**

|  | 94th Congress (1975-1976) | 99th Congress (1985-1986) | 104th Congress (1995-1996) | 109th Congress (2005-2006) | 114th Congress (2015-2016) |
|---|---|---|---|---|---|
| **Daily Press** | 1,125 | 1,375 | 1,699 | 1,417 | 1,162 |
| **Periodical Press** | 723 | 1,219 | 1,668 | 1,244 | 1,106 |
| **Radio/TV** | 571 | 1,393 | 1,942 | 2,577 | 3,515 |
| **Press Photographers** | 169 | 287 | 362 | 307 | 233 |
| **Total** | **2,588** | **4,274** | **5,671** | **5,545** | **6,016** |

**Sources:** U.S. Congress, Joint Committee on Printing, *Official Congressional Directory*, 94th Cong., 1st sess., updated through March 10, 1975, (Washington: GPO, 1975), pp. 870-950; U.S. Congress, Joint Committee on Printing, *Official Congressional Directory*, 99th Cong., 1st sess., updated through April 5, 1985, S.Prt. 99-39 (Washington: GPO, 1985), pp. 896-1004; U.S. Congress, Joint Committee on Printing, *Official Congressional Directory*, 104th Cong., 1st sess., updated through May 5, 1995, S.Pub. 104-14 (Washington: GPO, 1995), pp. 969-1035; U.S. Congress, Joint Committee on Printing, *Official Congressional Directory*, 109th Cong., 1st sess., updated through July 11, 2005, S.Pub. 109-12 (Washington: GPO, 2005), pp. 929-1031; U.S. Congress, Joint Committee on Printing, *Official Congressional Directory*, 114th Cong., 1st sess., updated through February 12, 2016, S.Pub. 114-1 (Washington: GPO, 2015), pp. 981-1082.

**Note:** Counts represent the number of individual names listed under "Members Entitled to Admission" in the *Official Congressional Directory* for each gallery.

JA135

Case 1:23-cv-02321-JDB   Document 24-4   Filed 10/04/23   Page 15 of 21
USCA Case #24-5004   Document #2055098   Filed: 05/17/2024   Page 138 of 256
*Congressional News Media and the House and Senate Press Galleries*

**Table 2** provides the number of credentialed news outlets in selected years, subdivided by gallery type. Correspondents may be credentialed as representatives of multiple news outlets, and although the number of accredited correspondents has increased, the number of media outlets they represent has diminished by more than half, decreasing from 1,272 in 1975 to 581 in 2015. This may reflect broader trends in the news industry, including the consolidation of smaller media outlets into larger entities.[44]

#### Table 2. Number of Credentialed Media Outlets in Selected Years

|  | 94th Congress (1975-1976) | 99th Congress (1985-1986) | 104th Congress (1995-1996) | 109th Congress (2005-2006) | 114th Congress (2015-2016) |
|---|---|---|---|---|---|
| **Daily Press** | 858 | 624 | 336 | 246 | 192 |
| **Periodical Press** | 160 | 259 | 218 | 190 | 143 |
| **Radio/TV** | 125 | 116 | 160 | 204 | 194 |
| **Press Photographers** | 129 | 98 | 79 | 84 | 52 |
| **Total** | 1,272 | 1,097 | 793 | 724 | 581 |

**Sources:** U.S. Congress, Joint Committee on Printing, *Official Congressional Directory*, 94th Cong., 1st sess., updated through March 10, 1975, (Washington: GPO, 1975), pp. 870-950; U.S. Congress, Joint Committee on Printing, *Official Congressional Directory*, 99th Cong., 1st sess., updated through April 5, 1985, S.Prt. 99-39 (Washington: GPO, 1985), pp. 896-1004; U.S. Congress, Joint Committee on Printing, *Official Congressional Directory*, 104th Cong., 1st sess., updated through May 5, 1995, S.Pub. 104-14 (Washington: GPO, 1995), pp. 969-1035; U.S. Congress, Joint Committee on Printing, *Official Congressional Directory*, 109th Cong., 1st sess., updated through July 11, 2005, S.Pub. 109-12 (Washington: GPO, 2005), pp. 929-1031; U.S. Congress, Joint Committee on Printing, *Official Congressional Directory*, 114th Cong., 1st sess., updated through February 12, 2016, S.Pub. 114-1 (Washington: GPO, 2015), pp. 981-1082.

**Notes:** Counts represent the number of entities listed as the media services represented in the *Official Congressional Directory* for each gallery. Records available in the *Official Congressional Directory* can vary across years; in some years and for some outlets, a news organization and its parent organization are listed separately, resulting in some duplication and overestimation of these counts. Freelance reporters are listed as a category in the *Official Congressional Directory* but are excluded from the counts of radio/television and press photographer organizations.

**Figure 1** and **Figure 2** illustrate how the proportion of journalists and outlets holding credentials from the daily press, periodical press, radio/TV, and press photographers galleries compare between the 94th Congress (1975-1976) and the 114th Congress (2015-2016). The number of accredited correspondents increased for all the press galleries during this time period, but the number of radio/TV correspondents grew most substantially, as shown in **Figure 1**. In the 114th Congress, a majority of the congressional correspondents (58%) held radio/TV credentials, whereas only 28% of correspondents held radio/TV credentials in the 94th Congress. This change likely reflects the growth of video-based cable and satellite news that occurred during the same time period. The same dynamic may also be reflected in the larger proportion of credentialed radio/TV news outlets, relative to outlets in other gallery types, as shown in **Figure 2**.

---

[44] Amy Mitchell, Jesse Holcomb, and Rachel Weisel, *State of the News Media 2016*, Pew Research Center, Washington, DC, June 15, 2016, at http://assets.pewresearch.org/wp-content/uploads/sites/13/2016/06/State-of-the-News-Media-Report-2016-FINAL.pdf.

JA136

Case 1:23-cv-02321-JDB   Document 24-4   Filed 10/04/23   Page 16 of 21
USCA Case #24-5004      Document #2055098        Filed: 05/17/2024      Page 139 of 256
*Congressional News Media and the House and Senate Press Galleries*

### Figure 1. Number of Credentialed Correspondents in Selected Congresses



**Sources:** U.S. Congress, Joint Committee on Printing, *Official Congressional Directory*, 94th Cong., 1st sess., updated through March 10, 1975, (Washington: GPO, 1975), pp. 870-950; U.S. Congress, Joint Committee on Printing, *Official Congressional Directory*, 99th Cong., 1st sess., updated through April 5, 1985, S.Prt. 99-39 (Washington: GPO, 1985), pp. 896-1004; U.S. Congress, Joint Committee on Printing, *Official Congressional Directory*, 104th Cong., 1st sess., updated through May 5, 1995, S.Pub. 104-14 (Washington: GPO, 1995), pp. 969-1035; U.S. Congress, Joint Committee on Printing, *Official Congressional Directory*, 109th Cong., 1st sess., updated through July 11, 2005, S.Pub. 109-12 (Washington: GPO, 2005), pp. 929-1031; U.S. Congress, Joint Committee on Printing, *Official Congressional Directory*, 114th Cong., 1st sess., updated through February 12, 2016, S.Pub. 114-1 (Washington: GPO, 2015), pp. 981-1082.

**Note:** Counts represent the number of individual names listed under "Members Entitled to Admission" in the *Official Congressional Directory* for each gallery.

### Figure 2. Number of Credentialed Media Outlets in Selected Congresses



**Sources:** U.S. Congress, Joint Committee on Printing, *Official Congressional Directory*, 94th Cong., 1st sess., updated through March 10, 1975, (Washington: GPO, 1975), pp. 870-950; U.S. Congress, Joint Committee on Printing, *Official Congressional Directory*, 99th Cong., 1st sess., updated through April 5, 1985, S.Prt. 99-39 (Washington: GPO, 1985), pp. 896-1004; U.S. Congress, Joint Committee on Printing, *Official Congressional Directory*, 104th Cong., 1st sess., updated through May 5, 1995, S.Pub. 104-14 (Washington: GPO, 1995), pp. 969-1035; U.S. Congress, Joint Committee on Printing, *Official Congressional Directory*, 109th Cong., 1st sess., updated through July 11, 2005, S.Pub. 109-12 (Washington: GPO, 2005), pp. 929-1031; U.S. Congress, Joint Committee

Case 1:23-cv-02321-JDB   Document 24-4   Filed 10/04/23   Page 17 of 21
USCA Case #24-5004   Document #2055098   Filed: 05/17/2024   Page 140 of 256
*Congressional News Media and the House and Senate Press Galleries*

on Printing, *Official Congressional Directory*, 114th Cong., 1st sess., updated through February 12, 2016, S.Pub. 114-1 (Washington: GPO, 2015), pp. 981-1082.

**Notes:** Counts represent the number of entities listed as the media services represented in the *Official Congressional Directory* for each gallery. Records available in the *Official Congressional Directory* can vary across years; in some years and for some outlets, a news organization and its parent organization are listed separately, resulting in some duplication and overestimation of these counts. Freelance reporters are listed as a category in the *Official Congressional Directory* but are excluded from the counts of radio/television and press photographer organizations.

# Additional Considerations and Developments

The basic operating structure of the House and Senate press galleries has remained relatively unchanged over the years. This system is comprised of independent correspondents' committees, which establish gallery rules and credentialing requirements; professional nonpartisan administrative staff who manage day-to-day gallery operations; and the House Speaker and Senate Committee on Rules and Administration, which retain authority over the galleries' operations. This division of responsibilities, along with the longstanding gallery rules, has generally addressed potential concerns regarding conflicts of interest or infringements on press freedom. Occasionally, the congressional press galleries have adapted to significant changes in the news media environment; one key example was the establishment of the radio and television galleries in 1939.

## Independence of Correspondents' Committees

Although the Speaker of the House and the Senate Committee on Rules and Administration must formally approve of gallery rules and are responsible for oversight, the galleries themselves run fairly autonomously. Nonpartisan, professional personnel operate the galleries on a daily basis, and the correspondents' committees are responsible for many decisions, including accreditation of journalists. The independence of the correspondents' committees from Congress is an important feature of how the press galleries operate, helping to maintain a boundary between the two. Prior to the 1877 establishment of the first correspondents' committee, observers were concerned that, at times, Members seemed too close to the press, and at other times, were somewhat antagonistic to the press.[45] Some observers continue to voice similar concerns,[46] but generally, this separation is thought to improve media accountability and ensure that press access to Congress is not contingent on favorable coverage.[47] Independence of correspondents' committees is also thought to relieve concerns about government infringements on the freedom of

---

[45] The publication of congressional documents not authorized for release occurred several times throughout the mid-1800s, illustrating both the close access reporters could have to Congress and how that could lead to tension between Congress and the press. Reporters were arrested and detained by the Senate Sergeant at Arms both in 1848 and in 1871 for publishing treaties that they obtained but were not yet public. Press coverage of congressional scandals also led to greater tensions between Members and reporters. See Marbut, pp. 105-107.

[46] For example, see Bruce D. Collins, "Journalists as Congressional Agents—Legal Confusion and Conflict in the Radio and Television Gallery," *CommLaw Conspectus*, vol. 21, no. 2 (2013), pp. 298-335.

[47] Examples of tension between Members and reporters date back to the first Congress, and during these early years, sometimes affected press access to the chambers. See McPherson, p. 69. For a more general discussion of government and press relations, see also Martha Joynt Kumar and Alex Jones, "Government and the Press: Issues and Trends," in *The Press*, eds. Geneva Overholser and Kathleen Hall Jamieson (Oxford: Oxford University Press, 2005), ch. 13, pp. 226-247; Timothy Besley and Andrea Prat, "Handcuffs for the Grabbing Hand? Media Capture and Government Accountability," *The American Economic Review*, vol. 96, no. 3 (June 2006), pp. 720-736.

JA138

Case 1:23-cv-02321-JDB   Document 24-4   Filed 10/04/23   Page 18 of 21
USCA Case #24-5004   Document #2055098   Filed: 05/17/2024   Page 141 of 256
*Congressional News Media and the House and Senate Press Galleries*

the press,[48] since the press—and not any agent of the House or Senate—is largely responsible for formulating and enforcing its own rules.[49]

## Establishing and Maintaining Journalistic Standards

The system of press credentialing requirements and associated gallery rules can be viewed as ways to establish and maintain certain journalistic standards for congressional reporters. Many of the current rules can be traced back to the first rules created in the late 1800s. Press credentialing requirements originated, in part, as a way to ensure legitimate news reporters had access to Members of Congress while preventing lobbyists—who sometimes posed as reporters—from gaining similar access to advance their own agendas. In these early years, congressional staff sometimes also served as newspaper correspondents, leading to concerns about conflicts of interest and occasional speculation that staff might be responsible for the publication of unreleased information.[50]

The rules of the galleries continue to prohibit accredited journalists from participating in lobbying, paid advocacy, or advertising activity on behalf of any individual, corporation, organization, political party, or federal government agency. Credentialed correspondents must also be primarily employed as journalists, as concerns have been raised that additional sources of income may affect correspondents' impartiality.[51] Occasional questions have also been raised about whether the disclosure requirements are sufficient and achieve their intended aims, or if enforcement of the rules by independent correspondents' committees introduces the risk that committee members may, at times, be somewhat permissive regarding their peers' activities.[52]

In addition to these individual-level restrictions, the media outlets that employ congressional correspondents must be editorially independent of any entity that lobbies the federal government. By excluding individuals and organizations that have a clear connection to policy advocacy, these rules help assure Members of Congress that congressional correspondents are primarily interested

---

[48] Congressional initiatives that would have required honoraria disclosure from journalists, for example, have raised these types of concerns. See "Right Job, Wrong Tool," editorial, *Boston Globe*, August 15, 1995, p. F4; Debra Gersh Hernandez, "Senator Wants to Monitor Reporters' Incomes," *Editor & Publisher*, vol. 128, no. 32 (August 12, 1995, p. 9, at https://www.editorandpublisher.com/news/senator-wants-to-monitor-reporters-incomes-p-9/; Rep. Charles T. Canady, remarks in the House, *Congressional Record*, daily edition, vol. 141, part 23 (November 16, 1995), pp. H13135-H13136; Rep. Barney Frank, Ibid., pp. H13136-H13137; David A. Schultz, "The Truth Behind the Truth in Reporting Proposal," *Editor & Publisher*, vol. 128, no. 49 (December 9, 1995).

[49] For example, the rules for the daily press gallery provide that the Standing Committee of Correspondents may propose rule changes to the Speaker of the House and Senate Committee on Rules and Administration only upon receiving a written petition signed by at least 100 of the gallery's members. See *Official Congressional Directory*, 114th Cong., 1st sess., p. 982.

[50] Donald A. Ritchie, *Press Gallery: Congress and the Washington Correspondents* (Cambridge, MA: Harvard, University Press, 1991), pp. 75-77, 92-112, 121; Marbut, pp. 33, 140-141, 154.

[51] For a discussion of some of these issues, and whether or not journalists should be required to disclose honoraria, speaking fees, or other sources of outside income, see Howard Kurtz, "Money Talks," *Washington Post Magazine*, January 21, 1996, pp. 10-15, 22-25, available at https://www.washingtonpost.com/archive/lifestyle/magazine/1996/01/21/money-talks/12b89778-29f6-4481-ac01-32e5e014c3fb/; Alicia C. Shepard, "Talk is Expensive," *American Journalism Review*, vol. 16, no. 4 May 1994, pp. 20-27, at http://ajrarchive.org/Article.asp?id=1607; Ken Auletta, "Fee Speech," *New Yorker*, vol. 70, September 12, 1994, p. 40.

[52] For example, see Sen. Charles E. Grassley, "Speaking Fees and Journalists," remarks in the Senate, *Congressional Record*, daily edition, vol. 140, part 85 (June 29, 1994), p. S7879; Sen. Robert C. Byrd, "Senate Resolution 162—Relative to the Senate Press Gallery," remarks in the Senate, *Congressional Record*, daily edition, vol. 141, part 134 (August 10, 1995), pp. S12291-S12292; Rep. Gerald C. "Jerry" Weller, "Amendment Offered by Mr. Weller," remarks in the House, *Congressional Record*, daily edition, vol. 141, part 23 (November 16, 1995), pp. H13128-H13135.

JA139

Case 1:23-cv-02321-JDB   Document 24-4   Filed 10/04/23   Page 19 of 21
USCA Case #24-5004   Document #2055098        Filed: 05/17/2024   Page 142 of 256
*Congressional News Media and the House and Senate Press Galleries*

in reporting the news and are not seeking access in the interest of promoting their own policy objectives.

## New Media Environment and Gallery Operations

Changes in how news is produced and distributed have sometimes led the House, Senate, and correspondents' committees to revisit the existing rules, facilities, and administration related to the congressional press. Once radio became a popular news format, for example, the House and Senate rules were amended to include radio reporters, and the chambers created the radio and television galleries.[53] Since the addition of the radio/TV galleries, the overall structure of the congressional press galleries has remained fairly unchanged. Within that structure, new facilities for the existing galleries became available in 2008 upon the completion of the Capitol Visitor Center (CVC). Those who study the news industry have observed several trends in recent decades that may affect the composition of congressional press gallery membership and may be relevant to consideration of congressional rules or resources related to the galleries.[54]

Television, for example, has become the predominant news source for most Americans and many prefer to watch cable networks, which can include more editorializing than the broadcast networks.[55] If it appears that journalists representing these outlets are advocating for particular interests, this might contradict the spirit of the longstanding lobbying and advocacy prohibitions in the press gallery rules. Media consolidation trends sometimes raise similar concerns, if a large corporation owns news outlets along with other holdings that may be affected by federal policies or regulations.[56]

Internet-based news represents another important development in news production and consumption that may receive additional consideration.[57] Currently, Internet-based journalists

---

[53] "Assignment of Space in Gallery of House of Representatives to Radio Reporters," consideration of H. Res. 169, *Congressional Record*, vol. 84, part 4 (April 20, 1939), p. 4561.

[54] For an overview of some of these trends, see John Carey and Nancy Hicks Maynard, "The Future of News, the Future of Journalism," in *The Press*, eds. Geneva Overholser and Kathleen Hall Jamieson (Oxford: Oxford University Press, 2005), ch. 25, pp. 415-432; Samuel L. Popkin, "Changing Media, Changing Politics," review of *All the News That's Fit to Sell* by James Hamilton and *American Foreign Policy in the New Media Age* by Matthew Baum, *Perspectives on Politics*, vol. 4, no. 2 (June 2006), pp. 337-338.

[55] Jonathan S. Morris, "Slanted Objectivity? Perceived Media Bias, Cable News Exposure, and Political Attitudes," *Social Science Quarterly*, vol. 88, no. 3 (September 2007), pp. 707-728; Norman H. Nie, Darwin W. Miller, III, and Saar Golde, et al., "The World Wide Web and the U.S. Political News Market," *American Journal of Political Science*, vol. 54, no. 2 (April 2010), pp. 428-439; Amy Mitchell and Dana Page, Millennials & Political News, Pew Research Center, Washington, DC, June 1, 2015, at http://www.journalism.org/files/2015/06/Millennials-and-News-FINAL-7-27-15.pdf.

[56] Dell Champlin and Janet Knoedler, "Operating in the Public Interest or in Pursuit of Private Profits? News in the Age of Media Consolidation," *Journal of Economic Issues*, vol. 36, no. 2 (June 2002), pp. 459-468; Pamela Taylor Jackson, "News as a Contested Commodity: A Clash of Capitalist and Journalistic Imperatives," *Journal of Mass Media Ethics*, vol. 23, no. 2-3 (June 2009), pp. 146-163.

[57] Michael T. Heaney, "Blogging Congress: Technological Change and the Politics of the Congressional Press Galleries," *PS: Political Science & Politics*, vol. 41, no. 2 (April 2008), pp. 422-426; Ryan Witte, "It's MY News Too!," *Yale Journal of Law & Technology*, vol. 12, no. 1 (January 2010), pp. 208-347; Amy Mitchell, Jeffrey Gottfried, Michael Barthel, et al., The Modern News Consumer, Pew Research Center, Washington, DC, July 7, 2016, at http://assets.pewresearch.org/wp-content/uploads/sites/13/2016/07/08140120/PJ_2016.07.07_Modern-News-Consumer_FINAL.pdf; Kristen Purcell, Lee Raine, and Amy Mitchell, et al., Understanding the Participatory News Consumer, Pew Research Center, Washington, DC, March 1, 2010, at http://www.pewInternet.org/2010/03/01/understanding-the-participatory-news-consumer/; Norman H. Nie, Darwin W. Miller, III, and Saar Golde, et al., "The World Wide Web and the U.S. Political News Market," *American Journal of Political Science*, vol. 54, no. 2 (April 2010), pp. 428-439.

JA140

Case 1:23-cv-02321-JDB   Document 24-4   Filed 10/04/23   Page 20 of 21
USCA Case #24-5004   Document #2055098   Filed: 05/17/2024   Page 143 of 256
*Congressional News Media and the House and Senate Press Galleries*

apply to the gallery that best matches how they report the news and must meet similar employment and parent publication rules as traditional media journalists. Because websites can provide text, photographs, audio, video, or a combination of these formats, it may be more difficult to draw distinctions between media types for these outlets.[58] Publication can also occur immediately and may obscure differences between daily and periodical publications. The low cost to self-publish on the Internet could also present challenges to the gallery requirements that journalists must be primarily employed by a news outlet. Non-journalists may also be able to effectively report news from the Capitol with handheld Internet-connected devices, like smartphones, and the ubiquity of social media publishing and broadcasting applications. These considerations may be relevant for the congressional press galleries, or for broader chamber rules and policies regarding photography, broadcasting, or use of electronic devices.

# Concluding Observations

Since the 1800s, a number of changes have occurred in how news is produced and distributed. The basic structure of the congressional press galleries, however, has remained fairly consistent. Credentialing requirements originated as a way to facilitate professional news reporting from Congress, preventing congressional staff from doubling as reporters and lobbyists from posing as reporters to gain access. Today, the accreditation process continues as a measure to provide access to Congress for credible journalists and news outlets.

The system of having an independent correspondents' committee, comprised of gallery members, as the gatekeepers for congressional press credentials for that gallery, generally addresses potential concerns that Congress might infringe upon the rights of a free press or only allow for favorable news coverage. Although the Speaker of the House and the Senate Committee on Rules and Administration must approve any gallery rules, the substance of the rules often reflect measures initiated by the correspondents' committees and gallery members. Designated administrative staff in each gallery further help to insulate the press galleries from possible political pressure.

The level of administrative resources granted to the galleries has increased since their creation, but the number of credentialed correspondents has also continued to grow, particularly in the radio/TV galleries. This may be relevant to the consideration of what resources are allocated to the galleries, or how these resources are distributed across each chamber's galleries. Previously clear distinctions between media types and publication schedules, which form the basis of the current gallery divisions, may become increasingly blurred, and this may be relevant as Congress considers how to accommodate multimedia journalists and Internet-based news.

## Author Information

Sarah J. Eckman
Analyst in American National Government

---

[58] One scholar notes that Congress is "the only national legislature to divide its galleries among different forms of media." See Ritchie, p. 217.

Case 1:23-cv-02321-JDB   Document 24-4   Filed 10/04/23   Page 21 of 21
USCA Case #24-5004   Document #2055098   Filed: 05/17/2024   Page 144 of 256

*Congressional News Media and the House and Senate Press Galleries*

# Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.

JA142

# EXHIBIT D

| About Us | Accreditation | For Gallery Members | Membership | Special Events and Announcements | Contact Us |

Home

# Accreditation

Congressional press accreditation for magazines, newsletters, non-daily newspapers, and on-line publications are handled through the Periodical Press Gallery. The **Executive Committee of Correspondents** decides which publications qualify for press credentials.

The application process can be lengthy with the potential for taking six months to a year to complete, and some applications have taken even longer. Approval is not guaranteed at the end of the process. Please see the **rules and regulations** to review the qualifications.

New credentials are issued for each session of Congress (annually) and a new application form must be submitted every Congress in order to continue membership in the Gallery.

Please note that old press credentials must be turned in to receive new credentials.

**Accreditation**

Application Process

Rules and Regulations

New Applicants

Renewing Applicants

Foreign Press Applicants

Temporary Credentials

House Periodical Press Gallery

U.S. Capitol

H-304

Washington, DC 20515

Phone: (202) 225-2941

USCA Case #24-5004      Document #2055098      Filed: 05/17/2024      Page 147 of 256

Copyright     Privacy     House.gov     Accessibility

JA145

# EXHIBIT E

Next Vote: Tuesday At 5:30 P.M.



(https://www.dailypress.senate.gov)

                                            Search...

# Governing Rules

Home (https://www.dailypress.senate.gov/) » Membership
(https://www.dailypress.senate.gov/membership/) » Governing Rules

1. Administration of the press galleries shall be vested in a Standing Committee of Correspondents elected by accredited members of the Galleries.

The Committee shall consist of five persons elected to serve for terms of two years. Provided, however, that at the election in January 1951, the three candidates receiving the highest number of votes shall serve for two years and the remaining two for one year. Thereafter, three members shall be elected in odd-numbered years and two in even-numbered years. Elections shall be held in January. The Committee shall elect its own chairman and secretary. Vacancies on the Committee shall be filled by special election to be called by the Standing Committee.

2. Persons desiring admission to the press galleries of Congress shall make application in accordance with Rule VI of the House of Representatives, subject to the direction and control of the Speaker and Rule 33 of the Senate, which rules shall be interpreted and administered by the Standing Committee of Correspondents, subject to the review and an approval by the Senate Committee on Rules and Administration.

3. The Standing Committee of Correspondents shall limit membership in the press galleries to bona fide correspondents of repute in their profession, under such rules as the Standing Committee of Correspondents shall prescribe.

4. An applicant for press credentials through the Daily Press Galleries must establish to the satisfaction of the Standing Committee of Correspondents that he or she is a full-time, paid correspondent who requires on-site access to congressional members and staff.

Correspondents must be employed by a news organization:
(a) with General Publication periodicals mailing privileges under U.S. Postal Service rules, and which publishes daily; or
(b) whose principal business is the daily dissemination of original news and opinion of interest to a broad segment of the public, and which has published continuously for 18 months.

The applicant must reside in the Washington, D.C. area, and must not be engaged in any lobbying or paid advocacy, advertising, publicity or promotion work for any individual, political party, corporation, organization, or agency of the U.S. Government, or in prosecuting any claim before Congress or any federal government department, and will not do so while a member of the Daily Press Galleries.
Applicants' publications must be editorially independent of any institution, foundation or interest group that lobbies the federal government, or that is not principally a general news organization. Failure to provide information to the Standing Committee for this determination, or misrepresenting information, can result in the denial or revocation of credentials.

5. Members of the families of correspondents are not entitled to the privileges of the Galleries.

6. The Standing Committee of Correspondents shall propose no changes in these rules except upon petition in writing signed by not less than 100 accredited members of the galleries.

The above rules have been approved by the Committee on Rules and Administration.

View Congressional Directory
(https://www.govinfo.gov/content/pkg/CDIR-2020-07-22/pdf/CDIR-
2020-07-22-PRESSGALLERIES.pdf)

# U.S. SENATE PRESS GALLERY

# (HTTPS://WWW.DAILYPRESS.SENATE.GOV/)

**Phone:** (202) 224-0241

**Email:** Senate_Press_Gallery@SAA.Senate.gov
(mailto:Senate_Press_Gallery@SAA.Senate.gov)

**Address:** U.S. Capitol, Room S-316



(htt

ps:/

/twi

tter.

com

/Se

nate

Pre

ss)

JA149

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SIMON ATEBA,                     .
                                 .
          Plaintiff,             .   CA No. 23-2321 (JDB)
                                 .
     v.                          .
                                 .
KARINE JEAN-PIERRE et al.,       .   Washington, D.C.
                                 .   Thursday, November 2, 2023
          Defendants.            .   10:10 a.m.
. . . . . . . . . . . . . . . . .

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff:              ERIC A. SELL, ESQ.
                            1311 South Main Street
                            Suite 301
                            Mount Airy, MD 21771

                            GARY LAWKOWSKI, ESQ.
                            Dhillon Law Group, Inc.
                            2121 Eisenhower Avenue
                            Suite 608
                            Alexandria, VA 22314

For Defendants:             MICHAEL F. KNAPP, ESQ.
                            JOSEPH E. BORSON, ESQ.
                            U.S. Department of Justice
                            Federal Programs Branch
                            1100 L Street NW
                            Washington, DC 20005

Court Reporter:             BRYAN A. WAYNE, RPR, CRR
                            U.S. Courthouse, Room 4704-A
                            333 Constitution Avenue NW
                            Washington, DC 20001
                            (202) 354-3186

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

```
 1                      P R O C E E D I N G S

 2            THE DEPUTY CLERK:  Good morning, Your Honor.  We're

 3     on the record in civil case 23-2321, Simon Ateba versus

 4     Jean-Pierre et al.  Starting with plaintiff's counsel, may

 5     you please approach the podium and state your appearance for

 6     the record.

 7            MR. SELL:  Good morning, Your Honor.  Eric Sell along

 8     with my co-counsel, Gary Lawkowski, appearing on behalf of the

 9     plaintiff.

10            THE COURT:  Good morning.

11            MR. KNAPP:  Good morning, Your Honor.  Michael Knapp

12     on behalf of defendants.  With me at counsel table is Joseph

13     Borson and Lesley Farby.

14            THE COURT:  Good morning to you as well.  Will only

15     counsel who just did the introductions be making the arguments

16     or is there any splitting of the arguments that's going to be

17     made?  First on behalf of the plaintiff.

18        You have to always use the microphone for the court

19     reporter's convenience.  Thank you.

20            MR. SELL:  Your Honor, I will be handling the First

21     Amendment arguments and my co-counsel will be handling the APA

22     argument.

23            THE COURT:  All right.  And for the government?

24            MR. KNAPP:  Your Honor, we'll also be splitting.  I'll

25     be handling the first claim, the unbridled discretion claim,
```

1    and then Mr. Borson will be handling the second and third

2    claims.

3            THE COURT:  All right.  We will hear first from the

4    plaintiff.  It is the plaintiff's case, and there are

5    cross-motions for summary judgment.  I'm anticipating

6    something in the neighborhood of 30 to 45 minutes total for

7    each side, so use your time accordingly and anticipate that I

8    have read all the papers, have thought about it, and will have

9    some questions along the way.

10        Mr. Sell.

11            MR. SELL:  Thank you, Your Honor.  May it please the

12    Court.

13        The current White House hard pass program is

14    unconstitutional.  It relies on arbitrary, irrational, and

15    unreasonable criteria in regulating access to the White House

16    press area.  Hard pass holders enjoy on-demand access to the

17    press area during business hours and need not wait for a

18    chaperone upon entering the White House grounds.  Neither

19    privilege is available to a day pass holder.

20        This tiered credentialing scheme provides --

21            THE COURT:  Is that the only difference between the day

22    pass and the hard pass, just that the person may have to wait

23    a little longer for the security clearance and for someone to

24    escort them?  Is that it?

25            MR. SELL:  No, Your Honor.  They have to register ahead

JA152

1   of time for every single day that they wish to appear.  They

2   can register for a week's worth on Sunday night if they wish

3   to.  But the bottom line is they have to register for every

4   single day that they plan on going to the White House.  So if

5   there is a spontaneous media event, World War III breaks out

6   and they didn't apply for a day pass the day before, they're

7   out of luck, they can't get there.

8      So this truly is a second-class status in terms of which

9   journalists have access to the White House briefing room.

10          THE COURT:  Well, why should I be so concerned that

11   someone has decided not to bother applying for a pass the day

12   before?  That's their choice.

13          MR. SELL:  Your Honor, they shouldn't be burdened with

14   having to apply for a pass every single day.  They should get

15   equal access --

16          THE COURT:  You're burdened to have to apply for a hard

17   pass.  There's burden involved to some extent all along.

18          MR. SELL:  Sure.

19          THE COURT:  Anybody, any correspondent even, cannot

20   just walk into the White House.  There's some process, some

21   burden involved.  Why is the burden for the hard pass in this

22   context so much greater?

23          MR. SELL:  Mr. Ateba's simply asking for equal terms in

24   accessing the White House press area.  And right now he is

25   effectively shut out of the White House program based off of

1    this arbitrary and irrational requirement that he first have

2    the stamp of approval --

3        THE COURT:  Well, "effectively shut out" may be a

4    little bit of an advocate's overstatement, but I understand.

5    Some of the cases dealing with this subject matter --

6    *Sherrill*, *Karem*, to a lesser extent but still a similar

7    subject matter, my *Getty Images* case -- all deal with actual

8    denials of access.

9      This case does not deal with a denial of access.  It's just

10   that the mode of access, or the means of access has changed

11   and become a little more burdensome.  Does that make a

12   difference?

13       MR. SELL:  Respectfully, Your Honor, I think that is

14   factually incorrect.  *Karem*, if you look at the district court

15   opinion, the court of appeals opinion, the complaint and the

16   briefing, it appears that it was all about denial of access to

17   the hard pass program specifically, not denial of access to

18   the day pass program.  So it appears that Mr. Karem still had

19   access to the day pass --

20       THE COURT:  Okay.  I see your point there in terms of

21   denial of access to the hard pass program.

22       MR. SELL:  Yes.  Yes.  The D.C. Circuit in its analysis

23   of what Mr. Karem was denied was focused specifically on his

24   denial of access to the hard pass.  And there was no

25   indication that he couldn't access the day pass program and

1    still access the briefing area.

2        So this entire dispute that Mr. Karem was involved in was

3    about his exclusion from the hard pass specifically, which is

4    the expedited access that Mr. Ateba is entitled to because

5    every other journalist is entitled to it, because the White

6    House has chosen to open up this government property to the

7    press.  Doesn't have to do that.

8        THE COURT:  Is there a fundamental difference in the

9    analysis between a context where there's an outright denial of

10    access and just access is made much more burdensome?  Or is

11    the analysis the same in both situations?

12        MR. SELL:  I believe the analysis would be the same,

13    Your Honor.  I think that if you're creating a tiered

14    credentialing scheme and you're providing preferential access

15    for some, the way in which you categorize who gets that

16    preferential access has to meet constitutional scrutiny.

17        It has to satisfy constitutional scrutiny.  You can't

18    create this arbitrary classification where the only

19    individuals who are allowed this expedited access are those

20    who satisfy or get the stamp of approval from the congressional

21    press galleries.  They're completely immune from suit under

22    the *Consumers Union* case.

23        So what the White House has done here is outsource their

24    filtering mechanism to a body that is completely immune from

25    suit under D.C. Circuit precedent.  They can do whatever they

1    want.  So they may say that they've adopted these objective

2    standards to make sure that all the journalists are bona fide,

3    but there is no judicial review of their decisions.

4        You could appeal their decisions to the Speaker of the

5    House and the Senate Rules Committee, but there's no judicial

6    review beyond that.  And, frankly, as a matter of practice,

7    the Speaker of the House and Senate Rules Committee is not

8    reviewing the credentialing decisions of the congressional

9    press galleries.  So it's a black box.  There is no way to

10   review what they're deciding.  And the White House has now

11   incorporated that credentialing process into its own.

12              THE COURT:  "Now" is not totally accurate.

13              MR. SELL:  Fair enough.

14              THE COURT:  That's been the case since the Gerald

15   Ford administration.

16              MR. SELL:  Fair enough, Your Honor.

17              THE COURT:  Except for a brief less than two-year

18   period.

19              MR. SELL:  Yes, Your Honor.  And I think if you look at

20   the history of this, when this all came about, it was I

21   believe after the *Consumers Union* case.  Once the D.C. Circuit

22   said the congressional press galleries are immune from suit,

23   that's when the White House, it appears, has incorporated that

24   criterion into its own hard pass program.

25              THE COURT:  The other two branches, the legislative

1  branch and the judicial branch at the Supreme Court, have

2  these press galleries.  The White House doesn't have that

3  structure with a complicated press gallery and admission to it

4  in the same way.  Why is it unreasonable -- and I use that

5  word intentionally -- why is it unreasonable for the White

6  House to rely on that process that exists in the legislative

7  branch?

8       MR. SELL:  It's unreasonable because the congressional

9  press galleries can do whatever they want.  It's unreasonable

10  because there is absolutely no way for someone like Mr. Ateba

11  to --

12       THE COURT:  So if there were judicial review of

13  decisions by either the House or the Senate with respect to

14  admission to their press galleries, then you wouldn't have a

15  case.

16       MR. SELL:  No, Your Honor.  I think that gets us

17  closer.

18       THE COURT:  But that's why you said it was

19  unreasonable.  Because of the lack of judicial review.

20       MR. SELL:  I have a second point, Your Honor.  In

21  addition to the lack of judicial review, it also doesn't make

22  any sense to send someone to Congress to get press credentials

23  before getting press credentials at the White House.  Why

24  should Mr. Ateba, who wants to cover the White House full

25  time -- doesn't necessarily want to cover Congress, he wants

1     to spend his time going to the White House --

2              COURT REPORTER:  You need to slow down.

3              MR. SELL:  Sorry.  -- wants to go to the White House

4     to --

5              THE COURT:  He doesn't have to cover Congress in order

6     to get into the congressional press galleries.

7              MR. SELL:  No, Your Honor.

8              THE COURT:  That's not a standard.  That's not part of

9     their standard.

10             MR. SELL:  It just doesn't make any sense to create

11    this additional hurdle when the only purpose of it is to weed

12    out the riffraff from the hard pass program.  I mean, it

13    appears to be.  The government has provided no explanation for

14    why this additional requirement serves any purpose for, you

15    know, capacity restrictions or making sure the White House

16    press area is used for its intended purpose.  Why should

17    someone have to go to Congress, jump through all these

18    additional hoops, pay a small fee, to cover the White House?

19       It just is irrational and doesn't make any sense.  Just

20    because they've done it for 50 years?  That's not a good

21    enough reason to keep doing it.  Journalists are excluded from

22    the hard pass program.  Bona fide correspondents like

23    Mr. Ateba are excluded from the hard pass program simply

24    because they haven't yet received the stamp of approval from

25    the congressional press galleries.  That doesn't make any

1    sense at all.

2        THE COURT:  Are you aware -- there's nothing in the

3    record to say that journalists are excluded.  Are you aware of

4    any other journalist that is of the view that she or he has

5    been excluded improperly from the hard pass program because of

6    an inability to get acceptance in the congressional press

7    galleries or the Supreme Court press galleries?

8        MR. SELL:  Your Honor, in the verified complaint that

9    we originally filed, the only complaint so far in this case,

10    we outlined that there were 440 approximately other

11    journalists who had their hard pass canceled, and some of

12    those, a subset of those, were actively using their hard

13    passes in covering --

14        THE COURT:  But are you aware that any of them are of

15    the view that they've been improperly excluded by that?

16        MR. SELL:  I don't believe that's in the record.

17        THE COURT:  You're just making that assumption.

18        MR. SELL:  I don't believe --

19        THE COURT:  And I understand there's some logic to the

20    assumption, but it is just an assumption.

21        MR. SELL:  Fair enough, Your Honor.  Yes.  But I think

22    that is a fair assumption, and if we have the opportunity to

23    file an amended pleading at some point in this case, if it's

24    necessary we can certainly --

25        THE COURT:  Let's return to the First Amendment here.

1    Your argument is that the First Amendment protects a right of

2    access to the White House press area because that access will

3    lead to better news gathering and reporting.  What case do you

4    rely on for that?

5        MR. SELL:  *Sherrill*, I think, is the clearest case on

6    point.

7        THE COURT:  So to the extent that you rely on *Sherrill*,

8    how do you reconcile it with *Houchins v. KQED* and *Flynt v.*

9    *Rumsfeld* in the D.C. Circuit -- the first case being in the

10    Supreme Court -- which basically hold that reporters have no

11    special rights of access to public facilities?  How do you

12    reconcile those later cases with the earlier *Sherrill* case?

13    Why is *Sherrill* still good law?

14        MR. SELL:  Your Honor, those cases are not inconsistent

15    with *Sherrill*.  The government property at issue in the *Flynt*

16    case, for example, was the theater of war.  Larry Flynt wanted

17    access to the U.S. troops and the government was not providing

18    any media access to the United States military troops

19    overseas.

20    Here they have opened up access to some reporters.  We're

21    not arguing that there's a First Amendment right to access the

22    White House in general; we're saying there's a First Amendment

23    right to equal access to the press area once the government

24    has voluntarily opened it up.  So that's the question here.

25    It's not whether, you know, Mr. Ateba and any other journalist

1    can force the government to open up the White House to the

2    press.  The White House has already chosen to do that.

3         THE COURT:  You think that observation in the *KQED* case

4    is also distinguishable because of the context in that case?

5         MR. SELL:  Your Honor, if I recall that case correctly,

6    that was also a case that they were asking for access to

7    government property that wasn't already opened to the public

8    or to the press.  So I do think there is a different line of

9    cases where you talk about, you know, what the Constitution

10    requires the government to open up, what government property

11    does the --

12         THE COURT:  So will you agree that based on those

13    cases, reporters have no special right of access to public

14    facilities?

15         MR. SELL:  Public facilities, Your Honor, that the

16    government has not opened up to the press, yes.  I would agree

17    with that.

18         THE COURT:  The distinction here is that the press area

19    has been opened up to the press or certain members of the

20    press.

21         MR. SELL:  Yes, Your Honor.  Yes.  And when the

22    government has chosen to do that, it can certainly regulate

23    access to that property.  We're not objecting to that.  It

24    just has to do so in a fair and nonarbitrary manner and the

25    government, the White House is not doing that here.

1           THE COURT:  So there's a lot of ink that's been spilled

2      over whether it's a *Sherrill* analysis or a forum analysis, and

3      if it's a forum analysis, is it a nonpublic forum versus a

4      limited public forum.

5         What I want to hear from you is what's the standard that is

6      to be applied by the Court in any of those settings, either

7      under *Sherrill* or under either of the two prongs of the forum

8      analysis, does it all boil down to a reasonableness standard?

9           MR. SELL:  No.  No, Your Honor, it has --

10          THE COURT:  Why not?

11          MR. SELL:  It has to be viewpoint neutral.  That's

12     always a requirement --

13          THE COURT:  That's part of the reasonableness standard.

14          MR. SELL:  Fair enough.  Fair enough.  The reason the

15     viewpoint neutrality component of that isn't met here --

16          THE COURT:  And if it has to be viewpoint neutral,

17     what's the evidence that there's any viewpoint discrimination

18     here?  What's the evidence of that?

19          MR. SELL:  A credentialing scheme that is based on

20     unbridled discretion is inherently viewpoint discriminatory,

21     Your Honor, because there's no way to determine whether the

22     government is engaging in viewpoint discrimination or not, so

23     the courts have --

24          THE COURT:  So your view then is that it's because of

25     the unbridled discretion and the possibility of viewpoint

1      discrimination, not that there has been any viewpoint

2      discrimination.

3              MR. SELL:  On our facial challenge yes, Your Honor.  It

4      is the unbridled discretion itself that is the failure of the

5      viewpoint neutrality requirement.

6              THE COURT:  All right.  Then we have to get to what I

7      think is one of the major issues in the case, and that is does

8      it matter that the decisionmaker here is not the White House?

9              MR. SELL:  No.

10             THE COURT:  So the unbridled discretion cases say that

11     the purpose of the doctrine as you've just identified it is to

12     prevent -- I think most of them talk about either content or

13     viewpoint discrimination -- by the decisionmaker, and

14     self-censorship by the speaker in order to please the

15     decisionmaker.  In all those cases the defendant is the

16     decisionmaker.  I think in all of them.

17         So does it affect how we apply the unbridled discretion

18     doctrine if the decisionmaker is not the defendant?  Here we

19     have the press gallery, not the White House, deciding whether

20     Mr. Ateba can get the credential.  Your fear isn't viewpoint

21     discrimination by the press gallery.  Your fear is viewpoint

22     discrimination by the White House.  That's what your fear is.

23         So isn't that fear that the White House will engage in

24     content or viewpoint discrimination, not the press gallery,

25     isn't that something that makes this case fundamentally

```
1      different, because of the identity of the decisionmaker?  Why
2      are we concerned about unbridled discretion by the press
3      gallery?  That's not where your fear lies.  Your fear lies
4      with what the White House will do.
5           MR. SELL:  Your Honor, we disagree with that.  Our fear
6      is absolutely that the congressional press galleries will
7      discriminate --
8           THE COURT:  What's the basis for a fear that the press
9      galleries will discriminate on the basis of viewpoint?  What's
10     the basis for that fear?
11          MR. SELL:  That they don't have any standards, Your
12     Honor.  That they don't have any standards to constrain their
13     discretion determining whether Mr. Ateba is worthy enough to
14     obtain a hard pass.
15        And I also quibble with the Court's point that the cases
16     involving unbridled discretion and cases like the unbridled
17     discretion cases only involve challenges to the defendant
18     decisionmaker.  If you look at *Mansky*, the Supreme Court case
19     that addressed the Minnesota statute involving access to the
20     polling places with political messages, those decisions, the
21     decisionmaker in those cases were thousands of independent
22     election judges across the state of Minnesota who were making
23     the decisions.  And the concern was that they would engage in
24     viewpoint discrimination.  The defendant in that case was the
25     Minnesota state board of elections administrator.
```

1          So it isn't always that the defendant named in the lawsuit

2     needs to be the decisionmaker in the unbridled discretion

3     cases.

4          THE COURT:  There's a closer connection between those

5     two than there is between the press galleries and the White

6     House in terms of controlling what's happening.

7          MR. SELL:  Fair enough, Your Honor, but I still don't

8     think the danger of viewpoint discrimination is eliminated

9     when you outsource the decision to a third party in regulating

10    access to your own government property as a government entity.

11    So the White House can outsource this to the National Press

12    Club --

13         THE COURT:  What possible motivation would the press

14    galleries have for viewpoint discrimination against Mr. Ateba?

15    Or anyone else?  What possible motivation would they have?

16         MR. SELL:  Your Honor, the executive committees of the

17    press gallery are Mr. Ateba's competition.

18         THE COURT:  That's not viewpoint discrimination.

19    That's an economic discrimination; it is not viewpoint

20    discrimination.

21         MR. SELL:  Your Honor, but I do believe that it does

22    create a context in which viewpoint discrimination is fostered

23    and is likely, especially when there is no standard --

24         THE COURT:  Why?  Why do you think that because there's

25    competition there's going to be viewpoint discrimination?

JA165

 1          MR. SELL:  Your Honor, it's not just the competition,

 2     it's that these journalists all work for established outlets

 3     in the D.C. area that they themselves deem reputable and

 4     important and quality news outlets, and they look down on

 5     people who maybe don't have that same level of history and

 6     credential and experience --

 7          THE COURT:  Again, that's not really viewpoint

 8     discrimination.

 9          MR. SELL:  Your Honor, it can lead to --

10          THE COURT:  They look down on them because they're not

11     part of the institutional team, but not because they're

12     reporting one way or another on issues.

13          MR. SELL:  I don't think that's necessarily true, Your

14     Honor.  I think the congressional --

15          THE COURT:  I mean, the institutional members of the

16     press gallery include Fox News, *The Washington Post*, *New York

17     Times*, *The Wall Street Journal*, et cetera.  They're not of one

18     viewpoint.  There's no reason to believe that those

19     institutional members -- and I'll grant that they are

20     institutional members of the media -- will have a skew on

21     viewpoint, unless you're of the view -- maybe this is an

22     argument that you want to make -- that the media is biased

23     overall in one direction and that Mr. Ateba is in the other

24     direction.  I don't think that's something that you want to

25     argue or could argue.

1          MR. SELL:  No, Your Honor.  That's not the basis of our

2     argument.  Our argument is that there is no check on whether

3     the executive committees are engaging in viewpoint

4     discrimination.  That's the problem.  So they can if they

5     choose to, and that's the problem.

6          THE COURT:  So if you accept for a moment that your

7     fear is more about the White House engaging in viewpoint

8     discrimination than it is in the press galleries engaging in

9     viewpoint discrimination, wouldn't it make sense to place the

10    decision-making discretion in an outside professional group

11    like the press galleries, because that's a way to actually

12    reduce the discretion of the White House and the possibility

13    that the White House will engage in viewpoint discrimination?

14    Doesn't that seem to be something that reduces the risk of

15    viewpoint discrimination by the White House, which is, it

16    seems to me, what your real fear is, and doesn't that

17    really -- and that's what the unbridled discretion doctrine is

18    supposed to address.

19       It seems to me that -- it strikes one as being somewhat

20    reasonable to look to that outside entity because that

21    actually reduces the possibility of White House

22    discrimination.

23          MR. SELL:  A couple points, Your Honor.  That may make

24    sense if the standards that the third party are using are

25    actually objective and measurable and there is some process

1    for reviewing those outside credentialing decisions.  Some

2    process -- when you're talking about exercising constitutional

3    rights being dependent on a third party credentialing agency,

4    there needs to be some meaningful level of review of that

5    third party credentialing decision.  And right now there is

6    not any review of that decision.  Unless the Court can view

7    the fact that the White House is incorporated into its own

8    process, and the fact that the White House is subject to suit,

9    that would be one way to review the third party decision, but

10   it would be doing so by attributing it to the White House and

11   the process that that third party is using and attributing

12   that to the White House, and allowing people like Mr. Ateba to

13   sue the White House for the third party credentialing

14   decisions.  That would be more acceptable because then at

15   least there is some kind of third party check on that process

16   to determine whether it's acceptable or not.

17       I don't think that it makes sense entirely to outsource to

18   a third party because that would allow, you know, the

19   Federalist Society to serve, if the White House chose to, to

20   serve as the credentialing body for the White House press

21   area.  That doesn't make any sense.  The Federalist Society

22   may uphold --

23           THE COURT:  Certain White Houses have outsourced to the

24   Federalist Society quite a bit.

25           MR. SELL:  Not for access to the press area, Your

JA168

1   Honor, and that's the problem here.  This is exercising of a

2   fundamental First Amendment right, equal access to a

3   designated press area, but dependent on outsourcing to a third

4   party that is completely immune from judicial review, doesn't

5   have any standards really for Mr. Ateba to know whether he's

6   reputable or not or of repute or not, and it's really just a

7   black box.  And he has to subject himself to it.  And either

8   he gets approved or he doesn't, and there's no way for him to

9   appeal that decision.

10      So his access to the White House press area is totally up

11   to the whim of the executive committees of the press

12   galleries.

13      THE COURT:  We've talked a lot about viewpoint

14   discrimination, and I want to talk about the viewpoint

15   discrimination claim.  But is that you or is that your --

16      MR. SELL:  That would be me, Your Honor.

17      THE COURT:  Okay.  So we'll get to that in a minute.

18   But in terms of the standard, not the hard pass policy

19   standards but the standard in the press gallery, a large part

20   of your case is the vagueness or lack of objective standards

21   from this reputable correspondent language.  The language is

22   "bona fide resident correspondent of reputable standing,

23   giving their chief attention to the gathering and reporting of

24   news."

25      So your view is that that's not sufficiently -- it's not

1    reasonable because it's not sufficiently objective and

2    manageable, in part.

3        MR. SELL:  Yes, Your Honor.  And we also believe that

4    that violates the unbridled discretion doctrine which again we

5    assert is per se --

6        THE COURT:  I know.  We're in the middle of the

7    unbridled discretion doctrine even with this.  So why do you

8    view that as standing alone?  If you look at the entirety of

9    the language in the press gallery standards, there's other

10   things there.  There are other sentences that add a little bit

11   to that in terms of who you're employed by, what you are not

12   engaged in.  There's a lot there that sort of supplements or

13   fleshes out a little bit what a reputable correspondent is.

14   Why don't I have to look at that entire package rather than

15   just those isolated words?

16       MR. SELL:  Your Honor, you should look at the entire

17   package, and I encourage the Court to notice that if an

18   applicant checks off every single box but isn't deemed of

19   repute by the congressional press galleries, they're out of

20   luck.  What does "of repute" mean?  There's no way to know

21   that.  It's really up to these five individuals who work for

22   the daily press gallery to determine whether Mr. Ateba is of

23   repute or not.  We don't even know what that means.  It's

24   whatever these five individuals decide it means.

25        And that is entirely subjective.  They're in an industry,

1      again, like I said, they're Mr. Ateba's competition, and I

2      understand that Your Honor thinks that that only is an

3      economic injury but I think that certainly lends itself to

4      viewpoint discrimination if they don't think that Mr. Ateba

5      and his publication is providing the correct news or the

6      correct angle on the news, they have the 100 percent power to

7      exclude him from the hard pass program if they choose to.  And

8      there's absolutely no way to prevent that.  There's no check

9      at all.

10          THE COURT:  All right.  What else do you want to say

11     before we take a minute on viewpoint discrimination?

12          MR. SELL:  Your Honor, I think we've covered just about

13     everything.  And again, just think of the ramifications of

14     ruling in the government's favor on this facial challenge and

15     what the government could do to insulate itself in its

16     credentialing decisions if this process were allowed to stand.

17          THE COURT:  So to drive home my point that your fear is

18     more about viewpoint discrimination by the White House, you

19     have a claim --

20          MR. SELL:  Yes.

21          THE COURT:  -- that is actually --

22          MR. SELL:  Yes, Your Honor.

23          THE COURT:  -- premised on viewpoint discrimination by

24     the White House.  So if I find that the hard pass policy

25     targeted Mr. Ateba based on his identity, on who he is, not

1   because of his viewpoint, is that nonetheless viewpoint

2   discrimination?

3           MR. SELL:  Yes, Your Honor.  I believe it is --

4           THE COURT:  Why?

5           MR. SELL:  Viewpoint discrimination, Justice Scalia

6   discussed this -- both the majority opinion in *Citizens United*

7   and Justice Scalia's concurrence in *Citizens United* discussed,

8   you know, this idea of identity-based viewpoint discrimination

9   based off of who a person is, and also attempts to distinguish

10  between the institutional press and everyone else.

11      And what happened here was Mr. Ateba had been covering the

12  White House for several years, had been routinely trying to

13  obtain answers from the White House, sending questions, asking

14  questions.  He wouldn't get a response.  He started raising

15  his voice in the briefing room, and instead of enforcing a

16  conduct policy to address that conduct, the White House just

17  changed the rules of the game altogether to bar him from the

18  hard pass program.

19          THE COURT:  Well, there's a factual issue here as to

20  whether that's what the hard pass policy was directed at, as

21  opposed to the conduct policy put into place at the same time,

22  which sounds much more like what you're describing.

23          MR. SELL:  Your Honor, it's interesting.  The White

24  House says they canceled or changed the hard pass program to

25  get rid of all or cancel all the hard passes that weren't in

1    use.  Well, Mr. Ateba's hard pass was in use.  And why would

2    you add in this additional criterion for the congressional

3    press galleries if your only purpose for changing the hard

4    pass program is to cancel the old ones?  It smells fishy.  And

5    it certainly, when you look at the context and the timeline of

6    events, the media attention of Mr. Ateba's interactions with

7    the press secretary in the briefing room --

8            THE COURT:  But again, that sounds more like identity

9    focus rather than viewpoint focus.  And the Supreme Court,

10   although you've mentioned some Supreme Court cases, there are

11   other Supreme Court cases like *Reed v. Town of Gilbert* that

12   caution that if it is identity focus, then you really have to

13   look at this to see if it involves content or viewpoint

14   discrimination as well, that identity focus does not correlate

15   with viewpoint or content discrimination; you've got to find

16   that as well in order to subject it to really close scrutiny.

17           MR. SELL:  Your Honor, I think it's reasonable to infer

18   from our complaint and the facts that we've laid out in the

19   complaint that that additional content or viewpoint

20   discrimination is plausible.  And we're not moving for summary

21   judgment on this viewpoint discrimination claim.

22           THE COURT:  I understand that.

23           MR. SELL:  We have satisfied the plausibility

24   requirement here.  We think that we can obtain everything we

25   need to --

1          THE COURT:  So what is it that you think satisfies the

2     plausibility requirements for dismissal or not dismissal with

3     respect to your viewpoint discrimination claim?  What facts

4     or -- well, what facts do you point me to?

5          MR. SELL:  Your Honor, in the complaint we discuss the

6     specific interactions between Mr. Ateba and the press

7     secretary, including the Ted Lasso incident that happened in

8     March.  His objection was that the press secretary was using

9     that time for some, you know, staged event to draw attention

10     to the president's initiative instead of allowing reporters an

11     opportunity to ask questions, because that's what these press

12     briefings are designed for.

13        So his objections and the retaliation from the White House

14     against Mr. Ateba because he raised these objections, it's

15     reasonable to infer that the change in the White House was to

16     exclude him from the hard pass program because he raised these

17     objections.

18          THE COURT:  If I'm going to put those facts in one

19     bucket or another, and the two buckets are viewpoint based or

20     identity based, it seems to me they fall into the identity

21     based much more readily.  You say it's logical to infer, but

22     that sounds like it's identity based rather than -- or

23     identity based alone, and not viewpoint based.

24          MR. SELL:  Your Honor, this could have all been

25     resolved if the defendants had submitted some evidence, some

 1          declaration or affidavit --

 2               THE COURT:  That may be a failing on their part.  But

 3          right now I'm talking about the possible failings on your

 4          part.

 5               MR. SELL:  Sure.  Fair enough.  Fair enough.

 6          Your Honor, I would say that this isn't that -- the story

 7          that we presented in the complaint here and the government's

 8          failure to rebut that by saying it wasn't because of

 9          Mr. Ateba's viewpoint, the questions he was asking, his

10          concerns over how the White House press secretary is running

11          the briefing room, they all had the opportunity to say that

12          wasn't the reason they changed the hard pass program.  And

13          they didn't do that.

14          And, again, this is plausibility that we're trying to get

15          to at this stage in the litigation on this claim, and we

16          satisfied that bar, very certain of that, given the extensive

17          news coverage focused on all of this that pointed to Mr. Ateba

18          as the reason, the impetus for changing the hard pass program.

19          It was all focused on him.

20               THE COURT:  But would you agree that on this

21          plausibility point with respect to viewpoint discrimination,

22          that issue has been sufficiently briefed through the

23          combination of the summary judgment papers and the preliminary

24          injunction papers?

25               MR. SELL:  It's been sufficiently briefed to deny their

1     motion, Your Honor, but if the Court would like additional

2     briefing on any specific question, we'd be happy to provide

3     that.

4           THE COURT:  I understand that.  Thank you.

5      All right.  I think at this point you should save any time

6     that I'm going to give you for rebuttal, but I will hear now

7     from your colleague on the APA claim.

8           MR. LAWKOWSKI:  Thank you, Your Honor, and may it

9     please the Court.

10           THE COURT:  And is it Mr. Lawkowski?

11           MR. LAWKOWSKI:  Yes, sir.

12           THE COURT:  All right.

13           MR. LAWKOWSKI:  Up through July of 2023, Mr. Ateba had

14     a hard pass.  As of August he no longer did that worked.  The

15     U.S. Secret Service is a federal agency.  It issues hard

16     passes; it cancels hard passes.  It canceled Mr. Ateba's hard

17     pass.  This court has previously recognized --

18           THE COURT:  The "it" you're referring to is who?

19           MR. LAWKOWSKI:  The U.S. Secret Service, and the hard

20     pass.  I'm not sure which part of that sentence.

21      The government has not provided any explanation for the

22     cancelation of Mr. Ateba's hard pass.  It's referred to this

23     general White House policy, however, that appears to have no

24     applicability to Mr. Ateba when you get down to the reasons

25     for it.

1          First, the policy was issued without any explanation for

2     why it was issued.  Their ex post facto explanations have no

3     relation to Mr. Ateba.  Cleaning up kind of the use of hard

4     passes for people who aren't using them does not apply to him

5     because he used them frequently.  And the government has

6     effectively conceded through several rounds of briefing where

7     they have yet to address any nonarbitrary and capricious

8     reason for canceling Mr. Ateba's hard pass.

9          THE COURT:  So who would provide the reasoned

10    explanation that you think is lacking as to the cancelation of

11    the hard pass, or as to the resumption of the hard pass policy

12    that relies on the press galleries?  Who would provide that

13    explanation?

14          MR. LAWKOWSKI:  The Secret Service.

15          THE COURT:  Why do you say the Secret Service would?

16    The Secret Service didn't decide to put that into place and

17    the Secret Service didn't decide whether to rely on the press

18    galleries.  The White House did.

19          MR. LAWKOWSKI:  Whether the Secret Service is the

20    ultimate decisionmaker, they're the ones implementing the

21    decision, and in prior cases the court has recognized that the

22    APA applies to --

23          THE COURT:  I'll grant you that they implement it.  I

24    think the question then becomes do they implement it in a

25    ministerial fashion or something more?  And would you concede

1    that with respect to providing the reasoned explanation, if

2    further reasoned explanation is required, that would come from

3    the White House?

4         MR. LAWKOWSKI:  I think it would depend on the reason.

5    If it was a security based reason, that would clearly come

6    from the Secret Service.

7         THE COURT:  But that's not what the hard pass is based

8    on.  No one has said that.

9         MR. LAWKOWSKI:  In this case, no, but presumably if it

10   were to apply more broadly, you could add that as a possible

11   explanation.

12        THE COURT:  So let me look at it from another

13   direction.  If I conclude that the standard in the hard pass

14   policy, whether it's focused on the actual standards there or

15   the standards as adopted in the press gallery's standards, if

16   I conclude that the standard is not reasonable as written, it

17   doesn't satisfy whatever the APA or First Amendment

18   requirements may be, on your APA claim, to whom would I remand

19   the case, which is the typical APA relief, in order to revise

20   that standard?

21        MR. LAWKOWSKI:  Well, so to be clear, you would not

22   have to invalidate the policy in order to reinstate

23   Mr. Ateba's hard pass, because it's an as-applied challenge

24   with respect to the cancelation of his pass.  So it would be

25   remanded to the Secret Service to undo the cancelation or

1       provide a reasoned explanation for it.

2               THE COURT:  But if a reasoned explanation is required,

3       if that's the APA determination that I make, and it's lacking,

4       and I make the determination consistent with most APA law,

5       that a remand to the agency is the appropriate thing, who do I

6       remand it to?

7               MR. LAWKOWSKI:  The U.S. Secret Service.

8               THE COURT:  And the Secret Service would provide that

9       reasoned explanation?

10              MR. LAWKOWSKI:  They would provide it.  I presume they

11      would consult with the White House in drafting it, as happens

12      with many policies.  Presumably the White House would almost

13      certainly write it and give it to the Secret Service who would

14      then issue it, but that is consistent with --

15              THE COURT:  Other than the fact that you'd like them to

16      provide it because it means that you have an APA cause of

17      action against them, why do you think the Secret Service would

18      be the ones that would provide it, as opposed to what seems

19      logical, which is the White House would be providing it?

20              MR. LAWKOWSKI:  Because the Secret Service is the

21      implementing agency.  They're the one who's ultimately taking

22      the action, so they are the ones who are responsible for that

23      action.

24              THE COURT:  Okay.  What else?

25              MR. LAWKOWSKI:  I mean, I think that's the crux of this

1    issue is he had a pass, it had no expiration date, it was

2    canceled, there's been no not arbitrary and capricious reason

3    given for that cancelation.

4        I think it's worth noting that in the number of cases that

5    deal with kind of presidential discretion and agencies and

6    trying to -- drawing that line, they all refer to the specific

7    kind of Article II authorities and the things that -- and the

8    constitutional values that are at play there.  This isn't a

9    case that implicates those.  This isn't a foreign affairs

10   case.  This isn't a case that's going to get into the

11   confidential communications of the president like, say,

12   *Judicial Watch* was.  This isn't an Antiquities Act case where

13   there's a clear statutory delegation of authority to the

14   president --

15        THE COURT:  I understand that.  But most of those cases

16   that you're referring to -- and there are a lot of cases in

17   which there's some kind of presidential or White House

18   directive or executive order or what have you that then is

19   followed by, for example, a regulation or something that is

20   put in place by a specific agency.

21       In those cases, as far as I can tell, it's almost always

22   the case that that agency is exercising its authority and its

23   discretion in deciding what to promulgate.  That's not really

24   what we have here.  All the Secret Service did,

25   notwithstanding the fact that they do have some security

1    authority that could have been exercised in a different case,

2    but here all the Secret Service did really was much more of a

3    ministerial task of effectuating the White House policy that

4    involved the White House's discretion and judgment.

5    MR. LAWKOWSKI:  I disagree that the Secret Service

6    isn't exercising its own authority.  The entire hard pass

7    program is part of the Secret Service's authority to protect

8    the president.  Presumably the president could have a

9    situation where he just says I want to go meet with this

10   person, you know, whatever the Secret Service says, I'm going

11   to go do it.  So this is all part of the Secret Service's

12   authority to protect the president.

13   THE COURT:  If a correspondent does not satisfy the

14   hard pass policy created by the White House, perhaps because

15   of a failure to be able to get a press gallery authorization,

16   does the Secret Service in your view have discretion to

17   nonetheless admit that correspondent to the White House?

18   MR. LAWKOWSKI:  I think they could, yes.  I think

19   that --

20   THE COURT:  You think they could?

21   MR. LAWKOWSKI:  Yeah, I think they would almost

22   certainly get yelled at by the White House, but...

23   THE COURT:  All right.  Thank you.

24   Mr. Knapp.

25   MR. KNAPP:  Good morning, Your Honor.

1              THE COURT:  Good morning.

2              MR. KNAPP:  As I mentioned before, I'll be addressing

3      the first claim and my colleague will be addressing the

4      viewpoint -- the actual viewpoint discrimination claim and the

5      APA claim.

6          I want to emphasize at the outset the unique purpose that

7      the White House serves as both the president's --

8              THE COURT:  You need to speak up a little bit.  Your

9      voice is trailing.  Maybe get the microphone closer to you.

10             MR. KNAPP:  I'm sorry.  Does that work better?

11         I want to emphasize at the outset the unique function that

12     the White House serves as both the president's residence and

13     as the central offices for him and his closest staff.  It is

14     no surprise I think to anyone that access is closely

15     regulated, and that includes access to the press briefings.

16         As you are well aware, there are two means of accessing the

17     press briefings.  One is the hard pass we've been discussing,

18     and the other is the day pass.  The White House revised its

19     policy this past spring to change the eligibility criteria for

20     a hard pass, but even in doing so, it emphasized that those

21     who could not obtain a hard pass could still access the press

22     briefings through the day pass system, as Mr. Ateba has

23     continued to do.

24             THE COURT:  Let me jump into this void and talk about

25     the burdens a little bit.  So you waited in line this morning

1    to go through security to get in here, right?

2         MR. KNAPP:  Do you know that I did not, because I, as a

3    Department of Justice attorney, I have a badge that lets me

4    get through.

5         THE COURT:  That made it so you could get through

6    faster.

7         MR. KNAPP:  In this case, no, because I arrived very

8    early and there was no one else.  But yes, Your Honor, it does

9    make it so I can get through faster.

10         THE COURT:  But if instead of badging in, whether

11    through your Department of Justice pass or a judiciary

12    employee pass or a press pass, you have to instead go through

13    the longer line for security, wouldn't that be some burden on

14    your access to the building?

15         MR. KNAPP:  Absolutely, Your Honor.  That would be an

16    inconvenience.

17         THE COURT:  And isn't that true for Mr. Ateba as well

18    for the day pass, as opposed to the hard pass, that there is

19    some burden just from having to go through that additional

20    security check?

21         MR. KNAPP:  Yes, Your Honor.  Although you'll hear me

22    continue to refer to it as an inconvenience, because the cases

23    distinguish between the two.

24     First of all, with regard to the hard pass and the day

25    pass, the actual security system gone through is essentially

1    identical.  I believe Mr. Fletcher's declaration says it may

2    add up to two minutes.  The primary difference, as you heard

3    earlier, is that you -- for a hard pass, you have to apply for

4    a hard pass, you apply one time.  You have to also apply to

5    get this congressional credential or Supreme Court credential,

6    which is its own burden.

7        And then for the day pass, it's a brief online form.  You

8    click the link, you fill in name and identifying number and

9    date of birth, so that the Secret Service can perform the

10   security check.  And so -- and that is something as you heard

11   that you would have to do for each day you wish to access the

12   White House.

13       But the essential point is that as a matter of

14   constitutional law those kinds of inconveniences do not create

15   a First Amendment violation.  The -- I think the Fourth

16   Circuit's decision in *Wicomico County* is instructive on this.

17   That was one where the -- it was a paralegal who had I guess

18   special access to the prison, to interview prisoners and

19   employees, and that special access was rescinded.  And the

20   Fourth Circuit explained, like, well, yes, of course that did

21   inconvenience her, but that's constitutionally *de minimis*.

22           THE COURT:  And so that's part of your argument that

23   there is not a First Amendment injury here.

24           MR. KNAPP:  Yes, Your Honor.  Absolutely.

25           THE COURT:  And I guess I don't understand that as

1    being a standing argument.  It's not a standing argument.

2            MR. KNAPP:  No, Your Honor.

3            THE COURT:  You would concede that Mr. Ateba has

4    standing to bring the claims he's brought.

5            MR. KNAPP:  Yes, Your Honor.  I mean --

6            THE COURT:  It's more the lack of a constitutional

7    cause of action?

8            MR. KNAPP:  Yes, Your Honor.  I think that's correct.

9            THE COURT:  All right.  So let me give you a

10   hypothetical.  I'm going to change one thing from the facts of

11   this case.  In the press gallery standard, instead of just the

12   language with respect to being a reputable correspondent, it

13   says a correspondent employed by an employer that agrees with

14   the positions of the Democratic Party.  And Mr. Ateba doesn't,

15   and so he can't satisfy that.  Or another correspondent

16   doesn't and so can't satisfy that.  Do they have a First

17   Amendment claim they can bring?

18           MR. KNAPP:  So first of all, I think no, because the

19   day pass system would remain in place and so he would still

20   have no First Amendment injury.  You recall the claim here is

21   access to the White House.  This is not a regulation that

22   restricts his speech or his publication.  So there's a long

23   line of Supreme Court cases --

24           THE COURT:  So no matter what the standard is and no

25   matter how the standard is framed in terms of First Amendment

1   interests, there simply is no First Amendment right at issue

2   with respect to access to the White House press area.

3        MR. KNAPP:  With respect to hard pass access to the

4   White House press areas.  If that were the only means of

5   accessing the White House, then I think what you would say is

6   that that would be unreasonable to use that standard under the

7   First Amendment.  Because if it is the only means of access,

8   then it becomes a very different question.  And in fact, if

9   you were denied access --

10        THE COURT:  So it's the combination of the fact that

11   it's the White House press area and that access is not

12   prohibited -- it is just limited -- that makes it so there's

13   no First Amendment claim?

14        MR. KNAPP:  I don't think it actually turns on the

15   specific fact that it's the White House.  What it turns on is

16   that he can still access the area that he seeks to access.

17   That's what prevents him from having a First Amendment --

18        THE COURT:  So the First Amendment does not protect

19   against burdening access.  It only protects against

20   prohibiting access.

21        MR. KNAPP:  Yes, Your Honor.  I think that's correct.

22        THE COURT:  What case stands for that proposition?

23        MR. KNAPP:  I think if you look at -- I mean, if you

24   look at *Branzburg*, which obviously is outside of the access

25   context, but it talks about burdens on news gathering.  It

1    says that those are permissible as long as they're not beyond

2    those that are imposed on the general public.  If you look at

3    the line of prison access cases like *Houchins* and -- I think

4    it's cited in there, *Pell*, those say the same thing, that

5    those are burdens on news gathering unquestionably.

6              THE COURT:  So *Sherrill* is no longer good law.

7              MR. KNAPP:  We're not afraid of *Sherrill*, Your Honor.

8    I think the D.C. Circuit applied *Sherrill* and *Karem* --

9              THE COURT:  Dealing with access to the White House

10   press area on a First Amendment claim.

11             MR. KNAPP:  That's not correct, Your Honor.  That

12   was --

13             THE COURT:  Well, ultimately it was resolved perhaps

14   more on a Fifth Amendment claim.

15             MR. KNAPP:  Well, *Karem* certainly was resolved entirely

16   on a Fifth Amendment claim.  In *Karem* itself the D.C. Circuit

17   says we're addressing it as a Fifth Amendment.  And it

18   interprets *Sherrill* in the same way.  It says that the injury

19   that *Sherrill* recognized -- and in fact if you look at the

20   remedy that *Sherrill* ordered, it's a Fifth Amendment remedy.

21   It is additional process.  It was publication of procedures

22   and an opportunity to be heard.  Those are Fifth Amendment due

23   process remedies, not First Amendment remedies.

24        And I do want to emphasize -- I have to push back on the

25   suggestion from my friend on the other side, *Karem* definitely

1    did not have access to the White House.  It would be a fairly

2    toothless, you know, sanction if he was still able to attend.

3    And if you look at -- I mean, you can read the decision for

4    yourself, obviously, but that's certainly how the D.C. Circuit

5    understood it.  It talked about the injury as being exclusion

6    from the White House, talks about access to the White House

7    being like the currency of journalists in the modern age, 30

8    days of exclusion is an eternity.  So if he had continued to

9    have access, that case -- as a factual matter I can tell you

10   that he did not have access, although that's obviously not in

11   this record.

12       But the day pass system wasn't at issue there, and the D.C.

13   Circuit's decision --

14           THE COURT:  So there are quite a few cases, *Karem*,

15   *Sherrill*, and a couple of cases in this district court over

16   the past few years, that have dealt with access to the White

17   House press area.  Right?

18           MR. KNAPP:  Yes, Your Honor.

19           THE COURT:  Have any of those cases decided that

20   there's no First Amendment right involved with respect to

21   access to the White House press area?  Have any of those cases

22   decided that?

23           MR. KNAPP:  No.

24           THE COURT:  So they've all proceeded on the basis that

25   there was a First Amendment claim.

1              MR. KNAPP:  Well, yes, Your Honor, but I --

2              THE COURT:  They may not have decided a First Amendment

3    claim, but they've all proceeded on the basis that there was a

4    First Amendment claim.

5              MR. KNAPP:  And Your Honor, as I said a few moments

6    ago, I agree that there would be a First Amendment claim here

7    if there were complete denial of access.  Whether it be

8    meritorious is a separate question, but the --

9              THE COURT:  And again, what's the best case you can

10   cite me for that specific proposition, that there's only a

11   First Amendment claim if there's a complete denial of access

12   as opposed to a significant burdening of the access?  What

13   case do you want me to look at that actually says that?

14             MR. KNAPP:  So I think the cases I cited earlier.  I

15   mean, none is obviously specifically on point here, this is

16   the only case like this where he still has access.  But so if

17   you look at the long line of cases that talk about burdens on

18   the free press, those are dealing with burdens on publication.

19   If you look at the cases that say there is no First Amendment

20   violation, those are dealing with burdens on news gathering.

21   So that's a distinction that the cases clearly draw between

22   news gathering itself and publication or speech on the other

23   side.

24             THE COURT:  Let's assume for the moment, so we don't

25   take up all your time on whether there's a First Amendment

1    injury, let's assume for a moment that we're into the First

2    Amendment analysis.  And as I said to your counterpart on the

3    other side, a lot of ink has been spilled on whether it's a

4    *Sherrill* analysis versus a forum analysis, and if a forum

5    analysis, is it a limited public forum or a nonpublic forum.

6    Does it really matter that much, or is the same standard

7    applied in all those settings?

8       And I'll start with *Sherrill*.  If *Sherrill* does provide a

9    basis for the Court to look in at the hard pass policy

10   independent of forum analysis, what standard would I apply?

11   Would I apply the same reasonable standard that I apply in the

12   forum analysis?

13       MR. KNAPP:  I suppose it would be similar.  I think

14   what *Sherrill* actually required, right, was the publication of

15   standards and an opportunity to be heard.  And the White House

16   has done that with the hard pass policy here.

17       THE COURT:  Those are the Fifth Amendment rather than

18   the First Amendment components.

19       MR. KNAPP:  Yes.  I mean, I don't think that -- I think

20   reasonableness is the correct standard, to the extent that

21   *Sherrill* considered it under the First Amendment, it would --

22   saying that it required reasonableness.

23       THE COURT:  And that's the correct standard under

24   either nonpublic forum or limited public forum.

25       MR. KNAPP:  I believe in a limited public forum, Your

1  Honor, that -- I mean, the delineation between different types

2  of forums is a little muddled in the case law, but the

3  distinction we've tried to draw in our cases between no forum

4  analysis at all and nonpublic forum -- so *Price* says you don't

5  do forum analysis when it's not speech, when it's the free

6  speech conduct.  That's what we think applies here.

7   But that is the same standard as would apply in a nonpublic

8  forum, which is the reasonableness and viewpoint neutral.  And

9  I think -- I mean, under those standards, this policy which,

10  as you discussed with my friend on the other side, all it does

11  is it looks to an outside professional body that has decades,

12  over a century of experience.

13   THE COURT:  So why is it reasonable to look to that

14  outside body?  Why is it reasonable to effectively leave the

15  access decision regarding White House access to the press

16  gallery in Congress?  Why is that reasonable?

17   MR. KNAPP:  Well, I want to emphasize again, it is not

18  leaving the decision entirely to them because the day pass

19  system still exists.  So if you're looking at the system that

20  regulates access to the White House press areas as a whole, it

21  includes the day pass system.

22   THE COURT:  The decision on the easier access through

23  the hard pass is left to -- effectively left to the press

24  gallery.  So why is it reasonable to do that?

25   MR. KNAPP:  Because they are a body of journalists.

1  They are professionals who are better suited, or well suited

2  at least, to make the professional judgment about who should

3  be entitled to the -- to I guess the title of bona fide

4  journalist of repute in the profession.

5       The constitution consistently said -- the cases

6  interpreting the First Amendment consistently say there's no

7  real constitutional category of journalist; there's just

8  citizens, and sometimes they engage in press.  And that's why

9  the cases all say that --

10       THE COURT:  But isn't part of reasonableness, this

11  holistic reasonableness assessment -- I don't know whether

12  "isn't" is the right word.  But might not the reasonableness

13  assessment include consideration of whether the decision can

14  be examined by the courts?  Because their point, Mr. Ateba's

15  counsel, in part their point is, well, the White House is

16  jettisoning this decision over to the press galleries, where

17  it's unreviewable.

18       MR. KNAPP:  Your Honor, I mean, certainly

19  reasonableness is a capacious standard.  What I would say,

20  though, is that under First Amendment reasonableness, that

21  inquiry, it need not be the most reasonable or the only

22  reasonable.  It's I think as the D.C. Circuit said in *Price*,

23  it's like one notch above rational basis.

24       So, you know, if it were a private entity, I think there

25  would still be hurdles to bringing a lawsuit against them on

1    the basis of unbridled discretion, for example.  I think --

2    and, you know, maybe the broader point is that in the event

3    that there's a credible claim of viewpoint discrimination by

4    the press galleries, the remedy for that would probably be an

5    as-applied challenge as opposed to a facial challenge.  I

6    mean, even in the First Amendment context, facial challenges

7    are disfavored.

8        And, for example, in the *Los Angeles Police Department* case

9    cited in our brief, that was a case where, again, drawing that

10   distinction between restrictions on speech and press and

11   restrictions on gathering information, saying that a facial

12   challenge was completely inappropriate in that context.  Now,

13   that was an overbreadth, which is slightly different than an

14   unbridled discretion.  But facial challenge is highly unusual

15   in any context, but it's also unusual in the First Amendment

16   context.

17            THE COURT:  So on the unbridled discretion, part of

18   your argument seems to be that unbridled discretion doesn't

19   apply in a nonpublic forum.  Correct?

20            MR. KNAPP:  Yes.  Absolutely.

21            THE COURT:  How does that comport with the Supreme

22   Court's decision in *Mansky*?  Isn't *Mansky* a case where the

23   Supreme Court applied a type of unbridled discretion analysis

24   to a polling place, which is basically a nonpublic forum?

25            MR. KNAPP:  So certainly it applied a similar analysis.

1    I think it was very careful to put it under the reasonableness

2    context.  You know, it says unreasonable in this context.  In

3    the context of a rule that prohibits expression, the D.C.

4    Circuit says the same thing.

5        Obviously, the cases before them did deal with regulations

6    that limited core political expression in the case of *Mansky*

7    and *Zukerman*, which was -- the standard being challenged was

8    literally, is it political.  And so I think when you're doing

9    the reasonableness analysis, the specific context is extremely

10   important.  And in all three of those cases that they cited,

11   it dealt with the application of regulation that restricted

12   speech.  And this is not that.

13       THE COURT:  Some kind of expression.

14       MR. KNAPP:  Some kind of expression.

15       THE COURT:  So let's examine that for a second.  Why

16   isn't a reporter's questions expressive?  The White House

17   invites reporters to this press area, so to speak, with

18   respect to invites, to the press area, in order for them to

19   engage in an exchange with the White House.

20       Yes, perhaps the primary purpose is for the press to gather

21   information, but the White House is also hearing the questions

22   that they're asking, what the press is concerned about.  And

23   often there's a back and forth that occurs between a member of

24   the press and the White House spokesperson, where a question

25   will be asked, an answer will be given, a follow-up question,

1      and then further answer.  It could involve two or three

2      follow-up questions.  That seems to me to be very expressive

3      on the part of both parties in this communication, this

4      dialogue that is occurring where the White House is getting

5      information too in terms of what is of concern to the press

6      and therefore perhaps the public.  Why isn't that expressive?

7              MR. KNAPP:  It is literally speech, Your Honor,

8      absolutely.  And I think what I would point you to is to the

9      D.C. Circuit's decision in *Price*, where the individual there

10     was --

11             THE COURT:  Yeah, but that was just the bald

12     filmmaking.  It wasn't showing the film; it wasn't interacting

13     with any member of the public; it was just running the

14     projector.  Not a projector, but running the camera.

15             MR. KNAPP:  Yes, but he may have been narrating it.

16     The regulation at issue applied to all commercial filmmaking,

17     so it would have included things where you had actors putting

18     on a play in a public park, which is -- you know, that too is

19     expressive.

20        And if you look at the other cases, the Supreme Court

21     cases, for example, the prison cases, right, the issue there

22     is whether or not they can interview somebody.  An interview

23     involves the exchange of ideas between two people.  So it is

24     true that, obviously, you're correct that in the course of

25     speaking at a press conference the journalist is going to say

1        something, and through that, as you said, I think

2        communicate --

3              THE COURT:  They're going to say something more than

4        just "I have a question."  They're going to say here's what

5        the question is and here's why it's important for you to give

6        me an answer, and maybe, and here's why your answer is not

7        sufficient.

8              MR. KNAPP:  Right.  Absolutely.  And --

9              THE COURT:  I can't imagine that would one label that

10       not expressive.

11             MR. KNAPP:  Well, I think --

12             THE COURT:  The interchange that I'm describing --

13             MR. KNAPP:  -- I guess I'd agree with you it's not

14       expressive, but that is not what is -- the way the cases have

15       dealt with that is to differentiate that from the core, what

16       is at issue, which is here news gathering.

17          And I have to emphasize again that Mr. Ateba can still do

18       that.  He can still come to the press conference.  He can

19       still try to get his questions answered.  Although, as he

20       must, he acknowledges that he has no right to have his

21       questions answered.  But using the day pass system, he still

22       can stand up and engage, and to the extent that that is

23       expressive conduct, he still can do that.

24             THE COURT:  So *Mansky*, in making this assessment under

25       the forum of unbridled discretion on a reasonableness basis,

1       is really talking about an objective, workable or manageable

2       standard.  How is the bona fide resident correspondents of

3       reputable standing an objective workable standard?

4            MR. KNAPP:  Well, I mean -- I think *Bellion Spirits*,

5       the D.C. Circuit's decision in *Bellion Spirits* talks about the

6       way a term that may appear subjective can obtain meaning, and

7       one is through like long-standing use -- that's *Kovacs,* I

8       think, talks about "loud and raucous."  *Bellion Spirits*, I

9       think that maybe that -- part of the decision is talking about

10      constitutional vagueness, but it's the same thing, it talks

11      about -- it's people who work in the profession -- in that

12      case it was about health claims on liquor labels -- they know

13      what is required under the terms of the admittedly somewhat

14      open-ended terms.

15      And I believe it's the same here, where there's a hundred

16      years of the press galleries applying the standard.  You have,

17      as you alluded to earlier, you have the additional context

18      setting out, you know, who would qualify, you know, not

19      engaged in lobbying, avoids conflicts of interest.  You have

20      the ethical standards that we referred the Court to.  There's

21      a lot of context that is built up around this standard which

22      has existed for so long and which has been in use both by

23      Congress and other government entities for so long.

24      And so it is true that it's an open-ended word, but in the

25      context it's not -- it doesn't have no meaning, you know.  And

1    I think -- I think if you look to the Supreme Court's decision

2    in Arkansas Education -- I can't remember the rest of it,

3    Public TV versus Forbes, or whatever it was, you know, there

4    the standard that was applied was "serious candidate" or

5    something like that.  And I think that in the context of a

6    news organization hosting a debate, for example, that had

7    meaning.

8      Now, that's not exactly how the Court addressed it in that

9    case, but the same sort of analysis applies.  Sometimes the

10   context matters.  And that's why, for example, the *McDaniel*

11   case that they cite, which talks about citizens of repute for

12   witnessing an execution, is completely inapplicable here, is

13   that it's a completely different context with no apparent

14   history, or at least none that has been discussed, that would

15   build up the meaning around it.

16         THE COURT:  Now, part of your argument is that the

17   White House is not responsible for the decisions of the press

18   galleries.  So would it matter if I found that the press

19   galleries are effectively agents of the White House?

20         MR. KNAPP:  Well, I think you absolutely cannot find

21   that, Your Honor.

22         THE COURT:  I absolutely cannot find that.

23         MR. KNAPP:  They are an agent of Congress.  And to say

24   that an agent of Congress is controlled by the White House

25   would be very unusual.  But they are not.  I mean, there's no

1    indication whatsoever that they are directed or controlled by

2    the White House.  They are making independent decisions about

3    access to the congressional press gallery --

4        THE COURT:  So should I deny the unbridled discretion

5    claim because the discretion is being exercised by a different

6    decisionmaker?

7        MR. KNAPP:  I think you could deny it for that reason,

8    or you could deny it for the perhaps more straightforward

9    reason that the six criteria listed by the White House, which

10   are the criteria that the White House use, are objective.  And

11   so you never kind of peek under the curtain I guess or go to

12   the next step.

13       THE COURT:  Is there any other case that you're aware

14   of where a First Amendment unbridled discretion or First

15   Amendment claim utilizing the unbridled discretion doctrine

16   has been denied because the discretion was being exercised by

17   some other decisionmaker?

18       MR. KNAPP:  I'm not aware of any other case that arises

19   in a similar context that goes in either direction.

20       THE COURT:  So the fact -- is the fact that the

21   discretion is exercised elsewhere important to the resolution

22   here?  Even though there's no case I can really look to to

23   stand for that proposition because there's no case going

24   either way on that, there just isn't another case dealing with

25   that situation.

1          MR. KNAPP:  Yes.  It is important because as you were

2     discussing earlier, I mean, if we go to first principles here

3     about what this doctrine is about, is it's a prophylactic rule

4     that is aiming at preventing the opportunity for the licensing

5     body to engage in viewpoint discrimination.  And here the

6     licensing body is the White House, regulating access to the

7     White House.  I mean, the White House can't engage in

8     discrimination through the press gallery system because it has

9     no control over their decisions.

10          THE COURT:  All right.  Are you addressing the

11     viewpoint discrimination claim, or is that your colleague?

12          MR. KNAPP:  No, my colleague will be addressing that.

13          THE COURT:  And also the APA claim?

14          MR. KNAPP:  That's correct.

15          THE COURT:  Anything else you want to say with respect

16     to the First and Fifth Amendment claim?

17          MR. KNAPP:  No, Your Honor.  If you have no further

18     questions.

19          THE COURT:  All right.  Mr. Borson.

20          MR. BORSON:  Good morning, Your Honor.  Joseph Borson

21     on behalf the United States.  So I'll be brief on both points

22     because I think they're both fairly straightforward.

23       On the viewpoint discrimination point, as you discussed

24     with my colleague on the other side, they don't contest that

25     the hard pass policy is itself facially viewpoint

1      discriminatory.  Their claim is essentially that it was issued

2      to intentionally prevent Mr. Ateba from gaining a hard pass on

3      the basis of his viewpoint, on the basis of his ideology or

4      his perspective.  And that allegation simply is not plausible

5      based on the facts that he pled in the complaint.  And so that

6      resolves that there.

7          If you look at the complaint, the only evidence that he has

8      that the White House took any action with respect to the hard

9      pass policy based on him is really the March Ted Lasso press

10     conference where he himself notes that he engaged in the sort

11     of tactics, he interrupted the press secretary.  He cites

12     articles that note how the press conference descended into

13     chaos based on his actions.  It's clearly based on his

14     actions, even as he pleads it, not on the content of his

15     questions --

16         THE COURT:  They would ask that I infer that there is a

17     viewpoint basis lying behind that.

18         MR. BORSON:  I don't think that inference would be

19     plausible right there, Your Honor.  And I think the reason why

20     it's not plausible is because Mr. Ateba had been in the press

21     room for five years before that, presumably asking the same

22     types of questions.  In his reply brief, the fourth brief of

23     the cycle, he identifies his perspective as U.S.-African

24     politics, and that's his viewpoint.

25         There's no indication that the White House took any action

1   until, as he states, he started engaging in these assertive

2   tactics such as interrupting the press secretary, such as

3   causing what reporters and colleagues called chaos.  That's

4   based on his conduct.  That has nothing to do with the content

5   or the ideology reflected in his viewpoint and in his

6   questions.

7        THE COURT:  So they fault the defendants for not

8   submitting declarations or evidence as to the reasons for

9   adopting the hard pass policy.

10       MR. BORSON:  I don't think you should, Your Honor, and

11  I think the reason why you shouldn't is because on the face of

12  the complaint, their allegations aren't plausible.  And the

13  way -- as Your Honor well knows, the obligation to put forward

14  evidence wouldn't arise until there had been plausible

15  allegations of a claim on which relief could be granted.  So

16  we don't even need to get to that point.  The allegations they

17  have here on viewpoint discrimination are simply implausible

18  and that closes the door here.

19       THE COURT:  So the procedural posture is a little off

20  here.  Why should I grant summary judgment to the White House

21  on this claim when they have not been able to conduct any

22  discovery?  Is it more, as they have put it, and as you have

23  put it now, a plausibility question and therefore more whether

24  I should dismiss that claim?

25     There was a motion to dismiss that was filed in the context

1    of the preliminary injunction proceedings, I believe.  But now

2    we have a motion for summary judgment.  Is what you're asking

3    me to do effectively to dismiss that claim because it doesn't

4    satisfy the *Twombly* and the plausibility standard?

5        MR. BORSON:  Effectively, this is a 12(b)(6) motion in

6    the context of a Rule 56 motion.  And I think the reason why

7    this has come up in this way is because, as Your Honor noted,

8    the sort of odd procedural posture here.  I think we've laid

9    out our plausibility arguments, I think they've laid out their

10   plausibility arguments.

11       THE COURT:  It's fully briefed as far as you're

12   concerned.

13       MR. BORSON:  As far as we're concerned, it's fully

14   briefed.  To the extent it would be treated as a dismissal

15   under Rule 12(b)(6) rather than summary judgment in favor of

16   the defendants under Rule 56, we think the substantive

17   standards would be the same.  If that's a cleaner procedural

18   way of getting to the same results, just given this procedural

19   posture, we have no objections to that.  I think we all agree

20   that this is a plausibility standard here.

21       THE COURT:  All right.  What about the APA claim?

22       MR. BORSON:  I mean, I think the APA claim, as your

23   colloquy illustrated, this was a White House action.  The

24   May 5 letter makes clear that this was a White House action.

25   The Fleischer Declaration that we put forward from the Secret

1        Service makes clear that the White House decided who would be

2        getting passes and who wouldn't be --

3            THE COURT:  Well, Secret Service does have independent

4        statutory responsibility to control access to the White House.

5            MR. BORSON:  They do, but there's no evidence that

6        those authorities were implicated here.  I think this would be

7        a different case if this was like *Sherrill* where the Secret

8        Service said no, no, this particular person is a security

9        threat and so they can't get in.

10           But that's not what happened here.  What happened here is

11       the White House said, okay, everyone's hard passes are going

12       to expire on July 31.  And then everyone has to reapply, and

13       then what the White House then did was saying, okay, of the

14       people who've applied, these people meet the standards so

15       their hard passes stay on, this list of about 500 people don't

16       meet those standards, Secret Service, turn those off.

17           So the reason there's a Secret Service role is really just

18       why we're in this context in the first place.  If this was a

19       different entity where the White House itself was able to

20       issue security passes, then I don't think there would be a

21       discussion here at all.  Which is why I think the *Judicial*

22       *Watch v. Secret Service* case, although it's obviously a FOIA

23       case, is so instructive, because that case, the D.C. Circuit

24       addressed the same point, where the plaintiffs were saying,

25       you know, look, these are Secret Service records of who gets

1    in the White House.  And then the Court basically said, yes,

2    in some sense that is true, but these are really White House

3    records that illustrate White House equities.  The only reason

4    these are in the Secret Service in the first place is because

5    of the unique status of the White House.  But for separation

6    of powers reasons, we're not going to construe those as agency

7    records under the FOIA, which is essentially the same

8    definition for these purposes as the APA.

9        THE COURT:  So if I, either under the APA or the First

10   Amendment, decided that a satisfactory or reasonable

11   explanation had not been given for the agency action, or that

12   the standard, wherever, in the press gallery context or in the

13   White House hard pass policy, did not comport with the law and

14   had to be revised, who would I remand the case to and who

15   would do those revisions or provide that explanation?

16       MR. BORSON:  The White House press office, Your Honor.

17   These are White House press office standards.  And that's why

18   the APA claim doesn't work, because it would be a remand -- I

19   suppose if it was a remand to the Secret Service, the Secret

20   Service would hold their heads and say White House, please

21   give us a policy.

22       They would then say here's the White House's policy because

23   they decide who does and does not get into the press room,

24   which is just this court reviewing the White House's actions

25   under the APA by another name, which we know from cases dating

1    back under the *Soucie* line isn't appropriate under the APA

2    action because the APA doesn't reach the White House, or at

3    least those components of the White House.

4             THE COURT:  All right.  Mr. Borson, anything else?

5             MR. BORSON:  No, Your Honor.

6             THE COURT:  Thank you.

7             MR. BORSON:  Thank you, Your Honor.

8             THE COURT:  On rebuttal for five minutes will be

9    Mr. Sell?

10            MR. SELL:  Thank you, Your Honor.  I want to dispel

11   this notion that there isn't a burden that Mr. Ateba's facing

12   because he still has access to the day pass program.  He is

13   effectively denied access for spontaneous media events.  If

14   there is a significant event that prompts all the hard pass

15   holders to go to the briefing room, take up all the spots

16   while he's standing in line with his day pass, he's

17   effectively excluded from --

18            THE COURT:  That hasn't happened yet.

19            MR. SELL:  It hasn't happened yet, but it certainly

20   could happen.

21            THE COURT:  Indeed, he hasn't ever been denied access

22   to the White House, has he?

23            MR. SELL:  Not yet, Your Honor.  No.  He has been

24   denied access to the hard pass program which would effectively

25   result in his denial.

1          THE COURT:  It went into effect in July, right, so it's

2     been three or four months.

3          MR. SELL:  August 1, Your Honor, yes.  So that

4     certainly is a possibility, particularly with the global

5     environment we're in right now.  And Your Honor, you're

6     correct that all of the cases that have looked at the press

7     credentialing at the White House have recognized that there is

8     a First Amendment interest involved here, and there is no

9     reason that that couldn't serve as a stand-alone claim for

10    violating traditional First Amendment doctrines that are in

11    place right now.  It makes no sense that you would also have

12    to bring some kind of due process claim in order to enforce

13    his First Amendment rights as a journalist at the White House.

14      Also, Your Honor, this is a limited public forum.  If you

15    want to go down the forum analysis route, this isn't a

16    nonpublic forum.  The Court in *Sherrill* cited *Conrad*, which

17    was a limited public forum case.  All the principles that

18    applied to a limited public forum are in full force here.

19          THE COURT:  But the only difference in terms of the

20    analysis is a little more confidence that unbridled discretion

21    is a doctrine that applies.

22          MR. SELL:  I think it has more teeth than that, Your

23    Honor.  Under the limited public forum analysis, obviously

24    viewpoint discrimination is not allowed.  But the individuals

25    for which the forum was opened up for, the class of

1    individuals, can't be denied access for impermissible reasons.

2    And those impermissible reasons would be an arbitrary

3    requirement such as having to get credentials from another

4    body in order to access the limited public forum.  So if the

5    Court does go down the forum analysis route, this is a limited

6    public forum.

7    Also, Your Honor, in *Price v. Garland*, the news gathering

8    was explicitly exempted from that regulation.  So this notion

9    that forum analysis is inapplicable in the news gathering

10   context, as the government is making, was not the holding in

11   *Price*, and in fact the regulations in that case explicitly

12   exempted news gathering.  So I don't think you can take *Price*

13   for the proposition that accessing press facilities is not

14   appropriate for a forum analysis.

15   Also the "of repute" standard, it's unclear what that

16   standard -- the purpose of that standard is.  So, you know,

17   there may be contexts in which some terms that aren't

18   really -- they're a little nebulous maybe and there might be

19   some subjectivity involved, there might be some contexts in

20   which that is permissible.  But here it's unclear what the "of

21   repute" standard is designed to do other than give the

22   congressional press galleries the ability, this final box that

23   needs to be checked, give them the ability to say oh, you're

24   not of repute or reputable enough, therefore your application

25   is denied.  That appears to be the only purpose of this --

1          THE COURT:  Is there a history of a problem with the

2     reputable standard?  It's been in existence, as I said

3     earlier, since the Gerald Ford administration.  Is there any

4     history of difficulty --

5          MR. SELL:  I don't know if --

6          THE COURT:  -- that anybody is aware of?  I know you

7     say well, of course not, because it's not reviewable.

8          MR. SELL:  Exactly, Your Honor.  I don't know if

9     anyone's ever filed a lawsuit over it.  They certainly haven't

10    been able to since the early '70s.  So I think that's probably

11    the primary explanation for why it hasn't been an issue.

12         THE COURT:  You do agree -- I guess I think you agree

13    that both the limited public forum and the nonpublic forum

14    have the same basic test that applies.  In *Price* it was

15    described for a nonpublic forum as viewpoint neutral and

16    reasonable given the purpose of the forum and all the

17    surrounding circumstances.  And in *Price* for a limited public

18    forum it was described as reasonable and viewpoint neutral in

19    view of the purpose for which the forum was opened.  Those

20    sound like virtually identical standards.

21         MR. SELL:  Yes, Your Honor.  And if that's how the D.C.

22    Circuit has framed it, then I think that's the framework that

23    the Court is obligated to operate under, although I think

24    there is a strong argument that under Supreme Court precedent

25    there may be a little bit more of a distinction there in that

1      a limited public forum is a breed of designated public forum.

2      It's one for a limited purpose instead of an unlimited

3      purpose.  And in that context I do think that, you know, there

4      might be a little bit more teeth to this than just reasonable

5      restrictions for the government property at issue.

6           THE COURT:  *Price* cites Supreme Court law for both of

7      those standards in both those contexts.

8           MR. SELL:  Yes, Your Honor.  And, Your Honor, to the --

9      this argument that Mr. Ateba was -- that the White House

10     changed the hard pass program because of his conduct and not

11     his viewpoint, he had no notice that his conduct was going to

12     lead to White House wholesale excluding the hard pass program,

13     to revising the hard pass program to exclude him from it.  He

14     had no notice of that.

15          THE COURT:  That's not a claim that's in your

16     complaint, though.

17          MR. SELL:  No, Your Honor.  And if the Court were to

18     not agree with us on our existing claims, then we would ask to

19     be able to file an amended complaint to make this argument

20     because we think that, given the briefing, the admissions the

21     government has made in its briefing that it was his conduct, I

22     guess, that prompted the change to the hard pass program, we

23     would --

24          THE COURT:  I don't think they've made that admission.

25          MR. SELL:  It appears to be.

```
 1              THE COURT:  I think they've said that that's what your
 2        complaint actually amounts to.  But go ahead.
 3              MR. SELL:  Your Honor, if that is indeed the -- you
 4        know, their position on how our complaint is currently
 5        structured, we would think that it would be appropriate to
 6        flesh this out with more facts through an amended complaint,
 7        especially given the expedited time frame that we've been on
 8        here.
 9              THE COURT:  All right.  Thank you, Mr. Sell.
10              MR. SELL:  Thank you, Your Honor.
11              THE COURT:  Thank you all.  The case is submitted.  I
12        will try to get a decision out in a reasonably prompt time
13        frame as I've promised in this whole proceeding.  I thank you
14        all for the quality of the briefing and the arguments today,
15        and have a good day.
16              (Proceedings adjourned at 11:33 a.m.)
17
18
19
20
21
22
23
24
25
```

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**SIMON ATEBA,**

     **Plaintiff,**

     **v.**

**KARINE JEAN-PIERRE, in her official capacity as White House Press Secretary, et al.,**

     **Defendants.**

**Civil Action No. 23-2321 (JDB)**

---

**ORDER**

Upon consideration of [22] defendants' motion for summary judgment, [23] plaintiff's cross-motion for summary judgment, and [24] plaintiff's motion for judicial notice, and the entire record herein, and for the reasons stated in the accompanying Memorandum Opinion issued on this date, it is hereby

**ORDERED** that [22] defendants' motion for summary judgment is **GRANTED** as to Counts One and Three of the Complaint, and **DENIED** as to Count Two of the Complaint; it is further

**ORDERED** that [23] plaintiff's cross-motion for summary judgment is **DENIED**; it is further

**ORDERED** that [24] plaintiff's motion for judicial notice is **GRANTED**; and it is further

**ORDERED** that Count Two of the Complaint is **DISMISSED WITHOUT PREJUDICE**.

**SO ORDERED**.

JA213

_____ /s/
JOHN D. BATES
United States District Judge

Dated: <u>December 7, 2023</u>

JA214

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SIMON ATEBA,

    Plaintiff,

    v.

KARINE JEAN-PIERRE, in her official
capacity as White House Press Secretary, et
al.,

    Defendants.

Civil Action No. 23-2321 (JDB)

## MEMORANDUM OPINION

For decades, the White House has granted special access passes—known as hard passes—

to journalists tasked with reporting on the President and his administration.  See generally Sherrill

v. Knight, 569 F.2d 124 (D.C. Cir. 1977).  Hard pass holders can generally come and go from the

White House as they wish, subject to a security screening at the door.  On May 5, 2023, the White

House announced changes to the criteria for obtaining a hard pass, reimplementing a requirement

that had been in place for most of the last 50 years—that the applicant hold a press credential from

the Supreme Court or one of the press galleries of the United States Congress.  Journalists who

could not satisfy these requirements by July 31, 2023, would lose their expedited access.  Simon

Ateba, the White House correspondent for Today News Africa, was one of about 500 journalists

whose hard passes were deactivated under this policy.  Ateba, who is known for interrupting press

briefings and attracting the ire of the Press Secretary, alleges that the new policy was designed to

exclude him from the press room.  In this lawsuit, he claims White House Press Secretary Karine

Jean-Pierre (the "White House") engaged in unconstitutional viewpoint discrimination against him

by changing the criteria, and that the new hard pass policy unreasonably confers unbridled

discretion on the congressional press galleries.  He also claims that Director of the United States

JA215

Secret Service Kimberly Cheatle and the United States Secret Service (collectively "the Secret Service") acted arbitrarily and capriciously in deactivating his hard pass.  Before the Court are the parties' cross-motions for summary judgment.

**Background**

I.   **Factual Background**

   A.  **Press Access to the White House**

As the residence and offices of the President, his family, and his personal staff, access to the White House is tightly controlled.  However, "the White House has voluntarily decided to establish press facilities for correspondents who need to report therefrom."  Sherrill, 569 F.2d at 124.  The press facilities include the James S. Brady Briefing Room, the press offices, the press apron, the North Grounds Stand Up Area, and the Driveway (collectively, the "Press Area").  Defs.' Resp. to Pl.'s Statement of Material Facts as to Which There Is No Genuine Dispute [ECF No. 26-1] ("Defs.' Resp. to Pl.'s Facts") ¶ 1.

The White House offers journalists two principal ways of accessing the Press Area.  First, a reporter may obtain a "temporary press pass," known as a "day pass," which is a daily credential issued upon application to the Secret Service.  Pl.'s Resp. to Defs.' Statement of Material Facts as to Which There Is No Genuine Dispute [ECF No. 23-3] ("Pl.'s Resp. to Defs.' Facts") ¶¶ 2–3.  Second, a reporter can obtain a "permanent press pass," known as a "hard pass," which is a credential that allows him or her to come and go freely once the pass is issued.  Id. ¶ 2.[1]  Day pass and hard pass holders can access the Press Area at the same times (from 5:30 a.m. to 10:30 p.m.).  Id. ¶ 5; Third Decl. of Nathan Fleischer, Asst. to the Special Agent in Charge, Presidential Protective Div., U.S. Secret Service [ECF No. 22-2] ("3d Fleischer Decl.") ¶¶ 7–8.  However, a

---

[1] A third form of access, the "appointment press pass," is not at issue here.  Pl.'s Resp. to Defs.' Facts ¶ 2.

2

JA216

reporter with a day pass must await an escort from the gate to the Press Area, which can take up to 45 minutes.  Defs.' Resp. to Pl.'s Facts ¶¶ 3–4; see id. ¶ 4 (White House disputing to the extent chaperones are available at the top of each hour).

Unlike a hard pass holder who can access the White House as long as his or her pass is active, a day pass user must submit a brief, online Secret Service form for each day that he or she wants to access the Press Area.  Pl.'s Resp. to Defs.' Facts ¶ 3; 3d Fleischer Decl. ¶ 9.  Journalists are directed to submit the form by 5:00 p.m. the night before, although the White House has also submitted evidence that passes have been granted day-of, including to Ateba.  Defs.' Resp. to Pl.'s Facts ¶ 2.  Because day passes are good for one day only, journalists must resubmit the form for every day they plan to access the Press Area.  Id.

Journalists seeking long-term hard passes must secure approval from the Secret Service and the White House.  The Secret Service reviews "whether the applicant presents a potential source of physical danger to the President and/or the family of the President so serious as to justify his or her exclusion from White House press privileges."  31 C.F.R. § 409.1.  The White House sets and enforces the remaining criteria for approval.  See Pl.'s Resp. to Defs.' Facts ¶ 1.  These criteria are discussed at length below.

### B.  Simon Ateba

Ateba is the White House correspondent for Today News Africa, "a daily online news publication covering American politics and relations between the United States and African countries."  Verified Compl. [ECF No. 1] ("Compl.") ¶ 3; see Pl.'s Resp. to Defs.' Facts ¶ 6.  He has worked as a journalist for fifteen years, the last five as a White House correspondent.  Compl. ¶¶ 3, 38.  For his first three years as a White House correspondent, he entered the White House with a day pass; from February 2021 through July 2023, he held a hard pass.  Pl.'s Resp. to Defs.' Facts ¶ 7.  During this time, he alleges, he was ignored by the Press Secretary, who generally

refused to take his questions or grant him interviews with the President.  See Compl. ¶¶ 42–45; Defs.' Resp. to Pl.'s Facts ¶ 9.

Ateba claims that in response to this alleged treatment, he has taken to speaking over the Press Secretary and other correspondents during White House briefings.  Compl. ¶¶ 45–53; see Pl.'s Resp. to Defs.' Facts ¶ 11.   In one notable incident, on March 20, 2023, he interrupted the Press Secretary's introduction of the cast members of the television show "Ted Lasso," who were at the White House to speak about mental health.  See Compl. ¶ 49; Defs.' Resp. to Pl.'s Facts ¶ 10.  The disturbance resulted in national news coverage.  See id. ¶ 50.  His pattern of disruption has drawn rebuke from the White House Press Secretary and other correspondents.  Id. ¶¶ 48, 50, 52.  Even amid the well-known rough-and-tumble atmosphere of the White House Press Area, see Karem v. Trump, 960 F.3d 656, 665 (D.C. Cir. 2020), Ateba's behavior has turned heads.  See Compl. ¶¶ 45–53; Defs.' Resp. to Pl.'s Facts ¶ 20.

### C.  Changes in White House Policy

On May 5, 2023, the White House announced two new policies relating to White House access.  First, the White House issued a conduct policy, setting forth expectations for behavior in the Press Area, and the process for revoking hard pass credentials of journalists who did not comply ("Conduct Policy").  Pl.'s Resp. to Defs.' Facts ¶ 10; see Compl., Ex. A [ECF No. 1-1] ("May 5, 2023 Letter") at 2.  Second, the White House announced that all hard passes would expire on July 31, 2023, unless the holder met the following criteria ("Hard Pass Policy"):

1. Full-time employment with an organization whose principal business is news dissemination (If you are freelance, we will need letters from two news organizations describing your affiliation, or, if you freelance primarily for one organization, a letter from that organization describing the extent and duration of your relationship with the organization);
2. Physical address (either residential or professional) in the greater Washington, D.C. area;

4

3. Have accessed the White House campus at least once during the prior six months for work, or have proof of employment within the last three months to cover the White House;
4. Assignment to cover (or provide technical support in covering) the White House on a regular basis;
5. Accreditation by a press gallery in either the Supreme Court, U.S. Senate or U.S. House of Representatives; and
6. Willingness to submit to any necessary investigation by the U.S. Secret Service to determine eligibility for access to the White House complex, where Secret Service will determine eligibility based on whether the applicant presents a potential risk to the safety or security of the President, the Vice President, or the White House complex.

Pl.'s Resp. to Defs.' Facts ¶ 8–9.  The White House did not explain the change, except to say that it sought to "be consistent with . . . prior administrations."  May 5, 2023 Letter.  In briefing, the White House suggested the change was made to reduce the number of passes in circulation.  Mem. of P. & A. in Supp. of Defs.' Mot. for Summ. J. [ECF No. 22-1] ("Defs.' Mot.") at 2 ("[U]nder the now-rescinded policy, hard passes were automatically renewed and there were an excessive number in circulation—including many that were no longer in active use, leading to concerns with administrability and the security risks inherent in the ballooning number of passes that grant access to the White House.").

Principally at issue in this case is Rule No. 5, the requirement that applicants hold credentials from the Supreme Court or one of the congressional press galleries.  Access to the Supreme Court press gallery is determined by the public information office and is limited to journalists who cover the Court full time.  See Defs.' Resp. to Pl.'s Facts ¶ 14.  Ateba has not secured a credential from the Supreme Court.  See id. ¶ 14; Compl. ¶ 77; id, Ex. D [ECF No. 1-4] (Letter to Supreme Court Public Information Office).  Given the undisputed and significant limitations on Supreme Court press passes, the Court credits Ateba's assertion that it would not be possible for him to obtain such a credential. The Court therefore focuses its analysis on the congressional press galleries' rules.

JA219

The congressional press galleries have long provided professional credentialing to journalists.  See Consumers Union of U.S., Inc. v. Periodical Correspondents' Ass'n, 515 F.2d 1341, 1343–44 (D.C. Cir. 1975) (discussing history of credential press galleries and credentialing rules).  The House and Senate each host four galleries for different types of journalists: daily press, periodical press, radio/TV, and press photographers.  See id.  Committees of journalists administer the credentialing requirements for the galleries, and journalists must renew their credentials every two years.  See Defs.' Resp. to Pl.'s Facts ¶¶ 15–16.  The credentialing requirements for the congressional press galleries are similar to each other.  The rules for the Senate Daily Press Gallery (also known as the Senate Press Gallery)—to which Ateba has sought access—are, in pertinent part:

3. The Standing Committee of Correspondents shall limit membership in the press galleries to bona fide correspondents of repute in their profession, under such rules as the Standing Committee of Correspondents shall prescribe.

4. An applicant for press credentials through the Daily Press Galleries must establish to the satisfaction of the Standing Committee of Correspondents that he or she is a full-time, paid correspondent who requires on-site access to congressional members and staff.

Correspondents must be employed by a news organization:

(a) with General Publication periodicals mailing privileges under U.S. Postal Service rules, and which publishes daily; or

(b) whose principal business is the daily dissemination of original news and opinion of interest to a broad segment of the public, and which has published continuously for 18 months.

The applicant must reside in the Washington, D.C. area, and must not be engaged in any lobbying or paid advocacy, advertising, publicity or promotion work for any individual, political party, corporation, organization, or agency of the U.S. Government, or in prosecuting any claim before Congress or any federal government department, and will not do so while a member of the Daily Press Galleries.

Applicants' publications must be editorially independent of any institution, foundation or interest group that lobbies the federal government, or that is not

6

JA220

principally a general news organization. Failure to provide information to the
Standing Committee for this determination, or misrepresenting information, can
result in the denial or revocation of credentials.

Req. for Judicial Notice, Ex. E (U.S. Senate Daily Press Gallery, Governing Rules) [ECF No. 24-

6] ("Senate Daily Press Gallery Rules"); <u>see</u> U.S. House Periodical Press Gallery, Rules and

Regulations, https://periodical.house.gov/accreditation/rules-and-regulations ("House Periodical

Press Gallery Rules") (similar);[2] <u>see</u> Defs.' Resp. to Pl.'s Facts ¶¶ 17–19.

### D.  Effect of White House Policy Changes on Ateba

On July 11, 2023, Ateba received a reprimand letter pursuant to the new Conduct Policy.

Pl.'s Resp. to Defs.' Facts ¶ 12.  The letter outlined four instances when he disrupted press briefings

and afforded him an opportunity to respond to the allegations.  Compl., Ex. B [ECF No. 1-2]

("Reprimand Letter") (detailing incidents on May 13, 2022, December 8, 2022, March 20, 2023,

and June 26, 2023).  While the letter contained a warning that Ateba's continued disruptions could

result in the suspension or revocation of his hard pass, the White House did not revoke Ateba's

hard pass pursuant to the Conduct Policy.  <u>Id.</u>; <u>see</u>  Pl.'s Resp. to Defs.' Facts ¶ 12.  On August 1,

2023, the White House directed the Secret Service to deactivate hard passes for approximately 500

journalists who did not qualify under the new Hard Pass Policy.   Pl.'s Resp. to Defs.' Facts ¶ 14.

---

[2] Ateba has submitted an unopposed motion for the Court to take judicial notice of the following documents:
(1) Brief of The White House Correspondents' Ass'n as Amicus Curiae Supp. Appellee, <u>Karem v. Trump</u>, Case No.
19-5255 (D.C. Cir. Jan. 13, 2020) [ECF No. 24-2]; (2) Transcript of Oral Decision, CNN v. Trump, 1:18-cv-02610-
TJK, at *7:19–22 (D.D.C. Nov. 16, 2018) [ECF No. 24-3]; (3) Congressional News Media and the House and Senate
Press Galleries, Congressional Research Service (Apr. 13, 2017) [ECF No. 24-4] at 4; (4) Periodical Press Gallery,
Accreditation, House Periodical Press Gallery [ECF No. 24-5]; and (5) Senate Daily Press Gallery Rules.  Req. for
Judicial Notice [ECF No. 24].

The Court may take judicial notice of facts "not subject to reasonable dispute" that are "generally known
within the trial court's territorial jurisdiction" and "can be accurately and readily determined from sources whose
accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  The motion is granted to the extent the facts are
relied upon in this opinion.  The Court also takes judicial notice of the rules of the House Periodical Press Gallery,
since Ateba has already pointed the Court to another part of that gallery's accreditation procedures.  Because Ateba
raises a facial challenge to the policy, it is appropriate for the Court to consider different rules under which a journalist
can obtain a credential.

JA221

Ateba lacked a credential from the Supreme Court or one of the congressional press galleries, as required under Rule No. 5 of the Hard Pass Policy, and his hard pass was deactivated.  Id.

Ateba applied for a credential from the Senate Daily Press Gallery on June 5, 2023.  Defs.' Resp. to Pl.'s Facts ¶ 17; see Compl., Ex. C [ECF No. 1-3] (Letter to Senate Daily Press Gallery). His request is under consideration but, as of October 11, 2023, has not been granted.  Defs.' Resp. to Pl.'s Facts ¶¶ 18–19.  Ateba did not apply to renew his hard pass before it was deactivated.  See Pl.'s Resp. to Defs.' Facts ¶ 13.  Ateba has continued to access the Press Area with a day pass.  Id. ¶ 15; see 3d Fleischer Decl. ¶ 17 (stating that, since Ateba's hard pass was deactivated, he has been granted day pass access to the White House each time he sought it, and that he has "entered the White House on several of those occasions").

## II.   Procedural Background

On August 10, 2023, Ateba sued White House Press Secretary Karine Jean-Pierre, in her official capacity, as well as Director of the United States Secret Service Kimberly Cheatle, in her official capacity, and the United States Secret Service.  Compl. ¶¶ 19–21.  Ateba simultaneously moved for a preliminary injunction to enjoin the Hard Pass Policy and restore his hard pass.  Pl.'s Mot. for Prelim. Inj. [ECF No. 2].

Ateba makes three principal claims.  First, he alleges that the Hard Pass Policy violates the First Amendment on its face, because it confers "unbridled discretion" on the congressional press gallery committees to determine who can obtain a hard pass (Count One).  Compl. ¶¶ 83–89. Second, he alleges that the White House discriminated against him based on his viewpoint by adopting Hard Pass Policy criteria "specifically designed to exclude [him] from eligibility" (Count Two).  Id. ¶¶ 90–95.  And third, Ateba alleges the Secret Service violated the Administrative Procedure Act (APA) by deactivating his hard pass without reasoned explanation (Count Three). Id. ¶¶ 96–103.

JA222

The Court denied Ateba's motion for a preliminary injunction, concluding that Ateba had failed to show he was "likely to suffer irreparable harm during the pendency of this litigation." Ateba v. Jean-Pierre, Civ. A. No. 23-2321 (JDB), 2023 WL 5748567, at *1 (D.D.C. Sept. 6, 2023). The Court concluded based on the facts presented that Ateba "remain[ed] able to enter the White House using the day pass system," which the Court found was an "acceptable alternative for the duration of the litigation." Id. at *4. However, "so that the merits of Ateba's challenge [could] be swiftly adjudicated," the Court ordered the parties to submit summary judgment briefing on an expedited schedule. Id. at *1, *6.

The White House submitted a motion for summary judgment on all three counts. Defs.' Mot. Ateba submitted a cross-motion for summary judgment on the facial First Amendment challenge and the APA challenge. Pl.'s Combined Mem. in Supp. of Summ. J. & Opp'n to Defs.' Mot. for Summ. J. [ECF No. 23] ("Pl.'s Cross-Mot. & Opp'n"). Ateba also asked the Court to deny the White House's motion for summary judgment on the viewpoint discrimination challenge and order discovery from the White House. Id. The Court held an oral argument hearing on the summary judgment motions on November 2, 2023. The motions are now fully briefed and ripe for decision.

## Legal Standard

A movant is entitled to summary judgment if he can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage, the court must "examine the facts in the record and all reasonable inferences derived therefrom in a light most favorable to the nonmoving party." Robinson v. Pezzat, 818 F.3d 1, 8 (D.C. Cir. 2016) (internal quotation marks omitted). "This mode of analysis serves to separate the jury functions of making credibility determinations, weighing the

JA223

evidence, and drawing legitimate inferences from the facts from the district court's role as the arbiter of legal questions." Id. (cleaned up). "When parties file cross-motions for summary judgment, each motion is viewed separately, in the light most favorable to the non-moving party, with the court determining, for each side, whether the Rule 56 standard has been met." Lerch Bates, Inc. v. Michael Blades & Assocs., Ltd., Civ. A. No. 20-2223 (BAH), 2023 WL 6276643, at *9 (D.D.C. Sept. 26, 2023).

## Analysis

### I.    First Amendment Injury

The White House claims that Ateba's First Amendment challenges cannot get off the ground because he has not suffered a cognizable First Amendment injury. Defs.' Mot. at 6. According to the White House, since Ateba has not lost access to the White House press briefings—only expedited hard pass access—he has suffered a mere inconvenience, not a violation of his First Amendment rights. See Defs.' Combined Opp'n to Pl.'s Mot. for Summ. J. & Reply in Supp. of Defs.' Mot. for Summ. J. [ECF No. 26] ("Defs.' Reply & Opp'n") at 1–3. The Court considers this argument relevant to Ateba's facial challenge and his viewpoint discrimination claim.[3]

Generally, the First Amendment does not provide journalists any greater right of access to government property or information than it provides to members of the public, despite the fact that access to government information "might lead to more thorough or better reporting." JB Pictures,

---

[3] At oral argument, counsel for the White House acknowledged that this argument—while described as a challenge to Ateba's "injury"—does not attack Ateba's constitutional standing. Nor could it. Ateba is plainly injured by losing the hard pass, which provided him expedited access to the White House briefing room. See Flynt v. Rumsfeld, 355 F.3d 697, 702 (D.C. Cir. 2004) (appellants had standing where they sought and were denied access to accompany U.S. troops in combat); see also Zukerman v. U.S. Postal Serv., 567 F. Supp. 3d 161, 170–71 (D.D.C. 2021) ("[F]or Article III standing purposes at least, the required threshold is quite low."). The loss of the hard pass is traceable to actions of the White House and the Secret Service. And his injury can be redressed by an order that the defendants reconsider the Hard Pass Policy or reinstate his hard pass.

JA224

Inc. v. Dep't of Def., 86 F.3d 236, 238 (D.C. Cir. 1996); see Branzburg v. Hayes, 408 U.S. 665,

684 (1972).  As it pertains to the press, the First Amendment primarily protects the right to

"communicate information once it is obtained," not the ability to collect it.  Houchins v. KQED,

Inc., 438 U.S. 1, 9 (1978) (plurality opinion).  Hence, courts have generally refused to find that the

First Amendment requires government entities to admit press into places not otherwise open to the

public, provide enhanced access to information under the government's control, or afford

journalists heightened access to places open to the general public.  See, e.g., L.A. Police Dep't v.

United Reporting Publ'g Corp., 528 U.S. 32, 40 (1999) ("California could decide not to give out

arrestee information at all without violating the First Amendment"); Houchins, 438 U.S. at 16

("[T]he media have no special right of access to [a jail] different from or greater than that accorded

the public generally."); Flynt v. Rumsfeld, 355 F.3d 697, 703 (D.C. Cir. 2004) (no First

Amendment right for press to travel with the military during combat); JB Pictures, 86 F.3d at 242

(no First Amendment right for media to attend military funerals).

The First Amendment may, however, provide some protections when journalists are denied

access to areas the government has specifically opened to the press.  The D.C. Circuit has read the

First and Fifth Amendments together to prohibit the denial of a journalist's access to the White

House Press Area without due process protections.  Sherrill, 569 F.2d at 129–31; Karem, 960 F.3d

at 664–67.  This Court has, correspondingly, concluded that "the First and Fifth Amendments seem

to require, at a minimum, that before determining which media organizations receive the limited

access available, [a government agency] must not only have some criteria to guide its

determinations, but must have a reasonable way of assessing whether the criteria are met."  Getty

Images News Servs. Corp. v. Dep't of Def., 193 F. Supp. 2d 112, 121 (D.D.C. 2002).  Thus, where

the Department of Defense lacked an articulated process for deciding which journalists could

participate in the military's media flights to Guantanamo Bay in the wake of September 11, the plaintiffs had a cognizable injury under the First and Fifth Amendments.  Id.

While the D.C. Circuit did not reach this question in Karem, the Court reads Sherrill to support a First Amendment claim at least when a journalist is excluded from the Press Area for arbitrary reasons.  As the Sherrill court stated, "White House press facilities having been made publicly available as a source of information for newsmen, the protection afforded newsgathering under the first amendment guarantee of freedom of the press requires that this access not be denied arbitrarily or for less than compelling reasons."  Sherrill, 569 F.2d at 129 (internal citations and footnote omitted).  The White House's contention that Sherrill is a "due process case," "despite [its] First Amendment overtones," Defs.' Reply & Opp'n at 9, skips over a crucial part of Sherrill's analysis: although that court ultimately focused on the Secret Service's need to formalize security standards and provide applicants notice and an opportunity to respond to denials, the court first considered whether the standard articulated by the Secret Service in litigation—"whether the applicant presents a potential source of physical danger to the President and/or his immediate family so serious as to justify his exclusion"—comported with the First Amendment.  Sherrill, 569 F.2d at 130 (footnote omitted).

Recent cases in other circuits have accepted the premise that the denial of a reporter's access to a press briefing is a cognizable First Amendment violation, reviewable in the traditional framework of a First Amendment forum and subject to an order requiring not only due process, but access.  See John K. MacIver Inst. for Pub. Pol'y v. Evers, 994 F.3d 602, 610 (7th Cir. 2021) (reviewing criteria to access a media briefing under a First Amendment analysis for reasonableness and viewpoint neutrality); TGP Commc'ns, LLC v. Sellers, No. 22-16826, 2022 WL 17484331, at *4–5 (9th Cir. Dec. 5, 2022) (same); cf. Huminski v. Corsones, 396 F.3d 53, 88 (2d Cir. 2005)

JA226

(exclusion of individual journalist from all state courthouses otherwise open to press was "plainly overbroad" and "not 'tailored' to the threat"); Nicholas v. Bratton, 376 F. Supp. 3d 232, 259–60 (S.D.N.Y. 2019) (reviewing journalists' equal access claim to crime scene under the First Amendment).

Unlike the prior cases involving restrictions on White House access, however, this case does not concern a denial of access to the Press Area. Ateba has lost his hard pass, but he can still access the Press Area with a day pass. Accordingly, Ateba asks the Court to find his access to the Press Area has been burdened by the loss of his hard pass, and that this burden constitutes a First Amendment injury. Pl.'s Cross-Mot. & Opp'n at 17–18.[4]

The D.C. Circuit has not considered whether denial of a hard pass, when the reporter can still access the Press Area with a day pass, amounts to a First Amendment injury. See Sherrill, 569 F.2d at 130 (noting that denial of hard pass resulted in "exclusion . . . from White House press facilities"); Karem, 960 F.3d at 665 (describing sanction as "a month-long loss of White House access"). Neither party has cited any case directly addressing whether a burden on access to the Press Area (or any similar press area, for that matter) constitutes a First Amendment injury. Ateba urges the Court to rely on the general principle that "[g]overnmental action that 'burdens' First Amendment activity inflicts a cognizable injury no less than governmental action that 'prohibit[s]' such activity outright." Pl.'s Mot. & Opp'n at 17 (quoting Sorrell v. IMS Health, Inc., 564 U.S. 552, 566 (2011) (citing, inter alia, United States v. Playboy Ent. Grp., 529 U.S. 803, 812 (2000) (limitations on television programming time); and Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue, 460 U.S. 575, 582–83 (1983) (tax on the press))). The White House counters that

---

[4] Ateba also claims that loss of the hard pass itself is a cognizable injury under the First Amendment under Sherrill and Karem. Pl.'s Cross-Mot. & Opp'n at 17–18. While those cases recognized a right in the pass, the loss of a hard pass there was inextricably tied to the complete loss of access.

only burdens on the "freedom of the media to underline communicate information" are actionable, not burdens on obtaining information from the government. Defs.' Reply & Opp'n at 2 (quoting Houchins, 438 U.S. at 9); see Houchins, 438 U.S. at 4–5 (no First Amendment violation when news reporters were given "only limited access to the jail" on public tours that did not reach area of alleged prisoner abuse); Zemel v. Rusk, 381 U.S. 1, 17 (1965) ("[That] the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information . . . does not make entry into the White House a First Amendment right."); cf. ACLU of Md. v. Wicomico Cnty., 999 F.2d 780, 786 (4th Cir. 1993) (county did not engage in First Amendment retaliation by revoking an ACLU paralegal's special inmate access due to the ACLU's lawsuit against the jail). However, as Ateba argues elsewhere, his participation in press conferences is arguably expressive. Because he "speaks through his questions—broadcast on live television—which express a point of view regarding the events he thinks are worthy of discussion," Pl.'s Cross-Mot. & Opp'n at 8, even burdens on his access to the press area could affect his right to "communicate information," not only his right to collect it.

   As an initial matter, the undisputed facts do not support an inference that Ateba's access to the Press Area has been denied. It is undisputed that a day pass holder may access the same parts of the White House at the same times as a hard pass holder. And once the journalist reaches the Press Area, a day pass holder is not subject to any restrictions that would not also apply to a hard pass holder. If a day pass holder misses a spontaneous briefing, that is because he or she did not apply for a day pass, not because he or she has been excluded from the Press Area. No facts in the record suggest otherwise—that, for example, seats in the Press Area are reserved for hard pass holders, that day pass holders cannot bring in cameras, or that certain events or places are open to hard pass holders only. This case is, therefore, unlike Stevens v. N.Y. Racing Ass'n, 665 F. Supp.

164 (E.D.N.Y 1987), where the court found actionable a restriction prohibiting one journalist from entering a racetrack with a camera, while all other journalists were permitted to do so.  Id. at 175.

However, the undisputed facts also demonstrate that being required to use a day pass instead of a hard pass burdens Ateba's Press Area access to some degree.  Put differently, the facts in the record support an inference that a hard pass is a preferred form of access to a day pass. Whereas a hard pass holder can enter the White House at a moment's notice, other journalists must apply for a day pass up to a day in advance.  Thus, a journalist who does not prophylactically apply for day passes might miss a late-scheduled press event.  And while a hard pass holder can walk directly inside after security screening, a day pass holder must wait on an escort, which can take up to forty-five minutes depending on when the journalist arrives.  Perhaps it is on account of these differences, or changes in the White House day pass policy over time, that the White House Correspondents Association has remarked in previous litigation that "without the access that a hard pass grants, a White House correspondent cannot effectively perform his or her duties, which include providing the public with on-the-spot news coverage of unforeseen and unscheduled events, along with cataloguing the daily activities of the head of the executive branch."  Req. for Judicial Notice, Ex. A (Brief of The White House Correspondents' Ass'n as Amicus Curiae Supporting Appellee at 3, Karem v. Trump, No. 19-5255 (D.C. Cir. Jan. 13, 2020)).

Ultimately, the Court concludes that Ateba has an actionable First Amendment injury.  As the D.C. Circuit recognized in Sherrill, the White House has opened the Press Area to journalists who need to report therefrom.  569 F.2d at 129.  Although that case preceded modern-day forum analysis, the Sherrill court's characterization of the Press Area is akin to that of a First Amendment forum—government property that public officials have opened to certain members of the public for certain types of communication (here, newsgathering).  Other circuits have similarly treated

15

JA229

press briefings as First Amendment forums.  See Evers, 994 F.3d at 610; TGP Commc'ns, 2022 WL 17484331, at *4–5.  Accordingly, in deciding whether an injury exists, the Court must consider principally whether a burden on access to a First Amendment forum would amount to an injury. Even in a nonpublic forum—where government authority to restrict access is at its apex—a plaintiff has an actionable claim when the government has allegedly discriminated with respect to "who may use its facilities and on what terms."  Chi. Acorn v. Metro. Pier & Exposition Auth., 150 F.3d 695, 700 (7th Cir. 1998) (emphasis added) (finding actionable government agency's disparate waiver of fees for use of meeting rooms).  Where the White House "press facilities are perceived as being open to all bona fide Washington-based journalists," Sherrill, 569 F.2d at 129 (footnote omitted), disparate forms of access to that forum are likewise actionable under the First Amendment.

This is not a case, as the government urges, where a member of the press seeks greater access—or better terms—than members of the public.  See Houchins, 438 U.S. at 4–5.  Nor is it a case about journalists seeking information in the government's possession.  See L.A. Police Dep't, 528 U.S. at 40.  Rather, this case involves a journalist seeking access to a forum—opened by the White House—on the same terms as other journalists.  To conclude that only outright denials of access are actionable would undermine the protections established by Sherrill, for it would suggest that the White House could alter the hard pass criteria—and thereby impose disparate burdens on journalists seeking access to a place generally opened to them—in entirely viewpoint-discriminatory ways, and journalists would have no cause of action.  Counsel for the White House admitted as much at oral argument.  Oral Argument Rough Hr'g Tr. 35:2–16 (agreeing that under the Court's hypothetical policy granting hard passes only to partisan news organizations, a journalist would have no cause of action).

JA230

That is not to say that every restriction the White House might impose on access to the White House <u>violates</u> the First Amendment.  Indeed, the Court will conclude in this case that the Hard Pass Policy does not facially violate the First Amendment.  However, it does mean that regulations as to who may obtain a hard pass—even when a day pass is available—are subject to First Amendment scrutiny.  As the Court will discuss below, when the White House decides who gets expedited access and who does not, its regulations must be reasonable and viewpoint neutral.

## II.    Facial Challenge to the Hard Pass Policy

Ateba claims the Hard Pass Policy facially violates the First Amendment because the policy is unreasonable and confers "unbridled discretion" on the Press Galleries who supply the requisite credentials for obtaining a hard pass.  The Court concludes that the policy is reasonable, and that discretion is sufficiently cabined to satisfy the First Amendment.

### A.  Legal Standards

When considering "[t]he amount of access to which the government must give the public for First Amendment activities," courts generally apply forum analysis.  <u>Evers</u>, 994 F.3d at 609. In a forum analysis, a court classifies the government property by type of forum (i.e., public, designated public, limited public, or nonpublic) and applies the appropriate standard to evaluate the constitutionality of limitations on the First Amendment activity.  <u>Id.</u>[5]  Courts have the "least tolerance for restrictions on First Amendment freedoms" in public forums, <u>id.</u>,—places where people have historically "assemble[d] and . . . communicate[d] with others," or which the

_____

[5] The White House argues that the Press Area does not lend itself to forum analysis at all, citing <u>Price v. Garland</u>, 45 F.4th 1059 (D.C. Cir. 2022).  In <u>Price</u>, the D.C. Circuit declined to apply the heightened protections of a public forum to commercial filmmaking in a National Park, since "filmmaking, like typing a manuscript, is not itself a communicative activity."  <u>Id.</u> at 1070.  This argument misses the mark because participation in a news conference is expressive, since reporters communicate with White House staff and raise issues of public importance to the President and his team.  <u>See</u> <u>Evers</u>, 994 F.3d at 611–12; <u>TGP Commc'ns</u>, 2022 WL 17484321, at *4; <u>cf.</u> <u>Price</u>, 45 F.4th at 1071 n.2 (distinguishing <u>Evers</u> because it "does not even deal with filming" but rather applied forum analysis to "'gathering information for <u>news</u> dissemination'" (quoting <u>Evers</u>, 994 F.3d at 612)).

JA231

government has intentionally opened for that purpose.  <u>Price v. Garland</u>, 45 F.4th 1059, 1067–68

(D.C. Cir. 2022).  In public forums, regulations based on the content of speech are subject to strict

scrutiny—they must be necessary to serve a compelling state interest and narrowly drawn to

achieve that end.  <u>Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n</u>, 460 U.S. 37, 45 (1983).

Content-neutral time, place and manner restrictions in public forums must meet intermediate

scrutiny—they must be narrowly tailored to serve a significant government interest.  <u>Id.</u> at 45–46.

The government has more latitude when regulating access to nonpublic and limited public forums,

i.e., places not opened to public communication, or "limited to use by certain groups or dedicated

solely to the discussion of certain subjects."  <u>Price</u>, 45 F.4th at 1068 (quoting <u>Pleasant Grove City</u>

<u>v. Summum</u>, 555 U.S. 460, 470 (2009)).  In a nonpublic or limited public forum, government

regulations need only be viewpoint neutral and "reasonable given the purpose of the forum and all

the surrounding circumstances."  <u>Id.</u> (internal quotation marks omitted).[6]

       The parties dispute whether the Press Area is a nonpublic or limited public forum.     The

White House contends the Press Area is a nonpublic forum because access is "selective" and

"limited to those who satisfy the six criteria or are otherwise invited; the White House has not

generally opened its grounds to all comers or even to all journalists."   Defs.' Mot. at 8.  Ateba

---

[6] Ateba also contends that <u>Sherrill</u> offers a test for evaluating the constitutionality of press pass restrictions. Pl.' Cross-Mot. & Opp'n at 5–7.  Specifically, he points to the language in <u>Sherrill</u> stating that "access [should] not be denied arbitrarily or for less than compelling reasons."  <u>Sherrill</u>, 569 F.2d at 129; <u>see id.</u> at 130 ("[R]efusal must be based on a compelling governmental interest").  The White House contests Ateba's assertion that <u>Sherrill</u> dictates any standard under the First Amendment.  Defs.' Reply & Opp'n at 9.

       Since <u>Sherrill</u> preceded modern forum analysis, it is difficult to ascertain the precise legal equivalent, but the term "compelling" need not—and should not—be taken to suggest the application of a strict scrutiny standard (nor does Ateba ask the Court to apply strict scrutiny).  Rather, when the <u>Sherrill</u> court briefly addressed the adequacy of the Secret Service's substantive standard for regulating access to the White House—"whether the applicant presents a potential source of physical danger to the President and/or his immediate family so serious as to justify his exclusion"—the court acknowledged the standard was "circumspect" and allowed the Secret Service to "exercise[e] expert judgment which frequently must be subjective in nature."  <u>Id.</u>  The latitude afforded the Secret Service suggested a standard similar to reasonableness.  Accordingly, the Court finds review under the "reasonableness" standard of forum analysis appropriate even under <u>Sherrill</u>.

JA232

responds that the Press Area is a limited public forum because "[b]y long practice, the White House created and has operated the Press Area for the purpose of allowing journalists access to the White House to communicate with the President and his staff and to gather and disseminate the news." Pl.'s Cross-Mot. & Opp'n at 8.  The parties' positions on this point are at odds with their arguments elsewhere in the litigation.  Where the White House contends elsewhere that access is available to any journalist who can pass a minimal Secret Service screening (i.e., eligible for a day pass), here the White House suggests access is open only to hard pass holders or invited guests.  Ateba elsewhere suggests that a journalist cannot effectively access the Press Area without a hard pass. But here he contends the area is open to all journalists for reporting.  Ultimately, the Court need not wade through the parties' internal inconsistencies, since regardless of the type of forum at issue—nonpublic or limited public—the standard of review is the same: whether a challenged limitation is reasonable and viewpoint neutral.  See ACLU Found. v. Washington Metro. Trans. Auth., 303 F. Supp. 3d 11, 17 (D.D.C. 2018).

In a nonpublic or limited public forum, "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." Perry Educ. Ass'n, 460 U.S. at 46.  "In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise."  Id.  Thus, in such forums, the government may draw distinctions based on "subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral."  Cornelius v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788, 806 (1985). "Although a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum, or if he is not a member of the class of speakers for whose especial benefit the forum was created, the government violates the First Amendment when

it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." Id. (internal citations omitted); see Christian Legal Soc'y Chapter of Univ. of Cal., Hastings College of L. v. Martinez, 561 U.S. 661, 680–82 (2010) (discussing parallel characteristics of a limited public forum).

Reasonableness requires "something more than the toothless 'rational basis' test used to review the typical exercise of a state's police power." Price, 45 F.4th at 1072. However, a regulation can be reasonable without being "the most reasonable or the only reasonable limitation." Cornelius, 473 U.S. at 808. A court must assess limitations in light of the "purpose of the forum and all the surrounding circumstances." Id. at 809. "The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message." Id. "In contrast to a public forum, a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated." Id. at 808. The reasonableness of a limitation can be established "by evidence in the record or even by a commonsense inference." Price, 45 F.4th at 1072.

The parties dispute whether a reasonableness analysis incorporates the doctrine of "unbridled discretion." That doctrine emerged in the context of prior restraints on expressive activity, i.e., government rules prohibiting individual expression without a license. See Forsyth County v. Nationalist Movement, 505 U.S. 123, 130–31 (1992) (public demonstration permitting); City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 753, 763–64 (1988) (newsstand licensing). The Supreme Court has allowed facial challenges and even invalidated challenged regulations when they provide "overly broad licensing discretion" to the administrator. City of Lakewood, 486 U.S. at 764 (quoting Freedman v. State of Maryland, 380 U.S. 51, 56 (1965)). The

20

Court has stated that "narrow, objective, and definite standards [are needed] to guide licensing authority." Forsyth County, 505 U.S. at 131 (quoting Shuttlesworth v. Birmingham, 394 U.S. 147, 150–151 (1969)).  The doctrine seeks to reduce "the risk of self-censorship" by speakers hoping to obtain a necessary license, "and the risk that the licensing official, not limited by express standards, will use his power to suppress speech."  Southworth v. Bd. of Regents of Univ. of Wisc. Sys., 307 F.3d 566, 576 (7th Cir. 2002) (discussing City of Lakewood, 486 U.S. at 757–58).  As a secondary component of the doctrine, the Supreme Court has sometimes required officials to abide by certain "procedural safeguards," including expeditious judicial review and timelines for decision making.  Thomas v. Chi. Park Dist., 534 U.S. 316, 321–22 (2002).

     The White House contends that the unbridled discretion doctrine does not apply to access to the Press Area—a nonpublic or limited public forum—claiming that the Supreme Court silently rejected the application of the unbridled discretion doctrine to nonpublic forums by refusing to embrace the plaintiff's argument in Arkansas Educational Television Commission v. Forbes, 523 U.S. 666 (1998).  See Defs.' Mot. at 9–10.  However, as Ateba points out, the Supreme Court has extended at least some of the protections of the unbridled discretion doctrine to nonpublic forums. See Pl.'s Cross-Mot. & Opp'n at 13–14.  In Minnesota Voters Alliance v. Mansky, 138 S. Ct. 1876 (2018), the Court held that a Minnesota law banning "political" apparel in a nonpublic forum— the polling place—was unreasonable because it contained no "objective, workable standards."  Id. at 1891; see id. at 1888.  Although the state had a legitimate goal of creating "an island of calm in which voters can peacefully contemplate their choices," id. at 1887 (internal quotation marks omitted), it needed a standard that "articulate[d] some sensible basis for distinguishing what may come in from what must stay out," id. at 1888.

The D.C. Circuit has since distilled "unbridled discretion" and the <u>Mansky</u> rule to a "single

challenge":

> whether [a regulation] is so broad as to provide [the government] with no meaningful
> constraint upon its exercise of the power to squelch.  If so, then it is not "reasonable" as
> that term is used in <u>Mansky</u>, and not constitutional because it provides [the government]
> with unbridled discretion.  Put the other way around, if [the regulation] is capable of
> reasoned application, as <u>Mansky</u> demands, then it does not confer unbridled discretion
> upon [the government].

<u>Am. Freedom Def. Initiative v. Washington Metro. Area Transit Auth.</u> ("<u>AFDI</u>"), 901 F.3d 356,

372 (D.C. Cir. 2018); <u>accord</u> <u>Zukerman v. U.S. Postal Serv.</u>, 961 F.3d 431, 449 (D.C. Cir. 2020).

The White House urges the Court to read this principle narrowly, arguing that the cases

from which it emerged concern "core First Amendment activity: the <u>expression</u> of ideas," Defs.'

Reply & Opp'n at 6, not "the distinct context of journalist access to what is, at most, a nonpublic

forum," Defs.' Mot. at 10.  But such a limitation is not warranted here.  While the press may not

challenge every law involving discretion as censorship, the press may challenge those laws

"hav[ing] a close enough nexus to expression, or to conduct commonly associated with expression,

to pose a real and substantial threat of the identified censorship risks."  <u>City of Lakewood</u>, 486

U.S. at 759.

White House press conferences involve a communicative exchange between the

government and news reporters.  As journalists ask questions, they raise issues important to their

readers, and foster public discussion of the President's administration.  <u>See</u> Pl.'s Cross-Mot. &

Opp'n at 8.  Other circuits have likewise recognized that participating in press conferences has a

"nexus" to expression.  <u>See</u> <u>Evers</u>, 994 F.3d at 611–12 (characterizing "gathering information for

news dissemination" as a "form[] of expressive activity); <u>TGP Commc'ns</u>, 2022 WL 17484331,

at *4 (describing news conference as a place for "speech on limited topics").  Moreover, the

purposes of the unbridled discretion doctrine would be served by its application to White House

JA236

press access.  See Pl.'s Cross-Mot. & Opp'n at 14.  A rule limiting press access without "objective, workable standards" could encourage journalists to self-censor to obtain access, and shelter decisionmakers from accountability if they excluded reporters based on their comments.  Cf. Pen Am. Ctr. v. Trump, 448 F. Supp. 3d 309, 326–27 (S.D.N.Y. 2019) (concluding journalists adequately pleaded retaliation claim based on credential revocation after speaking critically of former President Trump).  Accordingly, the Court will take account of the unbridled discretion doctrine in reviewing the Hard Pass Policy for reasonableness and viewpoint neutrality.

### B.  Reasonableness Review

As an initial matter, neither party argues that the press credentialing requirement is itself viewpoint discriminatory.  Rather, Ateba argues that the requirement of credentialing by the press galleries is "arbitrary and unreasonable."

The White House asserts that it "surely has a legitimate interest in maintaining a degree of control over media access to the White House complex," Defs.' Mot. at 11 (quoting Karem, 960 F.3d at 668), "given the purpose of White House briefings and the limits that must exist, for reasons of security and government efficiency, on access to the White House," id.  The White House further argues that "[i]mplicit in that interest is the ability . . . to limit the press areas to those engaged in journalism."  Id.  The requirement of credentialing by an outside professional organization, it contends, is a reasonable way to do so.  Id.

Ateba concedes that limiting Press Area access to those engaged in journalism is a "legitimate reason for requiring press credentials."  Pl.'s Cross-Mot. & Opp'n at 15.  However, he argues that the requirement of credentialing by the congressional press galleries is unreasonable for two principal reasons: first, because the gallery credentialing requirement is "standardless and susceptible to abuse," id. at 10, and second, that requiring a press gallery credential lacks a

JA237

"rational nexus with the government's compelling reason for the restriction," given that "[j]ournalists covering the White House might not want to cover Congress," id. at 15.

The White House has long relied on credentialing by the congressional press galleries as a prerequisite to obtaining a press credential.  See Sherrill, 569 F.2d at 129 n.19 (noting the requirement in 1977); Karem, 960 F.3d at 660 (same in 2020); see id. ("Forty years on [from Sherrill], today's hard pass system is little changed . . . .").  And the requirements for credentialing by the press galleries are functionally the same as they were around the time of Sherrill, including the requirement that journalists be "bona fide . . . reporters of reputable standing."  See Consumers Union of U.S., 515 F.2d at 1344–45 (quoting Rules Governing Periodical Press Galleries in 1975).  While not passing directly on the question, the D.C. Circuit has never questioned the requirement of press credentialing or the substance of the standards.  And as the White House points out, it is commonplace for government entities to rely on professional credentialing bodies as a means of determining access.  See Defs.' Mot. at 11 (citing examples).

The standards that the press galleries apply are also directly related to determining whether an applicant is "engaged in journalism," and not a lobbyist or investor seeking to influence or derive benefit from access to government officials.  See Defs.' Reply & Opp'n at 10 (contending that the credentials are a "reasonable heuristic for identifying bona fide journalists and ensuring the White House press areas are properly limited to those genuinely engaged in journalistic pursuits").  Indeed, the rules of the Senate Daily Press Gallery—to which Ateba has sought access—require that the applicant be employed by a news organization "whose principal business is the daily dissemination of original news and opinion of interest to a broad segment of the public, and which has published continuously for 18 months," and which is "editorially independent of any institution, foundation, or interest group that lobbies the federal government."  Senate Daily

Press Gallery Rules.  Further, "[t]he applicant must . . . not be engaged in any lobbying or paid advocacy," including before Congress or any part of the federal government.  Id.

Ateba's narrow focus on the allegedly "standardless and susceptible to abuse" requirement that an applicant be a "bona fide resident correspondent[] of repute in their profession," Pl.'s Cross-Mot. & Opp'n at 10, removes the important context of the credentialing rules.  While the Court does not undertake to offer a binding or limiting definition of the term "of repute" as used in the press credentialing rules, it is apparent that the term at least draws meaning from the rules that follow.  See Senate Daily Press Gallery Rules.  Unlike in McDaniel v. Lombardi, 227 F. Supp. 3d 1032 (W.D. Mo. 2016), where selection of execution witnesses was based on the naked requirement that the individual be "reputable" in the warden's point of view, id. at 1034, 1038–39, the standard here is followed by detailed regulations suggesting a more definite meaning differentiating "[who] may come in from [who] must stay out."  Mansky, 138 S. Ct. at 1888.  The term "of repute" derives meaning from the central tenets of the regulations—that the person is working as a journalist for an established news organization and that the person does not have any conflicts of interest.[7]

While not directly considering the additional principle of unbridled discretion, the Seventh Circuit has concluded that a very similar set of rules, "adapted from established standards used by . . . the United States Congress" and including the requirement that the journalist be "a bona fide correspondent of repute in their profession," was a reasonable means for the Wisconsin governor to determine access to press conferences.  Evers, 994 F.3d at 606–07, 610–11.  The court determined that the criteria were "reasonably related to the viewpoint-neutral goal[s]" of

---

[7] The additional rules governing eligibility for press credentials also tend to foreclose Ateba's argument that "reputable" is a "transparent classification among journalists" in favor of the "institutional press."  Pl.'s Cross-Mot. & Opp'n at 16 (citing Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 352 (2010)).

JA239

"increasing the journalistic impact of the Governor's messages by including media that focus primarily on news dissemination, have some longevity in the business, and possess the ability to craft newsworthy stories" and "increasing journalistic integrity by favoring media that avoid real or perceived conflicts of interest or entanglement with special interest groups, or those that engage in advocacy or lobbying." Id. at 610.  This Court agrees.

Importantly, reliance on a professional credentialing body also tends to reduce the risk Ateba apparently fears most—that the White House will discriminate against journalists based on their relationship with the White House.  See, e.g., Pl.'s Cross-Mot. & Opp'n at 24 (alleging the White House sought to exclude him from the Press Area).  Ateba stresses that the credentialing scheme is "uniquely susceptible to abuse" because the press gallery committees are "comprised of a group of journalists who work for news outlets that have a strong institutional foothold in the Washington, D.C. media ecosystem." Pl.'s Cross-Mot. & Opp'n at 12–13.  But on Ateba's own logic, the gallery-review process seems less susceptible to abuse than the apparent alternative of review by the (allegedly biased) White House.

Under the Hard Pass Policy, the White House has constrained its discretion to exclude speakers it disagrees with (except through the Conduct Policy, which is not challenged here).  Instead of employing discretion in determining which journalists are eligible to hold a hard pass, the White House Press Office and the Secret Service employ "six clear and definite standards that are not amenable to discretionary judgments," one of which is whether the applicant holds a Supreme Court or congressional press credential.  Defs.' Mot. at 15.  This procedure reduces the risk highlighted in the unbridled discretion cases that a government official—here, the White House—might allocate licenses (hard passes) based on the views of certain speakers (reporters).  See Mansky, 138 S. Ct. at 1891 (expressing concern that "[w]ithout [objective, workable

JA240

standards], an election judge's own politics may shape his views on what counts as 'political'");

<u>City of Lakewood</u>, 486 U.S. at 763–64 (explaining that in the absence of "standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or the viewpoint of the speaker").

Ateba's point that a hard pass seeker may not want to cover Congress or the Supreme Court is well-taken, but it does not defeat the other reasonable features of the credentialing gallery requirement. A regulation can be reasonable without being "the most reasonable or the only reasonable limitation." <u>Cornelius</u>, 473 U.S. at 808. If the White House had its own press gallery but required journalists to seek a credential from the gallery of another branch of government, the reasonableness of the requirement might be more significantly undermined. But those are not the facts presented here.[8]

Finally, Ateba argues that the congressional press credentialing requirement violates the "unbridled discretion" doctrine because the press galleries are not required to make decisions in any specific period of time. Pl.'s Cross-Mot. & Opp'n at 12. His concern, as articulated in some prior unbridled discretion cases, is that the decisionmaker will "indefinitely suppress[] permissible speech" without giving a reason. <u>FW/PBS, Inc. v. City of Dallas</u>, 493 U.S. 215, 227 (1990) (Opinion of O'Connor, J.). The Court is wary of applying the extraordinary procedural protections of content-based prior restraints to the application here of content-neutral criteria for press credentialing. As the D.C. Circuit has acknowledged, "[m]ost circuits have held content-neutral

---

[8] The extent to which a journalist must actually cover Congress to obtain a congressional press gallery credential is not clear. The Senate Daily Press Gallery rules state that an applicant must establish that he or she "requires on-site access to congressional members and staff." Senate Daily Press Gallery Rules. The House Periodical Press Gallery rules, by contrast, only require that an applicant "justify the need of Congressional press credentials." House Periodical Press Gallery Rules. From the White House's long history of requiring such credentials as a prerequisite to obtaining a hard pass, the Court infers that such credentials can be obtained even by journalists who focus their attention on covering the White House. <u>See</u> <u>Sherrill</u>, 569 F.2d at 129 n.19 (noting that the White House "stated that the applicant is required to have a pass to the House and Senate galleries because this verifies the 'professional credentials' of the applicant").

licensing schemes need not contain explicit timeframes for processing permit applications." Boardley v. U.S. Dep't of Interior, 615 F.3d 508, 518 (D.C. Cir. 2010); see Griffin v. Sec'y of Veterans Affs., 288 F.3d 1309, 1328 (Fed. Cir. 2002) (noting that the procedural safeguards requirement generally "comes into play" where "an explicit censorship scheme—which by definition is not content-neutral—is under attack"). Here, the press gallery regulations are content-neutral, and Ateba does not face a prior restraint on the publication of news articles. Moreover, he still has access to the Press Area with his day pass during the credentialing process, such that his speech there is not entirely curtailed while he awaits a decision. Accordingly, the Court does not find it appropriate to apply the strict procedural safeguards of timely decision-making.

In sum, the Court concludes that the Hard Pass Policy, as it incorporates the requirements of the congressional press galleries, is facially reasonable and viewpoint neutral.

## III.   Viewpoint Discrimination Challenge to the Hard Pass Policy

Ateba separately claims that the White House violated the First Amendment by engaging in unconstitutional viewpoint discrimination against him. His argument is not that the Hard Pass Policy itself discriminates on the basis of viewpoint—by, for example, providing access only to reporters working for liberal-leaning news organizations. Rather, his allegation is that "the White House intentionally rejiggered its hard-pass criteria and canceled existing passes because of Mr. Ateba's protected speech." Pl.'s Reply in Supp. of Mot. for Summ. J. [ECF No. 29] ("Pl.'s Reply") at 14. The White House seeks summary judgment on this claim, while Ateba urges the Court to deny summary judgment and afford him the opportunity to obtain discovery. Because the Court

28

JA242

concludes that Ateba has failed even to state a plausible claim, <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009), discovery will be denied, and the Court will dismiss the claim.[9]

The government may violate the First Amendment when it regulates speech based on "the specific motivating ideology or the opinion or perspective of the speaker." <u>Reed v. Town of Gilbert</u>, 576 U.S. 155, 168 (2015) (quoting <u>Rosenberger v. Rector and Visitors of Univ. of Va.</u>, 515 U.S. 819, 829 (1995)). The government may not "den[y] access to a speaker solely to suppress the point of view he espouses." <u>Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.</u>, 508 U.S. 384, 393 (1993) (quoting <u>Cornelius</u>, 473 U.S. at 806). Viewpoint discrimination occurs when the government "target[s] 'a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered.'" <u>People for the Ethical Treatment of Animals v. Tabak</u>, Civ. A. No. 21-2380 (BAH), 2023 WL 2809867, at *13 (D.D.C. Mar. 31, 2023) (quoting <u>Rosenberger</u>, 515 U.S. at 831).

The thrust of the Complaint is that the White House "generally ignore[d]" Ateba's written and oral questions and refused him access to President Biden. Compl. ¶¶ 42–44. Frustrated, he took to "assert[ing] himself in the briefing room, speaking over other reporters and the White House Press Secretary in an attempt to make his concerns known." <u>Id.</u> ¶ 5. As examples, he highlights one "notable incident" in which he interrupted the Press Secretary's introduction of the "Ted Lasso" cast by "questioning why he has not received any responses to his written inquiries or been given the opportunity to ask a question during the press briefing," <u>id.</u> ¶ 49, and "a number of other occasions" since December 2021 in which he "asserted himself during briefings . . .

---

[9] After the Court denied Ateba's motion for a preliminary injunction, the Court ordered the parties to file expedited summary judgment briefing. The White House has, thus, not filed a motion to dismiss (apart from a footnote in its opposition to Ateba's motion for a preliminary injunction, requesting that the Court alternatively dismiss the Complaint). <u>See</u> Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj. [ECF No. 17] at 6 n.2. However, at oral argument on the summary judgment motions, the parties agreed that the issue of the viewpoint discrimination claim's plausibility had been sufficiently briefed for decision.

seeking answers to his questions," id. ¶ 52. He claims that the "significant media coverage focusing on [his] conduct in the briefing room prompted the Biden White House to act" by adopting the Hard Pass Policy that resulted in deactivation of his pass. Id. ¶¶ 54, 62.[10]

Assuming the truth of Ateba's allegations, he has alleged discrimination based on his conduct in the briefing room, not any view he holds or shares in his reporting. His claim is that the White House sought to exclude (or limit his access to) the Press Area to prevent his disruptive behavior. But Ateba's conduct is not itself a viewpoint. See Oberwetter v. Hilliard, 639 F.3d 545, 553 (D.C. Cir. 2011) (regulations that "prohibit disruptive speech regardless of its message" "plainly do not discriminate on the basis of viewpoint"); Eichenlaub v. Township of Indiana, 385 F.3d 274, 281 (3d Cir. 2004) (concluding that "a motive . . . to prevent [] badgering, constant interruptions, and disregard for the rules of decorum" is "sustainable and content-neutral."); see also Cornelius, 473 U.S. at 811 ("The First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic forum and hinder its effectiveness for its intended purpose.").

In his summary judgment reply brief (his fourth substantive brief in this case), Ateba belatedly pivots and suggests that the White House disliked "his focus on U.S. relations with African nations, which Mr. Ateba seeks to cover at the White House." Pl.'s Reply at 14 (citing Compl. ¶¶ 3–4, 44). "[I]t is a well-settled prudential doctrine that courts generally will not entertain new arguments first raised in a reply brief." Benton v. Laborers' Joint Training Fund,

---

[10] While Ateba's viewpoint discrimination claim reads more like a First Amendment retaliation claim, he has not briefed it as such. In the D.C. Circuit, "[t]o state a claim for First Amendment retaliation, a plaintiff must allege that: '(1) he or she engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him or her.'" Black Lives Matter D.C. v. Trump, 544 F. Supp. 3d 15, 46 (D.D.C. 2021) (quoting Aref v. Lynch, 833 F.3d 242, 258 (D.C. Cir. 2016)). The Court does not pass judgment on whether revocation of a hard pass is sufficiently adverse action as to "deter a person of ordinary firmness in plaintiff's position from speaking again," and, thus, whether Ateba's claim could survive if briefed within the retaliation framework. See Pen Am. Ctr., 448 F. Supp. 3d at 326–27.

121 F. Supp. 3d 41, 51 (D.D.C. 2015) (internal quotation marks omitted).   Doing so is not only unfair to the defendant, but also risks "an improvident or ill-advised opinion on the legal issues tendered." Id. (quoting McBride v. Merrell Dow & Pharm., 800 F.2d 1208, 1211 (D.C. Cir. 1986)). But even if the Court were to consider the argument, the Complaint alleges no facts supporting an inference that the White House adopted the Hard Pass Policy to silence discussion of U.S.-African relations or because of Ateba's focus on this topic. [11]   Ateba does not claim, for example, that the White House has generally sought to shut down discussion of that topic, or that others who cover that topic similarly lost their press passes.   "That [the White House] put in place a much broader ban . . . suggests it was not discriminating against the views of [Ateba]." AFDI, 901 F.3d at 367.

While the facts alleged in the Complaint support an inference that the White House Press Office disfavored Ateba even before he began disrupting press conferences, those facts do not support the further inference that his viewpoint, or even the content of his speech, has anything to do with this disfavor.   He alleges that over five years as a correspondent, he has "rarely received any response" to his questions and has been permitted to attend a press conference with President Biden just once.   Compl. ¶¶ 42–43; see id. ¶ 3 (alleging he has had "almost no opportunity to meaningfully communicate with the White House"); id. ¶¶ 46–53 (suggesting that Ateba's outbursts were treated differently from his colleagues').

It is true that the Supreme Court has at times suggested that speaker-based discrimination suffices to raise a speech discrimination claim.[12]   See Citizens United, 558 U.S. at 340–41 (holding unconstitutional campaign finance regulations based on the corporate identity of the speaker); see

---

[11] In the Complaint, Ateba briefly asserts a claim for content-based discrimination, the general category into which viewpoint discrimination falls.   Compl. ¶ 91.   However, he has failed to elaborate on this theory in any of his briefing on the preliminary injunction or summary judgment.   The Court, therefore, considers the argument forfeited. Al-Tamimi v. Adelson, 916 F.3d 1, 6 (D.C. Cir. 2019).

[12] Ateba primarily raised this argument in his preliminary injunction briefing.   See Pl.'s Reply in Supp. of Mot. for Prelim. Inj. [ECF No. 18] at 13.

JA245

also Surita v. Hyde, 665 F.3d 860, 870–71 (7th Cir. 2011) (holding unconstitutional mayor's exclusion of one particular speaker from participating in a public meeting). However, before and after Citizens United, the Supreme Court has primarily followed the principle that speaker-based discrimination is prohibited when and because it accompanies content discrimination. See Sorrell, 564 U.S. at 565; Asaf Weiner, A Speaker-Based Approach to Speech Moderation and First Amendment Analysis, 31 Stan. L. & Pol'y Rev. 187, 214 (2020). Thus, as the Court summarized in Reed, "[c]haracterizing a distinction as speaker based is only the beginning—not the end—of the inquiry." 576 U.S. at 170. Although the Court recognized there that "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content," it proceeded to suggest that speaker-based concerns arise "when the legislature's speaker preference reflects a content preference." Id. (alteration in original) (first quoting Citizens United, 558 U.S. at 340; then quoting Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 658 (1994)). Ateba's Complaint does not raise any plausible connection between the viewpoint of his speech (or even its content) and the White House's alleged animosity toward him. Thus, the Court concludes that the Complaint lacks "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The factual allegations, if proved, would not "allow the court to draw the reasonable inference," Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (cleaned up), that the White House adopted the Hard Pass Policy with the "inten[t] sub silentio to suppress [Ateba's] views." AFDI, 901 F.3d at 365. The viewpoint discrimination claim thus fails.

## IV. APA Challenge to Cancellation of Ateba's Hard Pass

Ateba's final claim is that the Secret Service "violated the [APA] by cancelling [his] hard pass." Pl.'s Cross-Mot. & Opp'n at 19. He asserts that the cancellation was "arbitrary and capricious" because the Secret Service never gave him a reason for canceling the hard passes ex

JA246

ante, and the ex post explanation (offered in litigation) that too many passes were in circulation, including many that were no longer actively used, "makes no sense applied to Mr. Ateba, who did actively use his hard pass."  Id.  The White House and Secret Service have not in litigation offered any rationale (beyond the Hard Pass Policy) for cancelling Ateba's hard pass, but rather argue that the Secret Service's cancellation of Ateba's hard pass is immune from APA review because it was done at the direction of the White House Press Office.  Defs.' Mot. at 21–25.[13]

The President's actions are not subject to review under the APA.  Franklin v. Massachusetts, 505 U.S. 788, 800–01 (1992).  This preclusion of review also extends to certain executive offices carrying out the President's directives.  See, e.g., Soucie v. David, 448 F.2d 1067, 1073–75 (D.C. Cir. 1971); cf. Wang v. Exec. Off. of the President, Civ. A. No. 07-0891 (JR), 2008 WL 180189, at *1 (D.D.C. Jan. 18, 2008) (holding that the White House Press Office is not "an 'agency' within the meaning of FOIA" because it "lacks . . . regulatory authority or government function" independent from the office of the President).  Ateba does not challenge the immunity of the White House Press Office from APA review.  See Pl.'s Reply at 11.  Accordingly, he appears to concede that he cannot challenge the Hard Pass Policy—a policy devised by the White House—under the APA.  See id.  He focuses instead on the Secret Service's cancellation of his hard pass. See Pl.'s Reply at 11.

Defendants do not dispute that actions of the Secret Service, a component of the Department of Homeland Security, may be reviewable under the APA.  See Defs.' Mot. at 22; see also Oryszak v. Sullivan, 576 F.3d 522, 524 (D.C. Cir. 2009) (affirming dismissal of claim without questioning the general applicability of the APA to the actions of the Secret Service); Citizens for

---

[13] The White House also argues that the Secret Service's "purely mechanical action of issuing a credential" is not "final agency action" subject to review under the APA.  Defs.' Mot. at 24–25.  The Court will assume without deciding that cancellation of Ateba's credential was final agency action.

Resp. & Ethics in Washington v. U.S. Dep't of Homeland Sec., 527 F. Supp. 2d 101, 102, 111–

112 (D.D.C. 2007) (similar).  However, the White House and Secret Service argue that APA

immunity extends to agency actions when taken to carry out "discretionary authority vested in the

President."  Detroit Int'l Bridge Co. v. Gov't of Canada, 189 F. Supp. 3d 85, 104 (D.D.C. 2016).

Defendants cite a line of district court cases holding unreviewable certain agency actions taken

within the authority of the President.  See Defs.' Mot. at 23.  In Detroit International Bridge, for

example, the court concluded that when the President delegated his discretionary bridge permitting

authority to the State Department, the decision remained unreviewable as if it were made by the

President.  Id. at 100–02.

Ateba claims that these cases are factually distinguishable, as they involve special

intrusions into presidential power inapplicable here.  See Pl.'s Reply at 11–12.  He asserts the

defendants' position would "prove[] too much" since "[t]he whole of the executive power rests

with the President," id. at 11, and he directs the Court instead to various cases in which courts have

reviewed agency decisions that implement a presidential directive, see Pl.'s Cross-Mot. & Opp'n

at 19–20, 20 n.8; see also Hawaii v. Trump, 878 F.3d 662, 680–81 (9th Cir. 2017) (per curiam)

(reviewing APA suit against "the President . . . [and] the entities charged with carrying out his

instructions" to exclude certain foreign nationals from entering the United States), rev'd and

remanded on other grounds, 138 S. Ct. 2392 (2018); O.A. v. Trump, 404 F. Supp. 3d 109, 147

(D.D.C. 2019) (undertaking APA review of an agency rule implemented pursuant to a presidential

proclamation pertaining to asylum seekers).

The White House and Secret Service reply in turn that Ateba's cited cases are "inapposite"

because they hold only that "when the President directs agencies to exercise their authority, the

agencies' exercise of their own authority in the form of a regulation or other final agency action is

not insulated from review merely because the President started that process."  Defs.' Reply & Opp'n at 11; see also Detroit Int'l Bridge Co., 189 F. Supp. 3d at 104 ("[W]hen the challenge is to an action delegated [by Congress] to an agency head but directed by the President, . . . the President effectively has stepped into the shoes of an agency head, and the review provisions usually applicable to that agency's action should govern." (quoting Elena Kagan, Presidential Administration, 114 Harv. L. Rev. 2245, 2351 (2001)).

The line between agency action attributable to the President versus that of an agency is concededly blurry.  Courts have not always articulated the clear rule offered by the White House, and they have reviewed the legality of presidential orders incorporated into agency actions.  See, e.g., Hawaii, 878 F.3d at 680–81.  But wherever courts should draw the line, purely administrative and ministerial actions by a federal agency effectuating the final step of a discretionary presidential decision fall within the scope of presidential immunity from the APA.  To hold otherwise would seriously undermine the protection afforded to the President from APA review and, in certain cases, raise concerns about separation of powers.  See Detroit Int'l Bridge Co., 189 F. Supp. 3d at 103.  Further, finding such actions reviewable "would suggest the absurd notion that all presidential actions must be carried out by the President him or herself in order to receive the deference Congress has chosen to give to presidential action."  Tulare Cnty. v. Bush, 185 F. Supp. 2d 18, 28–29 (D.D.C. 2001).

Here, defendants assert, and Ateba does not contest, "the invitation of members of the press into the White House by the Press Office" and the "authority to set the non-security standards for White House press passes" is "discretionary authority committed to the President" carried out by the Press Office.  Defs.' Mot. at 23; Defs.' Reply & Opp'n at 11; see Pl.'s Reply at 11–12.  The undisputed facts further demonstrate that while the Secret Service has discretionary authority to

determine when a reporter is a security risk, it has no discretionary authority or role in determining whether a journalist meets the other press-based criteria.  Pl.'s Resp. to Defs.' Facts ¶ 1 ("White House press access is determined by the White House Press Office, subject to a U.S. Secret Service security review." (citations omitted)).

> The Secret Service has no role in generating the list of press members that the White House Press Office authorizes for a hard pass.  The Secret Service's role in the process of authorizing entry into the White House complex is limited to conducting the necessary security checks and the issuance/renewal of the physical hard pass to the individual press member.

3d Fleischer Decl. ¶ 13.  Thus, when the Hard Pass Policy went into effect on August 1, 2023, "the White House Press Office instructed the Secret Service to deactivate the hard passes that did not meet the White House Press Office's requirements for renewal, including Mr. Ateba's."  Id. ¶ 5. The Secret Service simply rubber-stamped the White House's decision.

That the Secret Service has an independent statutory and regulatory role in determining White House access, Pl.'s Reply at 11, does not make the deactivation of Ateba's hard pass reviewable.  Unlike in Sherrill, the Secret Service did not deactivate Ateba's pass for security reasons.  If the President sought a change in security protocols, and the Secret Service enacted a new rule to enforce them, such action might be reviewable.  But that is not what we have.  Here, the deactivation reflected the White House's change in policy as to which journalists were entitled to expedited access.  The Secret Service's mere involvement at the final step does not warrant review.

The futility of APA review in these circumstances further supports the Court's conclusion that the Secret Service's decision is unreviewable.  Ateba's Complaint is that the Secret Service "failed to provide any reason to justify terminating Mr. Ateba's hard pass, let alone a 'good reason' or a 'reasoned explanation.'"  Compl. ¶ 101.  Yet, his own Complaint acknowledges that "the Secret Service appears to be relying on a policy issue[d] by the White House Press Office."  Id.

JA250

The Secret Service declaration confirms his suspicion.  If the Court held in favor of Ateba, the appropriate remedy would be a remand to the Secret Service to provide a reasoned explanation. But remand here would either be entirely unrevelatory—"the White House told us to"—or it would provide a backdoor to review the White House's decision-making.  Cf. Judicial Watch, Inc. v. U.S. Secret Serv., 726 F.3d 208, 225 (D.C. 2013) (refusing to permit plaintiff to access White House visitor log records from the Secret Service, when such records would disclose otherwise exempt information about the appointment calendars of members of the White House Office). Accordingly, the Secret Service is entitled to summary judgment on Ateba's APA claim.

## V.    Conclusion

For the reasons explained above, the Court will grant summary judgment to the White House and the Secret Service on Counts One and Three and dismiss Count Two without prejudice. A separate Order to this effect accompanies this Memorandum Opinion.

/s/
JOHN D. BATES
United States District Judge

Dated: December 7, 2023

JA251

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

SIMON ATEBA
_____
                              Plaintiff

            vs.                              Civil Action No. 1:23-cv-02321-JDB
                                                             _____

KARINE JEAN-PIERRE, et al.
_____
                              Defendant

# NOTICE OF APPEAL

Notice is hereby given this   4      day of   January              , 20 24    , that

 Plaintiff Simon Ateba

hereby appeals to the United States Court of Appeals for the District of Columbia Circuit from

the judgment of this Court entered on the    7           day of  December         , 20 23

in  favor of   Defendants Karine Jean-Pierre, Kimberly Cheatle, and the United States Secret Service

against said   Plaintiff Simon Ateba

                                        Harmeet K. Dhillon
                            _____
                                  Attorney or Pro Se Litigant

(Pursuant to Rule 4(a) of the Federal Rules of Appellate Procedure a notice of appeal in a civil
action must be filed within 30 days after the date of entry of judgment or 60 days if the United
States or officer or agency is a party)

**CLERK**        Please mail copies of the above Notice of Appeal to the following at the addresses
                 indicated:

 Joseph Evan Borson
 Michael Fraser Knapp
 U.S. DEPARTMENT OF JUSTICE
 Civil Division, Federal Programs Branch
 1100 L Street NW
 Washington, DC 20005

JA252

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SIMON ATEBA,** | |
| **Plaintiff,** | |
| **v.** | Civil Action No. 23-2321 (JDB) |
| **KARINE JEAN-PIERRE, in her official capacity as White House Press Secretary, et al.,** | |
| **Defendants.** | |

**ORDER**

Upon consideration of [35] plaintiff's consent motion for clarification of [31] the Court's December 7, 2023 Order, and the entire record herein, it is hereby

**ORDERED** that the motion is **GRANTED**; and it is further

**CLARIFIED** that the Court intended the December 7, 2023 Order to constitute a final, appealable judgment.

**SO ORDERED**.

/s/
JOHN D. BATES
United States District Judge

Dated: February 21, 2024

1

JA253

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2024, I electronically filed the foregoing Certificate with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Josh Dixon*
Josh Dixon
Attorney for Plaintiff-Appellant