**[ORAL ARGUMENT NOT SCHEDULED]**

No. 24-5004

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

SIMON ATEBA,

Plaintiff-Appellant,

v.

KARINE JEAN-PIERRE, in her official capacity as Press Secretary to
the President of the United States; UNITED STATES SECRET
SERVICE; and KIMBERLY CHEATLE, in her official capacity as
Director of the United States Secret Service,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

BRIEF FOR APPELLEES

———————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant
  Attorney General*

JOSHUA M. SALZMAN
STEVEN A. MYERS
  *Attorneys, Appellate Staff
  Civil Division, Room 7232
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 305-8648*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), undersigned counsel certifies as follows:

### A.    Parties and Amici

Plaintiff-appellant is Simon Ateba.  Defendants-appellees are Karine Jean-Pierre, in her official capacity as Press Secretary to the President of the United States; the United States Secret Service; and Kimberly Cheatle, in her official capacity as Director of the United States Secret Service.  No amici have appeared in district court or in this Court.

### B.    Rulings Under Review

The rulings under review (issued by Judge John D. Bates) are a memorandum opinion and order filed December 7, 2023, granting defendants summary judgment as to counts one and three of plaintiff's complaint and dismissing count two of the complaint without prejudice, as clarified by a February 21, 2024, order indicating that the district court intended its initial order to be final and appealable.  The memorandum opinion has not yet been published, but it is available on

Westlaw at 2023 WL 8469743. There is no official citation for the orders.

## C.    Related Cases

This case has not previously been before this Court or any court other than the district court. Undersigned counsel is unaware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

*/s/ Steven A. Myers*
STEVEN A. MYERS

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................1

STATEMENT OF JURISDICTION.........................................4

STATEMENT OF THE ISSUE...................................................4

STATEMENT OF THE CASE ....................................................5

    A.    Access To The White House By Journalists Covering
        The President. ...........................................................5

    B.    Simon Ateba ..........................................................10

    C.    District Court Proceedings .....................................11

SUMMARY OF ARGUMENT ................................................13

STANDARD OF REVIEW.......................................................16

ARGUMENT .........................................................................17

I.    Ateba's Arguments Fail At The Threshold Because He
    Remains Eligible To Access The White House, And Because
    The Rule Against Unbridled Discretion Does Not Apply In
    This Context. ...................................................................17

    A.    Content-Neutral Distinctions Between Hard Passes
        And Day Passes Do Not Implicate The First
        Amendment Because Day Pass Holders Retain Access
        To The White House Press Area. ..........................18

    B.    The White House Press Area Is, At Most, A Nonpublic
        Forum Where The Rule Against Unbridled Discretion
        Does Not Apply....................................................22

II.   The District Court Correctly Held That The White House's
      Hard Pass Criteria Satisfy Any First Amendment
      Requirements That Apply..............................................................33

      A.   The Hard Pass Criteria Do Not Violate The Unbridled
           Discretion Doctrine. ...........................................................33

           1.   Under The Hard Pass Policy, The White House
                Does Not Exercise Unlawful Discretion. .....................35

           2.   Under the Congressional Policies, The Galleries
                Do Not Exercise Unlawful Discretion. .........................38

           3.   The Hard Pass Policy Satisfies Any Timeliness
                Requirements That Apply. ...........................................46

           4.   Ateba's Arguments Concerning Judicial Review
                Are Forfeited And Wrong. ...........................................50

      B.   The White House's Eligibility Criteria Are Reasonable.......52

CONCLUSION ........................................................................................57

# TABLE OF AUTHORITIES

**Cases:** Page(s)

*Adams Outdoor Advert. Ltd. P'ship ex rel. Adams Outdoor GP, LLC v. Pennsylvania Dep't of Transp.,*
930 F.3d 199 (3d Cir. 2019) .............................................................. 49

*American Broadcasting Cos. v. Cuomo,*
570 F.2d 1080 (2d Cir. 1977) ........................................................... 32

*American Civil Liberties Union of Md., Inc. v. Wicomico County,*
999 F.2d 780 (4th Cir. 1993) ............................................................ 19

*American Freedom Def. Initiative v. Washington Metro. Area Transit Auth.,*
901 F.3d 356 (D.C. Cir. 2018) ......................................... 23, 24, 30, 31

*Archdiocese of Washington v. Washington Metro. Area Transit Auth.,*
897 F.3d 314 (D.C. Cir. 2018) ......................................................... 31

*Arkansas Educ. Television Comm'n v. Forbes,*
523 U.S. 666 (1998) ................................................................ 24, 28, 29

*Baltimore Sun Co. v. Ehrlich,*
437 F.3d 410 (4th Cir. 2006) ........................................................... 19

*Bellion Spirits, LLC v. United States,*
7 F.4th 1201 (D.C. Cir. 2021) .......................................................... 39

*Boardley v. U.S. Dep't of the Interior,*
615 F.3d 508 (D.C. Cir. 2010) ..................................... 40, 41, 48, 50, 51

*Bryant v. Gates,*
532 F.3d 888 (D.C. Cir. 2008) ......................................................... 24

*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006) ......................................................... 22

*Chiafolo v. Washington,*
591 U.S. 578 (2020) ............................................................... 3, 15, 34

*City of Lakewood v. Plain Dealer Publ'g Co.,*
486 U.S. 750 (1988) .................................. 15, 27, 35, 36, 41, 42, 43, 45

*City of Littleton v. Z.J. Gifts D-4, L.L.C.,*
541 U.S. 774 (2004) ............................................................. 49

*Community for Creative Non-Violence v. Turner,*
893 F.2d 1387 (D.C. Cir. 1990) ............................................. 42

*Consumer Fin. Prot. Bureau v. Community Fin. Servs.*
*Ass'n of Am.,*
601 U.S. 416 (2024) ............................................................. 34

*Consumers Union of U.S., Inc. v. Periodical Correspondents'*
*Ass'n,*
515 F.2d 1341 (D.C. Cir. 1975) ................................. 4, 8, 15, 38, 43, 52

*Conteers LLC v. City of Akron,*
No. 5:20-CV-00542, 2020 WL 5529656
(N.D. Ohio Sept. 15, 2020) ................................................... 52

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
473 U.S. 788 (1985) ............................................... 24, 25, 55

*Cox v. Louisiana,*
379 U.S. 559 (1965) ............................................................. 39

*Diener v. Reed,*
77 F. App'x 601 (3d Cir. 2003) ............................................. 51

*District of Columbia v. Air Fla., Inc.,*
750 F.2d 1077 (D.C. Cir. 1984) ............................................. 50

*Doe v. Harris,*
772 F.3d 563 (9th Cir. 2014) ................................................. 42

*Elrod v. Burns,*
427 U.S. 347 (1976) ......................................................... 21-22

*Encore Videos, Inc. v. City of San Antonio,*
330 F.3d 288 (5th Cir. 2003), *opinion clarified,*
352 F.3d 938 (5th Cir. 2003), *abrogated on other grounds by*
*Reed v. Town of Gilbert,* 576 U.S. 155 (2015) ....................... 49

*Field Day, LLC v. County of Suffolk,*
  463 F.3d 167 (2d Cir. 2006) ............................................................ 51

*FirsTier Mortg. Co. v. Investors Mortg. Ins. Co.,*
  498 U.S. 269 (1991) ..................................................................... 4

*Forsyth County v. Nationalist Movement,*
  505 U.S. 123 (1992) ....................................................................... 41

*Freedman v. Maryland,*
  380 U.S. 51 (1965) ....................................................................... 48

*FW/PBS, Inc. v. City of Dallas,*
  493 U.S. 215 (1990) ................................................................... 48, 49

*Globe Newspaper Co. v. Superior Ct. for Norfolk County,*
  457 U.S. 596 (1982) ...................................................................... 32

*Good News Club v. Milford Cent. Sch.,*
  533 U.S. 98 (2001) ....................................................................... 27

*Griffin v. Secretary of Veterans Affairs,*
  288 F.3d 1309 (Fed. Cir. 2002) ................................................ 28, 30

*Grosjean v. American Press Co.,*
  297 U.S. 233 (1936) ...................................................................... 32

*Huminski v. Corsones,*
  396 F.3d 53 (2d Cir. 2005) ............................................................ 32

*Iancu v. Brunetti,*
  588 U.S. 388 (2019) ...................................................................... 22

*InfoCision Mgmt. Corp. v. Griswold,*
  570 F. Supp. 3d 1051 (D. Colo. 2021) ............................................ 49

*Islamic Am. Relief Agency v. Gonzales,*
  477 F.3d 728 (D.C. Cir. 2007) ....................................................... 16

*John K. MacIver Inst. for Pub. Policy, Inc. v. Evers,*
  994 F.3d 602 (7th Cir. 2021) ...................... 24-25, 26, 32, 33, 45, 46

*Karem v. Trump,*
  960 F.3d 656 (D.C. Cir. 2020) ....................................................... 19

*Kovacs v. Cooper*,
336 U.S. 77 (1949) ..................................................... 39, 40, 44

*Matal v. Tam*,
582 U.S. 218 (2017) ............................................................ 22

*Minnesota Voters All. v. Mansky*,
585 U.S. 1 (2018) ............................................................... 30

*Niemotko v. Maryland*,
340 U.S. 268 (1951) ............................................................ 41

*Perry v. Sindermann*,
408 U.S. 593 (1972) ............................................................ 22

*Price v. Garland*,
45 F.4th 1059 (D.C. Cir. 2022) .................. 13, 18, 23, 26-27, 27, 30, 55

*Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality,
Repression & Criminalization of a Generation v. City of Seattle*,
550 F.3d 788 (9th Cir. 2008) .............................................. 51

*Sentinel Communications Co. v. Watts*,
936 F.2d 1189 (11th Cir. 1991) ........................................... 42

*Sherrill v. Knight*,
569 F.2d 124 (D.C. Cir. 1977) ........................... 6, 18, 19, 20, 38, 39, 40

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ........................................................... 21

*Tavoulareas v. Washington Post Co.*,
724 F.2d 1010 (D.C. Cir.), *rev'd on other grounds*,
737 F.2d 1170 (D.C. Cir. 1984) ......................................... 32

*TGP Commc'ns, LLC v. Sellers*,
No. 22-16826, 2022 WL 17484331 (9th Cir. Dec. 5, 2022) ..... 25-26, 26

*The Pocket Veto Case*,
279 U.S. 655 (1929) .................................................... 3, 15, 34

*Thomas v. Chicago Park Dist.*,
534 U.S. 316 (2002) ...................................................48, 50, 52

*United States v. Coughlin,*
 610 F.3d 89 (D.C. Cir. 2010) .............................................................. 17

*United States v. Nassif,*
 97 F.4th 968 (D.C. Cir. 2024) ............................................................ 23

*Utah Animal Rights Coal. v. Salt Lake City Corp.,*
 371 F.3d 1248 (10th Cir. 2004) ......................................................... 51

*Victory Through Jesus Sports Ministry Found. v. Lee's*
 *Summit R-7 Sch. Dist.,*
 640 F.3d 329 (8th Cir. 2011) ............................................................. 29

*Whiteland Woods, L.P. v. Township of West Whiteland,*
 193 F.3d 177 (3d Cir. 1999) .............................................................. 23

*Wilcox v. Georgetown Univ.,*
 987 F.3d 143 (D.C. Cir. 2021) .............................................................. 4

*Zukerman v. U.S. Postal Serv.,*
 961 F.3d 431 (D.C. Cir. 2020) ............................................... 30, 31, 42

**Statutes:**

18 U.S.C. § 3056 ..................................................................................... 6

18 U.S.C. § 3056A .................................................................................. 6

28 U.S.C. § 1291 ..................................................................................... 4

28 U.S.C. § 1331 ..................................................................................... 4

28 U.S.C. § 1361 ..................................................................................... 4

**Rule:**

Fed. R. Civ. P. 56(a) ............................................................................. 17

**Legislative Materials:**

Official Congressional Directory, 50th Cong. (2d ed. 1888), https://perma.cc/BH46-VRA4 ..................................... 1, 9, 34

Official Congressional Directory, 117th Cong., *Networks, Stations, and Services Represented* (2021), https://perma.cc/9KSW-BVXW ........................................... 45

Official Congressional Directory, 117th Cong., *Newspapers Represented in Press Galleries* (2021), https://perma.cc/8FUQ-AVXG ....................................... 44-45

Official Congressional Directory, 117th Cong., *Periodical Press Galleries* (2022), https://perma.cc/7UK4-9U7T ........................ 54

Official Congressional Directory, 117th Cong., *Press Galleries* (2022), https://perma.cc/8N34-5GRG .......................... 54

Official Congressional Directory, 117th Cong., *Press Photographers' Gallery* (2022), https://perma.cc/QWV3-763G ........... 54

Official Congressional Directory, 117th Cong., *Radio & Television Correspondents Galleries* (2022), https://perma.cc/4DCC-4SNZ .......................................... 54

S. Journal, 35th Cong., 2d Sess. (1859) ............................................ 10, 34

S. Rep. No. 76-317 (1939) ................................................... 9, 43

**Other Authorities:**

Am. Bd. of Internal Med., *Medical Oncology Policies, General Requirements*, https://perma.cc/48W6-7DVG ...................................... 36

Simon Ateba, *Republican Congressman Matt Gaetz Demands Oversight of U.S. Military Withdrawal from Chad*, Today News Afr. (May 17, 2024), https://perma.cc/ASR6-2YLK ....... 54

Simon Ateba, *U.S. Congressman Matt Gaetz Exposes Biden
Admin Cover-Up in Damning Report on U.S. Troop
Endangerment and Diplomatic Crisis in Niger*,
Today News Afr. (May 6, 2024), https://perma.cc/NJ8S-P2M7 ..... 54-55

Simon Ateba, *U.S.-Trained Soldiers Behind Recent African
Coups: American Congressman Matt Gaetz Demands
Accountability*, Today News Afr. (Aug. 31, 2023),
https://perma.cc/WK7X-RFP8 ............................................................. 55

David Bauder, *Decline in Local News Outlets Is Accelerating
Despite Efforts to Help*, Associated Press (Nov. 16, 2023),
https://perma.cc/82ZT-XYJX ............................................................. 45

Sarah J. Eckman, Cong. Research Serv., R44816,
*Congressional News Media and the House and Senate
Press Galleries* (2017) .................................. 1, 9, 9-10, 10, 43, 44, 45, 54

5 Asher C. Hinds, *Hinds' Precedents of the House of
Representatives of the United States* (1907) ................................. 10, 43

House Periodical Press Gallery, Rules & Regulations,
https://perma.cc/X2FF-5JMK .......................................................... 8-9

Va. Bd. of Bar Exam'rs, *Character & Fitness Requirements*,
https://perma.cc/LH7W-APRS .......................................................... 36

White House Correspondents Ass'n, *WHCA Officers and
Board*, https://perma.cc/ZE2N-L44K................................................ 54

## INTRODUCTION

Access by journalists to the seat of government is a longstanding feature of American democracy. And precisely because the tradition of media access to Congress and the White House is so well established, so too are many of the standards that govern such access. In particular, since the late 1800s, Congress has deferred to committees of professional journalists to determine whether reporters seeking credentials to cover Congress are "bona-fide correspondents of reputable standing," rather than "agents or representatives of persons or corporations having legislation before Congress." Official Congressional Directory, 50th Cong. 160 (2d ed. 1888), https://perma.cc/BH46-VRA4. Placing credentialing authority in the press corps "help[s] preserve the independence of the press corps by removing it from direct congressional influence," and the criteria that the press corps applies "reflect commonly held professional norms and standards of the news industry." Sarah J. Eckman, Cong. Research Serv., R44816, *Congressional News Media and the House and Senate Press Galleries* 4-5 (2017) (*Congressional News Media*) (JA129-30).

Since at least the administration of Gerald Ford, with only brief exceptions, the White House has required journalists seeking "hard passes"—which permit journalists to come and go from the building without seeking additional authorization—to be accredited to cover either Congress or the Supreme Court, thereby eliminating the need for the White House to make its own decisions about which reporters are deserving of accreditation. Plaintiff Simon Ateba is not accredited to cover either Congress or the Supreme Court, so he is ineligible for a hard pass under the White House policy. He nevertheless remains eligible to enter the White House and attend press briefings by submitting a simple form requesting access—access that has been granted every time that he has requested it.

In this appeal, Ateba asks this Court to hold that the credentialing criteria applied by the White House have "for decades" violated the First Amendment because they grant too much discretion to the committees of journalists who make credentialing decisions on behalf of Congress. *See* Ateba Br. 1. Yet even that characterization dramatically understates the sweep of Ateba's argument, for his principal theory necessarily implies the invalidity of the credentialing

rules that Congress has consistently applied since 1888, and that incorporate standards dating back decades earlier. This Court should be exceedingly wary of embracing such a theory, for "'[l]ong settled and established practice' may have 'great weight in a proper interpretation of constitutional provisions.'" *Chiafolo v. Washington*, 591 U.S. 578, 592 (2020) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)). Even putting aside the long historical tradition of relying on professional journalists instead of government officials to make credentialing decisions, the district court properly rejected Ateba's First Amendment claim. As it recognized, the hard pass criteria ensure that a journalist seeking access to the White House "is working as a journalist for an established news organization and … does not have any conflicts of interest," JA239, and by limiting the White House's role in vetting journalists, the criteria eliminate the risk "that the White House will discriminate against journalists based on their relationship with the White House," JA240. This Court has "never questioned the requirement of press credentialing or the substance of the standards," JA238; instead, nearly 50 years ago, this Court described a similar challenge as "tenuous" and suggested that the rules were not "facially

violative of constitutional guarantees." *Consumers Union of U.S., Inc. v. Periodical Correspondents' Ass'n*, 515 F.2d 1341, 1347-48 (D.C. Cir. 1975).

This Court should therefore affirm the judgment of the district court.

## STATEMENT OF JURISDICTION

Ateba invoked the jurisdiction of the district court pursuant to 28 U.S.C. §§ 1331 and 1361. JA12 ¶ 16. On December 7, 2023, the district court granted defendants summary judgment as to two counts of the complaint and dismissed a third count without prejudice. JA213-51.[1] Ateba filed a timely notice of appeal on January 4, 2024. JA252. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

The question presented is whether the district court correctly entered summary judgment for the government on Ateba's claim that

---

[1] Because the district court dismissed one count of Ateba's complaint without prejudice, it was initially unclear whether it had entered an appealable order. *See Wilcox v. Georgetown Univ.*, 987 F.3d 143 (D.C. Cir. 2021). On February 21, 2024, Ateba obtained an order from the district court clarifying that it "intended the December 7, 2023 Order to constitute a final, appealable judgment." JA253. Defendants agree that this order resolves any question of appellate jurisdiction. *See FirsTier Mortg. Co. v. Investors Mortg. Ins. Co.*, 498 U.S. 269 (1991).

the White House's hard pass policy violates the First Amendment on its face.

## STATEMENT OF THE CASE

### A. Access To The White House By Journalists Covering The President.

The White House complex is subject to strict security requirements, and access is tightly controlled. "The White House offers journalists two principal ways" of entering the building. JA216. "First, a reporter may obtain a 'temporary press pass,' known as a 'day pass,' which is a daily credential issued upon application to the Secret Service." JA216. "Second, a reporter can obtain a 'permanent press pass,' known as a 'hard pass,' which is a credential that allows him or her to come and go freely once the pass is issued." JA216. Day pass and hard pass holders have access to the same areas of the White House at the same times of day. JA216.

In order to obtain a day pass, a journalist "must submit a brief, online Secret Service form for each day that he or she wants to access the Press Area." JA217. As Ateba acknowledged in district court, a journalist "can register for a week's worth on Sunday night if they wish to." JA153.

"Journalists seeking long-term hard passes must secure approval from the Secret Service and the White House." JA217. In connection with its statutory responsibilities, the Secret Service conducts necessary security checks to determine whether the applicant poses a potential risk to the safety or security of the President, the Vice President, or the White House complex. 18 U.S.C. §§ 3056, 3056A. "The White House sets and enforces the remaining criteria for approval." JA217.

For most of the past 50 years, the White House's eligibility criteria have required an applicant to show, among other things, that he is credentialed to cover Congress or the Supreme Court. *See* JA156 (district court observing that this requirement has been in place in some form "since the Gerald Ford administration"); *Sherrill v. Knight*, 569 F.2d 124, 129 n.19 (D.C. Cir. 1977) (noting that "the applicant is required to have a pass to the House and Senate galleries because this verifies the 'professional credentials' of the applicant"); Declaration of Todd Joseph Gillman, *Karem v. Trump*, No. 1:19-cv-2514, ECF No. 2-8 ¶ 7 (D.D.C. Aug. 20, 2019) (describing requirements as including "[a]ffirmation that you have a congressional press credential").

For the first two years of the current administration, the White House did not require hard pass holders to be accredited to cover Congress.  On May 5, 2023, however, the White House announced a new policy that was largely consistent with previous policies, providing that "all hard passes would expire on July 31, 2023, unless the holder met" all the following criteria, JA218:

1. Full-time employment with an organization whose principal business is news dissemination … ;

2. Physical address (either residential or professional) in the greater Washington, D.C. area;

3. Have accessed the White House campus at least once during the prior six months for work, or have proof of employment within the last three months to cover the White House;

4. Assignment to cover (or provide technical support in covering) the White House on a regular basis;

5. Accreditation by a press gallery in either the Supreme Court, U.S. Senate or U.S. House of Representatives; and

6. Willingness to submit to any necessary investigation by the U.S. Secret Service to determine eligibility for access to the White House complex, where Secret Service will determine eligibility based on whether the applicant presents a potential risk to the safety or security of the President, the Vice President, or the White House complex.

JA218-19.

This appeal concerns the requirement that the applicant be accredited by a congressional press gallery.[2]  As the district court explained, the "House and Senate each host four galleries for different types of journalists: daily press, periodical press, radio/TV, and press photographers."  JA220.  House and Senate employees do not make credentialing decisions; instead, "[c]ommittees of journalists administer the credentialing requirements for the galleries."  JA220; *see also Consumers Union of U.S., Inc. v. Periodical Correspondents' Ass'n*, 515 F.2d 1341, 1345 (D.C. Cir. 1975) (explaining that an "elected body of seven members" "accredit[s] applicant publications and … issue[s] credentials to members").  And while the House and Senate each host multiple separate press galleries, the requirements for accreditation are all similar, including a requirement that the journalist be a "bona fide correspondent[] of repute" (Senate Daily Press Gallery), *see* JA220 (quotation marks omitted) or a "bona fide resident correspondent[] of reputable standing" (House Periodical Press Gallery), *see* House

---

[2] The government has not disputed that Ateba is ineligible for a Supreme Court credential because he does not cover the Supreme Court.  *See* Defs.' Resp. to Pl.'s Facts, ECF No. 26-1, ¶ 14; *see also* JA219.

Periodical Press Gallery, Rules & Regulations, https://perma.cc/X2FF-5JMK, rather than a person "engaged in any lobbying or paid advocacy … or in prosecuting any claim before Congress," JA220.

"The chambers have shared press gallery rules since at least 1888." *Congressional News Media* 2 n.6 (JA127 n.6). Those 1888 rules are functionally identical to the rules in effect today, relying on a committee of independent journalists to "see that the occupation of the gallery is confined to bona-fide correspondents of reputable standing in their business." Official Congressional Directory, 50th Cong., *supra*, at 160. Those requirements "reflect commonly held professional norms and standards of the news industry," and placing credentialing authority in the press corps "help[s] preserve the independence of the press corps by removing it from direct congressional influence." *Congressional News Media* 4-5 (JA129-30); *see also* S. Rep. No. 76-317, at 3 (1939) (noting that these rules were developed by the nineteenth-century press corps with the goal of "keeping the galleries for their legitimate uses").[3]

---

[3] From 1838 to 1888, journalists seeking accreditation in the House were required to seek the approval of the Speaker. *See*

*Continued on next page.*

### B. Simon Ateba

Simon Ateba covers the White House for *Today News Africa*, JA217, an irregularly updated website for which he appears to be the sole writer. He has covered the White House since 2018. JA17 ¶ 39. "For his first three years as a White House correspondent, he entered the White House with a day pass," JA217, but he obtained a hard pass in February 2021, during the period when "the White House did not require applicants [to] first be credentialed by the Supreme Court or a Congressional Press Gallery." JA78 ¶ 7. Because he is not accredited to cover Congress or the Supreme Court, his hard pass expired pursuant to the May 2023 policy effective August 1, 2023, and Ateba did not meet the qualifications for renewal. JA221-22.

---

*Congressional News Media* 2 (JA127). In 1852, "to remedy an abuse that had been increasing," the House required "the condition that [the journalist] should not be a claim agent should be a part of the written permission given by the Speaker." 5 Asher C. Hinds, *Hinds' Precedents of the House of Representatives of the United States* § 7306, at 1117 (1907). The Senate also began permitting reporters access to the floor in 1838, *Congressional News Media* 3 (JA128); in 1859, the Senate adopted a resolution providing that "[s]eats in the reporters' gallery … shall not be assigned to any person, unless the presiding officer shall be satisfied that such person is *bona fide* a reporter of the particular newspaper by whose editor or editors he shall be certified to be so employed." S. Journal, 35th Cong., 2d Sess. 119-20 (1859).

Since his hard pass was deactivated, "Ateba has continued to access the Press Area with a day pass." JA222; *see also* JA75 ¶ 17 (Secret Service declarant confirming that Ateba has been granted a day pass "each time he sought entry"). His request for accreditation from the Senate Daily Press gallery has apparently been pending since June 2023. *See* JA222; Ateba Br. 2.

## C. District Court Proceedings

Ateba commenced this action by filing a three-count complaint against the White House Press Secretary, the United States Secret Service, and the Director of the United States Secret Service on August 10, 2023. *See* JA8-31. In count one—the sole count that Ateba is pursuing on appeal, *see* Ateba Br. 14—Ateba contended that the White House's hard pass policy is unconstitutional on its face because it "gives the government unbridled discretion to permit the exercise of First Amendment rights." JA27 ¶ 84.[4] After denying Ateba's motion for

---

[4] The complaint included two other counts, both of which the district court rejected. In count two, Ateba alleged that the hard pass policy was adopted "to intentionally prevent Mr. Ateba from obtaining hard pass access." JA28 ¶ 91. In count three, he alleged that "the Secret Service has acted arbitrarily and capriciously" in terminating his hard pass. JA29 ¶ 102.

preliminary injunction, JA57-69, the district court issued an opinion that, as relevant here, granted summary judgment to the government with respect to count one.  *See* JA215-51.

The district court found that even though Ateba could still access the White House with a day pass, he had suffered a cognizable injury under the First Amendment.  JA224-31.  And it declined to resolve whether the White House Press Area is a limited public forum or a nonpublic forum, reasoning that in either case a challenged restriction must be reasonable and viewpoint neutral, and that reasonableness incorporates a form of the rule against unbridled discretion.  *See* JA233-37.

The district court then held that the White House's hard pass criteria satisfied these requirements.  As it explained, the "White House has long relied on credentialing by the congressional press galleries as a prerequisite to obtaining a press credential," JA238, the "standards that the press galleries apply are … directly related to determining whether an applicant is 'engaged in journalism,'" JA238, and "reliance on a professional credentialing body … tends to reduce the risk Ateba

apparently fears most—that the White House will discriminate against journalists based on their relationship with the White House," JA240.

## SUMMARY OF ARGUMENT

The district court correctly determined that the White House's hard pass criteria do not facially violate the First Amendment. Holding otherwise would call into question a credentialing policy that Congress has consistently applied since 1888, and that incorporates standards dating back decades earlier.

First, Ateba's loss of his hard pass does not cause him a First Amendment injury, as he remains eligible to enter the White House with a day pass, and he has been granted such access each time he has requested it. No decision of this Court holds that loss of a hard pass under such circumstances causes a cognizable injury to a reporter's First Amendment rights. And even if Ateba had suffered some form of First Amendment injury, his First Amendment claim is not amenable to forum analysis, for it would be a "category error to apply the speech-protective rules of a public forum to regulation of an activity that involves merely a noncommunicative step in the production of speech." *Price v. Garland*, 45 F.4th 1059, 1068 (D.C. Cir. 2022).

Even if forum analysis were applicable, the White House Press Area is at most a nonpublic forum, where the rule against unbridled discretion does not apply. While the district court believed that a requirement that licensing rules be "reasonable" incorporates a prohibition on unbridled discretion, all the cases upon which it relied involved restrictions on expressive activity, which are not at issue in this appeal.

In any case, the district court correctly held that even if the White House credentialing policy must comply with the unbridled discretion doctrine and otherwise be reasonable, the policy satisfies these requirements. The district court correctly recognized that the pertinent criteria ensure that an applicant "is working as a journalist for an established news organization and … does not have any conflicts of interest," JA239, and by limiting the White House's role in vetting journalists, the White House policy eliminates the risk "that the White House will discriminate against journalists based on their relationship with the White House," JA240. This Court has "never questioned the requirement of press credentialing or the substance of the standards," JA238; indeed, nearly 50 years ago, this Court described a similar

challenge as "tenuous" and suggested that the rules were not "facially violative of constitutional guarantees." *Consumers Union of U.S., Inc. v. Periodical Correspondents' Ass'n*, 515 F.2d 1341, 1347-48 (D.C. Cir. 1975).

Ateba's challenge would necessarily imply the invalidity of congressional credentialing criteria that have been in place for more than a century, but "'[l]ong settled and established practice' may have 'great weight in a proper interpretation of constitutional provisions.'" *Chiafolo v. Washington*, 591 U.S. 578, 592 (2020) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)). And the White House policy would satisfy the First Amendment even without its long historical pedigree. The White House's policy does not give it any discretion; whether a journalist is credentialed by Congress is an objective fact. Nor does the underlying congressional policy give the journalists who administer it excessive discretion; the rules are "directly related to determining whether an applicant is 'engaged in journalism,'" JA238, and Congress's "well-established practice," *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988), of credentialing journalists

from a wide variety of outlets demonstrates that Ateba's concerns about discriminatory application are entirely speculative.

Finally, the White House's decision to rely upon congressional credentialing determinations is reasonable, for it eliminates the possibility that the White House will discriminate against journalists based on the content of their coverage. Members of the White House press corps have complied with this policy for decades, and there is no evidence that a journalist's desire to cover the White House is an impediment to obtaining a congressional credential. Nor is there any evidence that the journalists who administer the credentialing process do so to exclude smaller, lesser-known media outlets.

This Court should therefore affirm the judgment of the district court.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo. *See, e.g.*, *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007). Under Rule 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).

## ARGUMENT

The district court correctly entered summary judgment on Ateba's

facial challenge to the White House's credentialing policy.  This Court

may affirm that judgment either by accepting the government's

threshold contentions about the limited First Amendment interests at

stake or by holding that the White House's policy satisfies any

requirements that are plausibly imposed by the First Amendment.  *See,*

*e.g.*, *United States v. Coughlin*, 610 F.3d 89, 108 (D.C. Cir. 2010) (court

of appeals "can affirm a correct decision even if on different grounds

than those assigned in the decision on review" (quotation marks

omitted)).

I.   **Ateba's Arguments Fail At The Threshold Because
     He Remains Eligible To Access The White House,
     And Because The Rule Against Unbridled
     Discretion Does Not Apply In This Context.**

The central premise of Ateba's argument is that limitations on

who may enter the White House on an expedited basis must satisfy the

same requirements as censorship regulations that prohibit a speaker

from engaging in speech or other expressive conduct.  That premise is

wrong, for it is a "category error to apply the speech-protective rules of a public forum to regulation of an activity that involves merely a noncommunicative step in the production of speech." *Price v. Garland*, 45 F.4th 1059, 1068 (D.C. Cir. 2022).

### A. Content-Neutral Distinctions Between Hard Passes And Day Passes Do Not Implicate The First Amendment Because Day Pass Holders Retain Access To The White House Press Area.

Ateba's claim fails at the threshold because while he no longer holds a hard pass, the White House has not denied him access to the White House or the ability to engage in expressive conduct once inside. Instead, as the district court explained, (1) Ateba "can still access the Press Area with a day pass," JA227; (2) "a day pass holder may access the same parts of the White House at the same times as a hard pass holder," JA228, and (3) "once the journalist reaches the Press Area, a day pass holder is not subject to any restrictions that would not also apply to a hard pass holder," JA228.

As the district court correctly observed, no decision of this Court holds that a reporter suffers a cognizable injury under the First Amendment when he "can still access the Press Area with a day pass." JA227. Instead, *Sherrill v. Knight*, 569 F.2d 124 (D.C. Cir. 1977), and

*Karem v. Trump*, 960 F.3d 656 (D.C. Cir. 2020), each involved "complete loss of access" to the White House. JA227 n.4; *see also Sherrill*, 569 F.2d at 130 (denial of hard pass resulted in "exclusion … from White House press facilities"); *Karem*, 960 F.3d at 665 ("month-long loss of his White House access"). As this Court held in *Sherrill*, the First Amendment "does not extend to every conceivable avenue a citizen may wish to employ in pursuing" information. 569 F.2d at 129. It follows that Ateba's loss of his hard pass, while he retains full ability to enter the Press Area with a day pass, did not injure him under the First Amendment. *See Baltimore Sun Co. v. Ehrlich*, 437 F.3d 410, 418-19 (4th Cir. 2006) ("[G]iving preferential access to some reporters and refusing to give access to or answer the questions of other reporters … is objectively *de minimis*."); *American Civil Liberties Union of Md., Inc. v. Wicomico County*, 999 F.2d 780, 786 & n.6 (4th Cir. 1993) (per curiam) (any harm from revocation of expedited access to prisoners that "inconvenienced" legal aid organization was constitutionally "*de minimis*").

The district court suggested that the First Amendment was implicated because of the possibility that Ateba might not

"prophylactically apply for day passes" and therefore "miss a late-scheduled press event" at which he would otherwise "express a point of view regarding the events he thinks are worthy of discussion." JA228-29 (quotation marks omitted). In other words, the purported First Amendment injury is that because it might take longer for Ateba to enter the White House, he might miss the opportunity to express himself once inside.

That theory fails for multiple reasons. As a threshold matter, Ateba has not alleged that seeking entry to the White House through a day pass ever prevented him from speaking at press conferences, perhaps because he recognizes that he "can register for a week's worth on Sunday night" if he wishes to do so. JA153; *see also* JA228 (district court recognizing that "[i]f a day pass holder misses a spontaneous briefing, that is because he or she did not apply for a day pass, not because he or she has been excluded from the Press Area"). Beyond that, Ateba has never contended that he has a constitutional right to be given the floor at White House press briefings—and he plainly does not. *Cf. Sherrill*, 569 F.2d at 129 (rejecting notion that "because the

President allows interviews with some bona fide journalists, he must give this opportunity to all").

More fundamentally, even if the First Amendment protects Ateba's ability to speak once inside the White House, his mode of entering the building—i.e., with a day pass or a hard pass—is a noncommunicative, preparatory step in the production of speech. And the imposition of minor burdens on an activity (i.e., entering the White House) that might facilitate speech once inside the White House is not actionable under the First Amendment. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) (recognizing that "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech"). While Ateba has suggested that burdens on First Amendment activity are actionable in the same manner as outright prohibitions on First Amendment activity, JA227, the cases upon which he relied in district court involved restrictions on First Amendment activity itself, not a noncommunicative step leading to later expression. *See Sorrell*, 564 U.S. at 563-64 (addressing law that "enacts content- and speaker-based restrictions" and "disfavors … speech with a particular content"); *Elrod v. Burns*, 427 U.S. 347, 373

(1976) (concerning government employees threatened with discharge for failure to support political party); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 302 (D.C. Cir. 2006) (explaining that the "pertinent liberty here is protection against government imposition of a state religion or religious preference"). None of these cases suggests that the government violates the First Amendment by engaging in content-neutral steps that could have downstream effects on an individual's opportunity to speak.[5]

## B. The White House Press Area Is, At Most, A Nonpublic Forum Where The Rule Against Unbridled Discretion Does Not Apply.

1. Should the Court determine that Ateba's First Amendment rights are implicated at all, it should conclude that this case does not involve a public forum, and therefore that the rule against unbridled discretion in granting permits to speak does not apply. At the outset, the hard pass program—the program to which Ateba actually seeks

---

[5] It does not follow that the White House may discriminate on the basis of viewpoint when assigning hard passes. *Cf.* JA230. Even where an individual lacks a constitutional right to a government benefit, it may be unconstitutional to condition access to that benefit on the content of one's speech. *See, e.g.*, *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *Iancu v. Brunetti*, 588 U.S. 388, 392-93 (2019); *Matal v. Tam*, 582 U.S. 218, 239-40 (2017) (plurality opinion).

access—is not a forum in which individuals engage in First Amendment activity. This Court has explained that "forum analysis applies only to communicative activities, not to activities that, even if generally protected by the First Amendment, are not communicative." *Price*, 45 F.4th at 1070; *see also American Freedom Def. Initiative v. Washington Metro. Area Transit Auth.*, 901 F.3d 356, 364 (D.C. Cir. 2018) ("Our analysis of *a restriction on speech* on government property begins with the forum doctrine." (emphasis added)); *Whiteland Woods, L.P. v. Township of West Whiteland*, 193 F.3d 177, 183 (3d Cir. 1999) (holding that a "restriction on [a party's] right to receive and record information" is not a regulation of "expressive activity" to which forum analysis applies). Entering the White House with a hard pass is not an expressive act governed by forum analysis.

Even if the putative forum is the White House Press Area, it is at most a nonpublic forum. *See, e.g.*, *United States v. Nassif*, 97 F.4th 968, 976-77 (D.C. Cir. 2024) (rejecting contention that Capitol buildings are a public forum, as "communications that take place in the Capitol are typically scheduled and controlled by Senators or Representatives," "[e]ntry to the Capitol buildings is … strictly regulated," and the

buildings are not "by policy or practice, generally open for use by members of the public to voice whatever concerns they may have" (quotation marks omitted)); *see also, e.g.*, *American Freedom Def. Initiative*, 901 F.3d at 364 (nonpublic fora include "other Government-owned property where some speech is permitted").

When "the government permits only 'selective access for individual speakers,' then it creates a nonpublic forum." *Bryant v. Gates*, 532 F.3d 888, 895 (D.C. Cir. 2008) (quoting *Arkansas Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 679 (1998)). In *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, for example, the government had consistently limited the Combined Federal Campaign charity drive to "appropriate" organizations that had to seek permission to participate. 473 U.S. 788, 804 (1985) (quotation marks omitted); *see also Forbes*, 523 U.S. at 679-80 (holding that candidate debate was a nonpublic forum). The Seventh Circuit has thus held that the government does not create a public forum when it "invit[es] a limited number of journalists to its press conferences," for "[r]equiring permission, limiting access, and having 'extensive admission criteria' … are signs that the government has not" created a public forum. *John K.*

*MacIver Inst. for Pub. Policy, Inc. v. Evers*, 994 F.3d 602, 609 (7th Cir. 2021). Here, access is limited to those who satisfy the six criteria or are otherwise invited. And the purpose of the White House Press Area is to facilitate journalists' coverage of the President. *Cf. Cornelius*, 473 U.S. at 805 ("The Government did not create the [Combined Federal Campaign] for purposes of providing a forum for expressive activity.").

The district court suggested that the government's arguments on this score were "at odds" with its contention that "access is available to any journalist who can pass a minimal Secret Service screening (i.e., eligible for a day pass)." JA233. That is incorrect: if day pass holders enjoy equivalent access to the Press Area as hard pass holders, that would mean that Ateba has suffered no First Amendment injury and that this Court should affirm on that basis. *See supra* p. 18-22. But if the universe of hard pass holders itself constitutes a meaningfully distinct group from which Ateba has been excluded, there plainly are criteria limiting access, creating a nonpublic forum.

For his part, Ateba suggests that "designated press areas are classic examples of limited public fora." Ateba Br. 21 (citing *TGP Commc'ns, LLC v. Sellers*, No. 22-16826, 2022 WL 17484331, at *4 (9th

Cir. Dec. 5, 2022)).  In *TGP*, reporters denied access to press briefings

brought both facial and as-applied First Amendment challenges, but

*TGP* did not reach the plaintiffs' facial challenge; it concluded only that

the plaintiffs were likely to succeed on their claim that the denial of a

press pass "was impermissibly content- and viewpoint-based."  2022 WL

17484331, at *3-4; *see also id.* at *4 (finding that "a predominant reason

for the County denying Plaintiffs a press pass was Conradson's political

views").  Indeed, *TGP* expressly distinguished the Seventh Circuit's

decision in *MacIver* on this ground.  *See id.* at *5 ("In *MacIver*, however,

the court noted that there was no evidence that the government had

manipulated the neutral criteria in a manner that discriminated

against the applicant." (alterations and quotation marks omitted)).  Any

statement about the nature of the forum in *TGP* was thus plainly dicta,

whereas *MacIver* carefully explains why the Wisconsin governor's press

conferences are not a public forum.  *See MacIver*, 994 F.3d at 609-10.

2.    Because the hard pass program's eligibility criteria do not

restrict access to any public forum, Ateba's heavy reliance on the

unbridled discretion doctrine is misplaced.  Outside of a public forum,

"the Government has far more leeway to regulate speech," *Price*, 45

F.4th at 1068; all the First Amendment requires is that a "restriction must not discriminate against speech on the basis of viewpoint, and the restrictions must be reasonable in light of the purpose served by the forum," *id.* at 1072 (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001)).  Similarly, if forum analysis does not apply at all, the "highly-protective rules of a traditional public forum are inapplicable," and the activity "is subject to the same degree of regulation … as it would be in a nonpublic forum."  *Id.* at 1071-72.

The unavailability of the unbridled discretion doctrine outside the context of public fora is unsurprising, for the doctrine arose in the context of restrictions on core First Amendment activity in traditional public fora.  It allows facial challenges to discretionary permitting regimes in order to protect core, expressive First Amendment activities from even the risk of viewpoint discrimination.  *See, e.g.*, *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755-56 (1988) ("[O]ur cases have long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny *expressive activity*, one who is subject to the law may challenge it facially without the necessity of first applying for, and

being denied, a license." (emphasis added)). "All of the modern cases in which the Supreme Court has set forth the unbridled discretion doctrine have involved public fora, and no Supreme Court case has suggested that the doctrine is applicable outside the setting of a public forum." *Griffin v. Secretary of Veterans Affairs*, 288 F.3d 1309, 1321 (Fed. Cir. 2002).

Applying the unbridled discretion doctrine outside public fora would be inconsistent with the Supreme Court's decision in *Forbes*. The Supreme Court there held that a congressional candidate debate hosted by a public broadcaster was a nonpublic forum, where restrictions "must not be based on the speaker's viewpoint and must otherwise be reasonable in light of the purpose of the property." 523 U.S. at 682. The public broadcaster excluded the plaintiff from the debate as an exercise of "journalistic discretion." *Id.* at 682-83. The Supreme Court rejected the candidate's challenge to his exclusion, without discussion of the unbridled discretion doctrine—even though it was the plaintiff's central point at oral argument and principal focus of the dissenting opinion. *See id.* at 683-84 (Stevens, J., dissenting) (criticizing the majority for upholding the "ad hoc decision" of the broadcaster in

contravention of the unbridled discretion doctrine); *see also id.* at 686 (describing "nearly limitless discretion" of broadcaster to exclude candidates); Respondent's Brief in Opposition, *Forbes*, 523 U.S. 666 (No. 96-779), 1997 WL 365332, at *44-46 (July 2, 1997) (arguing that exclusion violated unbridled discretion doctrine); Transcript of Oral Argument, *Forbes*, 523 U.S. 666 (No. 96-779), 1997 WL 664266 (Oct. 8, 1997) (including the term "unfettered discretion" and variants a dozen times).

Notwithstanding *Forbes*, some courts have understood the doctrine to apply in nonpublic fora. *See* Ateba Br. 21. Those cases are mistaken. *See Victory Through Jesus Sports Ministry Found. v. Lee's Summit R-7 Sch. Dist.*, 640 F.3d 329, 337 (8th Cir. 2011) (plaintiff's contention that unbridled discretion doctrine applies even in nonpublic forum "cannot be squared with the Supreme Court's decision in *Forbes*, which upheld a public broadcaster's *ad hoc* but reasonable exclusion of a qualified candidate from a campaign debate over a dissent that objected to the exercise of "'nearly limitless discretion'" in controlling a nonpublic forum for *political* speech"). As this Court has explained, courts must remain wary of "extending the public forum doctrine 'in a

mechanical way' to contexts that meaningfully differ from those in which the doctrine has traditionally been applied." *Price*, 45 F.4th at 1068. The rationales animating the unbridled discretion doctrine are not implicated in the distinct context of journalist access to what is, at most, a nonpublic forum. *Cf. Griffin*, 288 F.3d at 1323 (refusing "to apply the unbridled discretion doctrine mechanically … because restrictions in nonpublic fora may be reasonable if they are aimed at preserving the property for the purpose to which it is dedicated").

*Minnesota Voters Alliance v. Mansky*, 585 U.S. 1 (2018), and this Court's cases applying it, do not alter the analysis. *But see* JA235-36 (discussing *Mansky*; *American Freedom Def. Initiative*, 901 F.3d at 372; and *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 449 (D.C. Cir. 2020)). Each of those cases applies the principle that even outside of a public forum, restrictions on *speech* must be reasonable. Thus, *Mansky* invalidated a law unsusceptible to reasoned application that prohibited voters from "wear[ing] a political badge, political button, or anything bearing political insignia inside a polling place on Election Day," 585 U.S. at 5, which "plainly restricts a form of expression within the protection of the First Amendment," *id.* at 11. *American Freedom*

*Defense Initiative* involved a challenge to guidelines concerning commercial advertising. 901 F.3d at 359. And *Zukerman* involved a "blanket ban on 'political' content" on custom stamps. 961 F.3d at 436.

Unlike the policies at issue in those cases, the White House's hard pass criteria do not restrict expression, but instead regulate one of several means of access to the White House Press Area. Those criteria do not limit what can be said within the Press Area. And those criteria can be applied in a consistent manner by the White House Press Office without regard to the content or viewpoint of any speech.

These facts are dispositive because, as this Court's cases recognize, *Mansky* was concerned with direct regulation of speech. *See Zukerman*, 961 F.3d at 447 (describing *Mansky*: "a rule *limiting speech* in a nonpublic forum is reasonable only if it is 'capable of reasoned application.'" (emphasis added)); *Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 330 (D.C. Cir. 2018) (under *Mansky*, "a restriction may also be unreasonable if it is unclear what *speech* would be swept in" (emphasis added)). Because the hard pass criteria impose no analogous restriction on expression, the rule against unbridled discretion has no applicability.

Finally, Ateba contends that irrespective of forum analysis, anyone "engaged in press activity ha[s] an equal right of access to government property" that has been opened to some members of the press. Ateba Br. 23. That contention is wrong, for "reporters are not cloaked with automatic strict scrutiny protection merely because they are members of the press." *MacIver*, 994 F.3d at 612 (quotation omitted). The authority upon which Ateba relies does not hold otherwise. *See Globe Newspaper Co. v. Superior Ct. for Norfolk County*, 457 U.S. 596, 605 (1982) (holding that criminal trials are open to the public, including journalists); *Huminski v. Corsones*, 396 F.3d 53, 83 (2d Cir. 2005) (similar); *Grosjean v. American Press Co.*, 297 U.S. 233, 251 (1936) (holding unconstitutional a tax imposed on newspapers with circulation above particular threshold); *Tavoulareas v. Washington Post Co.*, 724 F.2d 1010, 1025 (D.C. Cir.) (explaining that newspaper had "no greater constitutional interest in free expression than that held by individuals"), *rev'd on other grounds*, 737 F.2d 1170 (D.C. Cir. 1984) (en banc) (per curiam). And as the Seventh Circuit has explained, *American Broadcasting Cos. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977)—an emergency, oral ruling—is difficult to reconcile with modern

First Amendment doctrine and of limited vitality today, particularly

because it involved the exclusion of "one of three undisputedly

equivalent broadcasting companies … without any neutral criteria

guiding the decision to exclude it." *MacIver*, 994 F.3d at 613.

## II. The District Court Correctly Held That The White House's Hard Pass Criteria Satisfy Any First Amendment Requirements That Apply.

For the reasons set out above, Ateba's loss of his hard pass does

not implicate the First Amendment, and the rule against unbridled

discretion does not apply.  But even if the White House's hard pass

criteria must satisfy the rule against unbridled discretion and otherwise

be reasonable, the district court correctly held that the criteria satisfy

these requirements.

### A. The Hard Pass Criteria Do Not Violate The Unbridled Discretion Doctrine.

The hard pass criteria do not violate the unbridled discretion

doctrine.  Indeed, it bears emphasis that, as Ateba forthrightly

acknowledges, he is asking this Court to hold that criteria applied by

both the White House and Congress to credential journalists have "for

decades … been unconstitutional."  Ateba Br. 1.  And even that

description dramatically understates the scope of his position, for his

principal argument would necessarily invalidate the credentialing criteria that Congress has applied since 1888, and that has origins decades earlier.  *See* Official Congressional Directory, 50th Cong., *supra*, at 160 (applications for accreditation "shall be authenticated in a manner that shall be satisfactory to the Standing Committee of Correspondents, who shall see that the occupation of the gallery is confined to bona-fide correspondents of reputable standing in their business"); S. Journal, 35th Cong., 2d Sess. 119-20 (1859) (Senate resolution providing that "[s]eats in the reporters' gallery … shall not be assigned to any person, unless the presiding officer shall be satisfied that such person is *bona fide* a reporter of the particular newspaper by whose editor or editors he shall be certified to be so employed").

This Court should hesitate to upend a system with such a long pedigree, for '[l]ong settled and established practice' may have 'great weight in a proper interpretation of constitutional provisions.'"  *Chiafolo v. Washington*, 591 U.S. 578, 592 (2020) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)); *see also, e.g.*, *Consumer Fin. Prot. Bureau v. Community Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 445 (2024) (Kagan, J., concurring) (looking to "continuing tradition" of "[t]he way our

Government has actually worked, over our entire experience"). And even without this long historical pedigree, the hard pass criteria would satisfy the First Amendment.

>   1. **Under The Hard Pass Policy, The White House Does Not Exercise Unlawful Discretion.**

The central premise of Ateba's lawsuit—that the White House's hard pass criteria "give[] the government unbridled discretion to permit the exercise of First Amendment rights," JA27 ¶ 84—is wrong. The unbridled discretion doctrine recognizes that "a licensing statute placing unbridled discretion *in the hands of a government official or agency* constitutes a prior restraint and may result in censorship," for "the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint," may lead individuals to censor themselves. *City of Lakewood*, 486 U.S. at 757 (emphasis added). But the White House's criteria do not give the White House discretion to deny a hard pass in cases where those criteria are satisfied; whether a journalist is accredited by a press gallery is an objective fact that provides no opportunity for the White House to engage in viewpoint discrimination. Ateba's fear is instead that the journalists who make credentialing

decisions on behalf of the congressional galleries exercise unbridled

discretion, but that does not implicate the principal concerns of the

unbridled discretion doctrine, which is concerned with the possibility of

*government* censorship.  *Id.*

It is entirely ordinary for the federal government to rely on

professional associations outside the Executive Branch to make

credentialing decisions in a variety of contexts, even where those

decisions have a plausible nexus to First Amendment activity.  The

Justice Department, for example, might convene a conference of

attorneys practicing in a particular field, at which attendance would be

limited to attorneys who have demonstrated to their state bar that they

possess "good moral character."  *See, e.g.*, Va. Bd. of Bar Exam'rs,

*Character & Fitness Requirements*, https://perma.cc/LH7W-APRS.  Or

the Food and Drug Administration might host a conference at which

attendance is limited to board-certified oncologists who show "moral

and ethical behavior in the clinical setting."  *See* Am. Bd. of Internal

Med., *Medical Oncology Policies, General Requirements*,

https://perma.cc/48W6-7DVG.  Ateba has identified no authority

suggesting that the possibility that such criteria could have

downstream effects on an individual's First Amendment activity renders them subject to an unbridled discretion challenge.

Indeed, there can be no reasonable dispute that the decisions of private actors can permissibly affect which reporters are able to maintain a hard pass, even in cases where those private actors exercise significant discretion.  For example, the White House criteria require that an applicant be assigned to cover the White House on a regular basis.  *See* JA219.  Accordingly, if a reporter at the New York Times were reassigned by his editor from the White House to some other beat, he would lose eligibility for a hard pass, even if he personally retained an interest in attending White House press briefings and expressing himself in the briefing room.  Yet it cannot seriously be maintained (and Ateba has never suggested) that a publication's unbridled discretion to choose which of its journalists will cover the White House renders unconstitutional the provision limiting hard passes to journalists assigned to cover the White House.

## 2. Under the Congressional Policies, The Galleries Do Not Exercise Unlawful Discretion.

Even assuming that the credentialing criteria applied by the congressional galleries are properly before the Court, Ateba provides no basis for this Court to reject a system that the galleries have consistently administered since 1888.  Indeed, while this Court did not directly pass on the legality of those criteria, its 1975 decision in *Consumers Union of U.S., Inc. v. Periodical Correspondents' Ass'n* described a similar First Amendment challenge as "tenuous," for the criteria were "not so facially violative of constitutional guarantees as to commend reexamination of established principles concerning justiciability."  515 F.2d 1341, 1347-48 (D.C. Cir. 1975).

This Court's skepticism is unsurprising, for the Constitution permits standards that require the exercise of judgment.  Thus, in *Sherill*, this Court held that neither the First nor Fifth Amendment "requires the articulation of detailed criteria upon which the granting or denial of White House press passes is to be based."  569 F.2d at 128.  Instead, it recognized that presidential security "does not lend itself to detailed articulation of narrow and specific standards" and that a lawful

standard could require "exercising expert judgment which frequently must be subjective in nature." *Id.* at 130. *Sherrill* also premised its holding on the fact that the plaintiff was a "bona fide Washington correspondent," necessarily implying that the phrase conveyed adequate meaning. *See id.* at 130.

*Sherrill* sits comfortably within Supreme Court precedent. In *Kovacs v. Cooper*, the Supreme Court rejected with "only a passing reference" the contention that the standard "loud and raucous" was too vague and thus afforded licensors excessive discretion. 336 U.S. 77, 79 (1949) (quotation marks omitted). While these were "abstract words," they had "through daily use acquired a content that conveys to any interested person a sufficiently accurate concept of what is forbidden." *Id.*; *see also Cox v. Louisiana*, 379 U.S. 559, 568-69 (1965) (statute prohibiting demonstrations "near" a courthouse did not leave enforcement officials excessive discretion). This Court has similarly upheld standards requiring health claims to be "adequately substantiated," *Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1213 (D.C. Cir. 2021), and standards premised on a "clear and present

danger to the public health or safety," *Boardley v. U.S. Dep't of the Interior*, 615 F.3d 508, 517 (D.C. Cir. 2010).

The terms "bona fide" and "reputable" fit within this precedent, for they provide "a sufficiently accurate concept" of what is required. *Kovacs*, 336 U.S. at 79. Just like the standard that this Court endorsed in *Sherrill*—"potential source of physical danger to the President"— the standard may require "exercising expert judgment" that may "be subjective in nature." 569 F.2d at 130. But the term provides a meaningful basis for judgment: as the district court explained, the requirement to be a "bona fide" correspondent "of repute" "draws meaning from the rules that follow." JA239; *see* JA220 (reproducing requirements that applicant "must not be engaged in any lobbying or paid advocacy … or in prosecuting any claim before Congress" and that publication must be "editorially independent" of institutions engaged in such lobbying or advocacy). In other words, the requirement "derives meaning from the central tenets of the regulations—that the person is working as a journalist for an established news organization and that the person does not have any conflicts of interest." JA239. Ultimately, "[f]ew licensing schemes would survive constitutional scrutiny if

certainty were a prerequisite," and the fact that standards endow "officials with some measure of discretion" or require a "predictive judgment based on the facts as [the official] knows them" does not render them unconstitutional. *Boardley*, 615 F.3d at 517.

The cases upon which Ateba relies are distinguishable, involving "unbounded" or "unbridled" discretion in permitting and licensing decisions governing expressive activity. Thus, in *City of Lakewood*, there were no standards guiding the mayor's discretion to allow a newsrack; the statute "contain[ed] no explicit limits on the mayor's discretion," and the city asked the court to "presum[e] the mayor will act in good faith and adhere to standards absent from the ordinance's face." 486 U.S. at 769, 770. Similarly, *Forsyth County v. Nationalist Movement* involved an ordinance that had no "'narrowly drawn, reasonable and definite standards' guiding the hand of the Forsyth County administrator" when he set permit fees, and therefore nothing "prevents the official from encouraging some views and discouraging others through the arbitrary application of fees." 505 U.S. 123, 133 (1992) (citation omitted) (quoting *Niemotko v. Maryland*, 340 U.S. 268, 271 (1951)). *Sentinel Communications Co. v. Watts* involved a system

for regulating newspaper vending machines that was "[u]naided (or unhindered) by any regulations, guidelines, procedures, ordinances, or standards." 936 F.2d 1189, 1198 (11th Cir. 1991). *Doe v. Harris* permitted authorities to disclose information about sex offenders whenever it was "necessary to ensure the public safety," with no further criteria governing the exercise of discretion. 772 F.3d 563, 580 (9th Cir. 2014) (quotation omitted). And *Community for Creative Non-Violence v. Turner* held that a requirement that protests occur in a "conversational tone" was unconstitutionally vague because it "provides no standard at all," being premised only on "the tone of the speaker." 893 F.2d 1387, 1395 (D.C. Cir. 1990) (quotation marks omitted).

None of these cases stands for the proposition that "[o]nly explicit textual limitations," Ateba Br. 28 (emphasis omitted), will suffice. And that is unsurprising, for the Supreme Court has expressly indicated that limits on a licensor's discretion may be found in "textual incorporation, binding judicial or administrative construction, or well-established practice." *City of Lakewood*, 486 U.S. at 751; *see also id.* at 770 n.11 (court must "presume any narrowing construction or practice to which the law is 'fairly susceptible'"); *Zukerman*, 961 F.3d at 451

("ordinary meaning … informed by all-important context" can render standards "objective and workable").

Here, well-established practice shows that the congressional criteria are understood and consistently applied to ensure that the applicant is working as a journalist reporting news, rather than an interested party seeking to influence Congress. *See Congressional News Media* 14 (JA139) (noting that "credentialing requirements originated, in part, as a way to ensure legitimate news reporters had access to Members of Congress while preventing lobbyists—who sometimes posed as reporters—from gaining similar access to advance their own agendas"); S. Rep. No. 76-317, at 3 (noting that these rules were developed by the nineteenth-century press corps with the goal of "keeping the galleries for their legitimate uses"); Hinds, *supra*, § 7306, at 1117 (rules were adopted "to remedy an abuse that had been increasing" of claim agents seeking access to the floor); *Consumers Union*, 515 F.2d at 372 (noting that floor access had been "abused with considerable frequency by journalists importuning Members on behalf of various claims before Congress"). That "well-established practice," *City of Lakewood*, 486 U.S. at 770, consistently applied for well over a

century, demonstrates that the criteria have "through daily use acquired a content that conveys to any interested person" what they require, *Kovacs*, 336 U.S. at 79.

In that regard, it bears emphasis that Ateba's primary fear—that the galleries will deploy the "bona fide" and "of repute" standards to exclude their competitors—is entirely unsupported. As Ateba acknowledges, nearly 600 different media outlets are credentialed to cover Congress. Ateba Br. 13 (citing *Congressional News Media* 12 (JA137)). And those outlets are plainly not limited to what he calls the "institutional press"—among the media outlets with credentialed reporters are both universally recognized brands like CNN, NBC News, and the Wall Street Journal and numerous lesser-known outlets with only one or two reporters.[6] *See* Official Congressional Directory, 117th

---

[6] Ateba suggests that "Congress's outsourcing of the gatekeeping function to established journalists has had a dramatic effect on outlet diversity in Congress," causing a significant reduction in the number of credentialed outlets between 1976 and 2016. *See* Ateba Br. 13. Ateba presents no theory for why a credentialing requirement that has been in place since 1888 suddenly started leading to a reduction in credentialed outlets almost a century later. The obvious explanation is instead the modern decades-long decline of local newspapers and the increasing consolidation of the media industry. *See, e.g.*, David Bauder, *Decline in Local News Outlets Is Accelerating Despite Efforts to Help*, Associated

*Continued on next page.*

Cong., *Newspapers Represented in Press Galleries* (2021),

https://perma.cc/8FUQ-AVXG; Official Congressional Directory, 117th

Cong., *Networks, Stations, and Services Represented* (2021),

https://perma.cc/9KSW-BVXW. Ateba provides no reason whatsoever to

doubt this "well-established practice," *City of Lakewood*, 486 U.S. at

770, of the congressional galleries consistently implementing the "bona

fide" and "of repute" requirements in a fair and reasonable manner.

The Seventh Circuit's decision in *MacIver* is particularly

instructive. In that case, two reporters challenged the credentialing

standards imposed by the governor of Wisconsin, which included a

requirement that a reporter be a "bona fide correspondent of repute in

their profession." 994 F.3d at 606. The Seventh Circuit explained that

this requirement is "reasonably related to the viewpoint-neutral goal of

increasing journalistic integrity by favoring media that avoid real or

perceived conflicts of interest or entanglement with special interest

---

Press (Nov. 16, 2023), https://perma.cc/82ZT-XYJX (noting that
approximately 3000 newspapers have closed in the past two decades);
*Congressional News Media* 11 (JA136) (noting that reduction in number
of credentialed outlets "may reflect broader trends in the news industry,
including the consolidation of smaller media outlets into larger
entities").

groups, or those that engage in advocacy or lobbying." *Id.* at 610. The

Court further noted that "[s]imilar standards are also used by other

governmental bodies such as the United States Congress." *Id.* at 610-

11. And the Court placed significant weight on the fact that the

credentialed outlets "include[] media outlets traditionally viewed as

conservative leaning such as the Washington Times, Wall Street

Journal, Fox News, and Washington Examiner, as well as those viewed

as liberal leaning such as the Capitol Times, New York Times, and

Huffington Post." *Id.* at 611. The same analysis applies here.

### 3. The Hard Pass Policy Satisfies Any Timeliness Requirements That Apply.

Ateba further suggests that the congressional credentialing rules

violate the unbridled discretion doctrine because "they do not require

the gallery to process applications within a set time frame." Ateba Br.

33. As set out above, however, the White House does not set or

administer the congressional credentialing rules, and Ateba does not

identify any timing-related deficiency in the White House's policy.

More fundamentally, as the district court explained, it would be

inappropriate to "apply[] the extraordinary procedural protections of

content-based prior restraints to the application … of content-neutral

criteria for press credentialing."  JA241; *see also* JA242 (explaining that Ateba "does not face a prior restraint on the publication of news articles").  The press credentialing scheme does not regulate Ateba's expression at all: it simply concerns one way, but not the only way, that he might enter the White House.  As the district court recognized, Ateba "still has access to the Press Area with his day pass during the credentialing process, such that his speech there is not entirely curtailed while he awaits a decision."  JA242; *see also* JA228 ("If a day pass holder misses a spontaneous briefing, that is because he or she did not apply for a day pass, not because he or she has been excluded from the Press Area.").  Ateba's retention of unimpeded access to the White House Press Area through a day pass while his application for congressional credentials is pending undercuts any claim premised on the lack of explicit textual deadlines.

Beyond that, as the Supreme Court explained in *Thomas v. Chicago Park District*, an ordinance need not "specify a deadline for judicial review of a challenge to a permit denial" where the scheme at issue "is not subject-matter censorship but content-neutral time, place, and manner regulation" and "[n]one of the grounds for denying a permit

has anything to do with what a speaker might say." 534 U.S. 316, 322 (2002); *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 228 (1990) (plurality opinion) ("The core policy underlying *Freedman* [*v. Maryland*, 380 U.S. 51 (1965)] is that the license for a First Amendment-protected business must be issued within a reasonable period of time, *because undue delay results in the unconstitutional suppression of protected speech*." (emphasis added)). The procedural requirements for a timely decision with expedited judicial review therefore do not apply outside the limited context of a "prepublication license deemed a denial of liberty since the time of John Milton," like a "classic censorship scheme." *Thomas*, 534 U.S. at 322-33; *accord Boardley*, 615 F.3d at 518 (noting that "[m]ost circuits have held content-neutral licensing schemes need not contain explicit timeframes for processing permit applications" and citing authority from the Sixth, Ninth, Eleventh, and Federal Circuits); *see also id.* (noting absence of any "post-*Thomas* decision holding that a content-neutral licensing scheme must contain an explicit timeframe for official action in order to withstand constitutional scrutiny").

Ateba's cases hold only that when the government restricts the expression of a limited subset of potential speakers, the licensing scheme must contain time limits. *See, e.g.*, *City of Littleton v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774 (2004) (addressing licensing requirement for adult businesses); *FW/PBS*, 493 U.S. at 226 (1990) (plurality opinion) (in challenge to licensing requirement for sexually oriented businesses, observing that "a licensing scheme creates the possibility that constitutionally protected speech will be suppressed" absent safeguards like time limits); *Adams Outdoor Advert. Ltd. P'ship ex rel. Adams Outdoor GP, LLC v. Pennsylvania Dep't of Transp.*, 930 F.3d 199, 208 & n.2 (3d Cir. 2019) (addressing "prior restraint on speech" on highway billboards); *Encore Videos, Inc. v. City of San Antonio*, 330 F.3d 288, 296 (5th Cir. 2003) (per curiam) (addressing "'licensing scheme' for expression" for adult businesses), *opinion clarified*, 352 F.3d 938 (5th Cir. 2003), *abrogated on other grounds by Reed v. Town of Gilbert*, 576 U.S. 155 (2015); *InfoCision Mgmt. Corp. v. Griswold*, 570 F. Supp. 3d 1051, 1063, 1073 (D. Colo. 2021) (addressing restrictions on charitable solicitations by specific entity, which "qualify as protected speech for First Amendment purposes" (quotation marks omitted)).

Finally, it is no answer to contend that the "bona fide" and "of repute" requirements are not content neutral because they violate the prohibition on unbridled discretion.  *See* Ateba Br. 34-35.  Even if this argument were correct, it would render Ateba's timeliness argument entirely redundant of his broader unbridled discretion argument.

### 4.    Ateba's Arguments Concerning Judicial Review Are Forfeited And Wrong.

Ateba further contends that the congressional credentialing scheme is unconstitutional because it "does not afford applicants a meaningful opportunity for judicial review."  Ateba Br. 38.  That contention fails for three reasons.

First, this argument was not presented in district court, rendering it forfeited on appeal.  *See District of Columbia v. Air Fla., Inc.*, 750 F.2d 1077, 1084 (D.C. Cir. 1984) ("It is well settled that issues and legal theories not asserted at the District Court level ordinarily will not be heard on appeal.").

Second, this argument again relies on cases addressing permitting requirements for expressive activity.  *See, e.g.*, *Thomas*, 534 U.S. at 322 (challenge to "scheme regulating speech in a public forum"); *Boardley*, 615 F.3d at 511 (regulations making it "unlawful to engage in

expressive activities within any of this country's 391 national parks unless a park official first issues a permit authorizing the activity"); *Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression & Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 800 (9th Cir. 2008) (challenge to law restricting expressive activity in public forum); *Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248 (10th Cir. 2004) (same); *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 178 (2d Cir. 2006) (same); *Diener v. Reed*, 77 F. App'x 601, 607-08 (3d Cir. 2003) (same).  Ateba does not cite a case in which these requirements have been applied in the press credentialing context, or any similar context.

Third, for the reasons set out above, the congressional credentialing criteria do "contain adequate standards to guide the official's decision and render it subject to effective judicial review," *Boardley*, 615 F.3d at 517 (quotation marks omitted).  While Ateba cites *Consumers Union* for the proposition that such review would be unavailable as a matter of fact because he cannot sue the galleries under the Speech and Debate Clause, *Consumers Union*'s holding was limited to circumstances in which the journalist did not allege "bad

51

faith or illegal conduct." 515 F.2d at 1348. It does not address the

extent to which judicial review would be available in other

circumstances. Nor, of course, does it address whether an as-applied

lawsuit might be available if Ateba were denied a hard pass on the

basis of a discriminatory denial of credentials by the congressional

galleries.[7]

## B. The White House's Eligibility Criteria Are Reasonable.

The district court also properly rejected Ateba's contention that

the White House's eligibility criteria are constitutionally unreasonable.

As it explained, the "White House has long relied on credentialing by

_____

[7] Ateba also cites a district court decision, *Conteers LLC v. City of Akron,* No. 5:20-CV-00542, 2020 WL 5529656, at *11 (N.D. Ohio Sept. 15, 2020), for the proposition that an ordinance must explicitly mandate the issuance of a permit where the relevant criteria are satisfied. *See* Ateba Br. 27. That argument was also not presented in district court. In any case, *Conteers*—yet another case addressing restrictions on expression—cites no authority for its belief that a licensing scheme must explicitly mandate the issuance of a permit, which stands in tension with *Thomas*'s warning against "insisting upon a degree of rigidity that is found in few legal arrangements." 534 U.S. at 325. Instead, to the extent that Ateba believes that individuals satisfying the credentialing criteria are nevertheless being denied credentials, "this abuse must be dealt with if and when a pattern of unlawful favoritism appears." *Id.*

the congressional press galleries as a prerequisite to obtaining a press credential," JA238 (noting that similar requirements date to at least 1975), and this Court has "never questioned the requirement of press credentialing or the substance of the standards." JA238. The district court further correctly determined that "reliance on a professional credentialing body also tends to reduce the risk Ateba apparently fears most—that the White House will discriminate against journalists based on their relationship with the White House." JA240.

Ateba contends that the White House's policy is constitutionally unreasonable because it requires him to demonstrate a need to cover Congress or the Supreme Court. *See generally* Ateba Br. 41-43. Ateba does not dispute, however, the district court's understanding that the congressional galleries routinely credential journalists who principally or exclusively cover the White House. *See* JA241 n.8 ("From the White House's long history of requiring such credentials as a prerequisite to obtaining a hard pass, the Court infers that such credentials can be obtained even by journalists who focus their attention on covering the White House."). And Ateba has good reason for not challenging that inference: it is plainly correct, which is how there is a corps of White

House reporters with hard passes.[8]  Nor is that surprising, for the

galleries' functions are not limited to credentialing reporters to cover

Congress.  *See Congressional News Media* 1-2 (JA126-27) ("In addition

to [their] regular responsibilities, the House and Senate press galleries

take on additional roles during presidential elections, overseeing

arrangements and credentialing for daily press at the national political

conventions and presidential inaugurations.").  There is simply no

reason to believe that Ateba's desire to cover the White House would

preclude him from being credentialed by the congressional galleries.[9]

---

[8] Every journalist serving as an officer of the White House Correspondents Association, for example, has been accredited by Congress.  *Compare* White House Correspondents Ass'n, *WHCA Officers and Board*, https://perma.cc/ZE2N-L44K, *with* Official Congressional Directory, 117th Cong., *Press Galleries* (2022), https://perma.cc/8N34-5GRG; Official Congressional Directory, 117th Cong., *Press Photographers' Gallery* (2022), https://perma.cc/QWV3-763G; Official Congressional Directory, 117th Cong., *Radio & Television Correspondents Galleries* (2022), https://perma.cc/4DCC-4SNZ; and Official Congressional Directory, 117th Cong., *Periodical Press Galleries* (2022), https://perma.cc/7UK4-9U7T.

[9] It is also a judicially noticeable fact that Ateba also covers Congress.  *See, e.g.*, Simon Ateba, *Republican Congressman Matt Gaetz Demands Oversight of U.S. Military Withdrawal from Chad*, Today News Afr. (May 17, 2024), https://perma.cc/ASR6-2YLK; Simon Ateba, *U.S. Congressman Matt Gaetz Exposes Biden Admin Cover-Up in Damning Report on U.S. Troop Endangerment and Diplomatic Crisis in Niger*, Today News Afr. (May 6, 2024), https://perma.cc/NJ8S-P2M7;

*Continued on next page.*

As the district court recognized, "[i]f the White House had its own press gallery but required journalists to seek a credential from the gallery of another branch of government, the reasonableness of the requirement might be more significantly undermined." JA241. Yet that is not the case, because for decades the White House has relied on the congressional galleries to perform this function. It is not irrational for the White House to rely on an outside body of reporters to assess the credentials of reporters seeking expedited access to the White House Press Area. As the district court recognized, "[a] regulation can be reasonable without being 'the most reasonable or the only reasonable limitation.'" JA241 (quoting *Cornelius*, 473 U.S. at 808); *see also Cornelius*, 473 U.S. at 809 (rejecting requirement that "the restriction be narrowly tailored or that the Government's interest be compelling"); *Price*, 45 F.4th at 1072 (reasonableness "may be established by evidence in the record or even by a commonsense inference").

---

Simon Ateba, *U.S.-Trained Soldiers Behind Recent African Coups: American Congressman Matt Gaetz Demands Accountability*, Today News Afr. (Aug. 31, 2023), https://perma.cc/WK7X-RFP8.

Finally, Ateba suggests that the hard pass policy is unreasonable because of the possibility that journalists may "limit their competition's access to government property open to the press." Ateba Br. 44. Ateba does not identify a case holding that an otherwise lawful credentialing policy is unreasonable under the First Amendment because of that possibility. Nor does he present any evidence that the galleries have ever used their credentialing authority in this fashion; as his own brief recognizes, "correspondents from the *New York Times*, *Washington Post*, *CNN*, and *ABC News* sit shoulder to shoulder with correspondents from publications with a mere fraction of the viewership and subscriber base of these larger outlets." Ateba Br. 5. There is simply no indication whatsoever that press galleries have abused their credentialing authority in the manner that Ateba fears. There is thus no justification for this Court to upend a credentialing system that has existed for decades.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*

JOSHUA M. SALZMAN
  */s/ Steven A. Myers*
STEVEN A. MYERS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7232*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-8648*
  *steven.a.myers@usdoj.gov*

JUNE 2024

57

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,051 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Steven A. Myers*
Steven A. Myers