# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 15, 2024 Decided April 8, 2025

No. 24-5004


SIMON ATEBA,
APPELLANT

v.

KAROLINE C. LEAVITT, IN HER OFFICIAL CAPACITY AS PRESS SECRETARY TO THE PRESIDENT OF THE UNITED STATES, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:23-cv-02321)

*Josh Dixon* argued the cause for appellant. With him on the briefs were *Harmeet Dhillon*, *Jesse Franklin-Murdock*, and *Eric Sell*.

*Steven A. Myers*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Joshua M. Salzman*, Attorney.

Before: WILKINS and PAN, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PAN.

PAN, *Circuit Judge*: Simon Ateba is a journalist who seeks preferred access to the White House Press Area with a special press credential known as a "hard pass." The White House issues hard passes only to reporters who are accredited by either the Supreme Court Press Gallery or a congressional press gallery. That policy ensures that holders of hard passes are bona fide journalists. The White House relies on the press galleries of the Supreme Court and Congress to make that determination because it has not established its own committee to review the qualifications of journalists.

Ateba applied for membership in the Senate Daily Press Gallery as a prerequisite to securing a hard pass. That application is still under consideration. In the meantime, he has accessed the Press Area with a daily pass that requires him to wait for an escort to take him there. Ateba argues that the White House Hard Pass Policy violates the First Amendment because it burdens his access to the Press Area and conditions fuller access on his accreditation by the Senate Daily Press Gallery, which exercises unbridled discretion in determining whom to certify and sets no deadline for adjudicating applications. Because the Hard Pass Policy is both reasonable and viewpoint neutral, we reject Ateba's First Amendment challenge.[1]

---

[1] Ateba filed this appeal challenging the Hard Pass Policy on January 4, 2024. Due to the change in administrations on January 20, 2025, the court ordered the parties to file supplemental briefs regarding the status of the challenged Hard Pass Policy and whether this appeal has become moot. Ateba's supplemental brief states that he still has not received a hard pass. The government's supplemental brief states that the case is not moot because the White House has not "formally rescind[ed]" the requirement that "condition[s] eligibility

# I.

## A.

The White House is the official residence of the President of the United States. *See* 3 U.S.C. § 102; *The White House Building*, https://perma.cc/FKC8-QA2S. It includes the President's private living quarters as well as government office space. *See Ateba v. Jean-Pierre*, 706 F. Supp. 3d 63, 69 (D.D.C. 2023). The White House Press Area consists of the briefing room, the press offices, and certain other locations in and around the White House that are open to correspondents. The Press Area is where journalists attend press briefings, interview White House officials, and report on the day-to-day activities of the administration.

The White House issues two types of passes that give journalists access to the Press Area. A "hard pass" allows its bearer to use an expedited security line and to enter the Press Area without an escort. Reporters who do not have hard passes may use a "day pass," which requires reporters to "resubmit [a] form for every day they plan to access the Press Area." *Ateba*, 706 F. Supp. 3d at 70. Day-pass holders must wait for an escort to take them from the White House gate to the Press Area, which may take up to 45 minutes. Both types of pass holders have the same privileges once they are inside the Press Area.

In May 2023, the White House announced that all hard passes would expire by the end of July 2023, and that correspondents seeking new hard passes would have to reapply

---

for a White House hard pass on accreditation by the congressional and Supreme Court galleries." Gov't Suppl. Br. 3. In light of the parties' representations, we conclude that this case is not moot and review the judgment of the district court based on the record before us.

under the terms of a revamped Hard Pass Policy. The White House explained that it had revised its policy to "be consistent with . . . prior administrations." *Ateba*, 706 F. Supp. 3d at 71. The White House also noted that the new policy would reduce the number of passes in circulation, which would address administrability issues and security risks.

The Hard Pass Policy requires "[a]ccreditation by a press gallery in either the Supreme Court, U.S. Senate or U.S. House of Representatives." *Ateba*, 706 F. Supp. 3d at 71. Except for two years, the White House has preconditioned hard passes on a journalist's certification by an outside body for over forty years. *See Sherrill v. Knight*, 569 F.2d 124, 129 n.19 (D.C. Cir. 1977). A key purpose of the accreditation requirement is to ensure that hard-pass holders are bona fide journalists. *See, e.g.*, *id.* (noting that "the applicant is required to have a pass to the House and Senate galleries because this verifies the 'professional credentials' of the applicant"). The Hard Pass Policy also requires applicants to be employed by a news organization; to have a physical address, whether residential or professional, in the greater Washington, D.C., area; to be assigned to cover the White House on a regular basis; to have accessed the White House at least once during the previous six months for work or to have proof of employment within the last three months to cover the White House; and to submit to an investigation by the Secret Service, if necessary.

After the Hard Pass Policy went into effect, around 500 journalists lost their hard passes, including Simon Ateba. Ateba is the White House correspondent for *Today News Africa*, "a daily online news publication covering American politics and relations between the United States and African countries." *Ateba*, 706 F. Supp. 3d at 70. He held a hard pass from February 2021 through July 2023. Before that, he used day passes to enter the Press Area for three years, from 2018 to

2021. After Ateba's hard pass expired due to the implementation of the Hard Pass Policy, he went back to accessing the Press Area with day passes. The record reflects that he has never been denied a day pass when he sought one.[2]

In pursuit of a new hard pass, Ateba applied to the Senate Daily Press Gallery for a press credential in June 2023. The congressional press galleries are administered by a Standing Committee of Correspondents, which has five members that are elected by accredited members of the galleries. The Standing Committee includes reporters from Fox News, *The Washington Post*, *The New York Times*, and *The Wall Street Journal*. According to the Governing Rules of the Senate Daily Press Gallery, "[p]ersons desiring admission to the press galleries of Congress shall make application in accordance with" House and Senate rules that are "interpreted and administered by the Standing Committee" "subject to the review and an approval by the Senate Committee on Rules and Administration." J.A. 147. The Governing Rules further provide that the Standing Committee "shall limit membership in the press galleries to bona fide correspondents of repute in their profession, under such rules as the Standing Committee of Correspondents shall prescribe." J.A. 147.[3] In addition,

---

[2] Ateba asserts in his supplemental brief that the Trump Administration has denied him day passes. But that change in circumstances is not in the record on appeal and we therefore may not consider it. *See, e.g.*, *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 518 n.22 (1981).

[3] A requirement that journalists be "of repute" has been in effect since 1888 and has origins from before then. *See* Off. Cong. Directory, 50th Cong. 160 (2d ed. 1888) [https://perma.cc/BH46-VRA4] (applications for accreditation "shall be authenticated in a manner that shall be satisfactory to the Standing Committee of Correspondents, who shall see that the occupation of the gallery is

under the Governing Rules, a member of the press galleries must be a "full-time, paid correspondent" of a "news organization"; "must reside in the Washington, D.C. area"; and "must not be engaged in any lobbying or paid advocacy, advertising, publicity or promotion work." J.A. 24–25, 148. The Rules do not include a deadline by which the Standing Committee must adjudicate a membership application.

**B.**

With his application to become a member of the Senate Daily Press Gallery still pending, Ateba filed suit against the White House Press Secretary in the district court. As relevant here, Ateba brought a facial First Amendment challenge to the Hard Pass Policy.[4] He asserted that the Hard Pass Policy is unreasonable because it confers unbridled discretion on the press galleries of the Supreme Court and Congress to determine who should receive preferred access to the White House Press Area.[5] He further claimed that it was unreasonable for the

---

confined to bona-fide correspondents of reputable standing in their business").

[4] Ateba also argued that the Hard Pass Policy was unconstitutional as applied to him, and that the Secret Service's cancellation of his hard pass violated the Administrative Procedure Act. Ateba does not renew those claims on appeal.

[5] Although Ateba raises a facial challenge to the Hard Pass Policy, it is permissible for him to focus on his application for membership in the Senate Daily Press Gallery to support his argument that the Policy confers unbridled discretion on external credentialing bodies. In a typical facial attack, plaintiffs need to establish "that no set of circumstances exists under which [the challenged law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). But in the context of a rule that "delegates overly broad discretion to the decisionmaker," plaintiffs may facially

White House to require him to be accredited by another branch of government before applying for a hard pass, and complained that the press galleries imposed no timeframe or deadlines for processing his membership application.

The district court granted the White House's motion for summary judgment. The district court concluded that Ateba had suffered a cognizable First Amendment injury because entering the Press Area with a day pass was more burdensome than with a hard pass. It decided, however, that the White House acted reasonably under the First Amendment when it outsourced part of its press-credentialing process. The district court also ruled that the Senate Daily Press Gallery did not impermissibly exercise discretion in deciding who could become a member of the gallery; and that extraordinary procedural protections — such as requiring deadlines for adjudicating membership applications — were not constitutionally required.

Ateba filed a timely appeal. We have jurisdiction under 28 U.S.C. § 1291.

---

challenge the rule even though some applications of the rule "may be constitutionally unobjectionable," because "every application creates an impermissible risk of suppression of ideas." *See Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 129, 133 (1992). Thus, Ateba may bring a facial challenge based on his contention that the Hard Pass Policy creates a risk of suppression of ideas by allowing outside credentialing bodies to exercise unbridled discretion to determine who may access the Press Area; and he may support that argument with evidence that the Senate Daily Press Gallery exercises unbridled discretion in its rules of admission.

**II.**

The First Amendment limits the restrictions that the government may impose on speech, including speech on government property. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985). Ateba asserts that the Hard Pass Policy violates his First Amendment rights because it burdens his access to the White House Press Area, which is government property where speech occurs. He argues that the Hard Pass Policy is unreasonable because it requires him to seek a press credential from another branch of the government that he does not want to cover, and allows an outside credentialing body, such as the Senate Daily Press Gallery, to exercise unbridled discretion in abridging his speech. To support his argument that the Senate Daily Press Gallery exercises such unbridled discretion, he points to: (1) the gallery's governing rule that limits membership to "bona fide correspondents of repute in their profession," J.A. 147; and (2) the gallery's failure to impose any deadline for its processing of membership applications. We find his arguments unpersuasive.[6]

[6] Ateba also argues that the credentialing process of the Senate Daily Press Gallery violates the unbridled discretion doctrine because the Gallery's membership decisions are not subject to judicial review. He asserts that the Gallery should be required to provide written reasons for the denial of a membership application and complains that the Speech and Debate Clause precludes judicial review. But Ateba failed to adequately preserve those claims for appeal. Before the district court, he suggested only that the White House outsourced credentialing in an "attempt . . . to immunize its credentialing scheme from suit," and claimed that the Hard Pass Policy was "arbitrary and unreasonable" for requiring an outside press credential. *See* Pl's Combined Mem. Supp. Summ. J. & Opposing Def's Mot. Summ. J. 16, ECF No. 23; J.A. 156–57

**A.**

As an initial matter, the government argues that Ateba's asserted constitutional harm is *de minimis* and therefore not cognizable. Relying on out-of-circuit cases, the government argues that withdrawing preferential access to government property or providing less access for some reporters to cover government officials does not implicate the First Amendment. *See ACLU of Md., Inc. v. Wicomico Cnty.*, 999 F.2d 780, 786 & n.6 (4th Cir. 1993); *Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 416, 418 (4th Cir. 2006). But the cases cited by the government do not address facial First Amendment challenges to a regulatory scheme, and instead consider claims of retaliation for protected activity. Although the Fourth Circuit did characterize the harms at issue in each case as "*de minimis*," it held that the government's actions were insufficient to constitute retaliation, and did not speak to what might constitute a cognizable injury in the different context of a facial First Amendment challenge. *See ACLU of Md.*, 999 F.2d at 786 n.6 ("We merely find that these § 1983 plaintiffs suffered no more than a *de minimis* inconvenience and that, on the facts of this case, such inconvenience does not constitute cognizable retaliation under the First Amendment."); *Balt. Sun*, 437 F.3d at 416 ("A plaintiff seeking to recover for retaliation must show that the defendant's conduct resulted in something more than a

---

(reiterating same claim at oral argument). That conclusory argument was insufficient to put the district court on notice that he was invoking the unbridled discretion doctrine to challenge the lack of judicial review, in specific reliance on the Gallery's failure to provide written decisions and the barrier posed by the Speech and Debate Clause. *See United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1195 (D.C. Cir. 2005) ("litigant does not properly raise an issue by addressing it in a cursory fashion, with only bare-bones arguments"); *United States v. Miller*, 799 F.3d 1097, 1108 (D.C. Cir. 2015).

*de minimis* inconvenience to her exercise of First Amendment rights." (cleaned up)). It appears, then, that the government's theory is not well-supported by the cited precedents.

Nevertheless, the record does reflect that Ateba has maintained access to the Press Area by using day passes. A hard pass merely offers convenience, allowing him to enter more quickly and without an escort, and relieving him of the obligation to apply for day passes. The lesser burden on Ateba distinguishes this case from our other cases involving the White House Press Area, which considered only the *denial* of access to that space. *See Sherrill*, 569 F.2d at 130 (concerning the denial of a hard pass for security reasons that resulted in "exclusion . . . from White House press facilities"); *Karem v. Trump*, 960 F.3d 656, 665 (D.C. Cir. 2020) (concerning a "month-long loss of . . . White House access"). Furthermore, the inconvenience of not having a hard pass that assures preferential access differs significantly from the burden imposed by licensing schemes that preclude some speakers from using a forum altogether. *See, e.g.*, *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 769–70 (1988) (concerning the grant of licenses to place newsracks on government property).

Although the government's argument has some force, we need not resolve whether Ateba states a cognizable injury under the First Amendment. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 346 (1936) (Brandeis, J., concurring) ("The Court will not 'anticipate a question of constitutional law in advance of the necessity of deciding it.'" (quoting *Liverpool, N.Y. & Phila. S.S. Co. v. Emigration Comm'rs*, 113 U.S. 33, 39 (1885)). Even assuming that the lack of a hard pass is a First

Amendment harm, the burdens imposed by the Hard Pass Policy are not unconstitutional.[7]

**B.**

"[T]o evaluate government restrictions on purely private speech that occurs on government property," we first consider the level of First Amendment scrutiny that should be applied. *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015). The level of scrutiny depends on the type of forum for speech that has been created by the government. *See Boardley v. Dep't of the Interior*, 615 F.3d 508, 514 (D.C. Cir. 2010). "As a general principle, 'the extent to which the Government can control access [to a forum it owns or controls] depends on the nature of the relevant forum.'" *Bryant v. Gates*, 532 F.3d 888, 894 (D.C. Cir. 2008) (quoting *Cornelius,* 473 U.S. at 800) (alteration in original).

Here, the parties dispute whether the Press Area is a "nonpublic forum" or a "limited public forum." In particular, the government contends that the Press Area is "at most, a nonpublic forum where the rule against unbridled discretion does not apply." Gov't Br. 22, 26. The government asserts that it has "'far more leeway to regulate speech'" in a nonpublic forum, *id.* at 26 (quoting *Price v. Garland*, 45 F.4th 1059, 1068 (D.C. Cir. 2022)); and that "'[a]ll of the modern cases in which the Supreme Court has set forth the unbridled discretion doctrine have involved public fora,'" *id.* at 28 (quoting *Griffin v. Sec'y of Veterans Affs.,* 288 F.3d 1309, 1321 (Fed. Cir. 2002)). We agree with the government that the Press Area is a

---

[7] Because we assume that Ateba has asserted a First Amendment injury, we do not consider the government's argument that Ateba's claims implicate only a "noncommunicative, preparatory step in the production of speech" and therefore enjoy no First Amendment protections. Gov't Br. 21–22, 31.

nonpublic forum, but we disagree with its claim that the unbridled discretion doctrine is categorically inapplicable there, *see infra* Part D.

A nonpublic forum is government property "that is not by tradition or designation a forum for public communication," such as a government office building. *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)). Although the government is not required to open such spaces for any speech at all, the government creates a "nonpublic forum" when it provides "'selective access for individual speakers.'" *Bryant*, 532 F.3d at 895 (quoting *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998)). For example, in *Cornelius*, the Supreme Court held that the government's Combined Federal Campaign charity drive was a nonpublic forum, because the government limited inclusion on the list of approved charities to "appropriate" organizations that had to seek permission to participate. 473 U.S. at 804. Similarly, we have held that United States Capitol buildings are nonpublic forums, even though members of the public regularly enter for the purpose of expressive activity, because entry is still "strictly regulated" and the communications are "scheduled and controlled." *United States v. Nassif*, 97 F.4th 968, 976–77 (D.C. Cir. 2024) (cleaned up).

By contrast, a "limited public forum" is government property that is made available for "use by certain groups or dedicated solely to the discussion of certain subjects." *Price*, 45 F.4th at 1068 (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009)). Such a forum is generally open to the designated groups or for the designated purpose of discussing particular topics. *See Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of L. v. Martinez*, 561 U.S. 661, 681 (2010) ("a defining characteristic" of limited public

forums" is the government's authority to "reserve them for certain groups" (cleaned up)); *Perry*, 460 U.S. at 47–48 (noting that a limited public forum would be open only to groups of "similar character"). For example, a student activity fund at the University of Virginia that purported to provide funds for all extracurricular activities that were "related to the educational purpose of the University" was deemed a limited public forum. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 823–26 (1995) (cleaned up).

We conclude that the White House Press Area is a nonpublic forum. To the extent the White House is generally open to the public — for tours, for example — the restrictions on entry are similar to those imposed at the U.S. Capitol, which is a nonpublic forum. *See Nassif*, 97 F.4th at 977 (noting restricted hours and mandatory security screening of persons and items entering the Capitol buildings). The Press Area has its own set of restrictions. The purpose of the Press Area is to provide "press facilities for correspondents who need to report therefrom," *Sherrill*, 569 F.2d at 129, thereby enabling select journalists to attend briefings by the Press Secretary and to gather information about the administration. Access to the Press Area is limited to journalists who satisfy the White House's admission criteria and secure either a hard pass or a day pass to enter, subject to space availability. In *Sherrill*, we acknowledged that entry to the Press Area may be selectively granted, noting that the government is entitled to "exercis[e] expert judgment" that may "be subjective in nature" when deciding who may be barred from the Press Area for security reasons. *Id.* at 130. Although *Sherrill* predated modern forum analysis, its description of the Press Area fits the definition of a nonpublic First Amendment forum. Because the White House "strictly regulate[s]" entry to the Press Area, and briefings by the Press Secretary are "scheduled and

controlled," the Press Area is a nonpublic forum. *See Nassif*, 97 F.4th at 976–77 (cleaned up).

Ateba attempts to characterize the Press Area as a limited public forum by arguing that it is open to a class of journalists — *i.e.*, all reporters who cover the White House. But his argument fails to address the limits that the White House imposes on who may be admitted to the Press Area. Because the Press Area is not generally open to a class of speakers (*i.e.*, *all* White House correspondents), we have no trouble concluding that it is a nonpublic forum.

**C.**

As a nonpublic forum, access to the White House Press Area "can be restricted as long as the restrictions are" viewpoint neutral and reasonable. *Cornelius*, 473 U.S. at 800. The purpose of the forum is central to this analysis, because the government may "reserve the [nonpublic] forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46. "Control over access to a nonpublic forum can be based" even "on subject matter and speaker identity so long as" it meets the requirements of reasonableness and viewpoint neutrality. *Cornelius*, 473 U.S. at 806.

The restrictions imposed by the Hard Pass Policy easily pass constitutional muster. First, the Hard Pass Policy is reasonable. To meet that requirement, a restriction "need not be the most reasonable or the only reasonable" restriction. *Cornelius*, 473 U.S. at 808. "[R]easonableness may be established by evidence in the record or even by a commonsense inference." *Price*, 45 F.4th at 1072 (cleaned up).

The Supreme Court gives the government substantial leeway to regulate access to a nonpublic forum and has upheld a range of restrictions that were justified in light of the forum's purpose. *See, e.g.*, *Forbes*, 523 U.S. at 682 (reasonable for a public television broadcaster to exclude an independent political candidate from a candidate debate because he had "generated no appreciable public interest"); *Cornelius*, 473 U.S. at 808–09 (reasonable to exclude certain legal defense and political advocacy organizations from the Combined Federal Campaign charity drive because donations to other charity causes were "more beneficial" and better served the purpose of the charity drive).

Here, the White House has opted to issue hard passes only to reporters who are accredited by either the Supreme Court Press Gallery or a congressional press gallery. That policy allows the White House to rely on the credentialing decisions of established press galleries, which have formed committees of journalists that evaluate the qualifications of reporters who seek to enter nonpublic areas to cover the work of the government. The White House does not have a press gallery and has no comparable vetting system in place. It is surely reasonable for the White House to open the Press Area only to bona fide journalists and to revert to its long-established practice of using press-gallery membership as a measure of a reporter's professional standing. Although Ateba objects to being evaluated by fellow journalists whom he claims are his "competitors," Ateba Br. 18, it is reasonable to allow established members of the profession to make the credentialing decision. Moreover, the White House's stated reasons for reimposing the accreditation requirement were reasonable — *i.e.*, to conform with the policies of previous administrations, and to implement a stricter set of guidelines that would reduce the security risks and administrative burdens associated with a high number of hard passes. We have no

basis to question such discretionary policies that reasonably limit access to a nonpublic forum, consistent with its purpose.[8]

Second, the Hard Pass Policy is viewpoint neutral. Viewpoint discrimination is an "egregious form of content discrimination," which occurs when a government regulation "targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. at 829. The Hard Pass Policy does not reference viewpoints in any way, and Ateba does not allege that either the White House or the Senate Daily Press Gallery denies press credentials based on the content of a correspondent's reporting.

Ateba generally argues that the Hard Pass Policy is "*per se* viewpoint discriminatory" because it "fail[s] to impose meaningful guardrails against viewpoint discrimination." Ateba Reply Br. 7–8. Although other circuits have concluded that the exercise of unbridled discretion to limit speech is *per se* viewpoint discrimination, we have not joined them. *See, e.g.*, *Kaahumanu v. Hawaii*, 682 F.3d 789, 806 (9th Cir. 2012);

---

[8] This case is distinghishable from our precedents in *Sherrill* and *Karem*, which held that the White House violates due process when it denies or suspends a journalist's hard pass without providing adequate procedures to challenge the denial or prior notice about the grounds for the suspension. *See Sherrill*, 569 F.2d at 128, 130 (requiring White House to provide notice, opportunity to rebut, and a written decision when denying a journalist's hard pass application, and to publish or make publicly known the standard it employs for determining whether a journalist will obtain a press pass); *Karem*, 960 F.3d at 667 (before "punishing" a journalist for misbehavior by suspending his hard pass for thirty days, White House was required to provide fair notice of the "magnitude of the sanction that might be imposed" for misbehavior (cleaned up)). Ateba does not raise a due process claim and we therefore address only the reasonableness of the Hard Pass Policy under the First Amendment.

*Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Schs.*, 457 F.3d 376, 384 (4th Cir. 2006); *Polaris Amphitheater Concerts, Inc. v. City of Westerville*, 267 F.3d 503, 508–09 (6th Cir. 2001). Instead, we have held that a violation of the unbridled discretion doctrine is generally unreasonable under the First Amendment. *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.* (*AFDI*), 901 F.3d 356, 372 (D.C. Cir. 2018). We therefore consider Ateba's unbridled-discretion argument within the framework of reasonableness.

**D.**

Ateba's primary argument is that the Hard Pass Policy violates the First Amendment because it delegates credentialing to the press galleries of the Supreme Court and Congress, and those galleries can arbitrarily limit press activity. Specifically, Ateba argues that the Senate Daily Press Gallery has "unbridled discretion" to grant press credentials only to those it considers "bona fide correspondents of repute." J.A. 147. Ateba asserts that the "of repute" requirement is unduly broad and essentially standardless. And the Hard Pass Policy is unconstitutional, he claims, because it relies on the gallery's arbitrary credentialing decisions.

In the context of a licensing or permitting scheme that controls access to a public forum, we have held that a restriction is "not reasonable" under the First Amendment if "it provides [the decisionmaker] with unbridled discretion" to suppress expression — that is, when the rule "is so broad as to provide . . . no meaningful constraint upon [the government's] exercise of the power to squelch [speech]." *AFDI*, 901 F.3d at 363, 372; *see also Lakewood*, 486 U.S. at 755; *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 133 (1992). By contrast, a rule that "is capable of reasoned application . . . does not

confer unbridled discretion upon" the government. *AFDI*, 901 F.3d at 372. As we noted in *Boardley*, "[i]t is not fatal to . . . regulations that they endow [] officials with some measure of discretion." 615 F.3d at 517. Rather, regulations must be "reasonably specific and objective, and . . . not leave the decision 'to the whim of the administrator.'" *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 324 (2002) (quoting *Forsyth Cnty.*, 505 U.S. at 133)).

The government argues that we need not entertain Ateba's unbridled discretion claim because the White House Press Area is a *nonpublic* forum, and the Supreme Court has applied the unbridled discretion doctrine to protect expression only in *public* forums. But just because cases like *Lakewood* and *Forsyth County* considered local ordinances that affected speech in public forums does not mean that their reasoning has no traction in a nonpublic forum. Although the government certainly has more discretion to impose restrictions in a nonpublic forum, such restrictions still must be reasonable in light of the forum's purpose, *see supra* Part C. And we have held that the exercise of unbridled discretion to deny access to a nonpublic forum is unreasonable. *See AFDI*, 901 F.3d at 364, 372. Here, Ateba argues that a credentialing body has wielded unchecked power to restrict a journalist's entry to the White House Press Area. We cannot agree with the government that he has no First Amendment claim merely because the Press Area is a nonpublic forum.

Turning to the merits, we consider Ateba's contention that the "of repute" standard injects unbridled discretion into the credentialing process because it allows the Standing Committee to make arbitrary and unconstrained membership decisions that ultimately restrict his access to the White House Press Area. We are unpersuaded. Ateba's argument mischaracterizes the "of repute" standard by isolating it and

divorcing it from the other criteria that the Standing Committee applies to grant membership in the Senate Daily Press Gallery. The rule plainly states, in relevant part, that membership is reserved for "bona fide correspondents of repute in their profession, *under such rules as the Standing Committee of Correspondents shall prescribe*." J.A. 147 (emphasis added). Under the provision's own terms, the evaluation of a journalist's "reputation" must be informed by the other rules prescribed by the Standing Committee. The Governing Rules mandate, *inter alia*, that credentialed correspondents work full-time for a news organization, reside in the Washington, D.C., area, and not engage in lobbying. When evaluating whether a rule confers unbridled discretion on a government decisionmaker, we must "presume any narrowing construction or practice to which [the regulation] is fairly susceptible." *Lakewood*, 486 U.S. at 770 n.11 (cleaned up). The Standing Committee's Governing Rules provide such a "narrowing construction" and make the "of repute" criterion capable of "reasoned application." *AFDI*, 901 F.3d at 372.

Properly read, the Senate Daily Press Gallery's membership requirements are readily distinguishable from the standardless rules that have been held to confer too much discretion on decisionmakers. In *Lakewood*, for example, the city ordinance at issue "contain[ed] no explicit limits on the mayor's discretion [to grant permits for newspaper racks]," and he was required to do nothing more than say that "it is not in the public interest" when denying a permit. 486 U.S. at 769. There was no "textual incorporation, binding judicial or administrative construction, or well-established practice" that limited the mayor's choices in any way. *Id.* at 770. Similarly, in *Forsyth County*, the Supreme Court held that a county ordinance that allowed an administrator to set a permit fee for "any activity on public property," based only on "his own judgment of what would be reasonable," violated the unbridled

discretion doctrine. 505 U.S. at 131–32. Again, there were "no articulated standards either in the ordinance or in the county's established practice" that limited the administrator's power to charge fees. *Id.* at 133.

In contrast to the regulations at issue in *Lakewood* and *Forsyth County*, the Senate Daily Press Gallery's Governing Rules provide concrete guidelines that cabin the Standing Committee's discretion when it applies the "of repute" standard. Ateba takes the "of repute" requirement out of context and ignores that it is subject to "such rules as the Standing Committee shall prescribe." The cross-referenced Governing Rules provide "standards" that "guid[e] the hand of the . . . administrator." *Forsyth Cnty.*, 505 U.S. at 133. The Standing Committee therefore does not exercise "unbridled discretion" in making press-gallery membership decisions.

**E.**

Ateba also asserts that the First Amendment requires the Senate Daily Press Gallery to set timelines for processing press-credentialing applications so that he and other applicants may more promptly obtain a hard pass. He claims that any credentialing scheme that allows a decisionmaker unlimited time to process applications violates the unbridled discretion doctrine because it allows the decisionmaker to indefinitely "censor" the applicants. Ateba Br. 33. That theory fails, however, because the processing delays at the Senate Daily Press Gallery do not "censor" Ateba — the record shows that he is still able to enter the White House Press Area with a day pass while he awaits the adjudication of his press-gallery application. Thus, even if Ateba's access to the Press Area is burdened, he has not established that any delay in procuring accreditation by the Gallery renders the Hard Pass Policy

constitutionally unreasonable because the Policy still allows him to access the First Amendment forum.

In any event, neither the Supreme Court nor this court has ever held that processing deadlines are constitutionally required in the context of a content-neutral licensing scheme. In *Boardley*, the appellant claimed that park officials exercised "overly broad discretion" in granting or denying permits to distribute printed matter in national parks because the officials were not required to process the permits within a "specific time period." 615 F.3d at 518. We rejected that argument, noting that "[m]ost circuits have held content-neutral licensing schemes need not contain explicit timeframes for processing permit applications"; and that the Supreme Court has imposed "extraordinary procedural safeguards" — like processing deadlines — only on "content-based schemes." *Id.* (citing *Freedman v. Maryland*, 380 U.S. 51, 59 (1965), and *Thomas*, 534 U.S. at 322–23). Indeed, the Court in *Thomas* expressly noted that lesser procedural protections are sufficient where content-based censorship is not an issue, and the government merely exercises "traditional" authority to "ensure the safety and convenience of the people," as a means of "safeguarding . . . good order." 534 U.S. at 323 (cleaned up). The Hard Pass Policy, which is intended to decrease the number of hard passes in circulation for administrative and security purposes, is the type of "traditional" exercise of government authority that does not trigger heightened procedural protections.[9]

[9] Ateba's reliance on *City of Littleton v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774, 782–83 (2004), is misplaced. That case concerned prompt judicial review of the denial of an "adult business" license, where securing a license determined whether the expressive activity could happen at all. *Id.* Here, as noted, Ateba has regular access to the Press Area with day passes, which makes the extraordinary safeguard of an administrative processing deadline for his Senate Daily Press Gallery application unnecessary.

* * *

In sum, we conclude that the White House Hard Pass Policy does not violate the First Amendment. Assuming that Ateba's loss of preferential access to the Press Area implicates the First Amendment at all, his rights have not been impermissibly burdened because the White House's reliance on an outside credentialing body is both reasonable and viewpoint neutral. Moreover, the role played by the Senate Daily Press Gallery in the credentialing process does not inject "unbridled discretion" into the process because its membership decisions are guided by the concrete standards enumerated in its Standing Committee Governing Rules; and the First Amendment does not require the gallery to set a deadline for the adjudication of membership applications. We therefore affirm the judgment of the district court.

*So ordered.*